**No. 26-3283**

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

JANINE CHANDLER; KRYSTAL GONZALEZ; TOMIEKIA JOHNSON; NADIA ROMERO: CATHLEEN QUINN; AND CHANNELL JOHNSON;
*Plaintiffs-Appellants*,

v.

JEFF MACOMBER, Secretary of the California Department of Corrections and Rehabilitation, in his official capacity; ANISSA DE LA CRUZ, Warden, in her official capacity; LAVELLE PARKER, Warden, in her official capacity,

*Defendants-Appellees*
and

TRANGENDER, GENDER-VARIANT & INTERSEX JUSTICE PROJECT, et al.,

*Intervenor-Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of California
No. 1:21-cv-01657-JLT-HBK
Hon. Jennifer L. Thurston

---

## APPELLANTS' OPENING BRIEF

---

KARIN M. SWEIGART
JESSE D. FRANKLIN-MURDOCK
SWEIGART MURDOCK, LLP
1160 Battery St., Ste. 100
San Francisco, CA 94111
Phone: 415-873-0123
Email: Karin.Sweigart@sm-llp.com

LAUREN ADAMS BONE
WOMEN'S LIBERATION FRONT
1802 Vernon St. NW
Washington, D.C. 20009
Phone: (202) 507-9475
legaldirector@womensliberationfront.org

1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................3

INTRODUCTION ............................................................................................7

ISSUES PRESENTED ......................................................................................9

STATEMENT OF JURISDICTION ................................................................10

STATEMENT OF THE CASE ........................................................................10

STANDARD OF REVIEW.............................................................................13

SUMMARY OF THE ARGUMENT ...............................................................14

ARGUMENT..................................................................................................15

    I.    THE DISTRICT COURT ERRED IN DISMISSING APPELLANTS' EIGHTH AMENDMENT CLAIM. ...........................................................17

        A.    The FAC Plausibly Alleges an Ongoing Eighth Amendment Injury That Is Fairly Traceable to S.B. 132 and Redressable by Prospective Relief. ........................................................................17

        B.    The FAC Plausibly Alleges Both a Substantial Risk of Serious Harm and Deliberate Indifference.............................................22

    II.    THE DISTRICT COURT ERRED IN DISMISSING APPELLANTS' FIRST AMENDMENT CLAIMS. ............................................................25

        A.    Chandler And Romero Plausibly Allege an Ongoing Burden on Their Religious Exercise. ................................................................25

        B.    The FAC Plausibly Alleges Compelled Alteration of Appellants' Speech. ...........................................................................................28

        C.    The FAC Alleges Specific Retaliation for Grievances and Protected Speech, and the Relief Sought Does Not Require Showing That the Named Defendants Personally Retaliated. .......................................30

    III.    THE DISTRICT COURT ERRED IN DISMISSING THE APPELLANTS' EQUAL PROTECTION CLAIM..................................................................33

        A.    The FAC Alleges That The Appellants Are Personally Subjected to Unequal Governing Rules, Which Is Itself a Cognizable Injury. ....34

        B.    The FAC Plausibly Alleges That S.B. 132's Preference Cannot Survive the Applicable Level Of Scrutiny. ......................................37

        C.    Alternatively, the FAC Plausibly Alleges That the Unequal Rules Lack a Rational Relationship to a Legitimate Penological Interest. 39

    IV.    THE INTERVENORS' SEPARATE ARGUMENT FOR DISMISSAL FAILS BECAUSE THE REQUESTED REMEDY WOULD REDRESS THE COMPLAINED OF INJURIES. .......................................................40

CONCLUSION ..............................................................................................41

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis*, 600 U.S. 570 (2023).....................................................29

*Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053 (9th Cir. 2014)...........................34

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)...................................................................13

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).....................................................13

*Bell v. Wolfish*, 441 U.S. 520 (1979) ......................................................................38

*Berger v. City of Seattle*, 569 F.3d 1029 (9th Cir. 2009)........................................28

*Brodheim v. Cry*, 584 F.3d 1262 (9th Cir. 2009)............................................... 29, 31

*Burgert v. Lokelani Bernice Pauahi Bishop Trust*, 200 F.3d 661 (9th Cir. 2000) ..13

*Byrd v. Maricopa County Sheriff's Dept.*, 629 F.3d 1135 (9th Cir. 2011)..............37

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985).............................33

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)................................................19

*Clem v. Lomeli*, 566 F.3d 1177 (9th Cir. 2009).......................................................20

*Coakley v. Murphy*, 884 F.2d 1218 (9th Cir. 1989).................................................37

*Connick v. Myers*, 461 U.S. 138 (1983)...................................................................28

*Ex parte Young*, 209 U.S. 123 (1908)......................................................................32

*Farmer v. Brennan*, 511 U.S. 825 (1994)........................................................ passim

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) ...........................................19

*Forde v. Baird*, 720 F. Supp. 2d 170 (D. Conn. 2010)..............................................26

*Gallinger v. Becerra*, 898 F.3d 1012 (9th Cir. 2018)...............................................34

*Heller v. Doe*, 509 U.S. 312 (1993) .........................................................................17

*Helling v. McKinney*, 509 U.S. 25 (1993) ..................................................... 18, 20, 22

*Jolly v. Coughlin*, 76 F.3d 468 (2d Cir. 1996).........................................................26

*Jones v. Slade*, 23 F.4th 1124 (9th Cir. 2022) .........................................................39

*Jordan v. Gardner*, 986 F.2d 1521 (9th Cir. 1993) ..................................................23

*Kentucky v. Graham*, 473 U.S. 159 (1985)...............................................................32

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018).....................35

*Larson v. Valente*, 456 U.S. 228 (1982) ......................................................... 21, 28

*Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062 (9th Cir. 2013)......18

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ......................................................20

*Morrill v. Scott Financial Corp.* 873 F.3d 1136 (9th Cir. 2017).............................13

*Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656 (1993)........................................................................................ 34, 35

*People v. Tremaine D. Carroll, Madera County Super. Ct.* No. MCR 080645......12

*Perttu v. Richards*, 605 U.S. 460 (2025) .................................................................18

4

*Plyler v. Doe*, 457 U.S. 202 (1982)...................................................................... 17, 33

*Prison Legal News v. Ryan*, 39 F.4th 1121 (9th Cir. 2022).......................................39

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ........................................................28

*Republican Party of Minn. v. White*, 536 U.S. 765 (2002)......................................28

*Rhodes v. Robinson*, 408 F.3d 559 (9th Cir. 2005)..................................................30

*Schroeder v. McDonald*, 55 F.3d 454 (9th Cir. 1995)..............................................30

*Trump v. CASA*, 606 U.S. 831 (2025)......................................................................19

*Turner v. Safley*, 482 U.S. 78 (1987) ............................................................... 26, 39

*U.S. v. Virginia*, 518 U.S. 515 (1996)......................................................................37

*United States v. Skrmetti*, 605 U.S. 495 (2025) ................................................ 16, 37

*Watison v. Carter*, 668 F.3d 1108 (9th Cir. 2012)..................................... 13, 30, 31

*West v. Radtke*, 48 F.4th 836 (7th Cir. 2022)...........................................................25

*West Virginia v. B.P.J.*, no. 24-43, slip op. at 2 (U.S. June 30, 2026).............. 17, 37

*Wilk v. Neven*, 956 F.3d 1143, 1150 (9th Cir. 2020) ...............................................22

**Statutes**

28 U.S.C. § 1291 ......................................................................................................10

28 U.S.C. § 1331 ......................................................................................................10

28 U.S.C. § 1343 ......................................................................................................10

42 U.S.C. § 1983 ...........................................................................................10

Cal. Pen. Code § 2605..................................................................................29

Cal. Pen. Code § 2606..................................................................................12

California Penal Code §§ 2605–2606 .............................................. passim

Prison Rape Elimination Act of 2003. Pub. L. No. 108-79, 117 Stat. 972 (2003)..11

## U.S. Constitution

Eighth Amendment .......................................................................... passim

First Amendment.............................................................................. passim

Fourteenth Amendment ............................................................. 9, 33, 40

## Rules

Fed. R. Civ. P. 12 .........................................................................................13

## INTRODUCTION

Appellants Janine Chandler, Krystal Gonzalez, Tomiekia Johnson, Nadia Romero, Cathleen Quinn, and Channell Johnson (hereinafter "Appellants" or "Female Prisoners") are six women incarcerated in California's women's prisons. Each has a history of sexual abuse or assault and suffers lasting trauma, including PTSD. They allege that California's Transgender Respect, Agency, and Dignity Act, S.B. 132, has fundamentally altered the housing regime in those prisons. Under the statute, biological males who self-identify as transgender, nonbinary, or intersex are entitled to preferential consideration of their housing preferences and perceptions of safety. Appellants, as biological women, receive no corresponding statutory consideration of their own safety, dignity, or religious convictions.

The result, Appellants allege, is an ongoing conditions-of-confinement injury: they are forced to live in intimate proximity to a population with a materially elevated rate of violent and sexual offenses, under a regime that CDCR itself anticipated would increase safety concerns. They further allege that officials have punished them for reporting assaults and for declining to adopt the government's preferred terminology, and that two of them are forced to violate sincerely held religious beliefs against exposing their bodies to unrelated members of the opposite sex.

The district court acknowledged that Appellants alleged "wrenching" injuries. It nevertheless dismissed every claim for lack of Article III standing. That conclusion rests on three errors. First, it treated the injury as limited to completed past assaults rather than the ongoing, regime-created risk and unequal treatment that prospective relief can redress. Second, it imposed a personal-participation requirement that does not apply to official-capacity claims for prospective injunctive relief. Third, it used an Inspector General report—incorporated by reference—to resolve contested factual questions against Appellants at the pleading stage.

This Court should reverse. The First Amended Complaint plausibly alleges ongoing Eighth Amendment, First Amendment, and Equal Protection injuries that are fairly traceable to the CDCR Secretary and the two wardens' implementation of S.B. 132 and redressable by the prospective relief Appellants seek: restoration of individualized safety screening without the challenged statutory preference.[1]

Finally, a note on scope. The district court's earlier order dismissed Appellants' facial challenge to California Penal Code §§ 2605–2606 without leave

---

[1] Since filing the notice of appeal (ER-126), several news articles indicate that Defendant-Appellee Lavelle Parker has resigned as the Warden for CIW in Corona, California. These news articles indicate that the acting Warden for CIW in Corna, California is Sonia Padilla.

to amend. Appellants' Complaint and First Amended Complaint plausibly allege both facial and as-applied affects to the challenged law.

## ISSUES PRESENTED

1.     Whether the district court erred in holding that Appellants failed to plead Article III standing for their Eighth Amendment claim, where the operative complaint alleges an ongoing, substantial risk of serious harm from a housing-placement regime that officials knowingly implemented and declined to abate.

2.     Whether the district court erred in holding that Appellants failed to plead Article III standing for their First Amendment claims—free exercise, compelled alteration of speech, and retaliation—where the operative complaint alleges present, personal burdens on two Appellants' religious practice and specific adverse actions taken against several Appellants because of their protected grievances and speech.

3.     Whether the district court erred in holding that Appellants failed to plead Article III standing for their Fourteenth Amendment equal protection claim, where S.B. 132 affords trans-identifying, nonbinary, and intersex inmates statutory entitlements in housing and placement decisions that Appellants, as biological women, do not receive.

//

9

## STATEMENT OF JURISDICTION

The district court had federal question subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 (a) over Appellants' claims under 42 U.S.C. § 1983. Appellants appeal from the district court's final judgment dismissing their claims with prejudice. ER-3. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291.

## STATEMENT OF THE CASE

### Procedural History

Appellants filed this action on November 17, 2021, challenging S.B. 132 (codified at California Penal Code §§ 2605–2606). The district court granted an earlier motion to dismiss, holding that it lacked jurisdiction over a facial challenge to the statute, and permitted amendment of claims against the individual defendants. Appellants dismissed with prejudice the claims of organizational plaintiff Women II Women.

Appellants filed the operative First Amended Complaint ("FAC") on July 19, 2024, adding detailed allegations of assault, harassment, retaliation, and religious burden. On March 23, 2026, the district court granted Defendants' and Intervenors' motions to dismiss the FAC in full for lack of Article III standing and further held that the Eighth Amendment claim failed to state a claim against the named Defendants. The court granted limited leave to amend as to certain claims.

10

Appellants elected to stand on the sufficiency of the FAC. The district court entered judgment dismissing the action with prejudice on April 30, 2026. This appeal followed. ER-126.

## Statement of Facts

Appellants are women incarcerated in Central California Women's Facility ("CCWF") and California Institution for Women ("CIW"). ER 96-98. Each has been a victim of sexual abuse or assault from which she continues to suffer lasting effects, including post-traumatic stress disorder, panic attacks, anxiety, and autoimmune conditions. *Id*.

Before S.B. 132, placement of inmates who identified as transgender was governed by individualized assessment under the Prison Rape Elimination Act of 2003. Pub. L. No. 108-79, 117 Stat. 972 (2003), ER-100-101. That process considered vulnerability, abusiveness, criminal history, and institutional safety for both the requesting inmate and the receiving population. *Id*.

S.B. 132 changed that regime. It requires CDCR to house inmates according to their self-declared gender identity and to give "serious consideration" to their individual preferences and perceptions of health and safety in facility placement, bed assignment, housing, and programming decisions. ER-101-103. The statute constrains CDCR's ability to deny transfers on the basis of anatomy, sexual orientation, or factors present among other inmates at the preferred facility, while

11

retaining residual authority to consider "management and safety concerns." Cal. Pen. Code § 2606(a)(4), (b).

The FAC alleges that after S.B. 132 took effect, the number of biological males transferred into Appellants' facilities rose sharply. ER-105. Appellants allege that a substantial percentage of potential transferees are registered sex offenders or have committed sex offenses at rates far higher than the general male inmate population. ER-106. They further allege specific, repeated incidents of sexual assault, harassment, unwanted touching, stalking, and being viewed unclothed by transferred inmates, as well as witnessing attacks and attempted rapes.[2] ER-107-111. Officials allegedly responded to Appellants' grievances by altering the language of those grievances, accusing Appellants of harassment for using accurate biological descriptors, placing Appellants in solitary confinement, transferring them, and taking actions that delayed or denied parole. ER-112-113. Two Appellants allege that the presence of biological males in their housing areas forces them to violate

---

[2] As but one example, Intervenor Tremaine D. Carroll is a biological male who self-identifies as transgender and was housed at the Central California Women's Facility under S.B. 132. In March 2024, the Madera County District Attorney charged Carroll with two counts of forcible rape (both alleged to have occurred in January 2024 against female inmates at the facility) and one count of dissuading a witness from testifying. *See People v. Tremaine D. Carroll, Madera County Super. Ct.* No. MCR 080645. These charges illustrate the concrete risks Appellants allege flow from the housing regime challenged in this case.

sincerely held Muslim and Catholic beliefs against exposing their bodies to unrelated members of the opposite sex. ER-119.

CDCR itself anticipated that implementation of S.B. 132 would generate increased safety concerns and inmate complaints and sought additional funding to address those expected problems. ER-104. An Office of the Inspector General report acknowledged that assessing the sincerity and true intentions of transfer applicants is difficult, that purposeful misidentification is possible, and that such deception could become easier over time. *Id*.

## STANDARD OF REVIEW

This Court reviews de novo a district court's dismissal for lack of Article III standing and for failure to state a claim under Rule 12(b)(6). *Morrill v. Scott Financial Corp.* 873 F.3d 1136, 1141 (9th Cir. 2017); *Burgert v. Lokelani Bernice Pauahi Bishop Trust*, 200 F.3d 661, 663 (9th Cir. 2000). In either posture, this Court accepts as true all well-pled factual allegations in the FAC and construes them, together with all reasonable inferences, in Appellants' favor. *Watison v. Carter*, 668 F.3d 1108, 1112 (9th Cir. 2012). A complaint need not contain detailed factual allegations, but it must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

13

## SUMMARY OF THE ARGUMENT

The district court dismissed all four of Appellants' claims for lack of Article III standing. That was error, for reasons that recur across the claims and are addressed in turn below.

Part I explains why Appellants' Eighth Amendment claim rests on an ongoing, present risk—not merely completed assaults—that Defendants' own housing regime created and that prospective relief can redress, as well as why the complaint separately alleges deliberate indifference sufficient to state a claim.

Part II explains why the district court's rejection of Appellants' First Amendment claims rested on two related errors: treating present, personal burdens on Chandler's and Romero's religious exercise as if they were generalized objections to others' presence, and treating official-capacity claims for prospective relief as if they required proof that the named Defendants personally committed the challenged conduct. Neither the redressability analysis nor the personal-participation requirement the district court applied is correct.

Part III explains why S.B. 132's differential statutory treatment of trans-identifying, nonbinary, and intersex inmates, on one hand, and Appellants, on the other, is itself a cognizable equal-protection injury regardless of whether any Appellant personally sought and was denied a matching housing benefit, and why

that differential treatment plausibly fails both intermediate scrutiny and rational-basis review.

Running through all three claims is a fourth, independent error: the district court's reliance on a California Office of the Inspector General report to resolve, against Appellants, disputed factual questions about how effectively CDCR's transfer-review process actually functions. That reliance exceeded the limits of the incorporation-by-reference doctrine and infected the court's injury, causation, and redressability analysis throughout.

Part IV explains why the Intervenor-Defendants' separate argument for dismissal—that no remedy this Court could grant would redress Appellants' alleged harms—rests on the same mischaracterization of the relief Appellants actually seek and fails for the same reason.

For these reasons, this Court should reverse the judgment and remand for further proceedings.

## ARGUMENT

Prison officials have an affirmative constitutional duty to protect inmates from a known substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 833–834 (1994). That duty applies whenever officials knowingly expose a prisoner to a substantial risk of violence by another prisoner. It does not depend on the identity of the prisoner at risk or the prisoner creating the risk.

15

*Farmer* itself illustrates the neutrality of that rule. The plaintiff was a biologically male prisoner who identified as female, displayed feminine characteristics, and alleged that prison officials exposed Farmer to assault by placing Farmer in the general population of a male prison. *Id.* at 829–831. The same duty protects the Female Prisoners here. If officials must protect a transgender-identifying prisoner from a known risk posed by male inmates, they must protect female prisoners from a known risk allegedly created by placing biological males in women's prisons.

The Female Prisoners need not identify in advance which particular inmate will commit the next assault. "It does not matter whether the risk comes from a single source or multiple sources," or whether the risk is personal to one prisoner or shared by "all prisoners in [the same] situation." *Id.* at 843. Nor must they "await a tragic event such as an actual assault before obtaining relief." *Id.* at 845 (cleaned up).

The Constitution's evenhanded protection of transgender prisoners does not give transgender status constitutional priority over the women housed with them. As Justice Thomas recently explained:

> First, transgender status is not a suspect class requiring heightened equal-protection scrutiny. *United States v. Skrmetti*, 605 U.S. 495, 547–557, 145 S.Ct. 1816, 222 L.Ed.2d 136 (2025) (BARRETT, J., concurring). The class of people who claim transgender status could more accurately be described as people who are experiencing "gender dysphoria," which is not a "discrete group." *Id.*, at 550–551, 145 S.Ct. 1816 (internal quotation marks omitted); see also *id.*, at 566–567, 145 S.Ct. 1816 (ALITO, J., concurring and concurring in

judgment). Because "gender dysphoria" is a mutable mental state that is the object of psychiatric treatment, it does not resemble the immutable characteristics on the basis of which our precedents have applied heightened scrutiny—race, sex, or national origin. Instead, gender dysphoria resembles other characteristics on the basis of which legislatures may classify with a merely rational basis. See, *e.g.*, *Heller v. Doe*, 509 U.S. 312, 321, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (mental illness); *Plyler v. Doe*, 457 U.S. 202, 220, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (immigration status).

*West Virginia v. B.P.J.*, no. 24-43, slip op. at 2 (U.S. June 30, 2026) (Thomas J., concurring)

California may address gender dysphoria and protect inmates who experience it. But transgender status carries no constitutional preference that permits California to subordinate the rights of the Female Prisoners in its custody. Those women retain their own rights to safety, religious exercise, freedom of speech, and equal protection. S.B. 132 must be administered within those constitutional limits.

## I.     THE DISTRICT COURT ERRED IN DISMISSING APPELLANTS' EIGHTH AMENDMENT CLAIM.

### A.     The FAC Plausibly Alleges an Ongoing Eighth Amendment Injury That Is Fairly Traceable to S.B. 132 and Redressable by Prospective Relief.

The Female Prisoners allege an ongoing conditions-of-confinement injury: Defendants' mandatory housing regime under S.B. 132 has placed, and continues to place, them in intimate proximity to a population of biological males with a materially elevated rate of violent and sexual offenses, thereby exposing them to a substantial and statistically predictable risk of sexual assault and related harm. That

17

exposure is itself the concrete injury. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."); *Farmer v. Brennan*, 511 U.S. 825, 845 (1994) (a prisoner need not wait for a "tragic event" before obtaining relief). The Female Prisoners need not plead that another assault is certain or identify in advance the particular inmate who will commit it. Their alleged exposure to an ongoing, substantial risk is sufficient to establish injury-in-fact and presents a question of fact that "must be decided by a jury if there is any room for doubt." *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075–76 (9th Cir. 2013). The Supreme Court has determined that while "judges may resolve factual disputes in the course of determining whether subject matter jurisdiction is proper. … a court may not do so when the factual disputes are intertwined with the merits." *Perttu v. Richards*, 605 U.S. 460, 472 (2025).

The district court acknowledged that the Female Prisoners alleged concrete, personal, and "wrenching" injuries, including sexual assault, harassment, and exacerbated PTSD symptoms. Doc. 132 at 15. It nevertheless concluded they lacked standing because the FAC did not adequately connect those injuries to transfers under S.B. 132 and because prospective relief would not remedy already-completed assaults. *Id.* at 15–20. That analysis misapprehends both the pleaded injury and the

18

relief sought. The Female Prisoners do not rely solely on completed assaults. They allege a substantial fear of future assault and harassment; continuing fear, depression, anxiety, and distress; present conditions that aggravate PTSD and other illnesses; symptoms that "erupt constantly"; and a "clearly foreseeable risk" of future assault. ER-107, 110, & 115. They further allege that these injuries "do and will" continue absent an injunction.[3] ER-116. Those present conditions and continuing risks are precisely the injuries prospective relief can address.

Appellants' theory of injury readily satisfies the Supreme Court's recent clarification of standing principles governing claims that involve third-party conduct. See *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382–83 (2024); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013). Those decisions reject standing theories that rest on speculation about how a non-party might choose to behave. Appellants' theory does the opposite. It rests on Defendants' own affirmative housing regime—under which any biological male may self-identify as female without outward signs of transition, medical diagnosis, or safety screening,

---

[3] Appellants' FAC was filed on July 19, 2024, before *Trump v. CASA*, 606 U.S. 831 (2025). Because the district court dismissed this action on standing grounds, it did not address the merits or the permissible scope of injunctive relief. If the dismissal is reversed, Plaintiffs intend on remand to seek leave to add appropriate class allegations and, if necessary to obtain classwide relief, to seek certification under FRCP 23. Those remedial questions are not presented in this appeal, which concerns whether Plaintiffs have standing to pursue their claims.

19

and must then be transferred into a women's facility regardless of a documented history of sexual violence against women. Appellants have plausibly alleged that this regime has already increased Appellants' proximity to a population with a materially elevated rate of violent and sexual offenses (including the approximately 48–49% sex-offense rate among transferred biological males and the inability, under S.B. 132, to deny transfer even to inmates with histories of raping women). The resulting exposure itself is the concrete injury, just as the unsafe conditions of confinement were the injury in *Helling* and *Farmer*. The risk is not hypothetical. It is already materializing through documented assaults, harassment, and other victimization inside the facilities, and it continues each day Appellants remain housed under the current mandatory-transfer protocol.

The FAC also plausibly traces that injury to Defendants' implementation of S.B. 132. Although ordinary causation generally requires a connection fairly traceable to the defendant's conduct and not the result of an independent third party's action, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), the Eighth Amendment prison context is different. Officials may be held liable when they expose prisoners to a substantial risk of serious harm and disregard that risk by failing to take reasonable abatement measures; direct causation by affirmative action is not required. *Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009) (citing *Farmer*, 511 U.S. at 833, 847). The FAC alleges that CDCR transferred nearly fifty biological

males into CIW and CCWF under S.B. 132, that CDCR itself anticipated increased safety concerns and inmate complaints, and that Appellants remain exposed to the resulting conditions. ER-103-107. Those allegations supply a direct causal account: Defendants implement the challenged housing regime; that regime places an additional high-risk population in the Female Prisoners' intimate living spaces; and that continuing proximity aggravates their PTSD and produces constant fear, anxiety, panic attacks, and physical illness. ER-107-110, & 114-115.

As explained in Part III.A, the district court reached a contrary view of how well CDCR's screening process functions in practice largely by crediting the factual assertions in a California Office of the Inspector General report over Appellants' own well-pled, and equally plausible, contrary account. That was error, and it undermines the premise for the court's causation and redressability rulings here as much as in the equal protection context.

Finally, the injury is redressable by the prospective relief Appellants seek—a return to the pre-S.B. 132 individualized assessment process that weighed sincerity, criminal history, and safety concerns before any transfer into a women's facility. Restoring those procedural protections would eliminate the ongoing, regime-created exposure that constitutes the Eighth Amendment injury which is all that redressability requires. *See Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (relief need not eliminate an injury entirely, only redress it).

### B. The FAC Plausibly Alleges Both a Substantial Risk of Serious Harm and Deliberate Indifference.

"[P]rison officials have a duty ... to protect prisoners from violence at the hands of other prisoners," *Farmer*, 511 U.S. at 833, and inmates have the "right to be protected from violence at the hands of other inmates." *Wilk v. Neven*, 956 F.3d 1143, 1150 (9th Cir. 2020). Eighth Amendment protection extends to conditions of confinement "sure or very likely to cause serious illness and needless suffering" in the future. *Helling*, 509 U.S. at 33. A prison official's deliberate indifference to a substantial risk of serious harm violates the Eighth Amendment. *Farmer*, 511 U.S. at 834. The objective inquiry is whether the prisoner is incarcerated under conditions posing a substantial risk of serious harm; the subjective inquiry is whether the official knew of and disregarded an excessive risk to inmate health or safety, a state of mind that may be inferred from circumstantial evidence or the obviousness of the risk. *Id*. at 837, 842.

### 1. Appellants adequately pleaded a substantial risk of serious harm.

The district court did not hold that the complaint failed to allege a substantial risk of serious harm. It recognized that the Female Prisoners' statistics, allegations of prior abuse, and allegations concerning incarcerated women's vulnerability "could potentially show that some transfers might pose" such a risk. ER-26. The allegations do more than that. Appellants pleaded that 33.8% of potential transferees under S.B. 132 are registered sex offenders, and that approximately 48% had

committed sex offenses—rates far higher than the general male inmate population. ER-106-107. They further alleged that of the 26.2% of female inmates who had been victims of inmate-on-inmate violence, nearly 18% of those assaults were perpetrated by trans-identifying biological male inmates—a disproportionately high percentage relative to that group's share of the prison population. ER-105.

In addition, the Female Prisoners alleged specific, repeated instances of sexual assault, harassment, threats, stalking, unwanted touching, and being viewed unclothed without consent, as well as witnessing attacks, rape, and attempted rape. ER-107-111. Those events are not offered merely as completed past injuries. They are evidence that the pleaded risk has already materialized, is neither conjectural nor hypothetical, and remains ongoing under the current housing regime. Fifty-three percent of incarcerated women suffer from PTSD, including multiple Appellants; all Appellants have histories of sexual abuse or assault and suffer mental distress, fear, anxiety, hypervigilance, panic attacks, or autoimmune disease attributable to their present living conditions. ER-106-107. Courts assessing the unnecessary and wanton infliction of pain may account for the psychological trauma carried by a particular incarcerated population. *Jordan v. Gardner*, 986 F.2d 1521, 1525, 1528 (9th Cir. 1993).

### 2. Appellants adequately pleaded deliberate indifference.

The FAC also permits the required inference of knowledge and disregard. CDCR anticipated increases in both the transgender-identifying population and safety concerns after implementation of S.B. 132, and requested millions of dollars in additional funding to address the expected problems. ER-103-104. Appellants then repeatedly reported assaults, harassment, threats, and other abuse through grievances. ER-107-113. The pleaded response was not reasonable abatement of the risk, but the ignoring or suppression of those complaints and the punishment of the women who made them. *Id.*

The district court held that the officials alleged to have retaliated were not the named Defendants and that the FAC did not allege the Defendants' personal knowledge. ER-26. The deliberate indifference theory does not require the same official both to retaliate and to approve a particular transfer. The alleged rejection and suppression of safety complaints are circumstantial evidence that the challenged regime continued despite actual reports that its anticipated risks had materialized. *Farmer* permits knowledge to be inferred from circumstantial evidence and from a risk that is longstanding, pervasive, well-documented, expressly noted, or obvious. 511 U.S. at 842–43.

Appellants sued the Individual Defendants in an official capacity, asserting the Eighth Amendment claim against all Defendants, incorporating the preceding allegations, and alleging institutional knowledge by CDCR, CCWF, and CIW of the

24

increased risk created by S.B. 132. ER-100, 103-105, 113-116. The FAC further alleges that the institutions continued the challenged conditions after receiving documented complaints of assault, harassment, threats, and psychological harm. ER-108-113. Read as a whole and with reasonable inferences drawn in Appellants' favor, those allegations plausibly attribute the continued implementation of the challenged policy—despite institutionally documented risks and injuries—to the officials sued to administer CDCR and the two affected prisons. Whether the evidence ultimately establishes that the named officials actually drew the required inference is a question for later stages of the litigation. The FAC sufficiently alleges that the institutions they officially administer knew of and failed to respond reasonably to the ongoing risk.

The court's order should therefore be reversed insofar as it dismisses the Eighth Amendment claim against the CDCR Secretary and the two wardens, and the case should be remanded for further proceedings.

## II. THE DISTRICT COURT ERRED IN DISMISSING APPELLANTS' FIRST AMENDMENT CLAIMS.

### A. Chandler And Romero Plausibly Allege an Ongoing Burden on Their Religious Exercise.

Courts have recognized that forcing a prisoner to expose her body to members of the opposite sex can substantially burden sincerely held religious beliefs that prohibit such exposure. *See West v. Radtke*, 48 F.4th 836, 844–47 (7th Cir. 2022)

25

(holding under the strict-scrutiny standard of the Religious Land Use and Institutionalized Persons Act that requiring a Muslim inmate to submit to strip searches by a guard of the opposite sex substantially burdened his religious exercise, because Islamic teaching forbids exposing one's naked body to anyone but one's spouse); *cf. Forde v. Baird*, 720 F. Supp. 2d 170, 176–78 (D. Conn. 2010) (reaching the same substantial-burden conclusion under the Free Exercise Clause's *Turner* framework as to cross-gender pat searches of a Muslim female inmate). This "burden" manifests "where the state 'puts substantial pressure on a[] [prisoner] to modify h[er] behavior and to violate h[er] beliefs." *Forde*, 720 F. Supp. 2d at 176 (holding Muslim female inmate's free exercise rights were "substantially burdened by the absence of any viable choice" (quoting *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996))). A prison regulation that burdens an inmate's religious exercise survives only if it is "reasonably related to legitimate penological interests," judged under the four *Turner* factors: (1) whether a valid, rational connection exists between the regulation and the government interest asserted; (2) whether alternative means of exercising the right remain open; (3) the impact of accommodation on staff, other inmates, and prison resources; and (4) whether the regulation is an exaggerated response when a ready, low-cost alternative exists. *Turner v. Safley*, 482 U.S. 78, 89–91 (1987).

Chandler and Romero allege that S.B. 132's placement policy violates their sincerely held Muslim and Catholic beliefs, which require them not to expose their bodies to unrelated members of the opposite sex. ER-107-110, 118-120. They have no alternative means of avoiding this conflict: they cannot leave the facility or use alternative showers, bathrooms, or housing. Accommodating their beliefs through individualized safety screening would further, rather than undermine, the prison's legitimate safety interests.

The district court held that Chandler and Romero alleged no concrete or particularized injury because they did not allege that they personally shared intimate spaces with a transgender inmate or had been or would imminently be forced to undress, shower, or use the toilet in a transgender inmate's presence. ER-28. Read as a whole, the FAC alleges otherwise: that trans-identifying biological male inmates are housed in Chandler's facility; that her inability to control who observes her while undressing causes her extreme and ongoing distress; and that Romero's section similarly houses trans-identifying biological male inmates whose presence during undressing conflicts, continuously, with her faith. ER-107-110. These are allegations of a present, personal burden—having to live, undress, and uncover their bodies to members of the opposite sex—not a generalized objection to the treatment of others.

The district court also held that invalidating S.B. 132 would not redress this injury because some transgender inmates were housed in women's prisons before

27

the statute took effect. That reasoning asks whether relief would eliminate every transgender inmate rather than whether it would meaningfully reduce the challenged burden. The FAC alleges that S.B. 132 changed the governing placement standard and that numerous inmates were thereafter placed in Appellants' facilities. Relief restoring individualized screening would plausibly reduce the frequency and intensity of the conditions forcing Chandler and Romero to violate their beliefs. That is enough for redressability at the pleading stage. *See Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982).

### B. The FAC Plausibly Alleges Compelled Alteration of Appellants' Speech.

"[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983). Content-based restrictions on speech are subject to strict scrutiny. *Republican Party of Minn. v. White*, 536 U.S. 765, 774–75 (2002). Content-based laws that target speech based on its communicative content are presumptively unconstitutional and may be justified only if the government proves that they are "narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 161 (2015). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.*; *Berger v. City of Seattle*, 569 F.3d 1029, 1051 (9th Cir. 2009) (en

banc) (holding a restriction "is content-based if either the underlying purpose of the regulation is to suppress particular ideas or if the regulation, by its very terms, singles out particular content for differential treatment.").

"[T]he government may not compel a person to speak its own preferred messages." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023). Nor may it reject a prisoner's grievance merely because officials regard its language as disrespectful. *Brodheim v. Cry*, 584 F.3d 1262, 1271–72 (9th Cir. 2009).

The district court correctly observed that S.B. 132's pronoun provision imposes obligations on CDCR employees, staff, contractors, and volunteers, not on inmates. ER-27; Cal. Pen. Code § 2605(d). But the FAC alleges a different as-applied injury; that Defendants alter the wording of the Female Prisoners' grievances so that an assault reported as having been committed by a biological male is instead described as having been committed by a "transgender woman" using feminine pronouns. ER-116-118. It further alleges that officials accuse the Female Prisoners of harassment, issue disciplinary reports, and threaten sentence-related consequences when Appellants refuse the government's terminology. ER-111-113, & 115-116. On those allegations, the injury is not a statutory command addressed directly to inmates; it is the alleged alteration of the Female Prisoners' own complaints and pressure to adopt the government's preferred message.

The district court held that this alleged conduct was not caused by S.B. 132 and that enjoining the statute would not prevent it. ER-27. The FAC, however, expressly alleges that Defendants act in cooperation with S.B. 132, "use S.B. 132 to compel Appellants to speak," and employ the statute's terminology when changing the Female Prisoners' grievances and treating contrary language as harassment. ER-116-118. At the pleading stage, those allegations must be accepted as true; whether the challenged practices are ultimately authorized by the statute is a merits question distinct from whether the Female Prisoners plausibly alleged that Defendants implement the statute in that manner.

###### C. The FAC Alleges Specific Retaliation for Grievances and Protected Speech, and the Relief Sought Does Not Require Showing That the Named Defendants Personally Retaliated.

A prison retaliation claim under the First Amendment requires that: (1) the plaintiff engaged in protected conduct; (2) an official took adverse action against her; (3) the adverse action was causally connected to the protected conduct; (4) the action would chill a person of ordinary firmness or caused more than minimal harm; and (5) the action did not reasonably advance a legitimate correctional goal. *Watison v. Carter*, 668 F.3d 1108, 1114–15 (9th Cir. 2012). Filing grievances and pursuing litigation are protected conduct. *Rhodes v. Robinson*, 408 F.3d 559, 568 (9th Cir. 2005); *Schroeder v. McDonald*, 55 F.3d 454, 461 (9th Cir. 1995). Adverse actions that may support a retaliation claim include false disciplinary charges, placement in

administrative segregation or solitary confinement, statements that result in denial of parole, transfer to another prison, and threats. *Watison*, 668 F.3d at 1115; *Brodheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009). A chronology of events that supports an inference of retaliatory intent is sufficient at the pleading stage. *Watison*, 668 F.3d at 1115.

The FAC alleges a chronology of adverse actions tied by timing and by officials' own statements to protected conduct: officials refused Romero's request for separation after she filed a grievance; accused Gonzalez of harassment for describing her assailant as male; placed Tomiekia Johnson and Quinn in solitary confinement after they reported harassment; issued disciplinary reports accusing Appellants of false reporting; treated Tomiekia Johnson's participation in this litigation as evidence of bias when denying her parole "for political reasons"; caused Quinn's favorable parole decision to be vacated after a commissioner told her she "should have been quiet" about her "victimization"; and placed Channell Johnson in solitary confinement and transferred her after she reported threats. ER-109-113. These allegations directly tie adverse action to protected speech.

The district court did not hold that these allegations fail any element of a retaliation claim. It held instead that the FAC does not allege that the named Defendants personally retaliated, participated in another person's retaliation, or acted pursuant to an obligation imposed by S.B. 132. ER-27-29.

31

The district court's holding applies a personal-participation requirement that is inconsistent with the official-capacity claims for prospective injunctive relief. An official-capacity suit for prospective relief "is not a suit against the official personally, for the real party in interest is the entity" whose policy or practice is challenged. *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985). What matters is whether the named official has the requisite connection to enforcement of the challenged practices going forward. *See Ex parte Young*, 209 U.S. 123, 157 (1908). The FAC alleges that the named Defendants oversee the institutions responsible for the challenged grievance, discipline, and housing practices; that each is sued in an official capacity; and that each administers the institutions responsible for those practices. ER-100, 111-113, 117-118, & 123.

Nor does the retaliation theory depend on proving that S.B. 132 itself authorizes retaliation. Appellants instead allege that, in implementing S.B. 132, officials treated the Female Prisoners' accurate descriptions and safety complaints as harassment, altered grievance language to conform to the regime's terminology, and punished continued objections. ER-109-113, 116-118. Whether the statute compels that conduct is a merits question distinct from whether Appellants plausibly alleged that Defendants engaged in it while implementing the statute; at the pleading stage, the latter allegation must be accepted as true, not resolved against Appellants.

32

The FAC further alleges that Defendants' actions would chill a person of ordinary firmness from future First Amendment activity: they placed the Female Prisoners in greater danger, imposed solitary confinement and disciplinary proceedings, worsened their living conditions, and delayed or prevented release. The FAC alleges no legitimate correctional purpose for punishing truthful safety reports or conditioning the processing of grievances on the use of government-approved terminology.

The district court's order should therefore be reversed insofar as it dismisses Appellants' free exercise, compelled speech, and retaliation claims, and the case should be remanded for those claims to proceed against the officials sued to administer CDCR, CCWF, and CIW.

### III.   THE DISTRICT COURT ERRED IN DISMISSING THE APPELLANTS' EQUAL PROTECTION CLAIM.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (*quoting Plyler v. Doe*, 457 U.S. 202, 216 (1982)). The "first step [in the equal protection analysis] ... is to identify the state's classification of groups" and then "look for a control group ... composed of individuals who are similarly situated to those in the classified group in respects that are relevant to the state's challenged

policy." *Gallinger v. Becerra*, 898 F.3d 1012, 1016 (9th Cir. 2018) (cleaned up); *see also Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1064 (9th Cir. 2014) ("The groups need not be similar in all respects, but they must be similar in those respects relevant to the Defendants' policy.").

### A.   The FAC Alleges That The Appellants Are Personally Subjected to Unequal Governing Rules, Which Is Itself a Cognizable Injury.

The district court held that the FAC did not allege a personal injury because the Female Prisoners had not unsuccessfully requested a prison transfer or bed assignment while a similar request by a transgender inmate was granted. ER-30-31. That holding defines the injury too narrowly.

Controlling authority establishes that the injury in an equal-protection challenge to a discriminatory rule is the denial of equal treatment itself—not the denial of whatever benefit the rule ultimately allocates. "When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, … [t]he 'injury in fact' … is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993). A plaintiff challenging such a barrier need not show that she would have obtained the benefit under a nondiscriminatory scheme. *Id.*

34

S.B. 132 creates precisely that barrier. It statutorily entitles trans-identifying, nonbinary, and intersex inmates to have their individual preferences and perceptions of health and safety considered in facility placement, bed assignment, housing, and programming decisions, including requests for single-cell housing, a chosen cellmate, and removal of another inmate perceived as a threat. ER-102-103, 121-122. The FAC alleges no corresponding statutory entitlement for Appellants. That unequal treatment is the injury *Northeastern Florida* recognizes. The requested relief—restoring a regime in which all inmates' safety is considered without the challenged preference—would redress that unequal treatment without requiring an order removing any particular inmate from a women's facility.

The district court improperly relied on spurious claims made in the OIG Report to conclude that the unequal treatment of transfer requests doesn't matter. Incorporation by reference does not permit a court to assume the truth of a document in a way that disputes the well-pleaded allegations of the complaint. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002–03 (9th Cir. 2018). The district court treated the OIG Report's statement that movement "between the two [women's] prisons, and within each prison, is uniformly processed regardless of gender identity" as conclusive. ER-30. The same report also states that CDCR officials found it "difficult" to "accurately assess" a transferee's "sincerity" and "true intentions," that it is "possible" an inmate could "purposefully misidentify" to

35

obtain a transfer, and that such deception could "become easier" as incarcerated people share information about the review process. ER-20-21 (quoting OIG Rep. at 30). A report that simultaneously describes a process as "appropriately thorough" and acknowledges that bad-faith applications may be difficult to detect does not conclusively resolve, at the pleading stage, whether the process exposes Appellants to unequal treatment. Here, the district court did more than test whether Appellants accurately quoted the OIG Report. It relied on the Report's characterization of CDCR's process as "appropriately thorough," ER-10, to conclude that Appellants' well-plead allegations of a dangerously permissive transfer regime were implausible, and it repeatedly cited the Report to discount Appellants' allegations of ongoing risk—an inappropriate resolution of contested factual claims at the motion-to-dismiss stage, and, as explained in Part I.A, *supra*, one that colors the court's Eighth Amendment analysis in the same way.

Moreover, routine movement between or within the two women's prisons is not the only decision the FAC challenges. The FAC identifies the statutory preference governing placement in a men's or women's institution and the additional considerations governing bed, housing, cellmate, and programming decisions. ER-102. Whether CDCR administers those provisions uniformly is a factual question for later stages of the litigation; it does not erase the statutory preference or the FAC's contrary allegations at the pleading stage.

36

### B. The FAC Plausibly Alleges That S.B. 132's Preference Cannot Survive the Applicable Level Of Scrutiny.

State governments act incompatibly with equal protection principles when a law or official policy denies women equal protection of the laws because they are women. *See U.S. v. Virginia*, 518 U.S. 515, 531 (1996). Gender-based equal protection claims are ordinarily subject to intermediate scrutiny in this Circuit, requiring that the challenged policy be substantially related to an important government objective. *Byrd v. Maricopa County Sheriff's Dept.*, 629 F.3d 1135, 1140 (9th Cir. 2011). Where a policy does not implicate a fundamental right or the existence of a suspect classification, prison officials need only show that their policies bear a rational relationship to a legitimate penological interest. *Coakley v. Murphy*, 884 F.2d 1218, 1221–22 (9th Cir. 1989).

The level-of-scrutiny question is informed by the Supreme Court's recent confirmation, discussed above, that transgender status is not a suspect or quasi-suspect classification warranting heightened judicial protection. *West Virginia v. B.P.J.*, No. 24-43, slip op. at 2 (U.S. June 30, 2026) (Thomas, J., concurring) (citing *United States v. Skrmetti*, 605 U.S. 495, 547–557 (2025) (Barrett, J., concurring)). *B.P.J.* does not hold that a state must adopt biological-sex-based rules in every context; it holds that a state may do so, and that classifications keyed to gender identity do not carry elevated constitutional weight that would immunize S.B. 132's preference from ordinary review. That confirms two things for the analysis here:

37

first, that the familiar intermediate-scrutiny/rational-basis framework Appellants invoke below is the correct lens, not some more deferential standard tailored to protect gender-identity-based classifications as such; and second, that S.B. 132's departure from biological-sex-based safety screening reflects a policy choice subject to ordinary scrutiny, not a constitutionally compelled accommodation.

For policies examined under rational basis review, courts should accord wide-ranging deference to prison administrators "in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). But deference does not answer whether the government has drawn a classification, whether the Female Prisoners are personally subject to it, or whether the classification bears the required relationship to the asserted governmental objective. The FAC plausibly alleges an equal-protection violation under either intermediate scrutiny or rational-basis review.

Under intermediate scrutiny, the FAC alleges that S.B. 132 gives statutorily preferred consideration to gender-identity-based housing requests while denying equivalent consideration to the Female Prisoners' safety, dignity, and housing interests. ER-102-103, 121-122. It alleges that the pre-S.B. 132 process already permitted transgender inmates to be housed consistent with gender identity after individualized screening for victimization, abusiveness, violence, and institutional

38

safety. ER-100-102. Those allegations plausibly call into question whether the new preference is substantially related to an important objective rather than an overinclusive means of pursuing it.

### C. Alternatively, the FAC Plausibly Alleges That the Unequal Rules Lack a Rational Relationship to a Legitimate Penological Interest.

In evaluating a prison policy's relationship to legitimate penological interests, courts consider again the four *Turner* factors: the connection between the policy and the interest offered to justify it; whether alternative means remain to exercise affected rights; the effect of accommodation on staff, inmates, and resources; and whether ready alternatives suggest an exaggerated response. *Jones v. Slade*, 23 F.4th 1124, 1134 (9th Cir. 2022) (*citing Turner*, 482 U.S. at 84, 89–91). Legitimate penological interests include prison security, rehabilitation, reducing sexual harassment, preventing a hostile environment, and maintaining orderly operations. *Prison Legal News v. Ryan*, 39 F.4th 1121, 1132 (9th Cir. 2022); *Jones*, 23 F.4th at 1136.

S.B. 132's asserted penological objective—safely housing transgender inmates—is legitimate. The FAC alleges, however, that the pre-S.B. 132 system already advanced that objective through individualized screening that considered the risks to both the person requesting transfer and to the receiving population. ER-100-102. In contrast, S.B. 132 confers additional statutory weight to one group's

individual preferences and perception of safety while exposing the Female Prisoners to the harms detailed in the FAC. ER-102-107, 121-122. Because the statute retains residual safety discretion, the argument is not whether officials may ever deny a request, but whether the differential preference itself rationally advances safe housing when a neutral, individualized screening system already served that interest and the new rules predictably increased safety problems for the receiving population. Those allegations are sufficient to permit the equal protection claim to proceed beyond the pleading stage.

The district court's order should be reversed insofar as it dismisses the Fourteenth Amendment claim, and the case should be remanded for that claim to proceed.

## IV. THE INTERVENORS' SEPARATE ARGUMENT FOR DISMISSAL FAILS BECAUSE THE REQUESTED REMEDY WOULD REDRESS THE COMPLAINED OF INJURIES.

The Intervenor-Defendants moved to dismiss on the separate ground that no remedy this Court could grant would redress the harms Appellants allege. That argument rests on the same mischaracterization of Appellants' requested relief that runs through Defendants' own briefing below: it assumes Appellants seek a categorical exclusion of transgender, nonbinary, and intersex inmates from women's facilities. They do not. Appellants seek restoration of the individualized, pre-S.B. 132 screening process, under which transgender inmates could be and were housed

40

consistent with their gender identity after an assessment that also weighed the safety of the receiving population. A remedy of that kind is squarely within the district court's power to grant and, for the reasons explained in Parts I through III, would redress Appellants' ongoing injuries. The Intervenors' argument accordingly fails for the same reason the district court's own redressability analysis does.

## CONCLUSION

For the foregoing reasons, Plaintiffs-Appellants respectfully request that this Court (1) vacate the Judgment of the district court, (2) reverse the district court's orders dismissing their claims, and (3) remand to the district court for further proceedings in light of this Court's ruling.

Date: July 31, 2026

Respectfully Submitted,

**SWEIGART MURDOCK, LLP**
**WOMEN'S LIBERATION FRONT**

*/s/ Karin M. Sweigart*
Karin M. Sweigart
Jesse D. Franklin-Murdock
Sweigart Murdock, LLP
1160 Battery Street, Suite 100
San Francisco, CA 94111
Tel: (415) 873-0123

Lauren Adams Bone
Women's Liberation Front
1802 Vernon St. NW
Washington, DC 20009
Tel: (202) 507-9475

*Attorneys for Appellants*

## CERTIFICATE OF COMPLAINCE

I hereby certify that the foregoing motion complies with the requirements of FRAP 27(d). The Motion was prepared in Times New Roman 14-point font, and contains 7,650 words, as counted by Microsoft Word.

Dated: July 31, 2026

*/s/ Karin M. Sweigart*
Karin Sweigart