**No. 26-3283**

_____

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT

JANINE CHANDLER; KRYSTAL GONZALEZ; TOMIEKIA JOHNSON; NADIA ROMERO: CATHLEEN QUINN; AND CHANNELL JOHNSON;

*Plaintiffs-Appellants*,

v.

JEFF MACOMBER, Secretary of the California Department of Corrections and Rehabilitation, in his official capacity; ANISSA DE LA CRUZ, Warden, in her official capacity; LAVELLE PARKER, Warden, in her official capacity,

*Defendants-Appellees*

and

TRANGENDER, GENDER-VARIANT & INTERSEX JUSTICE PROJECT, et al.,

*Intervenor-Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of California
No. 1:21-cv-01657-JLT-HBK
Hon. Jennifer L. Thurston

### EXCERPTS OF RECORD

KARIN SWEIGART
JESSE FRANKLIN-MURDOCK
SWEIGART MURDOCK, LLP
1160 Battery St., Ste. 100
San Francisco, CA 94111
Phone: 415-873-0123
Karin.sweigart@sm-llp.com

LAUREN ADAMS BONE
WOMEN'S LIBERATION FRONT
1802 Vernon St. NW
Washington, DC 20009
Phone: (202) 507-9475
legaldirector@womensliberationfront.org

## TABLE OF CONTENTS

| Docket Entry | Description | ER Paage |
|---|---|---|
| 136 | Judgment | ER-3 |
| 135 | Order Dismissing Action with Prejudice on Plaintiffs' Election | ER-4 |
| 132 | Order Granting Motion to Dismiss with Leave to Amend in Part | ER-5 |
| 67 | Order Granting Defendants' Motion to Dismiss, Denying Defendant's Motion to File Redacted Exhibits and Defendants' Motion to Strike, and Denying as Moot Defendants' Request for Judicial Notice | ER-32 |
| 1 | Complaint for Declaratory and Injunctive Relief | ER-59 |
| 84 | First Amended Complaint for Declaratory and Injunctive Relief | ER-94 |
| 134 | Plaintiffs' Notice of Election to Stand on the Sufficiency of the First Amended Complaint | ER-124 |
| 139 | Plaintiffs' Notice of Appeal | ER-126 |
|  | U.S. District Court, Civil docket for Case #1:21-cv-01657-JLT-HBK | ER-128 |

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANINE CHANDLER , ET AL. , | **JUDGMENT IN A CIVIL CASE** |
| v. | CASE NO: **1:21–CV–01657–JLT–HBK** |
| CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION , ET AL. , | |

**Decision by the Court.** This action came before the Court. The issues have been tried, heard or decided by the judge as follows:

**IT IS ORDERED AND ADJUDGED THAT JUDGMENT IS HEREBY ENTERED IN ACCORDANCE WITH THE COURT'S ORDER FILED ON 4/30/2026 .**

ENTERED:    **April 30, 2026**        /s/  **Keith Holland**

Clerk of Court

**ER-3**

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JANINE CHANDLER, et al.,<br><br>             Plaintiffs,<br><br>v.<br><br>JEFFREY MACOMBER, et al.,<br><br>             Defendants. | Case No. 1:21-cv-01657 JLT HBK<br><br>ORDER DISMISSING ACTION WITH PREJUDICE ON PLAINTIFFS' ELECTION<br><br>(Doc. 134) |

In a previous order, the Court granted the defendants' motion to dismiss the complaint with leave to amend in part. (*See* Docs. 118, 120, 132.) Plaintiffs have given notice that they do not intend to file a further amended complaint and will stand on the sufficiency of their First Amended Complaint. (Doc. 84.) This action is therefore **DISMISSED** with prejudice, and the Clerk's Office is instructed to enter judgment for Defendants. *See Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1064 (9th Cir. 2004) ("[A] plaintiff may obtain an appealable final judgment by filing in writing a notice of intent not to file an amended complaint." (citations, alternations, and quotation marks omitted)).

IT IS SO ORDERED.

Dated:   **April 30, 2026**

UNITED STATES DISTRICT JUDGE

**ER-4**

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JANINE CHANDLER, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>JEFFREY MACOMBER, et al.,<br><br>Defendant. | Case No. 1:21-cv-01657 JLT HBK<br><br>ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND IN PART<br><br>(Docs. 118, 120) |

The plaintiffs in this case are six women incarcerated in California women's prisons. (*See* Doc. 84 ¶¶ 10–15.) In this lawsuit, they challenge a California law that dictates how prison officials and staff must address and house inmates who identify as transgender, nonbinary, or intersex. The plaintiffs allege that this law has forced three California prison officials, the defendants in this case, to transfer dangerous and violent people from men's prisons into women's prisons, simply because those people say (sometimes untruthfully) that they are transgender, nonbinary, or intersex. The plaintiffs also object more generally that they will be forced to share intimate spaces with transgender, nonbinary, and intersex inmates.

Reasonable people can certainly disagree in good conscience about how to ensure that all inmates are kept safe and treated fairly in these circumstances. A federal court is not necessarily the place to resolve those disagreements. Those who ask a federal district court to step in must show that the court has jurisdiction to do what they ask. The plaintiffs in this case have not done

1

this.  The reasons are straightforward:

(1)  This Court does not have the authority to manage California's prisons from day to day, such as by making decisions about transfers and housing assignments.

(2)  Even at this relatively early stage of the case, it is clear that the state law in question does not actually force prison officials to transfer inmates without regard for the safety and well-being of others.

(3)  The plaintiffs are not asking the Court to redress some specific harm or injury that has already befallen them.

(4)  The plaintiffs have not explained why the forward-looking order they would like this Court to issue—i.e., confirmation that the state's law is unconstitutional and an instruction that the defendants must not follow it in the future—is likely to prevent future harm.  California had been housing transgender inmates in women's prisons before the disputed law came into effect.

It is possible, however, that different or additional allegations could lay out a narrower and more limited dispute that this Court would likely have jurisdiction to resolve.  For that reason, the Court will permit the plaintiffs to file an second amended or supplemental complaint, if they choose, subject to certain limitations, as explained in more detail below.  The pending motions to dismiss (Docs. 118, 120) are thus **GRANTED** with leave to amend in part.

**ALLEGATIONS**

In 2021, the California Transgender Respect, Agency, and Dignity Act, also known as Senate Bill 132 or simply "S.B. 132," came into effect.  (*Id.* ¶ 23.)  The plaintiffs allege that under this law, if prisoners in men's prisons declare that they identify as women, the California Department of Corrections and Rehabilitation must begin treating them as women, from the pronouns it uses to the facilities where it houses them.  (*Id.* ¶¶ 28–29.)  That is so, the plaintiffs allege, regardless of whether the inmates use a male name, groom themselves in a traditionally masculine way, have ever previously presented themselves as women, have ever sought any care or treatment related to their gender, or plan to do so.  (*See id.* ¶¶ 29–31.)  The plaintiffs allege the health and safety of other inmates are subordinate concerns.  (*See id.* ¶¶ 32, 143.)  They fear that a

2

transfer may be required under S.B. 132 even for prisoners who are sex offenders with a history of raping women. (*See id.* ¶¶ 35, 39, 47–50, 101.) In addition, they allege, the law obligates prison officials to give special consideration to the transferring inmates' preferences for particular cell assignments and even cellmates. (*See id.* ¶¶ 28, 29.)

If there were any doubt about the implications of these allegations, the plaintiffs make clear that they believe California has, in effect, given violent men within its prison system "carte blanche access to female facilities." (Doc. 122 at 1.) They allege S.B. 132 allows any male inmate in a men's prison to transfer into a women's prison, where he may sleep in the same cells as women, shower with women, use the same restrooms as women, and assault women without significant risk of detection, all by the simple expedient of declaring falsely that he identifies as a woman. (*See* Doc. 83 ¶¶ 2–4, 41–44, 62.)

These allegations imply a transfer is a foregone conclusion once an inmate discloses a transgender identity. They imply as well that the safety and security of others are secondary, even irrelevant concerns under the terms of the statute itself. Fortunately, that is not so. The Court must generally assume the plaintiffs' allegations are true at this stage. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018); *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). It is not necessary to assume an allegation is true, however, if it contradicts some indisputable fact that is subject to judicial notice, or if it contradicts the materials a plaintiff has incorporated into the complaint by reference. *See Khoja*, 899 F.3d at 998–99, 1002–03; *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *as amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001). The California Penal Code, along with other materials the plaintiffs rely on in their complaint, reveals a more complex reality than they describe in their complaint.

This Court reviewed the statutory language in a previous order. (Doc. 67.) In brief, S.B. 132 added two sections to the California Penal Code. (*Id.* at 3.) The first, section 2605, instructs CDCR to check whether newly arrived inmates identify as men, women, or nonbinary; to ask how they prefer to be addressed (him, her, Mr., Ms., etc.); and to give new inmates a chance to disclose whether they are transgender, nonbinary, or intersex. (*Id.* at 3–4 (citing Cal. Pen. Code

3

**ER-7**

§ 2605(a)(1)–(3)).)  Inmates can decline to provide this information without discipline, or they can disclose it later.  (*Id.* at 4 (citing Cal. Pen. Code § 2605(b)–(c)).)  The same is true for inmates who were already within CDCR's custody when S.B. 132 became effective.  (*Id.*)  The law then prohibits CDCR staff, along with its contractors and volunteers, from "consistently" addressing inmates differently than they request.  (*Id.* (citing Cal. Pen. Code § 2605(d)).)  It does not impose similar requirements on others, such as inmates or visitors.

The second new section, 2606, addresses aspects of the treatment and housing of any inmates who identify as transgender, nonbinary, or intersex under section 2605.  (*See id.* at 4–5.)  They must be "addressed in a manner consistent with [their] gender identity."  (*Id.* at 4 (quoting Cal. Pen. Code § 2606(a)(1)).)  CDCR must also give "serious consideration" to their "perception of health and safety" in placements, bed assignments, programming, and other similar decisions.  (*Id.* (quoting Cal. Pen. Code § 2606(a)(4)).)  And in general, they must be "housed at a correctional facility designated for men or women based on their preference."  (*Id.* (quoting Cal. Pen. Code § 2606(a)(3)).)  But section 2606 expressly permits CDCR to deny inmates' requests for transfers and to consider the safety of others.  Although CDCR may not deny a request for "discriminatory reasons," such as the inmate's "physical characteristics," "genitalia," "sexual orientation," or factors "present among other people incarcerated at the preferred type of facility," *see* Cal. Pen. Code § 2606(c), the law expressly authorizes CDCR to deny requests and preferences for "management and safety concerns," *see id.* § 2606(a)(4), (b), (d).

This language shows S.B. 132 does not automatically permit the inmates of a men's prison to enter a women's prison with only a declaration of transgender identity.  And an inmate's false declaration, made in bad faith, based on a prurient desire for "access" to a women's prison may be denied based on concerns about prison "management" and the "safety" of the inmates in the women's prison under the plain terms of section 2506.  Even a good faith, honest, and accurate description of one's identity does not necessarily suffice to justify a transfer, if it would raise management and safety concerns.

To explain their belief that the opposite is true, the plaintiffs quote several passages from a report by the California Office of the Inspector General.  (*See* Doc. 84 ¶ 39 (citing Cal. Off.

**ER-8**

Inspector Gen., Transgender Special Review, Rep. No. 22-01 SR (Aug. 2023)).)[1]  They did not attach this report to their complaint.  As noted, a district court must normally limit its analysis to the complaint and its attachments when it evaluates a motion to dismiss or a jurisdictional motion that attacks the complaint on its own terms.  *See Khoja*, 899 F.3d at 998; *Leite*, 749 F.3d at 1121.  But if a complaint refers extensively to another document, or if that document forms the basis of a claim, then the court may consider it—all of it, not just the quoted passages—and even assume the statements within it are true.  *See Khoja*, 899 F.3d at 1002–03.  This doctrine is a discretionary tool that district courts can rely on to prevent litigants from portraying a crucial document inaccurately.  *See id.* at 1002.

It is appropriate to consider the entirety of the OIG report in this case, without converting the pending motions into motions for summary judgment or factual jurisdictional attacks.  The complaint quotes the OIG Report extensively, it uses the quoted passages to convey several facts about how CDCR has implemented S.B. 132, and those quotations are some of few factual allegations connecting the plaintiffs' legal claims to S.B. 132 in particular.  (*See* Doc. 84 ¶ 39.)

The report itself is not a particularly long or complex document.  The Office of the Inspector General began the investigation that culminated in that report in response to a request from a group of state senators.  OIG Rep. at 1.  They wanted more information about how CDCR was implementing S.B. 132.  *Id.*  The OIG thus described the process CDCR had created for evaluating inmates' requests for transfers under S.B. 132.  The process begins with a questionnaire that allows an inmate to identify as transgender, nonbinary, or intersex and to express a desire to be housed in a prison consistent with their gender identity.  *Id.* at 5.  After inmates housed in men's prisons complete the questionnaire, they are not immediately transferred to a women's prison (and women not to men's prisons), but rather to one of thirteen "hub" prisons, which offer "specialized programs and services" for transgender, nonbinary, and intersex inmates, such as medical care and mental health services.  *Id.* at 6 & n.4, 9, 11.  The requesting

---

[1]  The Court cites this report as the "OIG Rep." in the remainder of this order, with page citations referring to the numbers on the top of each page.  A copy of the report is available on the website of the Office of the Inspector General at https://www.oig.ca.gov/wp-content/uploads/2023/08/Special-Review-No.-22-01.pdf

**ER-9**

inmate must then complete a mandatory, eight-session course. The purpose of this course is to inform them about "cultural and rule differences between men's and women's prisons and prepare them for transfer." *Id.* at 6.

Many inmates decide not to go through with a transfer after completing this course. *See id.* at 18 n.9, 20. If an inmate completes the course and remains interested, their name is added to a list for a counselor to review. *Id.* at 6. The review process is "thorough." *Id.* at 2, 13. It includes a mental health evaluation, a review of the inmate's prison history, and an evaluation of the inmate's entire criminal history. *Id.* at 6. Counselors also interview the requesting inmates. They ask, for example, how old they were when they first started expressing themselves in their current gender and why they believe a different facility would be better for their health and safety. *Id.* at 15. Because only a few counselors conduct these reviews, and because they are so thorough, there is a significant backlog of transfer requests. *See id.* at 2, 13, 18–19. The OIG found that inmates must generally wait more than six months after completing their initial questionnaire before the review is complete. *Id.* at 2.

The next step is a hearing. *See id.* at 6–7. A transfer committee considers the information prepared during the review and hears from the inmate. *Id.* at 6. The committee chairperson (at the time of the report, a warden of one of the two women's prisons) then decides "whether transferring the prospective transferee would raise 'management or safety concerns' and should, therefore, be denied." *Id.* at 6, 15. Inmates whose requests are approved are transferred; those whose requests are denied may file a grievance and pursue challenges in court if they choose. *See id.* at 6–8. After a transfer is complete, the OIG found that the movement of inmates "between the two [women's] prisons, and within each prison, is uniformly processed regardless of gender identity." *Id.* at 8. If problems arise after a transfer, transgender inmates may be "returned to their originally designated prison." *Id.*

The OIG concluded that this review process was "appropriately thorough" but quite protracted. *Id.* at 13. It is "significantly longer and more detailed" than the process for other types of transfers. *Id.* at 14. At the time the OIG completed its review, nearly 400 people had requested a transfer, but CDCR had processed only 55 requests. *Id.* The number of inmates who

6

had requested a transfer under S.B. 132 was also much lower than the number who identified as transgender, nonbinary, or intersex: only about 40% of that total. *Id.* at 2.

A more recent CDCR report includes similar figures. As of March 4, 2026, about 1,110 of the 2,400 people in the incarcerated population who had identified as transgender, nonbinary, or intersex had requested a transfer. Cal. Dep't Corr. & Rehab., SB 132 Report (Mar. 11, 2026).[2] CDCR has denied far more requests than it granted: it has approved 54 and denied 144. *Id.* At least one of these denials—based on "an impermissible security risk at a women's facility" for an inmate whose "presence would negatively impact the culture at the female institution"—has even been the subject of litigation in this Court. *See Murray v. Harrington*, No. 21-01936, 2024 WL 923487, at *3 (E.D. Cal. Mar. 1, 2024), *report and recommendation adopted*, 2024 WL 1742863 (E.D. Cal. Apr. 23, 2024). Even more people who initially requested a transfer decided not to transfer during the review process, i.e., 148 inmates. *See id.*

The OIG looked into the reasons for the long delays and relatively small numbers of transfers. In addition to staff shortages and other similar causes, the OIG highlighted vague language in S.B. 132 itself. *See* OIG Rep. at 19. As noted above, S.B. 132 authorizes CDCR to deny transfer requests based on "management and safety concerns," but not for "discriminatory reasons." *Id.* One of these prohibited "discriminatory reasons" is "a factor present among other people incarcerated at the prison" where the inmate wishes to be housed. *Id.* The OIG found that language in particular to be "broad" and "challenging" in a way that made for more difficult reviews. *Id.* The OIG hypothesized that the statute could potentially be interpreted as barring CDCR from denying a transfer to a women's prison solely because the requesting inmate had a history of rape: "If people at the women's prison have been incarcerated for crimes involving rape, this may qualify under [S.B. 132] as a factor present among other people at the prison and may preclude the department from using it as the sole basis to deny the transfer request." *Id.* To be clear, the OIG did not endorse this interpretation. It merely cited this language to explain in

---

[2] The Court takes judicial notice of this report. *See, e.g.*, *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 788 (9th Cir. 2018) (taking judicial notice of materials available to the public on a government website). At the time this order was filed, a copy of the report was available at https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2026/03/STA472-032026-M.pdf

**ER-11**

part why the review process was difficult and time-consuming. *See id.* The OIG agreed with CDCR that more specific criteria, regulations, or statutory language should be developed to avoid this and other uncertainties. *Id.*

The OIG did not specifically confirm whether any inmates had misrepresented their gender identity or had attempted to take advantage of S.B. 132 in bad faith. *See id.* at 30. It did report, however, that several inmates who had been transferred under S.B. 132 believed that at least some transfer applicants (i.e., those who wanted to transfer but had not) "were being less than truthful about their gender identity." *Id.* at 25. "Some believed prospective transferees were seeking to transfer to have sexual relations with incarcerated people who were designated female at birth." *Id.* As one applicant put it, "There are a lot of wolves in sheep's clothing," i.e., "men who are now all of a sudden transgender." *Id.*

The OIG also acknowledged that it would be "difficult" to "accurately assess" an applicant's "sincerity" and "true intentions." *Id.* at 30. Its report notes as well that it is "possible" an inmate could "purposefully misidentify themselves to facilitate a transfer." *Id.* It also found this type of "deception" could "become easier as incarcerated people share information about the process, the interview questions they were asked, and the specific reasons they were denied." *Id.* But again, it described the review process as "appropriately thorough," *id.* at 13, and did not report there were any cases in which inmates had secured a transfer in bad faith or on false pretenses.

In later sections of the report, the OIG described the results of its investigation into the effects of S.B. 132 on inmates' safety and privacy. *See id.* at 25–38. Many people in the two women's prisons expressed concerns about living with transferred inmates. *Id.* at 25. Some of these concerns "derived from the belief that transferees are, generally, physically larger and stronger." *Id.* The OIG report notes as well that some inmates were especially concerned about "showering around transferees, particularly those who have not had gender-affirming surgery." *Id.* It could also be "particularly triggering" for women with a history of abuse to live in "close spaces" with transgender inmates. *Id.* at 29. The OIG also found living conditions could be "problematic" for those "who expressed religious objections to living with unrelated individuals

**ER-12**

designated male at birth." *Id.*

Investigators visited the prisons and documented the living arrangements within them, including by photograph. *See id.* at 26–29. The OIG found the women's prisons had separated, divided bathrooms and shower stalls with "adequate shower curtains," but it concluded that "privacy was still potentially compromised when entering and exiting the shower stalls." *Id.* at 29. Inmates could "report safety or security concerns to departmental staff, can request a bed change or be placed in temporary restrictive housing, and may file a grievance if their concerns are not resolved." *Id.* at 3. According to the OIG's report, CDCR had "properly investigated or responded to all allegations of consensual sexual misconduct and sexual assaults" that the OIG was able to review. *Id.* at 4, 34.

In addition to concerns about safety and privacy, the OIG found that S.B. 132 had led to feelings of "inequity and tension" among inmates. *Id.* at 3. Under S.B. 132, the health and safety concerns of transgender, nonbinary, and intersex inmates "must be given serious consideration," whereas "the rest of the incarcerated population . . . must either accept housing assignments or be subject to disciplinary action." *Id.* The OIG found this "disparity" had created "a feeling of resentment" and a "perception that transferees are treated differently." *Id.* "For example, some individuals reported that officers approve transferees' requests for bed moves, even requests for single cells, more often than they do for nontransferees . . . . One staff member also reportedly told an incarcerated person that transferees must be treated like an 'endangered species' for the department to avoid lawsuits." *Id.* at 26.

Beyond the OIG's Report, which the plaintiffs quote most extensively, they refer to a variety of other materials. It is not necessary for present purposes to review these other materials in detail. The Court assumes the complaint portrays their contents accurately. As the plaintiffs describe them, these other materials demonstrate that prison officials knew or should have known that S.B. 132 would lead to increases in the number of inmates who identify as transgender, increased safety risks, increased violence, increased sexual assaults, increased pregnancies, and increased harms to vulnerable inmates, especially among those who have been diagnosed with post-traumatic stress disorder. (*See* Doc. 84 ¶¶ 33–57.) For example, they point out that CDCR

**ER-13**

observed an increase in the number of inmates who identify as transgender, expected an increase in sexual assault allegations, and began offering condoms and other forms of birth control to inmates in women's prisons. (*Id.* ¶¶ 34, 36.) They also cite research and reports that, they allege, show transgender inmates are relatively more likely to have committed sex offenses, and they allege a disproportionately large number of the inmates in women's prisons have been diagnosed with post-traumatic stress disorder. (*See id.* ¶¶ 35, 40, 42, 47–50, 52.)

In far more personal terms, the plaintiffs allege that transgender inmates and CDCR's efforts to comply with S.B. 132 have imposed a severe personal hardships upon them. Krystal Gonzalez alleges she was sexually assaulted by a person she describes as "a trans-identifying biological male inmate" who transferred into her housing unit, although she does not say exactly when. (*Id.* ¶ 62.) She reported the assault, but "staff failed to pursue her report," ignored the grievance she filed, and accused her of wrongdoing, i.e., of "willful misgendering" the inmate who assaulted her. (*Id.* ¶¶ 63–64.) In her experience, transgender inmates "rush to engage in sexual relationships with female inmates" when they arrive in the women's prison and sometimes put on a "feminine" affect in the presence of prison guards, only to revert to "masculine habits" when guards are away. (*Id.* ¶ 65.)

Janine Chandler alleges she suffers from post-traumatic stress disorder as a result of domestic and sexual abuse she experienced at the hands of her former husband and other relatives. (*Id.* ¶ 10.) She alleges "the presence of criminal, intimidating males gives her flashbacks of her violent husband." (*Id.* ¶ 61.) She is Muslim, and her faith "instructs her not to be unclothed with unrelated males," but as a result of S.B. 132, she alleges that she might now be required to undress in the presence of people who she considers to be men. (*Id.*)

Tomiekia Johnson also suffers from post-traumatic stress disorder as a result of sexual assault and domestic violence in her past. (*See id.* ¶¶ 12, 66.) She alleges the presence of transgender inmates exacerbates her condition. (*Id.* ¶ 66.) Less directly, she alleges she has witnessed or heard about sexual harassment and an attempted rape by an transferred inmate, who she describes as a "large man who dresses and grooms masculinely and is not interested in making any effort to present as a woman." (*Id.* ¶¶ 67–69.) Johnson was not the victim, but she

10

alleges the prison did not reprimand or move the perpetrator away from the alleged victims; instead prison officials placed Johnson and the other accusers in solitary confinement and have accused them of making false reports, including in connection with this very lawsuit. (*Id.* ¶¶ 67–69, 85–87) Johnson also alleges that she is eligible for resentencing and a commutation but has been denied parole "for political reasons." (*Id.* ¶ 87.)

Cathleen Quinn alleges the same transgender inmate "peeped" at her as she used the restroom. (*Id.* ¶ 76.) She made a report, but it led to no consequences. (*Id.* ¶¶ 76–77, 88.) Instead, she alleges, parole officials punished her by extending her incarceration. (*Id.* ¶¶ 88–91.) She alleges the commissioner overseeing her parole hearing told her that "she should have been quiet" about her "victimization" so she could have "gone home." (*Id.* ¶ 92.)

Nadia Romero alleges she has been "repeatedly subjected to unwanted physical touching by a trans-identifying biological male inmate" while she was on a work assignment. (*Id.* ¶ 71.) Prison officials ignored her grievance and lectured her about how she had referred to the inmate who had touched her, i.e. as a man rather than as a woman. (*Id.* ¶ 72.) She describes herself as a "devout Catholic," and her religious convictions do not permit her to refer to transgender women using female pronouns; using those pronouns "is sinful as it is asserting a lie." (*Id.* ¶ 73.) The presence of people she considers men also conflicts with her religious beliefs. (*Id.*)

Channell Johnson alleges she was in a consensual sexual relationship with a transgender inmate "whose background includes having raped a woman in another female prison." (*Id.* ¶¶ 78–79, 93.) Prison staff discovered the relationship and placed the other inmate in administrative segregation. (*Id.* ¶ 80.) When Channel Johnson refused to lie about the relationship, her former partner began to threaten her and her family members. (*Id.*) She alleges she was then transferred to a different prison, while officials took no action to punish her former partner, who continues to threaten her. (*Id.* ¶¶ 81–82, 93.)

The plaintiffs allege S.B. 132 violates their constitutional rights in several ways. They pursue four claims, all via 42 U.S.C. §1983. First, they allege the defendants have subjected them to cruel and unusual punishment in violation of the Eighth Amendment because transfers under S.B. 132 subject them to trauma and an increased risk of sexual assault and violence. (*Id.* ¶¶ 94–

11

**ER-15**

106.) Second, they allege S.B. 132 violates the First Amendment because it "effectively compels the speech of female inmates." (*Id.* ¶ 113.) They feel they must "choose between speaking in line with S.B. 132's mandated pronoun language against their own conscience, or remaining in prison longer." (*Id.*) Third, Chandler and Romero allege S.B. 132 forces them to live with and expose themselves to people who are, in their view, unrelated men, a violation of their sincerely held religious beliefs, thus depriving them of their right to exercise their religious beliefs freely in violation of the First Amendment. (*Id.* ¶¶ 121–35.) Fourth, the plaintiffs allege S.B. 132 deprives them of their right to equal protection of the law in violation of the Fourteenth Amendment. They claim the law gives "preference to trans-identifying inmates' housing preferences over the safety and security of female inmates." (*Id.* ¶¶ 136–46.)

The plaintiffs seek an order declaring S.B. 132 unconstitutional, both on its face and as it has been applied; an injunction prohibiting the defendants from "enforcing" S.B. 132 or "otherwise interfering with [their] constitutional rights and federal guarantees"; an award of attorneys' fees and costs; and any other further relief the Court deems appropriate. (*Id.* at 29–30.) They do not seek damages. They also make clear in their opposition brief that they "simply seek an injunction against the enforcement of S.B. 132 . . . and a return to the regime before its enactment." (Doc. 122 at 1–2.)

There are three defendants: the Secretary of the CDCR and the wardens of the two facilities where the plaintiffs are housed. (*See id.* ¶¶ 16–18.) They move to dismiss the complaint for lack of jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6). (Doc. 118.) They do not currently dispute the plaintiffs' allegations; their jurisdictional arguments take the complaint at face value. (*See* Doc. 118-1 at 2.) The Court has also permitted several transgender inmates and the Transgender Gender-Variant & Intersex Justice Project to intervene in the case to advocate for their interests. (*See* Docs. 62.) They move to dismiss "for the additional reason that the [plaintiffs'] claims . . . the remedy they seek would not address the harms they allege and the only remedy that could possibly do so is not one this Court could grant." (Doc. 120). Briefing on both motions is complete, and the court determined no hearing was necessary. (*See* Docs. 121–24.)

**ER-16**

The pending motions to dismiss are second set of similar motions that this Court has adjudicated.  In response to the first set, the Court dismissed the plaintiffs' original complaint based in part on its conclusion that it has no jurisdiction to consider a facial challenge to S.B. 132. The Court permitted the plaintiffs to pursue claims against the individual defendants only (i.e., not CDCR itself) and limited those claims to those that this court has jurisdiction to redress. (Doc. 67 at 26.)  The plaintiffs agree the Court's previous order forecloses their facial challenge to S.B. 132.  They "do not seek to revive" their facial claim, nor ask the Court to reconsider its previous decision.  (Doc. 122 at 12.)  They included a facial challenge in their complaint to "preserve the issue for appeal."  (*Id.*)  The Court accordingly addresses only their challenge to the law as it has been applied to them.  As before, the Court concludes that it lacks jurisdiction under Article III.

**JURISDICTION**

Article III of the Constitution gives federal courts jurisdiction to hear "Cases" and "Controversies."  *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024) (quoting U.S. Const. art. III, § 2).  The Supreme Court has interpreted these words as requiring the one who invokes a federal court's jurisdiction to demonstrate three things: first, that it has suffered (or likely will suffer) an "injury in fact"; second, "that the injury likely was caused or will be caused by the defendant" or defendants; and third, "that the injury likely would be redressed by the requested judicial relief."  *Id.* at 380.  Plaintiffs must meet these requirements "'for each claim that they press' against each defendant, 'and for each form of relief that they seek.'"  *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)).  At the pleading stage, a plaintiff may rely on allegations to meet this standard.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Plaintiffs who satisfy these requirements are said to have "standing" to sue.  *All. for Hippocratic Med.*, 602 U.S. at 378.  The Supreme Court has reiterated in recent years that standing is a "fundamental" limit on a federal court's jurisdiction and "firmly rooted in American constitutional law."  *Id.* at 378, 380, 397 (citations omitted).  It has also urged lower courts not to make standing "more complicated than it needs to be."  *Bost v. Illinois State Bd. of Elections*, 146

S. Ct. 513, 523 (2026) (quoting *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 547 (2020)); *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 125 (2025) (same). The fundamentals of the standing rule are indeed "well-known." *All. For Hippocratic Med.*, 602 U.S. at 380. But they can be quite difficult to explain and apply succinctly. The Supreme Court has heard and resolved many hard-fought standing disputes over the last few years. *Diamond Alternative Energy*, 606 U.S. at 125 (collecting cases).

Under the first of the three standing requirements, plaintiffs must identify an injury that is both "concrete" and "particularized." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). This means the injury "must be real and not abstract" and "affect the plaintiff in a personal and individual way." *All. For Hippocratic Med.*, 602 U.S. at 381 (quoting *Lujan*, 504 U.S. at 560 n.1). It must also be "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). It "must have already occurred or be likely to occur soon." *All. For Hippocratic Med.*, 602 U.S. at 381. And when plaintiffs seek prospective relief, such as an injunction, they must demonstrate the injury they fear is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Although the word "certainly" implies certainty, this is also a question of likelihoods. *See All. For Hippocratic Med.*, 602 U.S. at 381 (citing *Clapper*, 568 U.S. at 401). A "substantial risk" of future harm can be enough. *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

Second, for causation, plaintiffs must show their "injury likely was caused or likely will be caused by the defendant's conduct." *All. For Hippocratic Med.*, 602 U.S. at 382 (emphasis omitted). This can be difficult to do in a case about a government's efforts to regulate "someone else." *Id.* (emphasis omitted) (quoting *Lujan*, 504 U.S. at 562). In these cases, "causation 'ordinarily hinges on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well.'" *Id.* (alterations omitted) (quoting *Lujan*, 504 U.S. at 562). Plaintiffs in this situation "generally cannot 'rely on speculation about the unfettered choices made by independent actors not before the courts.'" *Id.* at 383 (quoting *Clapper*, 568 U.S. at 415, n.5). They "must show that the 'third parties will likely

14

react in predictable ways'" and in doing so, injure them in turn. *Id.* (quoting *California v. Texas*, 593 U.S. 659, 675 (2021)). Any "speculative" and "attenuated" links in a proposed chain of cause and effect can prevent plaintiffs from showing they have standing. *Id.* If it is too hard to predict how third parties will react, or if the government's actions are too far removed from their allegedly adverse effects, then there is no case or controversy and no jurisdiction. *See id.*

Redressability, the third part of the test, is often a corollary of causation. *See Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 288 (2008). "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *All. For Hippocratic Med.*, 602 U.S. at 381. But sometimes a plaintiff might not have standing even if the defendant has caused an injury; some injuries are simply beyond a court's power to redress. *See, e.g.*, *United States v. Texas*, 599 U.S. 670, 677 (2023) (finding no standing to seek an order directing the Executive Branch to make more arrests or initiate more prosecutions).

The complaint in this case falls short of at least one of these requirements for each of the plaintiffs' claims.

## I.    Eighth Amendment

First, the plaintiffs allege S.B. 132 prevents prison officials from protecting them from danger in violation of the Eighth Amendment. (*See* Doc. 84 ¶ 99.) As summarized above, some of them have been sexually assaulted or harassed in the past, and others have suffered from the symptoms of post-traumatic stress disorder, exacerbated by the close physical presence of transgender inmates. (*See id.* ¶¶ 58–82.) There is no doubt that these alleged injuries are concrete and personal, even wrenching. The plaintiffs do not allege, however, that the defendants or anyone under their supervision transferred the inmates who were responsible for these injuries under the terms of S.B. 132, rather than some other regulation, such as those that were in place before S.B. 132 came into effect. For this reason, their complaint does not establish the necessary chain of cause and effect between past injuries and the law they challenge.

The plaintiffs tacitly acknowledge this missing allegation in opposition to the pending motions. (Doc. 122 at 14 n.2.) They clarify that it was their intention to allege that their injuries

all "arise from inmates transferred under and due to the new policies mandated by S.B. 132." (*Id.*)  They may not amend their complaint by making clarifications and arguments in an opposition brief.  "[A] court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss." *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) (emphasis omitted).  But even if they had alleged clearly that the inmates who assaulted them or caused their distress were transferred under S.B. 132, they have not explained how the forward-looking remedies they seek would redress a harm that has already befallen them.  They do not request damages or another type of retrospective relief, but rather a judicial declaration and an order instructing the defendants not to enforce or comply with S.B. 132 in the future.  An injunction or declaration would not relieve them of the harmful consequences of an event that has already occurred.  (*See* Doc. 67 at 22.)

By contrast, a judicial declaration or an injunction could potentially prevent and thus "redress" a future injury.  The plaintiffs have not demonstrated, however, that the law they ask the court to declare unconstitutional and to enjoin is likely to cause some concrete and particularized future injury in the future.  Injuries and harm in the past do not alone give the plaintiffs standing to pursue an injunction. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 106–07 (1983).  They cannot rely on their allegation that S.B. 132 compels prison officials to transfer dangerous and violent sex abusers into women's prisons whenever they "state that they now identify as transgender." (Doc. 84 ¶ 4.)  As summarized above, S.B. 132 expressly grants prison officials the authority to deny transfer requests based on concerns about prison management and safety.  CDCR has, accordingly, followed a protracted, multi-step process that includes a mandatory eight-session class, review of the inmate's mental health, a review of the inmate's prison and criminal records, an interview, and a hearing.  Under this process, CDCR has denied many more requests than it has granted.

The plaintiffs underscore the OIG's statement that it could be "difficult" for prison officials to "accurately assess" an applicant's "sincerity" and "true intentions."  OIG Report at 30. Inmates could potentially "misidentify themselves to facilitate a transfer." *Id.*  The OIG did not say that it located any inmates who had so "misidentified" themselves, and the plaintiffs do not

16

allege that specific inmates have successfully managed to dishonestly or insincerely insinuate their way into a women's prison and thus have become the likely source of a future harm. The possibility of such a deception does not show an injury is "imminent" or "likely." "Plaintiffs cannot rely on speculation about 'the unfettered choices made by independent actors not before the court.'" *Clapper*, 568 U.S. at 415 n.5 (quoting *Lujan*, 504 U.S. at 562). It would be speculation to assume that dangerous inmates are likely to successfully lie their way through a lengthy and thorough review process and into the plaintiffs' housing units and cells.

Setting aside false claims and pretexts, the plaintiffs allege also that inmates who honestly and accurately identify themselves as transgender will put them a risk. There are reasons to doubt this is true. (*See, e.g.*, Doc. 118-1 at 24.) But for present purposes, the Court will assume it is. Even with the benefit of that favorable assumption, the plaintiffs cannot show they have standing to press the claims they now assert.

To explain why, it is best to begin with the fact that the plaintiffs are not challenging a law that requires them to do something or that forbids them from doing something else. S.B. 132 does not regulate them. It regulates the defendants—the state's prison officials and the officers and staff members under their supervision—by instructing them what they can and cannot consider and what they must and must not do. (*See* Doc. 123 at 8.) S.B. 132 might also be said to indirectly "regulate" transgender, nonbinary, and intersex inmates as well by granting them rights or protections. The plaintiffs and the many other people in CDCR's custody are a further step away from the law. Their claims are about what will happen when CDCR officials interpret and apply S.B. 132 and how other people—such as the inmates who identify as transgender, nonbinary, and intersex under the terms of S.B. 132—will react to the government's actions.

For these reasons, this case is a dispute about a government's efforts to regulate "someone else." *All. For Hippocratic Med.*, 602 U.S. at 382 (emphasis omitted) (quoting *Lujan*, 504 U.S. at 562). The court's jurisdiction hinges "on the response of the regulated (or regulable) third party" and "others." *Id.* (alterations omitted) (quoting *Lujan*, 504 U.S. at 562). To show they have standing, the plaintiffs must offer allegations demonstrating these "third parties will likely react in predictable ways" without resorting to "speculative" and "attenuated" claims about the distant

17

ripple effects that might spread from any particular official's or officer's actions or any given inmate's reactions. *Id.* (citations and quotation marks omitted).

The plaintiffs have not offered the necessary allegations. It is simply too difficult to make anything more than guesses about how prison administrators, officers, and staff members will handle any given classification decision, housing arrangement, cell assignment, grievance, or safety risk that might attend to the custody or housing of a particular inmate. That is true even if transgender status is statistically linked to sexual assault and violence on the whole, as the plaintiffs allege. Too many other variables are at play, such as the transferred inmate's disciplinary and criminal history, the evidence available to the prison officials who approve any given transfer, how closely correctional officers supervise transferred inmates and their peers, cameras and any other available security measures, the individual housing and cell assignments, and even the architecture of the prisons themselves. Uncertainties like these are what persuaded the Supreme Court that it lacked jurisdiction in *Alliance for Hippocratic Medicine* and *Clapper*: federal courts do not have authority to adjudicate disputes about hypothetical injuries that may or may not occur, depending on how enforcement authorities will act, how third parties will react, and how these actions and reactions might play out in a complex web of surrounding circumstances. *See* 602 U.S. at 390–92; 568 U.S. at 410–14.

A contrasting case helps to explain what is missing from this one. The plaintiffs in *Diamond Alternative Energy* included companies that produced gas and diesel fuel for trucks and cars. *See* 606 U.S. at 108. They challenged California regulations limiting greenhouse gas emissions and increasing electric car production. *See id.* at 106–07. It was not difficult to see how these regulations would reduce fuel sales, and thus why the fuel producers had standing. The regulations would "likely cause a decrease in purchases of gasoline and other liquid fuels for automobiles." *Id.* at 114. That was "the whole point." *Id.* The point of S.B. 132 is not to make prisons more dangerous or create problems for prison management. Just the opposite: it is to ensure that transfers can occur only when they will *not* raise "management or safety concerns." Cal. Pen. Code § 2606(b). Prison administrators may very well fail in this endeavor from time to time, despite their best efforts, but the complaint offers no plausible allegation to show these

18

failures will be predictable or will affect the plaintiffs in particular in predicable ways.

With this said, the plaintiffs do describe some consequences of S.B. 132 that are easier to anticipate. They allege the close presence of transgender inmates in intimate spaces exacerbates the symptoms of their preexisting mental health conditions. It is not speculation to infer that S.B. 132 will lead to an increase in the number of transgender, nonbinary, and intersex inmates who are housed in women's prisons. But as this Court explained in its previous order, it cannot and will not "order CDCR officials to identify, locate, and remove over two dozen [now four dozen] transgender, intersex, and nonbinary individuals from California prisons." (Doc. 67 at 23.)

Quite understandably, the plaintiffs do not ask the Court to undertake such an effort. Now, as before, they ask the Court for a more limited order, one that simply requires the Defendants to reinstate "the regime" as it was before S.B. 132 came into effect. (Doc. 122 at 1–2; *see also* Doc. 41 at 7.) The plaintiffs have not explained how such a limited injunction would prevent them from sharing intimate spaces with transgender, nonbinary, and intersex inmates. Regulations in place since 2017 or earlier have referred transgender inmates "to a classification committee for a determination of appropriate housing at a designated institution." (Doc. 67 at 2–3 & n.2 (quoting Cal. Code Regs. tit. 15, § 3269(g) (2017) and Cal. Code Regs. tit. 15, § 3269(h) (2022–23)).) Transgender inmates could therefore be transferred to women's prisons before S.B. 132 came into effect. In fact, as the defendants point out, federal courts in California were adjudicating disputes related to the housing of transgender inmates before S.B. came into effect. (*See* Doc. 118-1 at 18 (citing *Quine v. Kernan*, 741 F. App'x 358, 361 (9th Cir. 2018) (unpublished); *Norsworthy v. Diaz*, No. 20-01859, 2020 WL 10965424, at *1 (N.D. Cal. June 10, 2020); *Guy v. Espinoza*, No. 19-00498, 2020 WL 309525, at *1 (E.D. Cal. Jan. 21, 2020), *findings & recommendations adopted*, 2020 WL 949556 (E.D. Cal. Feb. 27, 2020)).) By all accounts, and "regardless of the outcome of this suit, transgender women will continue to be housed in women's facilities." (Doc. 67 at 24.)

The answer is the same if redressability is the question. As noted above, the plaintiffs ask the court to reinstate "the regime before [S.B. 132's] enactment, which provided for inclusion of trans-identifying biological males in women's facilities under the process provided for in the

19

ER-23

Prison Rape and Elimination Act of 2003." (Doc. 122 at 10.)  Under this "regime," they argue, inmates were "individually vetted to consider the potential ramifications for the entire prison population." (*Id.* at 14.)  But according to the OIG Report—which, again, the plaintiffs rely on in their complaint specifically to substantiate their allegations of danger and future harm— California prison officials *do* consider the ramifications of individual transfers in a protracted, case-by-case process.  (OIG Rep. at 1–2, 5–24.)  And so, by the terms of the plaintiffs' briefing and pleadings, the order they request will essentially instruct the defendants to do what they are already doing.  It will not redress a future harm.

The Court appreciates and does not doubt the sincerity of the plaintiffs' concerns about their safety, privacy, or the effects S.B. 132 may have on prison life.  But federal courts cannot be expected to hear and resolve challenges to any government action that draws objections, even sincere and deeply personal objections.  *See All. For Hippocratic Med.*, 602 U.S. at 392.  If federal courts did have such broad jurisdiction, they would be expected to weigh in on the merits of virtually every government action.  *See id.*  Those who object in general to California's policy can take those concerns to the state's executive and legislative branches, or possibly even its own courts; none of these bodies are constrained by the "Case" or "Controversy" requirement in Article III.  *See id.* at 393.

If a plaintiff's allegations do not show the court has jurisdiction, the court can permit the plaintiff to amend the complaint.  *See* 28 U.S.C. § 1653.  "Leave to amend should be granted generously, after considering 'bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has previously amended the complaint.'"  *Bolden-Hardge v. Off. of Cal. State Controller*, 63 F.4th 1215, 1221 (9th Cir. 2023) (quoting *United States v. Corinthian Colls.*, 655 F.3d 984, 995 (9th Cir. 2011)).

The Court perceives no undue delay or unfair prejudice that a further amendment might cause in this case.  The obvious contradictions between the plaintiffs' allegations about S.B. 132's effects and its own plain language could suggest that something less than good faith underlies their counsel's drafting decisions, but any second amended complaint they file on their clients' behalf would be subject to Federal Rule of Civil Procedure 11(b)(3).  The plaintiffs have had one

previous opportunity to amend their complaint, but a further amendment would not be unwarranted for that reason alone. In many cases, shortcomings in a plaintiff's jurisdictional allegations can "easily" be "remedied by leave to amend," *NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606, 614 (9th Cir. 2016), and the plaintiffs argue in opposition to the pending motions that they could clarify the connections between their alleged injuries and the law they challenge. (*See* Doc. 122 n.2.) A further amendment would not be appropriate, however, if it would be an exercise in futility. *See Barke v. Banks*, 25 F.4th 714, 721 (9th Cir. 2022). The Court will therefore consider whether an amendment would be futile.

As noted, the plaintiffs argue they could amend their complaint to clarify that the inmates who abused or harassed them were all transferred under S.B. 132. (Doc. 122 n.2.) This clarification would not show that this Court has jurisdiction over claims about the mere presence of transgender inmates within the prisons. The Court will not permit any further amendments based on this theory of harm. Additional information about specific inmates and events could, however, eliminate some uncertainties about the risk of future abuse and harassment and whether S.B. 132 plays any role in that risk. It is at least possible that more detailed allegations about specific events and people might show that the plaintiffs have standing to assert claims along these lines. The Court will therefore consider whether the plaintiffs could potentially state an Eighth Amendment claim based on the risk of abuse and harassment in the future. It has jurisdiction to do so. *See Bolden-Hardge*, 63 F.4th at 1221 n.1.

Under the Eighth Amendment, "prison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (alteration omitted) (quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)). "[A] prison official violates the Eighth Amendment only when two requirements are met." *Id.* "First, the deprivation alleged must be, objectively, sufficiently serious." *Id.* (citation and quotation marks omitted). For claims based on a failure to prevent harm, inmates must show they are "incarcerated under conditions posing a substantial risk of serious harm." *Id.* Second, the plaintiff must show the official was deliberately indifferent to inmates' health or safety, i.e., that the defendant both knew of and disregarded "an excessive risk to inmate health or safety."

**ER-25**

*Id.* at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

The plaintiffs could not state a claim under these standards based on their incorrect allegations about S.B. 132's provisions or the process that CDCR has adopted to process transfers. S.B. 132 does not bar prison officials from considering whether an inmate's declaration of gender identity is subjectively false or in bad faith. (*Contra* Doc. 122 at 14–15.) It does not prohibit prison officials from considering whether inmates who request transfers have a history of violence or sexual assaults that raise management and safety concerns. (*Contra id.*) Transferred inmates do not have their choice of cells or cellmates. (*Contra id.* at 15.)

The plaintiffs argue they could demonstrate deliberate indifference among prison officials by citing (1) statistics showing there is a disproportionate risk of harm associated with the housing of transgender inmates, (2) evidence of previous abuse or harassment by transgender inmates, (3) the unique vulnerability of incarcerated women. (*See id.* at 13–15.) These allegations could potentially show that some transfers might pose a "substantial risk of serious harm," but they would not show that any officials deliberately disregarded those risks. The only allegations that might shed light on any official's state of mind are the plaintiffs' allegations that some prison officials have retaliated against some of the plaintiffs for filing complaints or grievances related to transgender inmates. (*See id.* at 15.) The plaintiffs argue that these allegations support their claims that prison officials are untroubled by the dangers they face. (*See id.*) The defendants, however, are not among the allegedly retaliatory officials. No allegations show the defendants were aware of the alleged retaliation. No allegations show that the allegedly retaliatory officials were responsible for evaluating transfer requests, making cell assignments, or any other similar tasks.

The plaintiffs do not propose any new allegations that might show the Secretary of the CDCR and the two defendant wardens deliberately disregarded any risks of harm to them in particular. They do not ask for permission to do so. These circumstances give the Court no confidence that an amendment would lead to anything but an exercise in futility when it comes to the claims against the CDCR Secretary and the two defendant wardens. The plaintiffs' Eighth

22

**ER-26**

Amendment claims against these defendants are dismissed without leave to amend.

The Court cannot exclude the possibility that another official or staff member—someone with more direct responsibility for and knowledge about their housing, cell assignments, supervision, security, and safety—might have deliberately disregarded a risk to one or more of the plaintiffs, or perhaps to another person. The Court will therefore permit the plaintiffs to assert such a claim in a second amended complaint or, given the passage of time since this case began, in a supplemental complaint. Claim one is dismissed with leave to amend in part, to this limited extent.

## II.    First Amendment

The plaintiffs' remaining claims have simpler and more fundamental shortcomings, at least as it pertains to this Court's jurisdiction.

Starting with their claims under the First Amendment, although they detail several alleged injuries, their complaint does not connect these injuries to S.B. 132 or to the defendants, and they have not demonstrated that the remedies they seek would redress those injuries. As above, some of the alleged injuries are based on events that occurred in the past. (*See, e.g.*, Doc. 84 ¶¶ 83–93.) The plaintiffs have not explained how prospective equitable relief, such as a judicial declaration or an injunction, would redress an injury that has already occurred. The plaintiffs do allege, however, that some of their injuries are ongoing or may occur again in the future.

First, they allege "S.B. 132 requires Plaintiffs to refer to all inmates with their preferred pronouns" in violation of the Free Speech Clause. (Doc. 84 ¶ 110.) That is not correct. S.B. 132 does not obligate inmates to use any particular pronouns or words. It imposes obligations on CDCR's employees, staff, and volunteers, not the inmates in its custody. *See* Cal. Pen. Code § 2605(d). If officers have changed the words in the plaintiffs' grievances or instructed them to use particular words, that is not a result of any provision that was added to the state's Penal Code under S.B. 132. Enjoining S.B. 132 or declaring that it is unconstitutional would not relieve the plaintiffs of any obligations to use or not to use any particular words.

Second, the plaintiffs allege officers and prison officials retaliate against them for exercising their First Amendment rights, i.e., for using male pronouns rather than female

23

pronouns when they refer to transgender inmates and for refusing to acknowledge other inmates' professed transgender or nonbinary identities. (*See, e.g.,* Doc. 84 ¶ 111.) The plaintiffs do not allege, however, that the three people they name as defendants—the CDCR Secretary and the two wardens—have or will retaliate against them or play any role in another person's allegedly retaliatory actions, nor that their actions would be connected to any obligations under S.B. 132. The plaintiffs do not cite any provisions within sections 2605 and 2606 that might permit or require prison officials or officers to take any adverse action against an inmate. They have not explained why an order enjoining S.B. 132 or a declaration that it is unconstitutional would protect them from similar retaliation in the future.

Third, Plaintiffs Romero and Chandler allege S.B. 132 is "incompatible" with the Free Exercise Clause because they "have sincerely held religious beliefs against nakedness in the presence of males." (Doc. 84 ¶ 125.) They allege "S.B. 132 unconstitutionally burdens [their] religious practices by forcing female inmates to live, undress, and uncover their bodies to members of the opposite sex, due to the proximity of living in overcrowded housing units with other inmates." (*Id.* ¶ 129.) An order blocking S.B. 132 or declaring it unconstitutional would not prevent these injuries. Transgender women were housed in women's prisons before S.B. 132 was passed, and there is no reason to believe that declaring it unconstitutional or enjoining its future enforcement would separate Romero and Chandler from transgender inmates in the future. (*See* Doc. 67 at 2–3, 23–26.)

It is also unclear whether Romero and Chandler are challenging S.B. 132 as it has been applied to them in particular, rather than on its face. If they are asserting an as-applied claim, they have not alleged that they have suffered any particularized or concrete injury. They do not allege that they have personally shared intimate spaces with transgender inmates or will soon be forced to do so. They do not allege that they have been or will soon be forced to undress, shower, or use the toilet in the presence of a transgender inmate, nor that transgender inmates have or will imminently undress, use a shower, or use the toilet in their presence. In the absence of such an allegation, the Court does not have jurisdiction to adjudicate their general objection to the joint housing of transgender, nonbinary, or intersex inmates with cisgender female inmates. *See All.*

*for Hippocratic Med.*, 602 U.S. at 392–93 ("We recognize that many citizens . . . have sincere concerns about and objections to others using mifepristone and obtaining abortions. But citizens . . . do not have standing to sue simply because others are allowed to engage in certain activities—at least without the plaintiffs demonstrating how they would be injured by the government's alleged under-regulation of others.").

In sum, the plaintiffs have not shown that they have standing to assert claims under the First Amendment based on the allegations in their current complaint. No amendment to the complaint could show that this Court has jurisdiction over a claim under the Free Speech Clause. S.B. 132 does not restrict the speech of inmates. No amendments to the complaint could show that this Court has jurisdiction over a retaliation claim based on S.B. 132. Penal Code sections 2605 or 2606 do not permit or require prison officials to retaliate against inmates for expressing opinions, for using any particular language, or for filing grievances. No amendment to the complaint could show that this court has jurisdiction to redress claims based on the mere presence of transgender inmates within California women's prisons. These claims are all dismissed without leave to amend.

It is possible, however, that the plaintiffs could show that they have standing to assert some more specific claims. For example, the Court cannot exclude the possibility that they could assert a retaliation claim about a specific disciplinary or parole decision that was tied to a particular plaintiff's beliefs or statements about transgender inmates. Similarly, it may be possible that one or more plaintiffs could allege claims about a specific housing or cell assignment that forces them to share intimate spaces with transgender inmates and thus to act in contravention of a sincerely held religious belief. But a broad-based injunction or declaration about S.B. 132 in general would not be the appropriate remedy to these potential claims. The Court will not permit the plaintiffs to seek that type of relief in any second amended complaint. Any future First Amendment claim must be tied to a specific action (or anticipated action) by a specific defendant and must seek relief related to that action in particular. Claims two and three are dismissed with leave to amend or supplement in part, subject to these limitations.

///

25

**III.    Fourteenth Amendment**

Finally, the plaintiffs allege S.B. 132 violates the Equal Protection Clause of the Fourteenth Amendment because it "overlooks legitimate safety and security interests of female inmates by failing to house men and women inmates separately and apart from one another" without "a compelling governmental interest." (Doc. 84 ¶¶ 139–40.)  The Court dismissed this facial challenge without leave to amend in its previous order.  (Doc. 67 at 25–26.)  Now, as before, an order blocking S.B. 132 would not remedy this injury because transgender women were housed in women's prisons before S.B. 132 came into effect.

The plaintiffs also allege S.B. 132 "violates the Equal Protection clause because it requires the [two women's prisons] to place trans-identifying male inmates in single-sex female prisons at their request, thereby discriminating against female inmates," who have no similar entitlement to the housing of their choice. (*Id.* ¶ 143.)  As summarized above, transgender inmates are not automatically entitled to transfers as a general matter.  According to the OIG Report that the plaintiffs extensively quote, the process for transferring into a women's prison is "significantly longer and more detailed" than the process for other types of transfers.  OIG Rep. at 14.  The OIG also found that the movement of inmates "between the two [women's] prisons, and within each prison, is uniformly processed regardless of gender identity." *Id.* at 8.  The complaint lacks factual allegations showing the plaintiffs have personally suffered any harms as a result of any unequal preferences that S.B. 132 might grant to transgender inmates.  They do not allege, for example, that they have applied unsuccessfully to move to a different prison or for a different bed assignment when a transgender inmate's similar request has been granted.  They do not allege that they intend or wish to apply for a different cell assignment or housing arrangements.  As before, their objection appears to be with S.B. 132 generally, on its face, not with the way it has been applied to them.

For these reasons, the plaintiffs have not made allegations that, if true, would give this Court jurisdiction over their equal protection claims under Article III.  It may be possible for them to assert a viable equal protection claim based on a specific transfer request, bed assignment, or similar decision. *Cf.* OIG Rep. at 26 ("One staff member also reportedly told an incarcerated

**ER-30**

person that transferees must be treated like an 'endangered species' for the department to avoid lawsuits."). The Court will permit an amendment or supplement along these lines, but no others. Claim four is dismissed with leave to amend in part.

**CONCLUSION**

The motions to dismiss (Docs. 118, 120) are **GRANTED** with leave to amend or supplement **in part**, as specified above. Any second amended or supplemental complaint must be filed within thirty days of the date this order is filed.

IT IS SO ORDERED.

Dated:    **March 23, 2026**

UNITED STATES DISTRICT JUDGE

27

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JANINE CHANDLER, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATIONS, *et al.*,<br><br>    Defendants. | Case No. 1:21-cv-01657-JLT-HBK<br><br>ORDER GRANTING DEFENDANTS' MOTION TO DISMISS, DENYING DEEFNDANT'S MOTION TO FILE REDACTED EXHIBITS AND DEFENDANTS' MOTION TO STRIKE, AND DENYING AS MOOT DEFENDANTS' REQUEST FOR JUDICIAL NOTICE<br><br>(Docs. 15, 15-2, 15-6, 38) |

Janine Chandler, Krystal Gonzalez, Tomiekia Johnson, and Nadia Romero are female[1] inmates, incarcerated in one of California's women's prisons. They bring this facial and as-applied constitutional challenge to California's "Transgender Respect, Agency, and Dignity Act," added to the California Penal Code by Senate Bill 132 (hereinafter, "S.B. 132"). They seek declaratory and injunctive relief against Defendants California Department of Corrections and Rehabilitation, Secretary of CDCR, Kathleen Allison, and Wardens Michael Pallares and Mona

---

[1] Plaintiffs dispute the use of the word "cisgender" to describe them, stating that it "is not legally defined (or even utilized) by the statute at issue (SB 132), anywhere in the U.S. Constitution or California Constitution, nor in [the Prison Rape Elimination Act]." (Doc. 36 at 5.) Even still, the Ninth Circuit has adopted definitions that will assist in making this order clear. "Transgender individuals have a '[g]ender identity'—a deeply felt, inherent sense' of their gender—that does not align with their sex at birth." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 768 (9th Cir. 2020) (footnote and citation omitted). "At birth, infants are classified as male or female based on visual observation of their external genitalia. This is a person's 'sex assigned at birth,' but it may not be the person's gender identity." *Id.* at n.3. Plaintiffs' allegations (Doc. 36 at 5–6) demonstrate that their gender identity corresponds with their sex assigned at birth. For clarity, they are described as cisgender, as that term is defined by the Ninth Circuit. *Cf. Hecox v. Little*, 79 F.4th 1009, 1016 (9th Cir. 2023), *withdrawn*, 2024 WL 1846141 (9th Cir. Apr. 29, 2024).

**ER-32**

D. Houston.

Pending is Defendants' Motion to Dismiss (Doc. 15), Motion to File Redacted Exhibits (Doc. 15-6), and Motion to Strike (Doc. 38).  For the reasons set forth below, Defendants' Motion Dismiss (Doc. 15) is **GRANTED**.  Defendants' Motion to Strike (Doc. 38) is **DENIED**, and Defendants' Motion to File Redacted Exhibits (Doc. 15-6) is **DENIED AS MOOT**.

## I.      FACTUAL BACKGROUND

### A.  Existing Law Prior to S.B. 132

Since at least 2017, Title 15 of the California Code of Regulations § 3269 ("Inmate Housing Assignments") governed the placement of transgender inmates within the California prison system.  *See* CAL. CODE REGS. tit. 15, § 3269 (2017).  The Code of Regulations provided: "Transgender inmates and inmates having symptoms of gender dysphoria as identified and documented in [the Strategic Offender Management System (SOMS)] by medical or mental health personnel within a CDCR institution shall be referred to a classification committee for a determination of appropriate housing at a designated institution."  CAL. CODE REGS. tit. 15, § 3269(g) (2017).[2]  For the classification of inmates, "the classification process shall take into consideration the inmate's needs, interests and desires, his/her behavior and placement score in keeping with the Department and institution's/facility's program and security missions and public safety."  CAL. CODE REGS. tit. 15, § 3375(b) (2017) ("Classification Process").[3]

In April 2019, the California Senate Committee on Public Safety considered the merits of S.B. 132.  S. COMM. PUB. SAFETY, B. ANALYSIS, S.B. 132 (Cal. Apr. 23, 2019).[4]  In the legislative analysis of S.B. 132, the bill's author, Senator Wiener, acknowledged that "the California Code of Regulations establishes a process by which an incarcerated transgender person is assigned to housing at a designated institution."  *Id.* at 4.  At that time, CDCR's Department Operations

---

[2] Since 2022, the Code of Regulations now contains this provision, with the exact language as prior versions, located at § 3269(h), respectively.  *See* CAL. CODE REGS. tit. 15, § 3269(h) (2022–23).

[3] This language has not changed since 2017, except for the 2019 added sub-section, requiring an "automated needs assessment tool that identifies an inmate's criminogenic needs" to be administered according to § 3375.6.  CAL. CODE REGS. tit. 15, § 3375(b)(1) (2019).

[4] The California Senate's legislative analysis can be located at: https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201920200SB132.

Manual ("DOM") required "[i]nmates who have been diagnosed as transgender or intersex, as documented on the Medical Classification Chrono" to "be referred to a classification committee for review of all case factors and determination of appropriate institutional placement and housing assignment." *Id.* at 7 (citing DOM § 62080.14); *see also* CAL. CODE REGS. tit. 15, § 3269 (2017) (transgender inmates referred to a classification committee).  CDCR specified that the housing of transgender inmates had "to ensure inmate-patients receive the necessary medical care/mental health treatment, transgender or intersex inmate-patients."  S. COMM. PUB. SAFETY, B. ANALYSIS at 7 (citing DOM § 62080.14).

However, Senator Wiener determined that this housing-transfer process did not go far enough to protect transgender women from rape and assault.  *Id.* at 4.  Indeed, the Senator commented, "[t]hese processes and criteria fail[ed] to take into account a person's gender identity and their perception of safety, making them more vulnerable to violence from other incarcerated people and solitary confinement while incarcerated."  *Id.*  The Senate's analysis of S.B. 132 cited to a study by the University of California, Irvine, which "found that transgender inmates were 13 times more likely to be sexually assaulted in prison than non-transgender inmates," *id.* at 7 (citation omitted), and that to best protect these particularly vulnerable transgender inmates, CDCR "sometimes remove[s] these inmates from the general population."  *Id.*  Thus, the California Legislature considered the merits of S.B. 132, which aimed in part, "to eliminate the practice of placing transgender inmates in segregated housing units when the inmate does not perceive a risk of violence or victimization if housed in another type of housing, and to require that transgender inmates are housed at a facility consistent with the inmate's gender identity."  *Id.* at 11.

B.  S.B. 132

On September 26, 2020, California Governor Gavin Newsom signed into law, "The Transgender Respect, Agency, and Dignity Act," Cal. S.B. 132 (2020), *codified at* Cal. Penal Code §§ 2605, 2606 [hereinafter, "S.B. 132"].  Penal Code § 2605 requires CDCR officials to "ask each individual entering into the custody of the department to specify all of the following:" (1) their gender identity of male, female, or nonbinary; (2) whether they identify as transgender,

3

nonbinary, or intersex; and (3) their gender pronoun and honorific.  Cal. Penal Code § 2605(a)(1)-(3).[5] CDCR may not discipline an inmate who refuses to answer or who fails to disclose complete information.  *Id.* § (b).  Section 2605 requires CDCR facility staff to "promptly repeat the process of offering the individual an opportunity to specify the gender pronoun and honorific most appropriate for staff to use in reference to that individual[.]" *Id.* § (c).  Finally, section 2605 prohibits "[s]taff, contractors, and volunteers of the department" from "consistently fail[ing] to use the gender pronoun and honorific an individual has specified in all verbal and written communications with or regarding the individual that involve use of a pronoun and honorific." *Id.* § (d).

S.B. 132 added section 2606 to the California Penal Code, which adds in relevant part:

(a)  An individual incarcerated by the Department of Corrections and Rehabilitation who is transgender, nonbinary, or intersex, regardless of anatomy, shall:

(1)  Be addressed in a manner consistent with the incarcerated individual's gender identity.
. . .

(3)  Be housed at a correctional facility designated for men or women based on the individual's preference, including, if eligible, at a residential program for individuals under the jurisdiction of the department . . .

(4)  Have their perception of health and safety given serious consideration in any bed assignment, placement, or programming decision within the facility in which they are housed . . . including, but not limited to, granting single-cell status, housing the individual with another incarcerated person of their choice, or removing the individual or individuals who pose a threat from any location where they may have access to the individual who has expressed a safety concern.  If, pursuant to this paragraph, the individual is not granted an alternative based on their perception of health and safety, the department shall document the reasons for that denial and share them with the individual.

(b)  If the Department of Corrections and Rehabilitation has management or security concerns with an incarcerated individual's search preference . . . or preferred housing placement . . . , the Secretary of the Department of Corrections and Rehabilitation, or the secretary's designee, shall, before denying a search preference or housing the incarcerated individual in a manner contrary to the person's preferred housing placement, certify in

---

[5] The term "gender pronoun" is defined as a person's "third-person singular personal pronoun, such as 'he,' 'she,' or 'they,'" and the term "honorific" is defined as "a form of respectful address typically combined with an individual's surname," such as "mister" ("Mr.") or "miss" ("Ms."). *See* Cal. Penal Code §§ 2605(e)(1)–(2).

**ER-35**

> writing a specific and articulable basis why the department is unable to accommodate that search or housing preference.

Cal. Penal Code. §§ 2606(a)(1)–(3), (b).

> ### C. Plaintiffs' Complaint

Plaintiffs, who are inmates at the Central California Women's Facility, filed the instant Complaint challenging S.B. 132 on several constitutional grounds.  (*See generally* Doc. 1; *id.* at ¶¶ 69–72.)[6]  Plaintiffs complain that S.B. 132 has created unsafe living conditions for cisgender, female inmates because "men commit the vast majority of violent and sexual offenses, [ ] women are disproportionately victimized by male sexual violence," (*id.* at ¶ 5), and "[r]egardless of the self-declared 'gender identity' of individual men or women, women are placed at heightened risk of sexual violence, sexual harassment, and trauma conditions (such as post-traumatic stress disorder) when forced to share housing quarters with men." (*Id.* at ¶ 8.)

Plaintiffs' Complaint alleges that "[b]y requiring women's correctional facilities to become mixed-sex facilities, S.B. 132 places incarcerated women in significantly increased danger of physical and sexual violence, consequences of consensual or nonconsensual sex with men (such as pregnancy and sexually transmitted disease), infringes upon the dignity of women to bodily security and privacy, and removes the rehabilitative benefits that accrue to women in an exclusively-female correctional facility."  (*Id.* at ¶ 12.)  Plaintiffs also allege that "CDCR has been approving transfers of men into women's facilities pursuant to S.B. 132 in a manner not consistent with S.B. 132."  (*Id.* at ¶¶ 36(a)–(d) (list of examples Plaintiffs believe are incorrect applications of S.B. 132).)

> #### i.  *Effects of S.B. 132 on Plaintiffs*

Since the implementation of S.B. 132, Plaintiffs represent that they "have experienced fear, anxiety, depression, and/or post-traumatic stress disorder, as a direct result of now:"

> [S]haring close-quarters housing, showering, dining, and recreation with men; observing that some incarcerated women are now having sexual relations with incarcerated men transferred into CIW and CCWF, creating a risk of pregnancy

---

[6] Plaintiffs also complain about similar conditions allegedly occurring at the California Institution for Women, however, none of the Plaintiffs are currently incarcerated there. (*See* Doc. 1 at ¶¶ 69–72 (all named plaintiffs stating they are housed at CCWF).)

and the health and emotional complications from becoming pregnant while incarcerated, which would not have occurred but for S.B. 132; and observing changes to the environment of women's facilities to become more like men's facilities, to the emotional and psychological detriment of incarcerated women.

(*Id.* at ¶ 42; *see also id.* at ¶ 47 ("[W]omen in CIW and CCWF experience psychological distress, fear, and anxiety at the constant possibility of additional men being house in the women's facilities.").)

Plaintiffs allege that "some incarcerated women sharing a cell with a man, along with other women, now make sleep schedules among the women so that a woman is on watch to try to prevent rape by the male cellmate." (*Id.* at ¶ 43.)  Plaintiffs state that prison staff in these facilities are "now armed with new, stronger pepper spray and riot control measures in anticipation that men are stronger and more violent than women."  (*Id.* at ¶ 44.)  Women's facilities "have procured condoms," "changed contraceptive policy to make them available to all female inmates," and have provided "printed information about pregnancy and sexually transmitted diseases," in anticipation that cisgender and transgender women would be sexually active.  (*Id.* at ¶ 45.)

Plaintiffs also fear that "CCF has considered cutting down the only shade trees in the exercise yard, which also attract birds that the women enjoy and appreciate, because incarcerated men might use the trees as weapons and/or because the trees cause visual blind spots that present security risks;" "numerous women suffered psychological distress at the prospect of having the women's only connection to nature stripped away because of the presence of male offenders." (*Id.* at ¶ 46.)

Furthermore, Plaintiffs complain that "incarcerated women have filed administrative grievances requesting that CDCR stop transferring men into the women's facilities, [but] CDCR has altered the complaining inmate's statements recounted or summarized in the written complaint forms" by changing the gender identity of "men" to "transgender females" or "transgender women," "thereby altering the complaining inmate's own words, perception, and substance of requested corrective action."  (*Id.* at ¶ 48.)

///

6

*ii. Plaintiffs' Specific Injuries*

Nadia Romero, Krystal Gonzalez, Janine Chandler, and Tomiekia Johnson have recounted in their Complaint specific injuries they incurred after the implementation of S.B. 132. (Doc. 1 at 17–18.) Romero is a cisgender, female offender incarcerated at CCWF. (*Id.* at ¶ 69.) She "is a survivor of severe sexual and physical abuse beginning in childhood," "has a history of anxiety, depression, and substance abuse," and claims that "[s]haring a housing unit with men has led to Nadia experiencing panic attacks, insomnia, and self-harm ideation." (*Id.*) Romero filed a grievance detailing an incident where "she was grabbed by a man in her unit," thereby "informing the prison of her heightened risk of rape and violence from male offenders," however the prison referred to the "men" in her unit as "transgender females." (*Id.*) Romero "does not believe that sex is determined by a person's internal identity." (*Id.*) She identifies as a "Catholic whose faith is deeply important to her, and whose religious practice is impaired by being placed in an intimate setting with unrelated [transgender women]." (*Id.*)

Gonzalez is a female offender incarcerated in CCWF. (*Id.* at ¶ 70.) She alleges she was "sexually assaulted by a man transferred to her unit under S.B. 132." (*Id.*) Gonzalez "filed a grievance and requested single-sex housing away from men;" the prison allegedly responded by referring to her assault as perpetrated by a "transgender women with a penis." (*Id.*) Gonzalez "does not believe that women have penises, and she the [sic] psychological distress caused by her assault is exacerbated by the prison's refusal to acknowledge the sex of the perpetrator." (*Id.*)

Chandler is a female offender incarcerated at CCWF. (*Id.* at ¶ 71.) She is an "observant Muslim whose right to privacy and right to exercise her religion are both violated when she is housed in facilities with [transgender women]." (*Id.*) "She is also a survivor of domestic abuse." (*Id.*) Johnson is a female offender incarcerated at CCWF. (*Id.* at ¶ 72.) She "is a survivor of domestic violence." (*Id.*)

## II.   PROCEDURAL HISTORY

Plaintiffs filed their Complaint, requesting declaratory and injunctive relief, permanently enjoining CDCR and Defendants from enforcing and implementing S.B. 132, on the basis that it violates several of Plaintiffs' constitutional rights under the First, Eighth, and Fourteenth

7

Amendments to the United States Constitution, as well as several provisions of the California Constitution.  (*See generally* Doc. 1 at 20–35.)

Before the Court is Defendants' Motion to Dismiss brought under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), attacking, in part, Plaintiffs' basis for establishing Article III standing on their federal constitutional claims.  (*See* Doc. 15-1 at 1–20.) The motion is supported by the Intervenors who also argue that Plaintiffs lack Article III standing.  (Doc. 32 at 18–23.) Plaintiffs oppose the motion.  (Doc. 36.)

### III.     LEGAL STANDARDS

#### A.   Rule 12(b)(1)

"Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'"  *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)); *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005).  As such, "[i]t is to be presumed that a cause lies outside this limited jurisdiction. . . and the burden of establishing the contrary rests upon the party asserting jurisdiction."  *Kokkonen*, 511 U.S. at 377 (internal citations omitted); *Advanced Integrative Med. Sci. Inst., PLLC v. Garland*, 24 F.4th 1249, 1256 (9th Cir. 2022) (same).

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, a party may challenge a claim for relief for lack of subject-matter jurisdiction.  FED. R. CIV. P. 12(b)(1).  It is well-established that Article III "[s]tanding is a constitutional requirement for the exercise of subject matter jurisdiction over disputes in federal court."  *Tailford v. Experian Info. Sols., Inc.*, 26 F.4th 1092, 1099 (9th Cir. 2022) (citing *Spokeo v. Robins*, 578 U.S. 330, 339 (2016)).  Thus, even where the defendant fails to raise or challenge a claim or Complaint for lack of standing, "federal courts have a duty to raise, sua sponte, questions of standing before addressing the merits" of any claim.  *Iten v. Los Angeles*, 81 F.4th 979, 984 (9th Cir. 2023) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)); *Jones v. L.A. Cent. Plaza LLC*, 74 F.4th 1053, 1058 (9th Cir. 2023) ("[A] jurisdictional issue such as Article III standing may be raised *sua sponte* by the court at any time.") (citation omitted); *see also* Fed. R. Civ. P. 12(h)(3) (requiring that "the court must dismiss the action" if it "determines at any time that it lacks

**ER-39**

subject-matter jurisdiction.").

Article III of the Constitution limits the Court's authority to resolving "Cases" or "Controversies." U.S. CONST., art. III, § 2. "The doctrine of standing, among others, implements this limit on [the Court's] authority." *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (internal quotation marks and citation omitted). The Supreme Court "has established that the irreducible constitutional minimum of standing contains three elements that a plaintiff must plead and—ultimately—prove." *Id.* (internal quotation marks and citation omitted). "First, the plaintiff must have suffered an injury in fact that is both concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* (internal quotation marks and citation omitted). "Second, the plaintiff's injury must be fairly traceable to the challenged action of the defendant, meaning that there must be a causal connection between the injury and the conduct complained of." *Id.* (internal quotation marks and citation omitted). "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (internal quotation marks and citation omitted).

"'The party invoking federal jurisdiction bears the burden of establishing' the [three] elements of standing, and 'each element must be supported in the same way as any other manner on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.'" *Meland v. WEBER*, 2 F.4th 838, 843 (9th Cir. 2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). "If at least one plaintiff has standing, the suit may proceed." *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023) (citing *Rumsfeld v. F. for Acad. and Inst. Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006)). "And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430–31 (2021) (parenthetical in original) (citations omitted).

### i. Facial Attack vs. Factual Attack

"Rule 12(b)(1) jurisdictional attacks can be either facial or factual." *San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 65 F.4th 1012, 1028 (9th Cir. 2023) (citation omitted), *cert. denied*, 144 S. Ct. 190 (2023). "In a facial attack, the challenger asserts that the

9

**ER-40**

allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Edison v. United States*, 822 F.3d 510, 517 (9th Cir. 2016) (quoting *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004)). The movant determines whether an attack is facial or factual, such as by introducing evidence outside the pleadings. *Compare San Diego Cnty. Credit Union*, 65 F.4th at 1028 ("CEFCU made the strategic decision to assert a factual jurisdictional attack in its motion to dismiss.") *with Mecinas v. Hobbs*, 30 F.4th 890, 896 (9th Cir. 2022) ("Here, the Secretary's motion was based solely on the allegations in Plaintiffs' amended complaint. It thus did not convert the motion to dismiss into a factual motion.").

B.  Rule 12(b)(6)

Pursuant to Rule 12(b)(6), a defendant may move to dismiss a claim in the plaintiff's complaint if the allegation "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), the plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"At the pleading stage, all allegations of material fact are taken as true and construed in the light most favorable to the non-moving party." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. As such, the plausibility standard is a "context-specific task that requires the reviewing court to [1] draw on its judicial experience and common sense," *Iqbal*, 556 U.S. at 679, and [2] to "'draw all reasonable inferences in favor of the nonmoving party.'" *Boquist v. Courtney*, 32 F.4th 764, 773 (9th Cir. 2022) (quoting *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014)). "Ultimately, dismissal is proper under Rule 12(b)(6) if it appears beyond doubt that the non-movant can prove no set of facts to support its claims." *Boquist*, 32 F.4th at 773–74 (internal

**ER-41**

citation and quotation marks omitted) (cleaned up).

Finally, though resolution of a motion to dismiss under Rule 12(b)(6) is normally confined to the allegations stated in the complaint, the Court "may also 'consider [1] materials that are submitted with and attached to the complaint'; [2] judicial notice of matters of public record'; and [3] unattached evidence on which the complaint necessarily relies if: [a] the complaint refers to the document; [b] the document is central to the plaintiff's claim; and [c] no party questions the authenticity of the document.'" *Beverly Oaks Physicians Surgical Ctr., LLC v. Blue Cross & Blue Shield of Ill.*, 983 F.3d 435, 439 (9th Cir. 2020) (quoting *United States v. Corinthian Colls.*, 655 F.3d 984, 998–99 (9th Cir. 2011)). The Court may review such material without converting a motion to dismiss into a motion for summary judgment. *Harris v. Cnty. of Orange*, 17 F.4th 849, 865 (9th Cir. 2021); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

**IV. DISCUSSION**

A. Motion to Strike (Doc. 38)

In their Opposition to Defendants' Motion to Dismiss, Plaintiffs attached declarations from the named Plaintiffs in this suit (Docs. 36-1–36-3, 36-12), current and former California inmates (Docs. 36-6–36-9, 36-11), two experts (Docs. 36-4, 36-5), and (4) counsel for Plaintiffs (Doc. 36-10). Defendants object to the declarations, asserting that (1) they are "immaterial" and "wholly irrelevant" to the Court's evaluation of the pending motion to dismiss, and (2) that they are extrinsic evidence that the Court may not rely on when evaluating Defendants' motion because they were not attached to Plaintiffs' Complaint nor incorporated by reference in the Complaint. (Doc. 38 at 3–5.)[7]

Plaintiffs argue that Defendants' motion to dismiss "relied upon a substantial amount of extrinsic evidence (314 pages) to factually 'attack' Plaintiffs' standing to pursue claims and to argue that Plaintiffs fail to state claims upon which relief may be granted." (Doc. 41 at 4.) Consequently, they argue that, on this basis, they may introduce evidence too. The extent to which they are correct depends upon the nature of the attack.

*i. Facial Attack*

---

[7] From this point forward, the Court refers to CM/ECF pagination, or, where unavailable, the parties' PDF pages.

**ER-42**

"Ordinarily, a court may look only at the face of the complaint to decide a motion to dismiss." *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002).  There are, of course, three well-known exceptions to this general rule: (1) materials attached to the Complaint; (2) judicial notice of matters of public record; and (3) unattached evidence incorporated into the complaint, for which it necessarily relies.  *Beverly Oaks Physicians*, 983 F.3d at 439 (citation omitted).  This means that when ruling on a 12(b)(6) motion to dismiss, "the Court may not consider any declaration[s] [nor] exhibits that Plaintiff[s] [have] attached to [their] opposition, nor may the Court consider the facts that Plaintiff[s] assert[] in [their] opposition." *Bd. of Trs. of the Bay Area Roofers Health & Welfare Tr. Fund v. Gudgel Yancey Roofing Inc.*, 225 F. Supp. 3d 1106, 1114 (N.D. Cal. 2016) (citation omitted).  This situation changes when a party raises a factual attack for lack of subject-matter jurisdiction under Rule 12(b)(1).  *San Diego Cnty. Credit Union*, 65 F.4th at 1028; *Mecinas*, 30 F.4th at 896.

Defendants bring a facial challenge to Plaintiffs' Eighth Amendment allegations, Free Exercise and Establishment Clause allegations under the First Amendment, and Equal Protection Clause allegations under the Fourteenth Amendment.  (*See* Doc. 15-1 at 6 ("In asserting an Eighth Amendment claim[] the Plaintiffs' *allegations* depend upon five assumptions that are generously described as speculative . . .") (emphasis added); *id.* at 8 ("Plaintiffs also *do not allege* any harm resulting from the *alleged* free exercise and establishment claims.") (emphases added); *id.* at 9 ("Plaintiffs' free exercise and establishment claims *depend upon allegations of harm* shared by the general public that cannot serve as the basis for standing.") (emphasis added); *id.* ("Plaintiffs' equal protection claim *fails to allege* any harm.") (emphasis added).)  In each instance, Defendants attack Plaintiffs' *allegations*, making Defendants' challenges to Plaintiffs' Article III standing *only* a facial attack for these claims.  *Edison*, 822 F.3d at 517 ("In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction.").  Indeed, in each section of their motion, Defendants cite only to paragraphs set forth in Plaintiffs' Complaint. (Doc. 15-1 at 6 (citing Doc. 1 at ¶¶ 42–48 and p. 21:13–17), 8 (citing to Doc. 1 at 10, 22–23), 9 (citing Doc. 1 at 25).)  Thus, the Court will not entertain any evidence as to these claims, except that which is permitted under Rule 12(b)(6).

*ii.  Factual Attack*

As to Plaintiffs' First Amendment free expression claim, Defendants challenge the alleged facts that "CDCR's responses to [their] grievances have referred to transgender inmates differently than identified in the grievance [citation] and then that CDCR has rejected their grievances unless they use the pronouns of transgender inmates." (Doc. 15-1 at 17–18, citing Doc. 1 at 17–18, 22–23).)  Defendants contend that this "claim is demonstrably false," and in support, attach the Declaration of J. Thissen in support of their argument.  (*Id.* at 17–18; Decl. of Thissen, Doc. 15-4.)  Thus, Defendants bring a factual challenge to this claim.  Indeed, footnote three of Defendants' motion acknowledges that regarding this claim, they launch a factual attack on standing.  (Doc. 15-1 at 8 n.3 ("The Court can review extrinsic evidence when evaluating a factual attack on Plaintiffs' standing.") (citation omitted).)

In launching a factual attack on standing, the Ninth Circuit has clearly and explicitly forbidden a review of extrinsic evidence "when the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits of an action." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (internal quotation marks and citation omitted). "The question of jurisdiction and the merits of an action are intertwined where a [federal law] provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief." *Id.* (internal quotation marks and citation omitted); *see also id.* at 1040 ("[T]he jurisdictional issue and substantive issue in this case are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits.").  Thus, a factual attack on standing is appropriate in cases where the defendant argues the plaintiff's federal claim is "immaterial, made solely for the purpose of obtaining federal jurisdiction, or wholly insubstantial and frivolous." *Id.* (internal quotation marks and citation omitted).

As such, Defendants' factual challenge of Plaintiffs' standing regarding their free expression claim is inappropriate for the Court at this time.  Defendants do not challenge that Plaintiffs' alleged free expression injuries are immaterial, or brought solely for the purpose of bringing that claim, but rather challenge the actual *merits* as to whether CDCR rejected and

**ER-44**

altered their internal grievances.  (Doc. 15-1 at 7–8.)  This clearly intertwines the inquiry regarding the Court's jurisdiction for this claim, and the substantive merits of Plaintiffs' free expression claim, and is therefore inappropriate.  Accordingly, the Court will neither review Defendants' Motion to Strike (Doc. 38) nor Plaintiffs' attached declarations to their Opposition in response to Defendants' factual challenge of standing.

Therefore, Defendants' Motion to Strike Plaintiffs' Declarations (Doc. 38), which this Court treats as Objections to Plaintiffs' Declarations, is **DENIED**.  Because Defendant's Motion to File Redacted Exhibits to Thissen Declaration (Doc. 15-6) is a motion regarding documents related to Defendant's factual attack on standing, this motion is **DENIED AS MOOT**.

B.  Defendants' Motion to Dismiss (Doc. 15)

i.  *Redundant Defendants*

Defendants argue that the Court should dismiss defendants Houston, Allison, and Pallares "because their state-entity employer is a named defendant."  (Doc. 15-1 at 26 (capitalizations and emphasis omitted).)  Indeed, the complaint sues each of the defendants in their official capacities while, at the same time, naming the CDCR.  (Doc. 1 at 19-20.)  However, Plaintiffs' only requested relief in this case is for declaratory and injunctive relief, not monetary damages.  (*Id.* at 34–35.)

When a plaintiff sues a state official for monetary damages in her official capacity, it "is not a suit against the official but rather is a suit against the official's office," and "[a]s such, it is no different from a suit against the State itself."  *Will v. Mich. Dep't of State Police*, 591 U.S. 58, 71 (1989) (collecting cases); *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) ("[A] plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself.") (footnote omitted).  A state official sued in their official capacity for injunctive relief is considered a "person" under § 1983 and "official-capacity actions for prospective relief are not treated as actions against the State."  *Will*, 591 U.S. at 71 n.10 (internal quotation marks and citations omitted); *see also Cornel v. Hawaii*, 37 F.4th 527, 531 (9th Cir. 2022) ("[S]tate officials are 'persons' under §1983 when sued for prospective injunctive relief.") (citation omitted).

14

**ER-45**

Accordingly, because Plaintiffs have sued CDCR state officials, Allison, Pallares, and Houston for only prospective relief, in their official capacities, the Court cannot determine that they are redundant defendants.  Defendants' motion is denied on this ground.

### ii.   Abandoned Claims

Defendants argue that "[t]he Eleventh Amendment bars this Court from hearing Plaintiffs' California constitutional claims."  (Doc. 15-1 at 22.)  Defendants request that the Court dismiss Plaintiffs' California constitutional claims against both the state official defendants and the CDCR,[8] citing to *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) and Ninth Circuit authority in support of this proposition.  (*Id.*)  Perhaps recognizing the futility of disagreement, Plaintiffs do not address this portion of the motion.  (*See generally* Doc. 36.)

The Court deems their claims waived as to the California State Constitutional claims.  *See Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 881 (9th Cir. 2022); *Est. of Sumner v. Cal. Dep't of Corr. and Rehab.*, No. 2:22-cv-01638-JAM-DB, 2023 WL 3304233, at *2 (E.D. Cal. May 8, 2023) (holding, in part, that Plaintiff's "failure to address CDCR's Eleventh Amendment argument" constituted waiver of that argument).  This action shall proceed against Defendants based only on Plaintiffs' federal claims.

### iii.   Eleventh Amendment Immunity

Though neither the Defendants nor Intervenors raised Eleventh Amendment immunity regarding Plaintiffs' *federal* causes of action, the Court may *sua sponte* address state sovereign immunity issues, as the doctrine implicates this Court's subject-matter jurisdiction.  *Seminole Tribe v. Florida*, 517 U.S. 44, 54 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States.") (internal quotation marks and citation omitted); *Seven Up Pete Venture v. Schweitzer*, 523 F.3d 948, 952 (9th Cir. 2008) ("The Eleventh

---

[8] Plaintiffs' California constitutional claims do not explicitly state whether they are brought against some or all of the defendants to this action.  (*See generally* Doc. 1 at 26–33 (state constitutional causes of action).)  The Court infers from Defendants' citations and broad language in argument, that Defendants raised Eleventh Amendment immunity for both the state officials and the CDCR.  (*See* Doc. 15-1 at 22 (citing *Vasquez v. Rauckauckas*, 734 F.3d 1025, 1041 (9th Cir. 2013) for the proposition that "state officials" are immune from federal courts instructing them on state law, and *S.B. v. Cal. Dep't of Educ.*, 327 F. Supp. 3d 1218, 1235 (E.D. Cal. 2018)—a case where the Court afforded a state agency and state officials immunity from suit under the Eleventh Amendment).)

**ER-46**

Amendment has been authoritatively construed to deprive federal courts of jurisdiction over suits by private parties against unconsenting States.") (footnote omitted) (citing *Seminole Tribe v. Florida*, 517 U.S. 44, 54 (1996)); *In re Jackson*, 184 F.3d 1046, 1048 (9th Cir. 1999) ("Eleventh Amendment sovereign immunity limits the jurisdiction of the federal courts and can be raised by a party at any time during judicial proceedings or by the court sua sponte.") (citations omitted); *Charley's Taxi Radio Dispatch Corp. v. SIDA of Haw., Inc.*, 810 F.2d 869, 873 n.2 (9th Cir. 1987) ("Like a jurisdictional bar and unlike a traditional immunity, however, the effect of the Eleventh Amendment must be considered *sua sponte* by federal courts.") (citation omitted).

The Eleventh Amendment immunizes states from suit in federal court "by citizens and noncitizens alike," and "extends not just to suits in which the state itself is a named party but also to those against an arm of the state." *Kohn v. State Bar of Cal.*, 87 F.4th 1021, 1025–26 (9th Cir. 2023) (collecting cases) (cleaned up) (internal quotation marks omitted); *e.g.*, *Munoz v. Sup. Ct. of L.A. Cnty.*, 91 F.4th 977, 980 (9th Cir. 2024) (holding Superior Court of State of California immune from suit under the Eleventh Amendment because it is an arm of the state). However, a state "may choose to waive its immunity in federal court at its pleasure," but its waiver and consent "must be unequivocally expressed" and "may not be implied." *Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 65 F.4th 1145, 1148 (9th Cir. 2023) (internal quotation marks and citations omitted); *Doe v. Regents of Univ. of Cal.*, 891 F.3d 1147, 1152–53 (9th Cir. 2018).

As a state agency, it is a long-established principle that the California Department of Corrections and Rehabilitation is immune from suit in federal court under the Eleventh Amendment. *Brown v. Cal. Dep't of Corr.*, 554 F.3d 747, 752 (9th Cir. 2009) ("The district court correctly held that the California Department of Corrections and the California Board of Prison Terms were entitled to Eleventh Amendment immunity.") (citation omitted); *see also Stevenson v. Cal. Dep't of Corr. and Rehab.*, No. 23-55090, 2023 WL 6879351, at *1 (9th Cir. Oct. 18, 2023); *Sands v. Cal. Dep't of Corr. and Rehab.*, 683 F. App'x 559, 559 (9th Cir. 2017) ("The district court properly dismissed Sands' action because the California Department of Corrections and Rehabilitation, as a state agency, is immune from suit under the Eleventh Amendment[.]") (citations omitted); *Est. of Sumner*, 2023 WL 3304233, at *2 ("In turn, the Eleventh Amendment

16

**ER-47**

unequivocally precludes Plaintiffs['] claims against CDCR.").

While not fully briefed by CDCR,[9] the Court cannot conclude that CDCR has unequivocally waived immunity and consented to federal jurisdiction.  Though CDCR has appeared and defended this action through the filing of a motion to dismiss, these actions do not constitute unequivocally expressing a waiver of immunity or consent to suit.  *See, e.g.*, *Demshki v. Monteith*, 255 F.3d 986, 989 (9th Cir. 2001) ("[Plaintiff] also argues that [defendant] waived its Eleventh Amendment immunity by defending the case on the merits and by supposedly failing to raise immunity in a timely manner.  This contention is without merit."); *see also Regents*, 891 F.3d at 1152–53 (noting that defendants' failure to raise Eleventh Amendment immunity on first motion to dismiss did not unequivocally express waiving immunity defense asserted in second motion to dismiss). Accordingly, the Court must **DISMISS** Plaintiffs' action against CDCR on this basis alone.

### iv.  Article III Redressability

On the other hand, the Court notes that Plaintiffs have failed to show that it is "likely, as opposed to merely speculative, that the[ir] injur[ies] will be redressed by a favorable decision." *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023). Plaintiffs have the burden to show that they have Article III standing for each claim pressed and for each of form of requested relief sought. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430–31 (2021); *Meland v. WEBER*, 2 F.4th 838, 843 (9th Cir. 2021).  This requirement does not change in either the declaratory judgment or permanent injunction context.  *See Haaland v. Brackeen*, 599 U.S. 255, 292–93 (2023) (analyzing standing for plaintiffs' requests for declaratory and injunctive relief); *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 407–10 (2013) (analyzing standing for plaintiffs' requests for a declaratory judgment and permanent injunction); *San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 65 F.4th 1012, 1022 (9th Cir. 2023) (Article III standing requirement "is not relaxed in the declaratory judgment context.") (internal quotation marks and citation omitted).

The last element—redressability—"requires that the court be able to afford relief *through*

---

[9] CDCR did, at least in part, raise Eleventh Amendment immunity in the body of its motion.  (*See supra*; Doc. 15-1 at 22.)

17

**ER-48**

*the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power." *Haaland*, 599 U.S. at 294 (emphases in original) (citations omitted). "To establish Article III redressability, the plaintiffs must show that the relief they seek is both (1) substantially likely to redress their injuries; and (2) within the district court's power to award." *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020). "To determine whether an injury is redressable, a court will consider the relationship between the judicial relief requested and the injury suffered." *California v. Texas*, 593 U.S. 659, 671 (2021) (internal quotation marks and citation omitted).

In their Complaint, Plaintiffs have alleged the following injuries:

> (1) Experiencing "fear, anxiety, depression, and/or post-traumatic stress disorder, as a direct result of":
>   a. "[S]haring close-quarters housing, showering, dining, and recreation with [transgender women]";
>   b. Observing that some incarcerated women are having sexual relations with some incarcerated transgender women; and
>   c. "[O]bserving changes to the environment of women's facilities to become more like men's facilities";
>
> (2) "[S]ome incarcerated women . . . now make sleep schedules" to prevent the alleged rape by transgender inmates;[10]
>
> (3) Prison staff are armed with new, stronger pepper spray and riot control measures in anticipation that transgender women are allegedly "stronger and more violent";[11]
> (4) Women's facilities have new contraceptive policies;[12]
>
> (5) CCWF "has considered cutting down the only shade trees in the exercise yard" because transgender women may "use the trees as weapons and/or because the trees cause visual blind spots" that pose security risks. "[N]umerous women suffered psychological distress at the prospect of having [their] only connection to nature stripped

---

[10] As this alleged injury relates only to "some incarcerated women" and not the named Plaintiffs to this lawsuit, this injury is not sufficiently particularized to state a cognizable Article III injury. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) ("For an injury to be 'particularized,' it must affect the plaintiff in a personal and individual way.") (internal quotation marks omitted) (collecting cases).

[11] Similarly, this injury has no relation to the Plaintiffs. Instead, it merely complains about additional alleged burdens incurred by CDCR *staff—not* the Plaintiffs to this suit. *Spokeo*, 578 U.S. at 339. Even if the suggestion is that these more forceful responses will be used against Plaintiffs in the event their conduct gives rise to the need for the use force, officers may only use that amount of force consistent with the Fourth Amendment.

[12] Plaintiffs have failed to allege how this constitutes an alleged injury that is particularized to them, especially because the facilities have "changed contraceptive policy to make them available to *all* females." (Doc. 1 at ¶ 45 (emphasis added).)

18

**ER-49**

away";[13]

    (6) The "statutory directive" imposes cruel and unusual punishment "by subjecting [Plaintiffs] to substantially increased risk of sexual harassment, sexual assault, rape, and physical violence, and to psychological fear of such harms" because there is a "known substantial risk or probability that such violence will occur";[14]

---

[13] "Article III requires a 'certainly impending' injury or, at the very least, a 'substantial risk that the harm will occur[.]" *Lake v. Fontes*, 83 F.4th 1199, 1204 (9th Cir. 2023) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Regarding this allegation that CCWF "has considered cutting down" shade trees, "Plaintiffs simply have not plausibly alleged a 'real and immediate threat of' future injury." *Id.* (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983)). "Such 'some day' intentions" of cutting down shade trees in the exercise yard— "without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that [the Supreme Court's] cases require." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) (emphasis in original).

Furthermore, "[t]he Supreme Court has repeatedly reiterated that . . . allegations of possible future injury are not sufficient." *Cal. Chamber of Com. v. Council for Educ. and Rsch. on Toxics*, 29 F.4th 468, 476 (9th Cir. 2022) (citing *Clapper*, 568 U.S. at 409) (internal quotation marks omitted). Thus, the "prospect" that CDCR may cut down shade trees at women's facilities cannot suffice as a proper Article III injury in fact allegation. *Id.*

[14] On this Eighth Amendment claim, Plaintiffs alleged injuries fail to establish probabilistic standing. *Lake*, 83 F.4th at 1204. The allegation that there is a "substantially increased risk of sexual" harassment and assault, is a conclusion, unsupported by factual allegations. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (disregarding "conclusory allegations" of standing affidavit); *Daniel v. Nat'l Park Serv.*, 891 F.3d 762, 765 (9th Cir. 2018) ("Daniel lacks standing because her complaint makes only conclusory allegations . . ."); *Carrico v. City and Cnty. of S.F.*, 656 F.3d 1002, 1006 (9th Cir. 2011) ("This conclusory allegation is insufficient to establish standing.") (citation omitted). The Court therefore gives no weight to Plaintiffs' Eighth Amendment allegations of alleged future harm of rape and assault. *Daniel*, 891 F.3d at 767 (holding threadbare and "naked assertions fail our edict that a plaintiff may not rely on a bare legal conclusion to assert injury-in-fact[.]") (internal quotation marks and citation omitted).

Also, Plaintiffs may not base their claim for injunctive relief on past harms of alleged rape and assault without more. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 680–81 (9th Cir. 2023) ("To bring a claim for prospective injunctive relief, the plaintiff must demonstrate that he has suffered or is threatened with a concrete and particularized legal harm, coupled with *a sufficient likelihood* that he will again be wronged in a similar way.") (emphasis added) (internal quotation marks and citation omitted). Plaintiffs have not tied their past harms to a written policy, *id.*, nor expressed that the harms of rape and assault are *ongoing* to each or any plaintiff. *Phillips v. U.S. Customs and Border Prot.*, 74 F.4th 986, 991 (9th Cir. 2023).

The ongoing nature of such harassment, assault, and violence is necessary, particularly to Plaintiffs' claims against state officials to fall under the *Ex parte Young* exception. *Va. Off. for Prot. and Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) ("[I]n determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.") (internal quotation marks and citation omitted); *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 80 F.4th 943, 955 (9th Cir. 2023) ("*Ex Parte Young* allows suits seeking prospective relief against a state official who has a fairly direct connection to an ongoing violation of federal law.") (internal quotation marks and citations omitted).

Finally, this allegation—on its face—does not contest the alleged unlawful activity of *Defendant CDCR*, but instead, surmises about the independent conduct of third parties—incarcerated transgender women. "[W]here a causal relation between injury and challenged action depends upon the decision of an independent third party . . . standing is not precluded, but it is ordinarily substantially more difficult to establish." *California v. Texas*, 593 U.S. 659, 675 (2021) (cleaned up) (internal quotation marks and citations omitted). "To satisfy that burden, the plaintiff must show at the least that third parties will likely react in predictable ways," *id.* (internal quotation marks and citation omitted), and "that the injury was not the result of the *independent* action of some third party," but that "the government's

**ER-50**

(7) Plaintiffs have filed administrative grievances requesting CDCR stop transferring transgender women into their facilities, but CDCR has allegedly altered their statements by changing the gender identity of "men" to "transgender females" or "transgender women";

(8) S.B. 132 allegedly compels CDCR inmates to use transgender inmates' preferred gender pronouns;[15]

unlawful conduct is *at least a substantial factor motivating the third parties' actions*." *Mendia v. Garcia*, 768 F.3d 1009, 1013 (9th Cir. 2014) (first emphasis in original, second emphasis added).

Plaintiffs cannot plausibly allege that CDCR has *motivated*—nor is currently motivating—incarcerated, transgender individuals to sexually harass and assault Plaintiffs, nor that CDCR is substantially likely to motivate these individuals in the future. Such an allegation is not only absent in Plaintiffs' Complaint but is untethered from S.B. 132. This claim therefore also fails on Article III traceability grounds.

[15] Here, because Defendants factually attack Plaintiffs' free expression claim, the Court may review the standing declarations brought by Romero, Johnson, and Gonzalez, as discussed in the section denying Defendants' Motion to Strike above. Only Tomiekia Johnson's declaration pertains to Plaintiffs' free expression claim, wherein she states that: "It is my understanding that because of my work for CDCR as an inmate, that I fall under SB 132's requirements to use so-called 'preferred pronouns.' Requiring me to call men 'she or her' violates my right to use common sense language to describe what I see and to speak freely about the problems I see happening from housing men with women." (Ex. C, Johnson Decl., Doc. 36-3 at ¶ 9.)

First, Plaintiffs have failed to establish that merely working during their imprisonment means that they are bound by the requirements of Penal Code section 2606. Indeed, such a conclusion leads to absurd results. For example, they are not entitled to determine the housing of inmates, to search them, to evaluate their health needs or determine their management or security needs. Thus, the suggestion that complying with Penal Code section 2700, which "requires every able-bodied prisoner imprisoned in any state prison" to work entitles the inmates to the privileges or imposes on them the obligations of the regulations imposed on the CDCR and its employees is unsupported by law or factual allegations, rather than mere conclusions or suppositions.

In any event, it is well-established that "[t]he self-censorship door to standing does not open for every plaintiff," *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003), and "self-censorship alone is insufficient to show injury." *Lopez*, 630 F.3d at 792 (citations omitted). "Mere allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Id.* (cleaned up) (internal quotation marks and citation omitted). Instead, the Court's inquiry focuses on "the credibility of the threat that the challenged law will be enforced against" the plaintiff. *Id.* (citation omitted).

"Where a plaintiff has refrained from engaging in expressive activity for fear of prosecution under the challenged [regulation], such self-censorship is a constitutionally sufficient injury as long as it is based on an actual and well-founded fear that the challenged statute will be enforced." *Porter v. Martinez*, 68 F.4th 429, 437 (9th Cir. 2023). In assessing a claimed threat of enforcement, the Court looks to three factors: "(1) whether the plaintiffs have articulated a 'concrete plan' to violate the law in question, (2) whether the prosecuting authorities have communicated a specific warning or threat to initiate enforcement proceedings, and (3) the history of past prosecution or enforcement under the challenged [regulation]." *Id.* (cleaned up) (footnote and citation omitted). "Bare allegations that a plaintiff's speech has been chilled by the challenged statute are insufficient to establish a reasonable fear of prosecution." *Wolfson v. Brammer*, 616 F.3d 1045, 1062 (9th Cir. 2010) (citation omitted).

The difficulty in assessing Johnson's alleged self-censorship injury lies in the fact that she has not alleged nor declared that CDCR has in fact compelled her speech, nor threatens to do so. Furthermore, while Plaintiffs' Complaint alleges that Plaintiffs "are all compelled by S.B. 132 to use words and language in a manner that suggests adherence to beliefs the speaker may not share," (Doc. 1 at ¶ 115), the Court may disregard allegations contradicted by Johnson's own declaration. *Sprewell v. Golden Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

Thus, it appears that Plaintiffs lack a "concrete plan" to make the same or similar remarks regarding gender pronouns

ER-51

(9) S.B. 132 has violated the Establishment Clause of the First Amendment "by requiring prison housing placements between men's and women's facilities to be made," and by imposing a "faith-based belief system," which "compel[s] [Plaintiffs] to profess adherence";[16]

(10) Romero and Chandler both allege their rights to religious exercise are violated by sharing housing with transgender women; and

(11) "S.B. 132 [ ] treats inmates differently on the basis of 'gender identity' or 'transgender status' causing disadvantage to inmates who have no 'gender identity' or whose 'gender identity' is not one of the identities favored under the statute," in alleged violation of the Equal Protection Clause. This is because "S.B. 132 converts women's correctional facilities into mixed-sex facilities, with no corresponding conversion of men's facilities, imposing on women on the basis of sex a significant disadvantage and burden in the form of serving prison time without the benefit of rehabilitating in a single-sex environment."[17]

---

and identity in the future, CDCR has not allegedly compelled Johnson's speech, nor punished her for restraining from using inmates' preferred gender pronouns, Johnson has not expressed that she intends to violate the law, CDCR has not threatened punishment, and Plaintiffs have not provided "the enforcement history of [S.B. 132] [to] corroborate[] a genuine threat." *Wolfson*, 616 F.3d at 1062 (citation omitted). Like *Wolfson*, then, Johnson "can have no well-founded fear that [s]he will be prosecuted for violating" S.B. 132. *Id.* at 1063.

[16] Plaintiffs complain that S.B. 132 incorporates in the definition of "transgender," those who identify as "two-spirit and mahu." (Doc. 1 at ¶ 23.) However, Plaintiffs also complain that S.B. 132 "does not define 'men,' 'women,' 'male,' 'female,' 'gender,' or 'gender identity,' yet uses all of those terms in tautological attempts to define other terms such as 'transgender[.]'" (Doc. 1 at ¶ 22.) To the contrary, the basis of Plaintiffs' Complaint is *not* the text of S.B. 132, but instead, the California Legislative Counsel's Digest. *See* CAL. LEGIS. COUNSEL'S DIGEST, 2020 Cal. Legis. Serv. Ch. 182 (S.B. 132) (Cal. Sept. 26, 2020).

To begin, it is now well-established that a plaintiff may not complain about a government-sponsored event or law that contains a religious theme. *City of Ocala v. Rojas*, 143 S. Ct. 764, 764 (2023) (Gorsuch, J.) *in approval of denying cert.* ("This Court has never endorsed the notion that an 'offended observer' may bring an Establishment Clause claim."); *id.* at 765 ("Moving forward, I expect lower courts will recognize that offended observer standing has no more foundation in the law than the *Lemon* test that inspired it."); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535 (2022) ("Nor does the Clause compel the government to purge from the public sphere anything an objective observer could reasonably infer endorses or partakes of the religious.") (internal quotation marks and citation omitted). At least one Justice views the "offended observer" injury as a part of Article III standing. *Rojas*, 143 S. Ct. at 764–65.

Thus, Plaintiffs cannot complain that S.B. 132's legislative history took into account "two-spirit" and "mahu" individuals because it makes them uncomfortable. And, as a matter of law, the Court cannot plausibly determine that transgenderism is a religion, *Edmo v. Corizon, Inc.* 935 F.3d 757, 768 (9th Cir. 2020), nor have Plaintiffs alleged that "two spirit" and "mahu" are religions. (Doc. 1 at ¶ 23.) Therefore, as a matter of both subject-matter jurisdiction, and for the purposes of plausibly alleging a claim, this injury and cause of action have no merit.

[17] Like many of Plaintiffs' aforementioned allegations, this allegation rests on the alleged unlawfulness of S.B. 132 *itself*, and not on the alleged unlawful conduct performed by *Defendant*. *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) ("Second, the plaintiff's injury must *be fairly traceable to the challenged action of the defendant*, meaning that there must be a causal connection between the injury *and the conduct complained of*.") (emphases added); *O'Handley v. Weber*, 62 F.4th 1145, 1161 (9th Cir. 2023) (alleged injury must be "fairly traceable *to the challenged conduct* of the defendant") (emphasis added).

**ER-52**

(Doc. 1 at ¶¶ 4, 42–48, 69–72, 82–84, 90, 95, 100, 103.)

For each federal constitutional claim, Plaintiffs request a declaratory judgment that S.B. 132 violates the Eighth, First, and Fourteenth Amendments to the U.S. Constitution. (Doc. 1 at 20–26.) Plaintiffs also request the Court issue a permanent injunction to "enjoin[] Defendants from enforcing or implementing S.B. 132." (*Id.* at ¶ 141.) In their opposition to the motion to dismiss, Plaintiffs state that their injuries are redressable via "restoring pre-SB 132 status quo[.]" (Doc. 36 at 15 (parentheticals omitted).) Similarly, in their opposition to the motion to strike, Plaintiffs reiterate that their injuries would be redressed through their "requested relief" of "return[ing] to status quo prior to SB 132, where male inmates were housed in women's prisons only on a case-by-case basis involving objective factors relevant to women's safety, which factors are 'off the table' under SB 132." (Doc. 41 at 7.)

There are several issues plaguing the Court's ability to redress Plaintiffs' grievances. To begin, the Court's issuance of a declaration that the government is violating the Constitution "alone is not substantially likely to mitigate the plaintiffs' asserted concrete injuries. A declaration, although undoubtedly likely to benefit the plaintiffs psychologically, is unlikely by itself to remediate their alleged injuries absent further court action." *Juliana*, 947 F.3d at 1170 (citations omitted); *see also Haaland*, 599 U.S. at 294 ("It is a federal court's judgment, not its opinion, that remedies an injury; thus it is the judgment, not the opinion, that demonstrates redressability."). The crux of Plaintiffs' requested remedy is a permanent injunction enjoining CDCR and its officials from further implementing and enforcing S.B. 132—*i.e.*, prohibiting CDCR staff and inmates from addressing incarcerated individuals who are "transgender,

---

Regardless, Plaintiffs still fail to adequately allege an equal protection injury. S.B. 132, Cal. Penal Code § 2606(a) allows "individual[s] incarcerated by [CDCR] who [are] transgender, nonbinary, or intersex, regardless of anatomy, shall . . . [to] [b]e housed at a correctional facility designated for men or women based on the individual's preference[.]" Cal. Penal Code § 2606(a)(3). While "[u]neven enforcement can pose an equal protection issue," *O'Handley*, 62 F.4th at 1164 (citation omitted), the crux of Plaintiffs' alleged equal protection injuries—that cisgender, male correctional facilities have not received as many transgender inmates as women's facilities—does not plausibly allege an equal protection injury incurred *at the hands of CDCR*. Not only is this absent in Plaintiffs' Complaint for the purposes of standing, but as a matter of law, it is also implausible when the plain text of S.B. 132 places that decision at the hands of inmates themselves—*not* the Government. That the law is "susceptible to uneven enforcement" is insufficient to confer standing. *Kumar v. Koester*, No. 2:22-cv-07550-RGK-MAA, 2023 WL 4781492, at *3 (C.D. Cal. July 25, 2023) (awaiting publication).

ER-53

nonbinary, or intersex . . . in a manner consistent with the incarcerated individual's gender identity," and prohibiting CDCR from housing such individuals in correctional facilities based on their preference.  Cal. Penal Code §§ 2606(a)(1), (3).

There are two fatal flaws concerning this requested injunction.  First, it would require the Court to order CDCR officials to identify, locate, and remove potentially over two dozen[18] transgender, intersex, and nonbinary individuals from California prisons (Doc. 1 at ¶ 39). Not only is it "beyond the power of an Article III court to order, design, supervise, or implement the plaintiffs' [suggested] remedial plan," which would inevitably "require a host of complex policy decisions entrusted, for better or worse, to the wisdom and discretion of the executive and legislative branches," *Juliana*, 947 F.3d at 1171, but this is also not what Plaintiffs' Complaint requests.  They request the Court enjoin CDCR and its officials from *further* enforcing or implementing S.B. 132.  (*See* Doc. 1 at ¶ 141.)  Even if the Court granted this relief, it would only stop further inflow of gender-nonconforming incarcerated individuals; those who CDCR has already housed in CCWF would remain.  (Doc. 32 at 18 ("An injunction against implementing the specific policy contained in SB 132 would do nothing to change CDCR's obligations to maintain a similar policy . . . and thus would do nothing to remedy Plaintiff[s'] alleged injuries.").)

Moreover, the Court is not convinced that life in these prisons "pre-SB 132" would redress Plaintiffs' complaints.  As Plaintiffs admit, California Code of Regulations, Title 15, § 3269 (2017) allowed transgender inmates and inmates with symptoms of gender dysphoria to be referred to a classification committee for a determination of appropriate housing at a designated institution.  CAL. CODE REGS. tit. 15, § 3269(g) (2017); (Doc. 41 at 7.)  This regulation existed at least three years prior to the enactment of S.B. 132 and allowed for transgender inmates to be housed with cisgender, female inmates.  *Id.* at §§ 3269(g), 3375(b) (2017).

In other words, the remedial scheme laid out in §§ 3269(g) and 3375(b)[19] directly

---

[18] At the time Plaintiffs filed their opposition brief, they represented that there were at least two dozen of such transfers into CIW and CCWF.  (Doc. 1 at ¶ 39.)  In their Opposition, however, Plaintiffs represent that there are at least 300 of such individuals housed in women's correctional facilities.  (Doc. 36 at 26.)  Regardless, the number of incarcerated gender non-conforming individuals is certainly high.

[19] Now located at CAL. CODE REGS. tit. 15, § 3269(h) (2022–23) and § 3375, respectively.

**ER-54**

undermines Plaintiffs' arguments that by restoring California's women's correctional facilities to their housing arrangements pre-S.B. 132, cisgender and transgender inmates would live in separate housing facilities. Indeed, Plaintiffs do not seek to enjoin *these* provisions of the California Code of Regulations, and such regulations would still exist if the Court issued Plaintiffs their requested injunction. Thus, Defendants correctly point out that "regardless of the outcome of this suit, transgender women will continue to be housed in women's facilities." (Doc. 15-1 at 19.)

Furthermore, it is entirely unclear how either a declaration or permanent injunction would redress Plaintiffs complaint regarding CDCR's alleged responses to their administrative grievances. Even if the Court granted Plaintiffs' request for a declaration and injunction, the Court lacks power to oversee and prohibit CDCR officials, staff, or even Plaintiffs from referring to gender-nonconforming individuals by their preferred gender identity, if they so choose. *Juliana*, 947 F.3d at 1171–72.[20] "[E]ven under such a scenario, the plaintiffs' request for a remedial plan would subsequently require the judiciary to pass judgment on the sufficiency of the government's response to the order, which necessarily would entail a broad range of policymaking. And inevitably, this kind of plan will demand action not only by the Executive, but also by Congress." *Id.* at 1172.

Accordingly, the Court determines that it cannot likely redress Plaintiffs' asserted injuries, even in the face of a favorable outcome. Such requested relief exceeds the power of an Article III court, invades the province of the other branches of government, and in the face of pre-existing California Code of Regulations provisions, would not guarantee that gender non-conforming individuals live separate and apart from cisgender, female inmates, as Plaintiffs request. Also, CDCR staff, Plaintiffs, and other prisoners may still choose to call such individuals by their preferred gender pronouns, honorifics, and gender identities.[21] For this reason, in addition to

[20] Alternatively, the Court *could* enjoin CDCR officials from requiring inmates refer to each other by their preferred gender pronouns, but as footnote 15 explains, Plaintiffs have not proffered a ripe injury of self-censorship.

[21] Indeed, such a ruling from this Court could constitute a prior restraint on speech. *Twitter, Inc. v. Garland*, 61 F.4th 686, 702–03 (9th Cir. 2023) ("In First Amendment law, a prior restraint is an order forbidding certain communications when issued in advance of the time that such communications are occur.") (internal quotation marks

issues of abandonment and immunity, the Court must **GRANT** Defendants' motion to dismiss. Defendants' Request for Judicial Notice (Doc. 15-2) is accordingly **DENIED AS MOOT**.

*v.   42 U.S.C. § 1983*

Finally, the Court notes that it must grant Defendants' motion to dismiss for failure to state a claim because Plaintiffs have failed to bring their claims pursuant to 42 U.S.C. § 1983. (*See generally* Doc. 1.) As recited throughout this order, Plaintiffs are state prisoners who have sued state officials and a state agency *directly* for alleged federal and state constitutional violations.  In *Nettles v. Grounds*, 830 F.3d 922, 927 (9th Cir. 2016), however, the Ninth Circuit held "that a § 1983 action *is the exclusive vehicle* for claims brought by state prisoners that are not within the core of habeas corpus."  (emphasis added); *id.* at 930 ("§ 1983 is the exclusive remedy for state prisoner claims that do not lie at the core of habeas."). By failing to bring their constitutional claims against Defendants pursuant to 42 U.S.C. § 1983, Plaintiffs have improperly brought this civil rights action.  This serves as yet another basis to grant Defendants' motion.

C.   Leave to Amend

Courts have broad discretion to grant leave to amend a complaint.  *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 420 (9th Cir. 2020).  In determining whether a plaintiff should be granted leave to amend, courts consider "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment."  *Kroessler v. CVS Health Corp.*, 977 F.3d 803, 814–15 (9th Cir. 2020) (internal quotation marks and citation omitted).  Generally, Rule 15 advises that "[t]he court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Indeed, "[i]t is the black-letter law that a district court must give plaintiffs at least one chance to amend a deficient complaint," unless there is "a clear showing that amendment would be futile."  *Barke v. Banks*, 25 F.4th 714, 721 (9th Cir. 2022) (internal quotation marks and citation omitted).

Granting leave to amend is futile, however, when the defendant enjoys sovereign

---

and citation omitted).  "[T]he government usually may not impose [such] prior restraints on speech," *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (citation omitted), as all restraints on speech are presumptively unconstitutional.  *Twitter*, 61 F.4th at 703.

**ER-56**

immunity. *See Ctr. for Biological Diversity v. U.S. Forest Serv.*, 80 F.4th 943, 955–56 (9th Cir. 2023) ("As the *Ex parte Young* exception does not apply, any amendment would be futile."); *Portnoy v. California*, 821 F. App'x 848, 848 (9th Cir. 2020) (amendment affirmed as futile because defendant enjoyed Eleventh Amendment immunity). Similarly, amendment is futile when the Court cannot redress Plaintiff's claims. *See Temple of 1001 Buddhas v. City of Fremont*, 588 F. Supp. 3d 1010, 1020 (N.D. Cal. 2022) (denying leave to amend claims where Plaintiff's injury was not redressable); *see also Huang v. Small Bus. Admin.*, No. 22-cv-03363-BLF, 2023 WL 3028087, at *5 (N.D. Cal. Apr. 19, 2023) (denying leave to amend, in part, because of "the fact that the lack of redressability could not be cured"). For claims that the plaintiff may redress, the Court must grant the plaintiff leave to amend if it dismisses the first complaint for lack of Article III standing. *Bolden-Harge v. Office of Cal. State Controller*, 63 F.4th 1215, 1221 n.1 (9th Cir. 2023).

Here, the Court determines not only that CDCR enjoys immunity under the Eleventh Amendment, but also that most of Plaintiffs' claims are not redressable under the bounds of Article III. As such, the Court **DENIES** Plaintiffs leave to amend their Complaint against CDCR, and for claims that the Court cannot redress. In light of this opinion, Plaintiffs may file an amended Complaint against only the state official defendants.

**VI.     CONCLUSION**

Based upon the foregoing, the Court **ORDERS**:

(1)     Defendants' Motion to Strike Plaintiffs' Declarations (Doc. 38), which the Court treats as an Objection to Plaintiffs' Exhibits, is **DENIED**.

(2)     Defendants' Motion to File Redacted Exhibits to Thissen Declaration (Doc. 15-6) is **DENIED AS MOOT**.

(3)     Defendants' Motion to Dismiss (Doc. 15) is **GRANTED with leave to amend** as to only the individual defendants and **without leave to amend** as to the California Department of Corrections and Rehabilitations.

(4)     Defendants' Request for Judicial Notice of Matters and Records in Support of Motion to Dismiss (Doc. 15-2) is **DENIED AS MOOT**.

26

(5)   **Within 21 days**, Plaintiffs may file an amended complaint or a notice of dismissal. Failure to timely file either document will result in dismissal of Plaintiffs' case with prejudice pursuant to Rule 41(b).[22]

IT IS SO ORDERED.

Dated:   **May 14, 2024**

UNITED STATES DISTRICT JUDGE

---

[22] *See Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1063–65 (9th Cir. 2004) (stating that a plaintiff's failure to take any action in response to a court's ultimatum to the plaintiff to either amend their complaint or to indicate to the court that it will not do so "is properly met with the sanction of a Rule 41(b) dismissal").

Candice Jackson (SBN 224648)
**FREEMAN MATHIS & GARY, LLP**
1010 B Street, Suite 300
San Rafael, California 94901
cjackson@fmglaw.com
Telephone:   415.352.6434

Lauren Adams (Wisconsin Bar No. 1095653)
(*Pro Hac Vice* forthcoming)
WOMEN'S LIBERATION FRONT
1802 Vernon St.  NW, #2036
Washington, DC  20009
Telephone:  202.964.1127
legal@womensliberationfront.org

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA (FRESNO DIVISION)

| | |
|---|---|
| JANINE CHANDLER; KRYSTAL GONZALEZ; TOMIEKIA JOHNSON; NADIA ROMERO, individuals; and WOMAN II WOMAN, a California non-profit corporation,<br><br>Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION; KATHLEEN ALLISON, Secretary of the California Department of Corrections and Rehabilitation, in her official capacity; MICHAEL PALLARES, Warden, in his official capacity; MONA D. HOUSTON, Warden, in her official capacity; and DOES 1-10, inclusive,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## NATURE OF THE ACTION

1.    This case challenges California Penal Code §§ 2605, 2606, sections added to the Penal Code by S.B. 132, an act titled "The Transgender Respect, Agency, and Dignity Act" (herein, "S.B. 132") on the ground that S.B. 132 cannot be applied in any manner that avoids violating the

1

federal and state constitutional rights of Plaintiffs, who are women incarcerated in one of California's women's correctional facilities, and a non-profit organization run by formerly and currently incarcerated women to advocate for justice-involved women, including women currently incarcerated in California. S.B. 132 became effective on January 1, 2021.

2.    S.B. 132 (at Cal. Pen. Code § 2606(a)(3)) acknowledges that in California, correctional facilities are designated either for men, or for women. However, S.B. 132 requires Defendant California Department of Corrections and Rehabilitation ("CDCR") to (1) ask each individual entering CDCR custody the individual's "gender identity of female, male, or nonbinary" and ask "Whether the individual identifies as transgender, nonbinary, or intersex" (Cal. Pen. Code § 2605(a)(1)-(2)) and then requires Defendant CDCR to (among other things) house the individual "at a correctional facility designated for men or women based on the individual's preference[.]" Cal. Pen. Code § 2606(a)(3).

3.    S.B. 132 limits Defendant CDCR's ability to deny an individual's "preferred housing placement" only to situations where CDCR "has management or security concerns with an incarcerated individual's…preferred housing placement preference" and certifies "in writing a specific and articulable basis why the department is unable to accommodate that…housing preference" and CDCR "shall not deny…a housing placement…based on any discriminatory reason, including, but not limited to…The anatomy, including, but not limited to, the genitalia or other physical characteristics, of the incarcerated person" or the "sexual orientation of the incarcerated person" or for "a factor present among other people incarcerated at the preferred type of facility." Cal. Pen. Code § 2606(b)-(c).

4.    There is no application of S.B. 132 that avoids violating the constitutional rights of the individual Plaintiffs, and the other incarcerated women on whose behalf Plaintiff Woman II Woman advocates, which include the rights of incarcerated women:

    a.  to be protected from known, elevated risks of the consequences of sex with men (such as pregnancy and sexually transmitted diseases),

    b.  to be protected from known, elevated risks of being raped and sexually assaulted by men,

2
**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**    **ER-60**

c.  to be protected from known, elevated risks of being sexually harassed by men;

d.  to privacy and dignity by not being compelled to sleep, shower, or otherwise be naked in the presence of (or exposed to the naked bodies of) incarcerated men;

e.  to equal protection of the laws in the form of opportunity for rehabilitation in a single-sex environment comparable to the single-sex environment provided for men;

f.  to equal protection of law in the form of as much deference and "serious consideration" given to the "preferences" and "perceptions" of a female prisoner *without any gender identity* about her housing placement, single-cell occupancy, choice of cellmate, and removal of incarcerated persons whom the woman believes to be a threat, as S.B. 132 (Cal. Pen. Code § 2606(a)(4)) requires be given to any incarcerated individual who does claim to have a gender identity;

g.  not to be compelled, coerced, or pressured into using speech that reflects a belief to which a woman does not subscribe (whether as a matter of contrary religious belief, personal or philosophical belief, or scientific understanding), in the form of pronouns that are self-selected by a person claiming a gender identity, but which pronouns depart from the sex-based indicator function of a pronoun and thus imply that the speaker believes an individual's sex to be whatever the individual's "personal pronoun" indicates;

h.  to practice, and not be forced to violate, a woman's sincerely-held religious beliefs that forbid her from living with a man other than a husband or family member, undressing in front of, being naked in the presence of, or being in the presence of the naked body of, a man other than a husband or family member.

5.  In both the general population, and the offender population, men commit the vast majority of violent and sexual offenses, and women are disproportionately victimized by male sexual violence.

6.  Women comprise less than ten percent of the California prison population. The only women's correctional facilities in California are overcrowded, at more than 150% above-capacity,

3

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**    **ER-61**

meaning for instance that eight women share a small room (cell) designed to accommodate four people.

7.    A significant proportion of incarcerated women have been subjected to domestic violence, sexual abuse, and sexual harassment throughout their lifetimes, perpetrated by men on the basis of sex, and many incarcerated women suffer from traumatic brain injury as a result of male-perpetrated violence against them, and the vast majority of female offenders suffer from physical or emotional trauma upon entry into the prison system.

8.    Male patterns of violence and sexual offending are not lower in the subset of men who claim a "gender identity of female" than in the overall population of men. Regardless of a man's declared "gender identity," men remain more likely to intimidate, overpower, harass, abuse, and violate women's safety and dignity than any such risk posed by women toward men. Regardless of the self-declared "gender identity" of individual men or women, women are placed at heightened risk of sexual violence, sexual harassment, and trauma conditions (such as post-traumatic stress disorder) when forced to share housing quarters with men.

9.    The rehabilitative environment created by an exclusively female prison population differs greatly from the environment created by an exclusively male prison population. Incarcerated women are much more likely than incarcerated men to be serving sentences for non-violent offenses and to be mothers motivated to earn release due to desire to reunite with children. Incarcerated women are far less likely to behave violently in prison than men, and the security measures and protocols utilized by CDCR therefore differ significantly in women's correctional facilities than in men's correctional facilities.

10.    Decades of research has demonstrated that female offenders fare best in rehabilitative environments away from men. Female-only prison spaces have consistently been shown to be effective, and cost-effective, penological methods of enabling female offenders to work through the complex issues involved in their offending and have the best chance of rehabilitation, release, and assimilation into society. Nearly all states, including California, have long concluded that separate correctional facilities for female offenders best serves the interests of women and of the state. The United Nations Standard Minimum Rules for the Treatment of Prisoners states that

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF    ER-62**

men and women shall so far as possible be detained in separated facilities (Rule 11).

11.    Women's correctional facilities involve minimal privacy for inmates, who live together in close proximity, sharing shower and toilet facilities and communal areas, and sleeping in very close quarters. Incarcerated women have little to no choice over whom they share their spaces with and little to no physical privacy from other inmates.

12.    By requiring women's correctional facilities to become mixed-sex facilities, S.B. 132 places incarcerated women in significantly increased danger of physical and sexual violence, consequences of consensual or nonconsensual sex with men (such as pregnancy and sexually transmitted disease), infringes upon the dignity of women to bodily security and privacy, and removes the rehabilitative benefits that accrue to women in an exclusively-female correctional facility. However, these negative consequences do not also fall upon men in men's correctional facilities because few incarcerated women (even women who claim a transgender or nonbinary identity) desire to be housed in a men's facility, and because women (regardless of any claimed identity) do not pose a threat of violence (or the consequence of pregnancy following sex) to men.

13.    S.B. 132 imposes these violations and harms upon incarcerated women for the stated purpose of avoiding the harms of "sexual abuse and sexual harassment" to "transgender women" and of "sexual and gender-based violence, harassment, and discrimination" to "transgender men." Stats 2020 ch 182 § 4 (SB 132), Sec. 2(a), 2(d). S.B. 132 states that "Regardless of the ways in which a person chooses or is able to express their gender or to take medical, social, or legal transitions steps, they deserve respect, agency, and dignity." *Id.* at Sec. 2(j).

14.    It is not constitutionally permissible to seek to avoid violating the rights of one protected class by deliberately transferring the risk of the same (and additional) types of violations of rights onto another protected class, nor is it permissible to purport to uphold the dignity of one class by inflicting indignities onto another.

15.    S.B. 132 expressly seeks to protect the "agency" and "dignity" of inmates who identify into a category labeled "transgender, nonbinary, or intersex" but does so by removing the agency and dignity of inmates who belong to (not by self-identity, but by virtue of material fact) the category "women," who are disproportionately subjected to violence, harassment, and

5

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF    ER-63

discrimination on the basis of belonging in the class of humans who are of the female sex, and such harms are inflicted upon women overwhelmingly by men (humans of the male sex).

16.    If both women, and a subset of men (those who self-identify as "transgender, nonbinary, or intersex") are at increased risk of harm from being housed with men, the solution cannot be to lower the vulnerability of that subset of men by increasing the vulnerability of women.

17.    Under S.B. 132, any man who claims a "transgender, nonbinary, or intersex" "identity" may state his "housing preference" for a women's facility and that preference must be granted unless CDCR can certify a "specific and articulable basis" for denying his housing preference, without relying on the factual bases that explain why men are a danger when housed with vulnerable women. That is, men's anatomy, genitalia, physical characteristics, and physiology all differentiate men as a class from women as a class and directly impact the fact that women suffer violence and subjugation imposed by men on the basis of sex – yet S.B. 132 expressly forbids taking men's physiology into account when CDCR considers whether to deny a man transfer to a women's facility due to "management or security concerns."

18.    Further, because S.B. 132 forbids CDCR from denying a man's housing preference based on, *inter alia*, "sexual orientation" without defining that term (Cal. Pen. Code § 2606(b)-(c)), S.B. 132 prevents CDCR from taking into account the probability of harm to women's safety and dignity by housing with women male offenders with paraphilias such as transvestic fetishism, autogynephilia, pedophilia, or other paraphilias that some consider to be sexual "orientations." but that present inherent risks of sexual offenses against women.

19.    By specifically forbidding CDCR from relying on "discriminatory" reasons to justify refusal to accommodate an inmate's housing preference, with discriminatory defined to include "a factor present among other people incarcerated at the preferred type of facility" (Cal. Pen. Code § 2606(b)-(c)), SB 132 precludes CDCR from refusing men's housing preference based on, *inter alia*, an inmate's mental illness, or conviction history, regardless of whether such factors may indicate a specific, articulable reason why an individual inmate poses a particular threat to women.

20.    S.B. 132 effectively eliminates women-only correctional facilities in California,

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**    **ER-64**

leaving incarcerated women at unnecessarily increased risk of physical and sexual violence and reduced opportunity for rehabilitation. Because few women desire to be housed in a men's facility, while hundreds and potentially thousands of men desire to be housed with women, the result of S.B. 132 is to transform the California prison system from being sex-separated with facilities for men, and facilities for women, to a system comprised of men's facilities, and mixed-sex facilities.

21.    S.B. 132's terminology rests on illogical, circular reasoning and counterfactual assertions that inevitably cause S.B. 132 to irrationally and arbitrarily harm, endanger, and violate the rights, of women.

22.    S.B. 132 does not define "men," "women," "male," "female," "gender," or "gender identity," yet uses all of those terms in tautological attempts to define other terms such as "transgender," "nonbinary," and "intersex." Stats 2020 ch 182 § 4 (SB 132), Sec. 2(a).

23.    S.B. 132 (annotated) states that the term "transgender" is "broad and inclusive of all gender identities different from the gender a person was assigned at birth including, but not limited to, transsexual, two-spirit, and mahu." *Id.* The annotated law goes on to state that "Nonbinary" is "an inclusive term used to describe individuals who may experience a gender identity that is neither exclusively male nor female or is in between or beyond both of those genders, including, but not limited to, gender fluid, agender or without gender, third gender, genderqueer, gender variant, and gender nonconforming." *Id.*

24.    S.B. 132 inaccurately claims that "intersex" is "a broad and inclusive term referring to people whose anatomy, hormones, or chromosomes fall outside the strict male and female binary." Stats 2020 ch 182 § 4 (SB 132), Sec. 2(a).

25.    People with differences of sexual development (DSDs, the preferred term over the older, less accurate term "intersex") are women, or men, who have any number of congenital, medical conditions that affect their reproductive systems and may result in a person's anatomy, hormones, and/or chromosomes falling outside the *normal presentation for the person's sex* but no such condition results in the person with a DSD falling "outside" being either male, or female.

26.    Adding further insult to people with DSDs, S.B. 132 claims that a person can "identify" as "intersex," (Cal. Pen. Code § 2605(a)(2)), as opposed to recognizing that DSDs are

7

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**    **ER-65**

objectively existing medical conditions, not a matter of self-declared "identity."

27. S.B. 132 grants the right to have a housing preference granted, and the right to be "addressed in a manner consistent with the incarcerated individual's gender identity" only to an incarcerated individual "who is transgender, nonbinary, or intersex, regardless of anatomy[.]" Cal. Pen. Code § 2606(a)(1), (3).

28. Classifying an incarcerated individual is done by CDCR asking the individual "The individual's gender identity *of female, male, or nonbinary*" and "Whether the individual *identifies as transgender, nonbinary, or intersex*." Cal. Pen. Code § 2605(a)(1)-(2).

29. S.B. 132 asserts that expression of a person's "gender" and granting the person "respect, agency, and dignity" (by granting the person the rights to, *inter alia*, have a housing preference granted), is required regardless of whether the person undertakes "Gender transition" in the form of "social transition, legal transition, medical transition, or none of these" and regardless of whether the person meets diagnostic criteria for the condition of "gender dysphoria" or otherwise experiences mental distress based on their sex.

30. Thus, S.B. 132 requires classification of an incarcerated individual as "transgender, nonbinary, or intersex" (and thus entitled to the right for a housing preference to be granted) based solely on the individual's subjective self-declaration that the person "identifies as transgender, nonbinary, or intersex." Any and all objective or factual inquiry into the manner in which, or for what motive or purpose, an individual "identifies" is prohibited by S.B. 132, including taking into account anatomy, genitalia, physical characteristics, or even legal sex designation. In short, there is no basis on which CDCR, or anyone else, can challenge the sincerity or factual correctness of an incarcerated individual's proclaimed "identity" as transgender, nonbinary, or intersex

31. Under S.B. 132, CDCR must house a man in a women's facility even if the man does *not* claim a "gender identity of female," since a man qualifies for this special right if he "identifies as transgender" which means any gender identity "different from the gender a person was assigned at birth" including labels such as "agender" or "genderqueer" or "gender fluid" (no definitions of these neologisms are given in the statute), or identifies as "nonbinary" (a gender identity that is "neither exclusively male nor female or is in between or beyond both of those

genders") or identifies as "intersex" (people whose "anatomy, hormones, or chromosomes fall outside the strict male and female binary").

32.    S.B. 132 thus requires incarcerated women to be housed with men who do not even claim a female gender identity and may instead be claiming an identity consisting of feeling entirely male one day and entirely female the next day (gender fluidity) or claiming to be neither male nor female (agender; nonbinary), or a feeling that one is 75% male and 25% female (nonbinary). S.B. 132 does not even attempt to ensure that incarcerated women are housed with men who believe they are, or wish to be, or feel best presenting and blending in as, women. Any man who does not "identify" as "exclusively male" has the right to be housed with women, many of whom have been traumatized by male violence in their past, and some of whom have been victimized physically or sexually by violence perpetrated by men who claim a "transgender" identity.

33.    In this way, S.B. 132 converts "women's facilities" into facilities housing a collection of women, and men with any self-declared "identity" that is not exclusively male even though such men may (and most do) retain the anatomy, genitalia, and physical characteristics that define them as male-sexed humans.

34.    By insisting that anatomy, genitalia, and physical characteristics must not be taken into account in determining whether CDCR has a legitimate reason to deny a man's housing preference, S.B. 132 impliedly acknowledges that it is precisely a combination of anatomy, genitalia, and physical characteristics that differentiate men from women, justifying sex-separation of prisons in the first place. If human beings were not sexually dimorphic, divided into males and females each with reproductive systems, hormones, and chromosomes that result in significant differences between men, and women, most of which place women in a physically, emotionally, and psychologically vulnerable position vis-à-vis men and result in women having medical and psychological needs exclusive to their status as female humans, then there would be no rationale or need to house incarcerated women separately from incarcerated men.

35.    The reality that men and women are factually, materially, immutably different, in ways that disadvantage women and necessitate attention to women's unique needs, supports protection of incarcerated women by providing women-only correctional facilities. S.B. 132

9

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF    ER-67

removes the protection of women-only facilities to the detriment of women, with no corresponding detriment to men.

36.    Recognizing some of the negative consequences for incarcerated women of converting women's facilities to mixed-sex facilities, on information belief, CDCR has been approving transfers of men into women's facilities pursuant to S.B. 132 in a manner not consistent with S.B. 132. For example:

    a.    Incarcerated women on the Inmate Advisory Council (IAC) at California Institution for Women ("CIW") were informed in July 2021 in an IAC meeting with an associate warden and other prison officials for CIW, that "no one will be forced to live with a transgender female," that "Transgender females will be clustered for their orientation period" and after orientation may "house together with someone they are compatible with…if they want to" and that the "preference is to place individuals in vacant cells" but "double-celled."

    b.    On information and belief, CDCR is requiring men who state a housing preference for a women's facility to take "orientation" courses before and after transfer to a women's facility.

    c.    On information and belief, CDCR staff are holding up many housing requests from men wishing to transfer to women's facilities due to staff's concerns that the men are applying for transfer under "false pretenses" and are not "really transgender or nonbinary."

    d.    On information and belief in August 2021 during a State Senate hearing, a CDCR official testified that the department has "elected to slow down a little bit in our implementation of SB 132. We're looking to contract with nationwide experts on this issue to help us navigate a complex issue. … So, as a department, as I said, we're slowing down a little bit. We want to make sure we get this right. We want to make sure we're providing safe housing for our population, and we get this right."

10

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**    **ER-68**

37. Nowhere does S.B. 132 permit CDCR to "cluster transgender females" or grant incarcerated women the right to "not be forced to live with a transgender female," nor does the statute give CDCR the discretion to require a man with a transgender identity to take "orientation" courses before granting the man's housing preference, nor does it provide any basis on which CDCR might determine that a man's claim to a transgender or nonbinary identity is "false," nor the option of "slowing down" implementation of S.B. 132 to first consult with "nationwide experts."

38. These actions by CDCR are *ultra vires* and in contravention of S.B. 132. That CDCR cannot implement S.B. 132 as written, out of concern that doing so will not "provide safe housing for our population," evidences the facial unconstitutionality of S.B. 132.

39. On information and belief, several hundred men have applied for transfer to a women's facility since S.B. 132 took effect, and CDCR has transferred some two dozen men into California Institution for Women ("CIW") and Central California Women's Facility ("CCWF"), and has denied zero requests for transfers from men's facilities into women's facilities.

40. If there was no difference between women, and men with a transgender identity, nonbinary identity, or intersex identity, then CDCR would not be faced with challenges with regard to how to "get this right" with regard to housing such men with women in women's facilities. There would be no need to "slow down" approving the hundreds of housing preference requests that men have made that CDCR has not yet granted, if such transfers were simply a matter of adding individuals who are the same as women, to the women's facilities. But precisely because there are meaningful differences between women and men (including men with these special identities), CDCR is unsurprisingly finding it difficult to house men with women and still provide women with safe housing.

41. When being of the female sex is replaced by stating an "identity" (of anything other than exclusively male) as the criterion for housing incarcerated individuals in women's facilities, the facilities are no longer sex-separated into men's and women's facilities, but are instead separated based on each individual's subjective belief about what it means to feel male, female, both, or neither. As there are no objective factors for such a selection criterion, under S.B. 132 all facilities in California have become mixed-sex as well as multi-"gender" (though "gender" is

11

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**    **ER-69**

nowhere defined or clarified as to whether gender is a synonym for sex, or something different from sex).

42.     On information and belief, incarcerated women including the individual Plaintiffs herein, have experienced fear, anxiety, depression, and/or post-traumatic stress disorder, as a direct result of now: sharing close-quarters housing, showering, dining, and recreation with men; observing that some incarcerated women are now having sexual relations with the incarcerated men transferred into CIW and CCWF, creating a risk of pregnancy and the health and emotional complications from becoming pregnant while incarcerated, which would not have occurred but for S.B. 132; and observing changes to the environment of women's facilities to become more like men's facilities, to the emotional and psychological detriment of incarcerated women.

43.     On information and belief, some incarcerated women sharing a cell with a man, along with other women, now make sleep schedules among the women so that a woman is on watch to try to prevent rape by the male cellmate.

44.     On information and belief, prison staff in women's facilities are now armed with new, stronger pepper spray and riot control measures in anticipation that men are stronger and more violent than women.

45.     On information and belief, women's facilities have procured condoms, have changed contraceptive policy to make them available to all female inmates, at least temporarily dispensed condoms to incarcerated women, along with printed information about pregnancy and sexually transmitted diseases, in anticipation that with male offenders now housed with female offenders, male/female sex would occur and present those risks to women.

46.     On information and belief, CCWF has considered cutting down the only shade trees in the exercise yard, which also attract birds that the women enjoy and appreciate, because incarcerated men might use the trees as weapons and/or because the trees cause visual blind spots that present security risks in a mixed-sex environment that are not present in a female-only environment, and numerous women suffered psychological distress at the prospect of having the women's only connection to nature stripped away because of the presence of male offenders.

47.     On information and belief, incarcerated women in CIW and CCWF experience

12

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF     **ER-70**

psychological distress, fear, and anxiety at the constant possibility of additional men being housed in the women's facilities. The psychological impact of being housed with men, and/or constantly fearing it, constitutes an "unofficial punishment" experienced by incarcerated women with no corresponding experience inflicted upon incarcerated men.

48. On information and belief, when incarcerated women have filed administrative grievances requesting that CDCR stop transferring men into the women's facilities, CDCR has altered the complaining inmate's statements recounted or summarized in written complaint forms to, for example, change references to "men" to "transgender females," or "transgender women," thereby altering the complaining inmate's own words, perception, and substance of requested corrective action.

49. Though not expressly stated, to the extent that a motivating purpose of S.B. 132 is to honor the "dignity" of a man who identifies as a "transgender woman" by allowing him to serve his sentence experiencing a female environment because such an environment is most consonant with the man's inner sense of feeling or desiring to be female, the very environment unique to a female-exclusive space deteriorates due to the presence of men (even men with a "gender identity" of female, and S.B. 132 does not require men even to claim a "gender identity" of female). Thus, under S.B. 132 both women, and men with a "female gender identity," are denied the experience of an exclusively-female environment in which to serve their sentences and try to rehabilitate.

50. On information and belief, the impact of S.B. 132 and the approximately 23 men transferred into women's facilities since it became effective, has already resulted in significant deterioration of the female environment of CCWF and CIW. Transfers of the nearly three hundred additional men who have already requested housing with women pursuant to S.B. 132 will only further that deterioration, resulting in loss of benefits to women with no benefit accruing to the transferred men in terms of experiencing an environment consistent with a "female gender identity."

51. CDCR's "Senate Bill 132 FAQs" on its website, found at https://www.cdcr.ca.gov/prea/sb-132-faqs/, claims that CDCR cannot house incarcerated individuals with a transgender identity in a facility specifically designed for transgender inmates, because that would violate the Prison Rape Elimination Act (PREA) Standard found at 28 C.F.R.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**    **ER-71**

115.42(g). However, PREA does not require the State of California to dismantle sex-separated correctional facilities, and leaves wide discretion to states to ensure the safety of inmates with transgender identities within the framework of single-sex facilities.

52.    CDCR's Prison Rape Elimination Policy in its Operations Manual (revised May 19, 2020) at Article 44, Section 54040.1, sets forth a goal of ensuring a "secure environment, free from offender on offender sexual violence, staff sexual misconduct, and sexual harassment" and the policy applies to "all offenders." The policy is to ensure compliance with PREA and provides "guidelines for the prevention, detection, response, investigation, and tracking" of sexual violence and harassment against offenders. *Id. at* Section 54040.2.

53.    PREA, and CDCR's PREA Policy contain special provisions to address the vulnerability of "LGBTI" offenders (the acronym used and defined in the CDCR's PREA Policy, Article 44, Section 54040.3, as meaning "sexual minorities, including lesbian, gay, bisexual, transgender and intersex"). These "LGBTI" provisions apply to both men and women. However, PREA, and CDCR's PREA Policy, are also intended to protect women (and men) who do not have "sexual minority" designation, further emphasizing that a goal of decreasing vulnerability of a subset of men (those with "sexual minority" designation) cannot be pursued by increasing the vulnerability of women (regardless of "sexual minority" designation).

54.    Incarcerated women are victimized by sexual assault (perpetrated almost entirely by male prison staff) at much higher rates than the general female population. Subjecting women to the presence of male *inmates* in addition to male staff substantially increases the risk of sexual violence and sexual harassment faced by incarcerated women. Given that men employed by the State, trained to work as corrections officers and other prison staff (including training specific to preventing sexual violence) perpetrate sexual harassment and assault against incarcerated women at a higher rate than male-on-female violence in the general population, there is every reason to believe that male *offenders* pose as great, or greater, a risk to incarcerated women.

55.    CDCR's PREA Policy does not mandate that male offenders who are "sexual minorities" (according to the definition used in the PREA Policy) must be transferred to women's facilities due to actual or potential sexual victimization by other men in men's facilities; alternative

procedures and processes are set forth to protect men who are at high risk of sexual violence in men's facilities (including sexual minorities, and others). Yet, S.B. 132 now requires CDCR to house a subset of that male inmate population with women.

56.    While PREA contains certain protections for offenders who are LGBTI, PREA's purpose, to prevent and redress sexual harassment and sexual assault in prisons, applies to women with or without LGBTI classification, as much as to men. Thus, decreasing the risk that a subgroup of men will suffer prison rape only by creating a corresponding increased risk that women will suffer prison rape, is neither constitutional nor compliant with PREA.

57.    S.B. 132 singles out men with self-declared identities of "transgender, nonbinary, or intersex" for the special right to be housed in women's facilities, while not granting that same right to other men who are "sexual minorities" under the PREA definition (such as, gay or bisexual men) nor to other men who are also at high risk of sexual victimization (for instance, inmates convicted of sexual offenses against minors).

58.    S.B. 132 ostensibly serves a legitimate or important purpose (preventing sexual victimization of some men who are at high risk of victimization by other men). But the means by which that purpose is served – housing men who identify as transgender, nonbinary, or intersex with women – results in those subgroups of men being safer from sexual victimization only by concurrently making women less safe from sexual victimization.

59.    Additionally, men who are also at high risk of sexual victimization in a men's facility are not provided by S.B. 132 with the right to "preferred" housing with women, solely because such men do not declare a specific "identity." Similarly, S.B. 132 grants men housed with women special rights to select cell arrangements and similar choices not granted to women, solely because such women do not declare a specific "identity." S.B. 132 therefore treats men, and women, less favorably on the basis of self-declared identity insofar as incarcerated men and women without the "right kind" of identity do not receive the rights granted to those inmates who do declare specific identities.

60.    Further, S.B. 132 grants special housing preference rights based solely on self declaration of identity, with no prerequisite demonstration that an individual is actually more

15

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**    **ER-73**

vulnerable to sexual victimization, such that any man regardless of actual vulnerability can secure the right to be housed with women. Absurdly, this can include a man with *no medical condition or difference of sexual development whatsoever* nor any self-declared "gender identity" at all, merely declaring himself to have an "intersex identity" and he is then entitled to be housed with women.

61.    Men who identify as "transgender" suffer from mental illness at higher rates than in the general male population. Male offenders who identify as "transgender" have higher rates of sexual offenses in their criminal backgrounds than the general male offender population. Mental illness, as well as sex offender status, are factors correlated with a higher risk of sexual victimization in prison. S.B. 132 therefore places women at knowingly increased risks of harm, by housing incarcerated women with men who are even more likely than other men to suffer from mental illness and commit sex offenses, and preventing CDCR from refusing housing preference requests by men based on mental illness or sex offender status.

62.    Under S.B. 132 any man can claim the right to be housed with women merely by uttering the incantation "I have a transgender (or nonbinary) (or intersex) identity." S.B. 132 specifically prevents CDCR from evaluating a male inmate's request for transfer to a women's facility based upon the man's "physical characteristics." S.B. 132 is not proportionately tailored to protect the population whom the statute ostensibly intends to help: men who claim a transgender, nonbinary, or intersex identity *who are vulnerable to sexual victimization by other men because of that identity*. Similar deficiency exists with respect to the statute's other stated purpose, of upholding the agency and dignity of men with a transgender, nonbinary, or intersex identity: there is no reasonable or compelling connection between that goal, and the "solution" of housing men with women – particularly since by definition, the men receiving that special right include not only men who claim a "female gender identity" but men whose identity is, essentially, anything except fully, exclusively male. There is thus no inherent, logical reason why these men's "dignity" is furthered by housing them with women, especially when doing so poses risks and harms to women, including women who claim a transgender, nonbinary, or intersex identity. Although S.B. 132 grants women the same right as men to claim a transgender, nonbinary, or intersex identity, the vast majority of inmates claiming such an identity *and also requesting to be housed with the sex opposite*

16

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**    **ER-74**

*of the sex of the requesting inmate*, are men. On information and belief, only a handful of women claiming a transgender, nonbinary, or intersex identity have requested to be housed with men, while hundreds of men have requested to be housed with women.

63. S.B. 132 is thus neither a rational nor substantially related means to achieving the legitimate or important interest of preventing sexual victimization of men with transgender, nonbinary, or intersex "identities" and violates the federal and state constitutional rights of Plaintiffs and other incarcerated women without adequate justification.

64. There is no administrative remedy available to address, redress, or remediate the harms, injuries, and deprivations of rights caused by S.B. 132 that CDCR can provide to Plaintiffs while complying with S.B. 132.

### JURISDICTION AND VENUE

65. This Court has original subject matter jurisdiction over Plaintiffs' claims that S.B. 132 is unconstitutional under the United States Constitution, pursuant to 28 U.S.C. § 1331.

66. This Court has authority to exercise supplemental jurisdiction over Plaintiffs' claims that S.B. 132 is unconstitutional under the California Constitution, pursuant to 28 U.S.C. § 1367.

67. This Court has personal jurisdiction over the Defendants, who are charged by law with implementing S.B. 132 and have in fact begun its implementation in CIW and CCWF, which are California state prisons operated by Defendant CDCR and by the individual Defendants in their official capacities, and one of which (CCWF) is located in this District, causing injury in fact to the individual Plaintiffs who are currently housed in CCWF.

68. This District is the appropriate venue for resolving this case or controversy under 28 U.S.C. § 1391(b), as each of the Defendants resides in this District, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District (Fresno Division).

### PARTIES

69. Plaintiff Nadia Romero ("Nadia") is a female offender currently incarcerated in Central California Women's Facility. Nadia is a survivor of severe sexual and physical abuse beginning in childhood. Nadia has a history of anxiety, depression, and substance abuse. Sharing a housing unit with men has led to Nadia experiencing panic attacks, insomnia, and self-harm

17

ideation. Nadia filed a grievance describing an incident where she was grabbed by a man in her unit informing the prison of her heightened risk of rape and violence from male offenders; the prison's response referred to men in her unit as "transgender females." Nadia does not believe that sex is determined by a person's internal identity. Nadia is a Catholic whose faith is deeply important to her, and whose religious practice is impaired by being placed in an intimate setting with unrelated men.

70.     Plaintiff Krystal Gonzalez ("Krystal") is a female offender currently incarcerated in Central California Women's Facility. Krystal was sexually assaulted by a man transferred to her unit under S.B. 132. Krystal filed a grievance and requested single-sex housing away from men; the prison's response to Krystal's grievance referred to her assault by a "transgender woman with a penis." Krystal does not believe that women have penises, and she the psychological distress caused by her assault is exacerbated by the prison's refusal to acknowledge the sex of her perpetrator.

71.     Plaintiff Janine Chandler ("Janine") is a female offender currently incarcerated in Central California Women's Facility. Janine is an observant Muslim whose right to privacy and right to exercise her religion are both violated when she is housed in facilities with men. She is also a survivor of domestic violence.

72.     Plaintiff Tomiekia Johnson ("Tomiekia") is a female offender currently incarcerated in Central California Women's Facility. Tomiekia is a survivor of domestic violence.

73.     Plaintiff Woman II Woman, Inc. ("Woman II Woman") is a nonprofit corporation formed under the laws of the State of California in March 2021 with a business address in Torrance, California, organized by formerly incarcerated women to advocate for incarcerated women. Woman II Woman provides dignified re-entry services, parole hearing preparation, and advocacy for the safety and dignity of incarcerated and other justice-involved women in California.

74.     S.B. 132 poses such a risk to the safety and dignity of incarcerated women that it is causing Woman II Woman to expend a distorted proportion of its modest revenues and time resources pursuing avenues for declaring S.B. 132 unconstitutional or otherwise repealed. As a result, Woman II Woman is diverting substantial portions of its monetary and time resources away

from projects and services core to its mission, such as providing no-cost re-entry services and parole hearing preparation to individual women in need.

75.    Woman II Woman assists and advocates for individual women, as clients, who reach out to Woman II Woman through the limited channels available for incarcerated women to seek outside assistance. Woman II Woman represents and advocates for the interests of its clients, including the many clients who are suffering harm as the direct result of S.B. 132.

76.    Those clients of Woman II Woman who remain incarcerated in California (as opposed to on parole) are being injured by S.B. 132, and remedying that injury by seeking to have S.B. 132 declared unconstitutional is germane to a core mission and purpose of Woman II Woman – promoting the safety and dignity of incarcerated women in California. Because this lawsuit seeks declaratory and injunctive relief, participation of Woman II Woman's individual clients is not necessary for Woman II Woman to pursue claims on their behalf.

77.    Defendant California Department of Corrections and Rehabilitation (CDCR) is a department of the State of California that manages all state-operated adult prisons, including the women's correctional facilities CIW and CCWF where the individual Plaintiffs, and many of Woman II Woman's clients, are currently housed. By statute, Defendant CDCR is charged with implementing the provisions of S.B. 132.

78.    Defendant Kathleen Allison ("Allison") is the current Secretary of CDCR and is responsible in her official capacity for the operation of all adult state correctional institutions, including the women's correctional facilities CIW and CCWF where the individual Plaintiffs, and many of Woman II Woman's clients, are currently housed. In that capacity, Defendant Allison is required by law to exercise powers and perform duties prescribed by law with respect to administration of California's prison system. Defendant Allison is legally responsible, in her official capacity, for implementing S.B. 132, including by exercising her authority to direct activities of subordinate officers and other CDCR employees. At all relevant times Defendant Allison was acting under color of law and is being sued in her official capacity.

79.    Defendant Michael Pallares ("Pallares") is the current Warden of CCWF and is responsible in his official capacity for the day to day operations of the women's correctional facility

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF    ER-77

CCWF where the individual Plaintiffs, and many of Woman II Woman's clients, are currently housed. In that capacity, Defendant Pallares is required by law to exercise powers and perform duties prescribed by law with respect to administration of California's prison system. Defendant Pallares is legally responsible, in his official capacity, for implementing S.B. 132, including by following directives from Defendant Allison and by exercising his authority to direct activities of subordinate CDCR employees. At all relevant times Defendant Pallares was acting under color of law and is being sued in his official capacity.

80.    Defendant Mona D. Houston ("Houston") is the current Warden of CIW and is responsible in her official capacity for the day to day operations of the women's correctional facility CIW where many of Woman II Woman's clients are currently housed. In that capacity, Defendant Houston is required by law to exercise powers and perform duties prescribed by law with respect to administration of California's prison system. Defendant Houston is legally responsible, in her official capacity, for implementing S.B. 132, including by following directives from Defendant Allison and by exercising her authority to direct activities of subordinate CDCR employees. At all relevant times Defendant Houston was acting under color of law and is being sued in her official capacity.

**FIRST CLAIM FOR RELIEF**
**(FOR DECLARATORY JUDGMENT THAT S.B. 132 VIOLATES THE EIGHTH AMENDMENT TO THE U.S. CONSTITUTION)**

81.    Plaintiffs reallege and incorporate herein by reference each of the foregoing allegations.

82.    As set forth above, S.B. 132 on its face imposes cruel and unusual punishment on incarcerated women, including the individual Plaintiffs and female offenders who are clients of the organizational Plaintiff.

83.    The Eighth Amendment to the U.S. Constitution prohibits cruel and unusual punishment. Prison officials have a duty under the Eighth Amendment to protect prisoners from physical and sexual violence and abuse by other prisoners, including a known substantial risk or probability that such violence will occur, and including the psychological distress and terror of

knowing that such violence may occur at any time.

84.    Women are disproportionately subject to sexual victimization by men. S.B. 132 permits any man, by stating an identity and without requiring any proof, evidence, or action on the man's part that would indicate any lower risk of male pattern violence than for an average man, to demand to be housed with women. This statutory directive unconstitutionally imposes cruel, unusual punishment on female offenders, by subjecting them to substantially increased risk of sexual harassment, sexual assault, rape, and physical violence, and to psychological fear of such harms, compared to those risks when men are not legally entitled to transfer to women's facilities based on a statement of "identity."

85.    S.B. 132 is unconstitutional in all applications, as there is no application that does not result in imposition of cruel, unusual, unconstitutional punishment imposed on Plaintiffs and other incarcerated women, in violation of the Eighth Amendment.

86.    Defendants have begun implementing S.B. 132 and, on information and belief, continue its implementation at least in part, even if Defendants have also "slowed down" implementation to consult with "national experts" on how best to implement S.B. 132 while meeting Defendants' known duty to provide safe housing to all populations in California prisons, including incarcerated women.

87.    A controversy has arisen over the constitutionality under the Eighth Amendment of S.B. 132, wherein Plaintiffs contend the statute is facially unconstitutional, and unconstitutional as applied to Plaintiffs, and on information and belief, Defendants will contend that it is possible to implement S.B. 132 in a constitutional manner that comports with the Eighth Amendment's prohibition against cruel and unusual punishment.

88.    Plaintiffs request a judicial declaration pursuant to 28 U.S.C. § 2201 that S.B. 132 is unconstitutional on its face and as applied to Plaintiffs under the Eighth Amendment, and that application by CDCR of the directives in Cal. Pen. Code §§ 2605, 2606 regarding housing male offenders who identify themselves as "transgender, nonbinary, or intersex" in women's facilities violates the duty of Defendants under the Eighth Amendment to protect Plaintiffs from cruel and unusual punishment.

21

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**    **ER-79**

**SECOND CLAIM FOR RELIEF**
**(FOR DECLARATORY JUDGMENT THAT S.B. 132 VIOLATES THE FIRST AMENDMENT TO THE U.S. CONSTITUTION)**

89.    Plaintiffs reallege and incorporate herein by reference each of the foregoing allegations.

90.    S.B. 132 grants to inmates who claim a "transgender, nonbinary, or intersex" identity the right to be referred to by pronouns and honorifics of the inmate's preference. The law contains no exception, exemption, or distinction between CDCR staff, and CDCR inmates, such that all are compelled by S.B. 132 to use words and language in a manner that suggests adherence to beliefs the speaker may not share (for instance, that "she" refers to a male person, or that once he has declared a "transgender" identity a man is no longer a man but is a "transgender woman").

91.    S.B. 132 requires individual Plaintiffs and other incarcerated women to refer to men using words and language that obscures the speaker's own perception and rationally-based belief about the sex of individuals required by S.B. 132 to be housed in women's facilities, subjecting women who do not comply with S.B. 132's demand for compelled speech and belief potentially to discipline with consequences ranging from placement in administrative segregation to denial of parole and extension of sentences. Knowing these likely, foreseeable consequences of speaking about the men housed in women's facilities (and awaiting transfer), Plaintiffs' freedom of speech and expression is chilled by S.B. 132.

92.    On information and belief, CDCR has applied S.B. 132's mandates regarding compelled speech and belief to individual Plaintiffs by, *inter alia*, refusing to consider Plaintiffs' own written statements of complaint about being housed with men and instead altering Plaintiffs' written statements that refer to men and males, using factual, neutral, and appropriate sex-indicative pronouns such as "he." By refusing to consider complaints and grievances that Plaintiffs actually presented to CDCR, and instead only considering versions of such complaints and grievances rewritten with language and concepts that reflect the government's approved set of beliefs, S.B. 132 as applied in this manner by CDCR violates Plaintiffs' First Amendment right to petition the government. Furthermore, S.B. 132 necessarily results in this deprivation of Plaintiffs' First

Amendment right to petition the government, because S.B. 132 mandates that an inmate who claims a "transgender, nonbinary, or intersex" identity "shall (1) Be addressed in a manner consistent with the incarcerated individual's gender identity." Cal. Pen. Code § 2606(a)(1).

93.    S.B. 132 violates the right of Plaintiffs to freedom of speech under the First Amendment of the U.S. Constitution by prohibiting Plaintiffs from using words and language with objective, neutral meaning to describe and express concerns about the dynamic of men housed with women created by S.B. 132. S.B. 132 further constitutes an unconstitutional prior restraint on Plaintiffs' speech, chilling Plaintiffs' speech and expression protected under the First Amendment.

94.    S.B. 132 contains no exemption or exception that might protect the right of women with sincerely held religious beliefs concerning sharing living quarters and intimate spaces with men other than the woman's husband or family member, including exposure of a woman's unclothed body to the view of men other than a woman's husband or family member, or exposure of such a man's unclothed body in the presence of a woman who holds such religious beliefs, to the free exercise of religion guaranteed under the First Amendment of the U.S. Constitution. A governmental interest in protecting certain men from sexual victimization in men's prisons, or in upholding the dignity of such men, is not a compelling reason to refuse to accommodate women's constitutionally guaranteed right to free exercise of religion.

95.    S.B. 132 violates the Establishment Clause of the First Amendment of the U.S. Constitution by requiring prison housing placements between men's and women's facilities to be made, and by imposing speech and expression requirements, based on a faith-based belief system founded on acceptance of the unproven (and unprovable) assertion that human beings have no objective, immutable sex or that a person's sex can be changed or made irrelevant by a person's inner "identity," when identity (like the theological concept of a "soul") has no scientific, factual basis yet human sexual dimorphism is a material fact of reality. Adoption by government of a faith-based belief system that is not grounded in objective, provable facts and contradicts objective, provable facts, establishes a government-sanctioned religious doctrine in which Plaintiffs and other incarcerated women are compelled to profess adherence, and upon which government actions regarding the treatment of women and men in prisons are founded, violates the Establishment

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**    **ER-81**

Clause's prohibition against government promotion of and entanglement with religion for purposes that are wholly religious in nature, not secular.

96.    A controversy has arisen over the constitutionality of S.B. 132, wherein Plaintiffs contend the statute is facially, and as applied to Plaintiffs, unconstitutional and in violation of the Free Speech Clause, Free Exercise Clause, right to petition the government, and Establishment Clause, of the First Amendment of the U.S. Constitution. On information and belief, Defendants will contend that it is possible to implement S.B. 132 in a constitutional manner that comports with the First Amendment and that CDCR has not applied S.B. 132 in a manner that has violated any Plaintiff's First Amendment rights.

97.    Plaintiffs request a judicial declaration pursuant to 28 U.S.C. § 2201 that S.B. 132 is unconstitutional on its face and as applied to Plaintiffs under the First Amendment, and that application by CDCR of the directives in Cal. Pen. Code §§ 2605, 2606 regarding housing male offenders who identify themselves as "transgender, nonbinary, or intersex" in women's facilities, and mandating that such male offenders be referred to only by pronouns and honorifics that validate the offender's chosen identity, violates the duty of Defendants under the First Amendment.

### THIRD CLAIM FOR RELIEF
### (FOR DECLARATORY JUDGMENT THAT S.B. 132 VIOLATES THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION)

98.    Plaintiffs reallege and incorporate herein by reference each of the foregoing allegations.

99.    S.B. 132 on its face deprives incarcerated women including the individual Plaintiffs and female offenders who are clients of the organizational Plaintiff from equal protection of the laws on the basis of sex and on the basis of "identity" or "gender identity" or "transgender status" in violation of the Fourteenth Amendment of the U.S. Constitution.

100.    A female-only environment best serves the interests of the government, and of women, in rehabilitation following criminal offenses committed by women. S.B. 132 converts women's correctional facilities into mixed-sex facilities, with no corresponding conversion of

men's facilities, imposing on women on the basis of sex a significant disadvantage and burden in the form of serving prison time without the benefit of rehabilitating in a single-sex environment.

101.    S.B. 132 imposes on female offenders increased risks of physical assault, sexual assault, sexual harassment, loss of dignity due to living in close quarters with and exposing one's naked body to persons of the opposite sex, and serious consequences of sexual relations between males and females such as pregnancy, abortion, and sexually transmitted diseases, with no corresponding increased risks imposed on men.

102.    S.B. 132 is not substantially related to any purported important governmental purpose aimed for by S.B. 132, and Defendants cannot justify imposing significant disadvantages, burdens, or increased risks of harms, on female offenders on the basis of sex. Incarcerated men, and incarcerated women, are similarly situated for purposes of whether men and women each are housed in single-sex correctional facilities. S.B. 132 results in elimination of women-only facilities, but not comparable elimination of men-only facilities. S.B. 132 causes harms to women from being housed with men, with no comparable harms imposed on men from being housed with women.

103.    S.B. 132 grants rights to inmates who declare a "transgender, nonbinary, or intersex" identity to choose to be housed with women, or with men, but also grants additional rights to "Have their perception of health and safety given serious consideration in any bed assignment, placement, or programming decision within the facility in which they are housed" including "but not limited to, granting single-cell status, housing the individual with another incarcerated person of their choice, or removing the individual or individuals who pose a threat from any location where they may have access to the individual who has expressed a safety concern." Cal. Pen. Code § 2606(a)(4). These rights are granted only to inmates who claim a "transgender, nonbinary, or intersex" identity, and not to persons who express safety concerns but whose "identity" is something other than "transgender, nonbinary, or intersex." S.B. 132 thus treats inmates differently on the basis of "gender identity" or "transgender status" causing disadvantage to inmates who have no "gender identity" or whose "gender identity" is not one of the identities favored under the statute. S.B. 132 serves no important governmental interest in treating people differently on the basis of "gender identity" or "transgender status" and does not employ means that are substantially related

25

to any governmental interest purported to be served by the statute.

104.    A controversy has arisen over the constitutionality of S.B. 132, wherein Plaintiffs contend the statute is facially, and as applied to Plaintiffs, unconstitutional and in violation of the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution, on the basis of sex and on the basis of "gender identity" or "transgender status." On information and belief, Defendants will contend that it is possible to implement S.B. 132 in a constitutional manner that comports with the Equal Protection Clause and that CDCR has not applied S.B. 132 in a manner that has violated any Plaintiff's Fourteenth Amendment rights.

105.    Plaintiffs request a judicial declaration pursuant to 28 U.S.C. § 2201 that S.B. 132 is unconstitutional on its face and as applied to Plaintiffs under the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution, and that application by CDCR of the directives in Cal. Pen. Code §§ 2605, 2606 violates the Equal Protection Clause on the basis of sex and of "gender identity" and/or "transgender status."

## FOURTH CLAIM FOR RELIEF
### (FOR DECLARATORY JUDGMENT THAT S.B. 132 VIOLATES ARTICLE 1 § 17 OF THE CALIFORNIA CONSTITUTION)

106.    Plaintiffs reallege and incorporate herein by reference each of the foregoing allegations.

107.    CA Constitution Art. 1 § 17 mandates that cruel or unusual punishment may not be inflicted. Prison officials have a duty under the California Constitution to protect prisoners from physical and sexual violence and abuse by other prisoners, including a known substantial risk or probability that such violence will occur, and including the psychological distress and terror of knowing that such violence may occur at any time.

108.    Women are disproportionately subject to sexual victimization by men. S.B. 132 permits any man, by stating an identity and without requiring any proof, evidence, or action on the man's part that would indicate any lower risk of male pattern violence than for an average man, to demand to be housed with women. This statutory directive unconstitutionally imposes cruel, unusual punishment on female offenders, by subjecting them to substantially increased risk of

26
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF    ER-84

sexual harassment, sexual assault, rape, and physical violence, and to psychological fear of such harms, compared to those risks when men are not legally entitled to transfer to women's facilities based on a statement of "identity."

109.   S.B. 132 is unconstitutional in all applications, as there is no application that does not result in imposition of cruel, unusual, unconstitutional punishment imposed on Plaintiffs and other incarcerated women, in violation of the CA Constitution Art. 1 § 17.

110.   Defendants have begun implementing S.B. 132 and, on information and belief, continue its implementation at least in part, even if Defendants have also "slowed down" implementation to consult with "national experts" on how best to implement S.B. 132 while meeting Defendants' known duty to provide safe housing to all populations in California prisons, including incarcerated women.

111.   A controversy has arisen over the constitutionality under CA Constitution Art. 1 § 17  of S.B. 132, wherein Plaintiffs contend the statute is facially unconstitutional, and unconstitutional as applied to Plaintiffs, and on information and belief, Defendants will contend that it is possible to implement S.B. 132 in a constitutional manner that comports with the prohibition in CA Constitution Art. 1 § 17 against cruel or unusual punishment.

112.   Plaintiffs request a judicial declaration pursuant to 28 U.S.C. § 2201 that S.B. 132 is unconstitutional on its face and as applied to Plaintiffs under CA Constitution Art. 1 § 17, and that application by CDCR of the directives in Cal. Pen. Code §§ 2605, 2606 regarding housing male offenders who identify themselves as "transgender, nonbinary, or intersex" in women's facilities violates the duty of Defendants under CA Constitution Art. 1 § 17 to protect Plaintiffs from cruel or unusual punishment.

**FIFTH CLAIM FOR RELIEF**
**(FOR DECLARATORY JUDGMENT THAT S.B. 132 VIOLATES ARTICLE 1 § 2 OF THE CALIFORNIA CONSTITUTION)**

113.   Plaintiffs reallege and incorporate herein by reference each of the foregoing allegations.

114.   CA Constitution Art. 1 § 2 provides: "Every person may freely speak, write and

publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."

115.    S.B. 132 grants to inmates who claim a "transgender, nonbinary, or intersex" identity the right to be referred to by pronouns and honorifics of the inmate's preference. The law contains no exception, exemption, or distinction between CDCR staff, and CDCR inmates, who are all compelled by S.B. 132 to use words and language in a manner that suggests adherence to beliefs the speaker may not share (for instance, that "she" refers to a male person, or that once he has declared a "transgender identity" a man is no longer a man but is a "transgender woman").

116.    S.B. 132 requires individual Plaintiffs and other incarcerated women to refer to men using words and language that obscures the speaker's own perception and rationally-based belief about the sex of individuals required by S.B. 132 to be housed in women's facilities, subjecting women who do not comply with S.B. 132's demand for compelled speech and belief potentially to discipline with consequences ranging from placement in administrative segregation to denial of parole and extension of sentences. Knowing these likely, foreseeable consequences of speaking about the men housed in women's facilities (and awaiting transfer), Plaintiffs' freedom of speech and expression is chilled by S.B. 132.

117.    S.B. 132 violates the right of Plaintiffs to freedom of speech under CA Constitution Art. 1 § 2 by prohibiting Plaintiffs from using words and language with objective, neutral meaning to describe the dynamic of men housed with women created by S.B. 132. S.B. 132 further constitutes an unconstitutional prior restraint on Plaintiffs' speech, chilling Plaintiffs' speech and expression protected under CA Constitution Art. 1 § 2.

118.    A controversy has arisen over the constitutionality of S.B. 132, wherein Plaintiffs contend the statute is facially, and as applied to Plaintiffs, unconstitutional and in violation of CA Constitution Art. 1 § 2. On information and belief, Defendants will contend that it is possible to implement S.B. 132 in a constitutional manner that comports with CA Constitution Art. 1 § 2 and that CDCR has not applied S.B. 132 in a manner that has violated any Plaintiff's rights under CA Constitution Art. 1 § 2.

119.    Plaintiffs request a judicial declaration pursuant to 28 U.S.C. § 2201 that S.B. 132

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF    **ER-86**

is unconstitutional on its face and as applied to Plaintiffs under CA Constitution Art. 1 § 2, and that application by CDCR of the directives in Cal. Pen. Code §§ 2605, 2606 regarding housing male offenders who identify themselves as "transgender, nonbinary, or intersex" in women's facilities, and mandating that such male offenders be referred to only by pronouns and honorifics that validate the offender's chosen identity, violates the duty of Defendants under CA Constitution Art. 1 § 2.

### SIXTH CLAIM FOR RELIEF
### (FOR DECLARATORY JUDGMENT THAT S.B. 132 VIOLATES ARTICLE 1 § 4 OF THE CALIFORNIA CONSTITUTION)

120.    Plaintiffs reallege and incorporate herein by reference each of the foregoing allegations.

121.    CA Constitution Art. 1 § 4 states: "Free exercise and enjoyment of religion without discrimination or preference are guaranteed. This liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State. The Legislature shall make no law respecting an establishment of religion."

122.    S.B. 132 contains no exemption or exception that might protect the right of women with sincerely held religious beliefs concerning sharing living quarters and intimate spaces with men other than the woman's husband or family member, including exposure of a woman's unclothed body to the view of men other than a woman's husband or family member, or exposure of such a man's unclothed body in the presence of a woman who holds such religious beliefs, to the free exercise of religion guaranteed under CA Constitution Art. 1 § 4. A governmental interest in protecting certain men from sexual victimization in men's prisons, or in upholding the dignity of such men, is not a compelling reason to refuse to accommodate women's constitutionally guaranteed right to free exercise of religion.

123.    S.B. 132 violates the prohibition against government establishment or promotion of religious belief, CA Constitution Art. 1 § 4, by requiring prison housing placements between men's and women's facilities to be made, and by imposing speech and expression requirements, based on a faith-based belief system founded on acceptance of the unproven (and unprovable) assertion that human beings have no objective, immutable sex or that a person's sex can be changed or made

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**     **ER-87**

irrelevant by a person's inner "identity," when identity (like the theological concept of a "soul") has no scientific, factual basis yet human sexual dimorphism is a material fact of reality. Adoption by government of a faith-based belief system that is not grounded in objective, provable facts and contradicts objective, provable facts, establishes a government-sanctioned religious doctrine in which Plaintiffs and other incarcerated women are compelled to profess adherence, and upon which government actions regarding the treatment of women and men in prisons are founded, violates the prohibition in CA Constitution Art. 1 § 4 against government establishment and promotion of religion.

124.    A controversy has arisen over the constitutionality of S.B. 132, wherein Plaintiffs contend the statute is facially, and as applied to Plaintiffs, unconstitutional and in violation of the guarantee of free exercise and enjoyment of religion and the prohibition in CA Constitution Art. 1 § 4 against government establishment of religion. On information and belief, Defendants will contend that it is possible to implement S.B. 132 in a constitutional manner that comports with CA Constitution Art. 1 § 4 and that CDCR has not applied S.B. 132 in a manner that has violated any Plaintiff's rights under CA Constitution Art. 1 § 4.

125.    Plaintiffs request a judicial declaration pursuant to 28 U.S.C. § 2201 that S.B. 132 is unconstitutional on its face and as applied to Plaintiffs under the free exercise and enjoyment of religion and prohibition against government establishment of religion provisions in CA Constitution Art. 1 § 4, and that application by CDCR of the directives in Cal. Pen. Code §§ 2605, 2606 violates the duty of Defendants under CA Constitution Art. 1 § 4.

### SEVENTH CLAIM FOR RELIEF
**(FOR DECLARATORY JUDGMENT THAT S.B. 132 VIOLATES ARTICLE 1 § 7 OF THE CALIFORNIA CONSTITUTION)**

126.    Plaintiffs reallege and incorporate herein by reference each of the foregoing allegations.

127.    CA Constitution Art. 1 § 7 protects against denial of equal protection of the laws. S.B. 132 on its face deprives incarcerated women including the individual Plaintiffs and female offenders who are clients of the organizational Plaintiff from equal protection of the laws on the

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF    ER-88**

basis of sex and on the basis of "identity" or "gender identity" or "transgender status" in violation of CA Constitution Art. 1 § 7.

128.    A female-only environment best serves the interests of the government, and of women, in rehabilitation following criminal offenses committed by women. S.B. 132 converts women's correctional facilities into mixed-sex facilities, with no corresponding conversion of men's facilities, imposing on women on the basis of sex a significant disadvantage and burden in the form of serving prison time without the benefit of rehabilitating in a single-sex environment.

129.    S.B. 132 imposes on female offenders increased risks of physical assault, sexual assault, sexual harassment, loss of dignity due to living in close quarters with and exposing one's naked body to persons of the opposite sex, and serious consequences of sexual relations between males and females such as pregnancy, abortion, and sexually transmitted diseases, with no corresponding increased risks imposed on men.

130.    S.B. 132 is not substantially related to any purported important governmental purpose aimed for by S.B. 132, and Defendants cannot justify imposing significant disadvantages, burdens, or increased risks of harms, on female offenders on the basis of sex. Incarcerated men, and incarcerated women, are similarly situated for purposes of whether men and women each are housed in single-sex correctional facilities. S.B. 132 results in elimination of women-only facilities, but not comparable elimination of men-only facilities. S.B. 132 causes harms to women from being housed with men, with no comparable harms imposed on men from being housed with women.

131.    S.B. 132 grants rights to inmates who declare a "transgender, nonbinary, or intersex" identity regarding housing with women, or with men, but also grants additional rights to "Have their perception of health and safety given serious consideration in any bed assignment, placement, or programming decision within the facility in which they are housed" including "but not limited to, granting single-cell status, housing the individual with another incarcerated person of their choice, or removing the individual or individuals who pose a threat from any location where they may have access to the individual who has expressed a safety concern." Cal. Pen. Code § 2606(a)(4). These rights are granted only to inmates who claim a "transgender, nonbinary, or intersex" identity, and not to persons who express safety concerns but whose "identity" is something

31

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**    **ER-89**

other than "transgender, nonbinary, or intersex." S.B. 132 thus treats inmates differently on the basis of "gender identity" or "transgender status" causing disadvantage to inmates who have no "gender identity" or whose "gender identity" is not one of the identities favored under the statute. S.B. 132 serves no important governmental interest in treating people differently on the basis of "gender identity" or "transgender status" and does not employ means that are substantially related to any governmental interest purported to be served by the statute.

132.    A controversy has arisen over the constitutionality of S.B. 132, wherein Plaintiffs contend the statute is facially, and as applied to Plaintiffs, unconstitutional and in violation of CA Constitution Art. 1 § 7 by denying equal protection of the laws on the basis of sex and on the basis of "gender identity" or "transgender status." On information and belief, Defendants will contend that it is possible to implement S.B. 132 in a constitutional manner that comports with CA Constitution Art. 1 § 7 and that CDCR has not applied S.B. 132 in a manner that has violated any Plaintiff's rights under CA Constitution Art. 1 § 7.

133.    Plaintiffs request a judicial declaration pursuant to 28 U.S.C. § 2201 that S.B. 132 is unconstitutional on its face and as applied to Plaintiffs under CA Constitution Art. 1 § 7, and that application by CDCR of the directives in Cal. Pen. Code §§ 2605, 2606 denies equal protection of the laws on the basis of sex and of "gender identity" and/or "transgender status."

## EIGHTH CLAIM FOR RELIEF
### (FOR DECLARATORY JUDGMENT THAT S.B. 132 VIOLATES ARTICLE 1 § 1 OF THE CALIFORNIA CONSTITUTION)

134.    Plaintiffs reallege and incorporate herein by reference each of the foregoing allegations.

135.    CA Constitution Art. 1 § 1 guarantees a right to privacy. Even in the setting of a correctional facility, women including individual Plaintiffs and the clients whose interests are represented by the organizational Plaintiff, have a right to keep one's physical body (particularly when one's body must be unclothed, as to use a toilet, shower, or change clothes) shielded from the view, scrutiny, and commentary of men. The dignity inherent in women's right to bodily privacy out of the presence of men is premised on long-recognized social norms that acknowledge the

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF    ER-90**

physical, biological, physiological differences between the females and males of the human species, and the prevention of indignity, embarrassment, and even sexual violation in the form of verbal harassment or sexual assault, posed to women who are forced to be unclothed in the presence of men.

136.    In the setting of a correctional facility, inmates may not have a general expectation of privacy as to unavoidable exposure of their unclothed bodies while using toilets, showers, or changing clothes. However, incarcerated women do have a reasonable expectation of privacy that their daily activities that unavoidably involve being unclothed occur outside the presence of men – particularly male inmates.

137.    Allowing men to be housed with women, such that female inmates are forced to live in close quarters with male inmates, including when engaged in daily activities that necessitate exposing one's body to other inmates (such as when using a toilet, shower, or changing clothes), constitutes an egregious breach of the social norms that uphold women's right to bodily privacy from men's view, scrutiny, commentary, or presence. S.B. 132, on its face, constitutes an invasion of women's rights to privacy in violation of CA Constitution Art. 1 § 1.

138.    A controversy has arisen over the constitutionality of S.B. 132 under CA Constitution Art. 1 § 1, wherein Plaintiffs contend the statute is facially unconstitutional, and unconstitutional as applied to Plaintiffs, and on information and belief, Defendants will contend that it is possible to implement S.B. 132 in a constitutional manner that comports with the right to privacy contained in CA Constitution Art. 1 § 1.

139.    Plaintiffs request a judicial declaration pursuant to 28 U.S.C. § 2201 that S.B. 132 is unconstitutional on its face and as applied to Plaintiffs under the rights to privacy guaranteed by CA Constitution Art. 1 § 1.

**NINTH CLAIM FOR RELIEF**
**(FOR PERMANENT INJUNCTION)**

140.    Plaintiffs reallege and incorporate herein by reference each of the foregoing allegations.

141.    SB. 132 is facially unconstitutional, and unconstitutional as applied to Plaintiffs, in the ways above alleged. Enforcement or implementation of S.B. 132 imposes irreparable harms on Plaintiffs. Plaintiffs have no adequate remedy at law, and the balance of equities weighs in favor of upholding Plaintiffs' constitutional rights. Plaintiffs are entitled to a permanent injunction enjoining Defendants from enforcing or implementing S.B. 132 (Cal. Pen. Code §§ 2605, 2606).

## **PRAYER**

WHEREFORE, Plaintiffs pray for judgment as follows:

1.  Judgment in Plaintiffs' favor on all claims;

2.  A judicial declaration that S.B. 132 is unconstitutional on its face, and as applied to Plaintiffs, under the Eighth Amendment to the U.S. Constitution;

3.  A judicial declaration that S.B. 132 is unconstitutional on its face, and as applied to Plaintiffs, under the First Amendment to the U.S. Constitution;

4.  A judicial declaration that S.B. 132 is unconstitutional on its face, and as applied to Plaintiffs, under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution;

5.  A judicial declaration that S.B. 132 is unconstitutional on its face, and as applied to Plaintiffs, under Article 1 § 17 of the California Constitution;

6.  A judicial declaration that S.B. 132 is unconstitutional on its face, and as applied to Plaintiffs, under Article 1 § 2 of the California Constitution;

7.  A judicial declaration that S.B. 132 is unconstitutional on its face, and as applied to Plaintiffs, under Article 1 § 4 of the California Constitution;

8.  A judicial declaration that S.B. 132 is unconstitutional on its face, and as applied to Plaintiffs, under Article 1 § 7 of the California Constitution;

9.  A judicial declaration that S.B. 132 is unconstitutional on its face, and as applied to Plaintiffs, under Article 1 § 1 of the California Constitution;

10. A permanent injunction prohibiting Defendants and their agents from implementing the directives contained in S.B. 132 (Cal. Pen. Code §§ 2605, 2606).

11. Costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 or as otherwise permitted by law;

12. Such other relief that the Court deems just and equitable.

Dated: November 17, 2021             RESPECTFULLY SUBMITTED,

By: ___/s/ Candice Jackson
Candice Jackson (SBN 224648)
**FREEMAN MATHIS & GARY, LLP**
1010 B Street, Suite 300
San Rafael, California 94901
cjackson@fmglaw.com
Telephone: 415.352.6434

Lauren Adams (Wisconsin Bar No. 1095653)
(*Pro Hac Vice* forthcoming)
WOMEN'S LIBERATION FRONT
1802 Vernon St. NW, #2036
Washington, DC 20009
Phone: 202-964-1127
legal@womensliberationfront.org

Counsel for Plaintiffs

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**     **ER-93**

HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
MARK P. MEUSER (SBN: 231335)
mmeuser@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
Telephone: (415) 433-1700
Facsimile: (415) 520-6593

MATTHEW HOESLY (SBN: 289593)
mhoesly@dhillonlaw.com
DHILLON LAW GROUP INC.
2424 S.E. Bristol Street, Suite 300
Newport Beach, CA 92660
Telephone: (415) 433-1700
Facsimile: (415) 520-6593

LAUREN A. BONE (*Pro Hac Vice*)
legaldirector@womensliberationfront.org
WOMEN'S LIBERATION FRONT
1802 Vernon Street NW, #2036
Washington, D.C. 20009
Telephone: (202) 507-9475

JORDAN C. CAMPBELL (*Pro Hac Vice Pending*)
jordan@cmppllc.com
CAMPBELL MILLER PAYNE PLLC
5955 Alpha Rd #1491
Dallas, TX 75240
Telephone: (214) 316-7156

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA (FRESNO DIVISION)

---

First Amended Complaint

Case Number: 1:21-cv-01657-JLT-HBK

**ER-94**



JANINE CHANDLER; KRYSTAL GONZALEZ; TOMIEKIA JOHNSON; NADIA ROMERO, CATHLEEN QUINN; and CHANNEL JOHNSON

Plaintiffs,

v.

JEFFREY MACOMBER, Secretary of the California Department of Corrections and Rehabilitation, in her official capacity; ANISSA DE LA CRUZ, Warden, in her official capacity; LAVELLE PARKER, Warden, in his official capacity; and DOES 1-10

Defendants

KELLI BLACKWELL; KATIE BROWN; TREMAYNE CARROLL; KENNARD LEE DAVIS; JENNIFER ROSE; and TRANSGENDER, GENDER-VARIANT & INTERSEX JUSTICE PROJECT

Intervenors

**Case No.:** 1:21-cv-01657-JLT-HBK

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---



First Amended Complaint

Case Number: 1:21-cv-01657-JLT-HBK

**ER-95**

*Prison walls do not form a barrier separating prison inmates from the protections of the Constitution.*

– Justice Sandra Day O'Connor, *Turner v. Safley*, 482 U.S. 78, 84 (1987).

Plaintiff inmates Janine Chandler, Krystal Gonzalez, Tomiekia Johnson, Nadia Romero, Channel Johnson, and Catherine Quinn, by their attorney, Dhillon Law Group, Inc. for their claims against Defendants Jeffery Macomber, in his official capacity as Secretary of the California Department of Corrections and Rehabilitations; Anissa De La Cruz, in her official capacity as Warden of Central California Women's Facility, Lavelle Parker, in his official capacity as Warden of California Institution for Women, and Does 1-10, allege and show the Court as follows (this "Complaint").

## NATURE OF THE ACTION

1.      California recently passed sweeping prison legislation—Senate Bill 132 ("S.B. 132")—requiring the California Department of Corrections to place biological male inmates in female correctional facilities.

2.      In accord with the requirements of S.B. 132, Defendants have adopted and implemented policies forcing biological women to live in close proximity with biological males simply because the biological males self-identify as transgender. This includes requiring female inmates to sleep, shower, and go to the bathroom with biological males.

3.      Many of these biological males who now identify as transgender have never self-identified as transgender prior to entering the prison system. Often, there is no evidence they are in the process of "transitioning." They do not call themselves by a female name, dress or otherwise groom themselves to appear as a female, and have not received or plan to receive treatment for their trans-identification such as hormonal treatment or genital surgery.

4.      Yet simply by stating they now identify as transgender, S.B. 132 requires the California Department of Corrections and Rehabilitation ("CDCR") to transfer them to a female correctional facility.

1



First Amended Complaint                    Case Number: 1:21-cv-01657-JLT-HBK

5.      This action presents facial and as-applied challenges to the constitutionality of S.B. 132, the enforcement of which infringes upon the (I) protection from cruel and unusual punishment under the Eighth Amendment, (II) freedom of speech of the First Amendment, (III) freedom of religion under the First Amendment, and (IV) equal protections under the Fourteenth Amendment.

## INTRODUCTION

6.      This action challenges the constitutionality of California Penal Code §§ 2605 and 2606, sections added to the Penal Code by S.B. 132, *The Transgender Respect, Agency, and Dignity Act*" (herein, "S.B. 132"), on the grounds that it cannot be applied or enforced in any manner without violating the constitutional rights of Plaintiffs, biological females incarcerated in California's women's correctional facilities.

## JURISDICTION AND VENUE

7.      This action arises under 42 U.S.C. § 1983 in relation to Defendants' deprivation of Plaintiff's fundamental rights to the freedom of religion and the freedom of speech under the First Amendment to the U.S. Constitution, Plaintiffs' right to equal protection under the Fourteenth Amendment of the U.S. Constitution, and Plaintiffs' right to the protection from cruel and unusual punishment of the Eighth Amendment of the U.S. Constitution.

8.      Accordingly, this Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has authority to award the requested injunctive relief and damages under 28 U.S.C. § 1343(a); and attorneys' fees and costs under 42 U.S.C. § 1988.

9.      This Court is the appropriate venue for this action pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) because it is the district where Defendants maintain offices, exercise their authority in official capacities, and will enforce S.B. 132. Further, this is the District in which substantially all the events giving rise to the claims occurred and continue to occur.

///

2



First Amended Complaint                    Case Number: 1:21-cv-01657-JLT-HBK

**PARTIES**

10.    Plaintiff Janine Chandler ("Janine") is a female inmate currently incarcerated in Central California Women's Facility ("CCWF"). She serves the prison in the optical clinic. She is also an observant Muslim who regularly meets with her imam and wears a hijab. Janine is a survivor of domestic abuse and numerous incidents of sexual abuse in her childhood. Janine's first became a victim of sexual assault by a family member at the age of 4. She was also later raped by a friend. Janine's cycle of violent abuse continued into her marriage where she endured domestic violence from her husband. She is in prison today for defending her life from her husband, who had a documented history of abusing Janine and other women. Janine shot her husband in self-defense, and unintentionally hit and killed a bystander. She is currently serving a life-sentence at CCFW.

11.    Plaintiff Krystal Gonzalez ("Krystal") is a 36-year-old mother and grandmother currently imprisoned in CCWF. She has been sexually assaulted by trans-identifying male inmate while imprisoned and CCWF has retaliated against her for reporting her assault.

12.    Plaintiff Tomiekia Johnson ("Tomiekia") is a female inmate currently incarcerated in CCWF. A mother, Tomiekia has endured persistent physical and sexual violence by multiple assailants throughout her lifetime. Like Janine, Tomiekia is a survivor of domestic violence and is in prison for defending her life against her late husband. Her victimization started during college, when one male acquaintance sexually assaulted her, and another strangled her for several minutes. When Tomiekia married her husband, Marcus, her exposure to violence only increased. For example, one incident involved Marcus attacking Tomiekia in their home, dragging her by her hair and throwing her body against the walls. Marcus committed this act so forcefully that their ceiling fan fell onto Tomiekia. After this assault, Marcus had nonconsensual sex with Tomiekia. At one point, Tomiekia recalls Marcus strangling her to such a degree that she thought she would die. Then, one night, during an argument, Marcus pointed a gun at Tomiekia before accidentally dropping it. Having to quickly decide whether to fight or flee, Tomiekia grabbed the firearm and shot Marcus, killing him. Despite this action being in self-defense, the State ruled that her use of force was excessive and

3

First Amended Complaint                    Case Number: 1:21-cv-01657-JLT-HBK

sentenced her to 50 years to life in prison.

13.     Plaintiff Nadia Romero ("Nadia") is a devoutly Catholic female inmate currently incarcerated in CCWF. Nadia is a survivor of severe sexual and physical abuse perpetrated by men starting from early childhood and continuing into the present. Even prison has not been a reprieve from the sexual and physical assault Nadia has been subjected to her entire life. At the age of 11, Nadia witnessed her uncle rape her 8-year-old sister, and during her attempt to save her sister, Nadia was sexually assaulted herself. A year later Nadia ran away to avoid having contact with her abuser only to subsequently be brutally raped by four different men. Due to such early exposure to sexual trauma, Nadia developed severe anxiety, depression, and substance abuse. Although Nadia has sought extensive mental health care to manage her post-traumatic stress disorder ("PTSD") symptoms, Nadia's trauma and symptoms are extremely exacerbated and directly correlated to the fact that she is forced to be housed with biological males who identify as transgender in CCWF.

14.     Plaintiff Cathleen Quinn ("Cathleen") is a female inmate at CCWF. Cathleen's life has been defined by domestic abuse and mental illness since she was a teenager. Her victimization started at the outset of her marriage. Just 18 years old and reeling with depression after the death of her brother, Cathleen entered marriage vulnerable; her husband quickly exploited this to become physically and sexually abusive. After Cathleen gave birth to the couple's daughter, Cathleen's husband began controlling every part of her finances, effectively making it impossible for her to escape the abusive marriage. After threatening to leave her husband, he attempted to drown her in a toilet and threatened to kill her if she tried to escape with their daughter. Cathleen's past prior to incarceration marked her with depression, trauma, and substance abuse issues upon entering prison. Since her incarceration and being forced to live with biological male inmates, Cathleen has experienced depression, mental anguish, and despair for her life. She developed stress-related alopecia and was prescribed medication to reverse the effects of this disease. Alopecia is caused by response to trauma and physical stressors.

15.     Plaintiff Channel Johnson (Channel") is a female inmate at the California

4

First Amended Complaint                    Case Number: 1:21-cv-01657-JLT-HBK

Institution for Women ("CIW"). Channel is a victim of sex trafficking, having been sold for sex from the age of 13. She is incarcerated for physically defending the safety of younger girls targeted by traffickers. As to be expected, Channel's life has been characterized by sexual violence.

16.    Defendant Lavell Parker is being sued in his official capacity as the acting Warden for CIW in Corona, CA. Defendant Parker has served as the acting Warden for CIW since March 2024.

17.    Defendant Anissa De La Cruz is being sued in her official capacity as the Warden for CCWF in Chowchilla, CA. Defendant De La Cruz was appointed Warden of the CCWF by Governor Gavin Newsom on April 23, 2024.

18.    Defendant Jeffrey Macomber is being sued in his official capacity as the Secretary of CDCR. Defendant Macomber was appointed Secretary of the CDCR by Governor Gavin Newsom on December 12, 2022.

## FACTUAL ALLEGATIONS

### A. Legislative History of the PREA

19.    Congress passed The Prison Rape Elimination Act of 2003 ("PREA") on September 4, 2003, to establish a zero-tolerance standard for prison rape in the United States. 41 U.S.C. § 15602(1). The Act sought to increase the accountability of prison officials who failed to detect, prevent, reduce, and punish prison rape," and to protect the Eighth Amendment rights of United States Prisoners. 41 U.S.C. § 15602(6).

20.    The PREA recommends standards for inmate screenings to reduce the risk of victimization and abusiveness and to make individualized determinations on how to ensure the safety of each inmate by ensuring that trans-identifying inmates are not placed facilities or housing units based solely on their sexual orientation, genital status, or gender identity.

21.    In 2009, California attempted to pass AB 382, *LGBT Prisoner Safety Act*, to require the CDCR to consider specific "risk factors," including sexual orientation and gender identity of inmates, when determining their housing assignments. AB 382 was vetoed by then

5



First Amended Complaint                    Case Number: 1:21-cv-01657-JLT-HBK

**ER-100**

Governor Arnold Schwarzenegger because the Act's language implemented standards identical to those already followed by the CDCR, in compliance with the PREA, such that the sexual orientation and gender identify of an inmate was already considered in evaluating whether an inmate would face potential risk for sexual violence and abuse in certain facilities.

22. In 2010, California attempted to pass AB 633, an amended version of AB 382 from 2009, which sought to amend inmate classification and housing assignment procedures. AB 633 would provide new risk factors that should be assessed in considering inmate victimization. The legislation was opposed by numerous organizations, including The California Correctional Supervisors Organization, because it required the CDCR to take into consideration sexual identity or orientation when classifying an inmate, a factor already considered by the CDCR and the PREA.

23. On September 26, 2020, California Governor Gavin Newsom signed into law S.B. 132, *The Transgender Respect, Agency and Dignity Act*, which became effective on January 1, 2021. The law added Sections 2605 and 2606 to the California Penal code, which requires the CDCR to house transgender, non-binary, and intersex prisoners based on their gender identity, regardless of their biological sex. Cal. Penal Code §§ 2605(a)(1)-(3), (6).

24. In expanding the PREA standards requiring the consideration of gender identification and sexual preference in assessing housing placements for inmates, S.B. 132 goes well beyond consideration, and instead prohibits the CDCR from denying housing placement based on the "anatomy or sexual orientation" of an inmate, "or a factor present among other people incarcerated at their preferred type of institution." The CDCR enables trans-identifying inmates who are biological males to be placed in a women's facility without any consideration as to their biological sex.

25. The PREA requires organizations responsible for federal, state, local and private prisons, jails or other penal facilities to adopt standards for the detection, prevention, reduction, and punishment of prison rape, as consistent with the natural standards adopted pursuant to the PREA. 34 U.S.C. § 30308(a)-(b).

26. The CDCR's Operation manual Article 44 § 54040 et seq. ensures compliance

6

DHILLON LAW GROUP INC.

with the PREA and 28 C.F.R. § 115 et seq. outlining guidelines for CDCR's response to sexual misconduct in their facilities.

27. The CDCR is required to ensure compliance with the PREA, and each correctional facility must screen inmates for "risk of being sexually abused by other inmates or sexually abusive towards other inmates" upon intake, before a transfer to another facility, referral or request for facility transfer, after a sexual assault incident, and upon receipt of "additional information that bears on the inmate's risk of sexual victimization or abusiveness." 28 C.F.R § 115.41(c). Screenings require an evaluation for the risk of sexually abusive behavior towards other inmates based on prior acts of sexual abuse, prior convictions for violent offenses, and history of prior institutional violence or sexual abuse. *See id.*

28. S.B. 132 also requires the CDCR to address inmates with their preferred pronouns and search inmates in accordance with their gender preference, regardless of their biological sex.

29. Further, S.B. 132 requires trans-identifying inmates "be housed at a correctional facility designated for men or women based on the individual's preference" and have an inmate's individual "perception of health and safety" given consideration for "any bed assignments, placement, or programming decision," including placing them in single-cell housing, and "housing the individual with another incarcerated person of their choice," or removing any other inmate that "poses a threat from any location they may have access to." Cal. Penal Code § 2606(1)-(4).

30. S.B. 132 therefore requires that each incarcerated individual's housing placement is based on their self-identification and declaration that they identify as transgender, non-binary, or intersex, which allows any inmate, regardless of their biological sex or genitalia, to be placed in the housing facility of their choice. S.B. 132 allows for biological male inmates to declare they are trans-identifying and be housed in a single-sex women's facility without any accompanying actions or evidence their declaration is true. Cal. Penal Code § 2606(c).

31. The CDCR is empowered by S.B. 132 to place any trans-identifying biological male inmate, no matter how legitimate the individual's "identification," in a women's facility

7



First Amended Complaint                    Case Number: 1:21-cv-01657-JLT-HBK

solely upon their request. This poses a present and actual danger to female inmates, particularly those who have suffered from past sexual, physical, and emotional abuse by males.

32.    S.B. 132 expressly seeks to protect the "agency" and "dignity" of inmates who identify as "transgender, nonbinary, or intersex" but does so by removing the agency and dignity of biological female inmates, forcing them to live with biological males, and subjecting them to legitimate risk of sexual assault, physical violence, and other emotional trauma that comes as a natural consequence of having been victims of prior abuse.

**B. The California Department of Corrections and Rehabilitations, California Institute for Women and California Correctional Women's Facility had knowledge of the increase of risk to female inmates by the implementation of S.B. 132.**

33.    The CDCR Division of Adult Institutions and California Correctional Health Care Services requested the following budget: $2.8M for FY22, $1.8M for FY23, and $1.2M FY24, "to develop and implement policies and procedures in response to Senate Bill 132" (the "Budget").

34.    The Budget states that "the department has identified the number of inmates who identify as transgender is increasing," likely due to "agency efforts to implement new procedures," including requiring that CDCR place inmates in their preferred sex-segregated facilities. Further, the CDCR expects the PREA sexual assault allegations will increase as S.B. 132 is implemented "because it will result in the integration of different populations that have not previously been housed together."

35.    The CDCR knew that implementing S.B. 132 would create significant safety issues and an increase in complaints *because* biological males would be housed with female inmates, and the CDCR knew that women inmates were at a greater risk of sexual assault by trans-identifying biological male inmates requesting being housed in women's facilities. The CDCR knows that many of the trans-identifying biological male prisoners are sexual abusers.

36.    On information and belief, prior to the passage of S.B. 132, the CDCR did not distribute condoms to female inmates in women's facilities or provide unlimited access to other forms of birth control. After the implementation of S.B. 132, the CDCR, CCWF and CIW

8



First Amended Complaint                        Case Number: 1:21-cv-01657-JLT-HBK

budgets have increased to anticipate the need for condom and birth control access for female inmates.

37. The CDCR is aware that S.B. 132 poses significant a security risk, and states that "the department anticipates a transition period within its institutions that may result in an increase in safety concerns and inmate complaints."

38. S.B. 132 does not require trans-identifying biological males to undergo sex change surgery before transferring to a women's prison. Nor does it require an inmate to even be in the process of transitioning, either socially or medically. S.B. 132 only requires that the inmate self-proclaim to identify as a woman or as non-binary.

39. In August 2022, The Office of the Inspector General released a Special Review of the CDCR's implementation of S.B. 132 with these findings:

    i.     "The Act's broad language limiting the bases to deny a transfer request has also made it challenging for the department to develop specific criteria to evaluate transfer requests."

    ii.     "If a person with a history of raping women requests to transfer to a women's prison, this language may prohibit the department from denying the person's transfer request based solely on the prospective transferee's history of raping women."

    iii.     It is difficult for the department to "accurately assess a prospective transferee's sincerity in self-identifying their gender identities or their true intentions in requesting a transfer under the Act."

    iv.     "Some believed prospective transferees were seeking to transfer to have sexual relations with incarcerated people who were designated female at birth. Some transferees suggested the department should better screen prospective transferees and deny transfer to those with histories of abuse to increase safety at women's prison . . . [o]ne prospective transferee made the following observation: 'There are a lot of wolves in sheep's clothing. There are a lot of men who are now all of a sudden transgender.'"

9



First Amended Complaint              Case Number: 1:21-cv-01657-JLT-HBK

40.    In July 2024, The Department of Justice, Office of Justice Programs published their Sexual Victimization Report by the Adult Correctional Authorities statistic tables ("Statistics Report") from 2019-2020 detailing incidents of assault in prisons. Of the 26.2% of female inmates who were victims of inmate-on-inmate violence, nearly 18% of assaults were perpetrated by trans-identifying biological males, an overwhelming disproportionate percentage compared to the overall number of trans-identifying biological male inmates.

41.    On information and belief, CCWF's facilities are overcrowded, housing as many as eight people in four person cells. The cells also have showers and toilets which additionally contribute to CCWF staff's inability to adequately protect against inmate-on-inmate violence.

42.    The Statistics Report provides that 54.1% of all nonconsensual sexual acts perpetrated by inmates occur in areas under no surveillance, and 36% of inmate-on-inmate sexual assault occurs in a victim's cell.

43.    CCWF continues to disregard the significant risk to female inmates by allowing trans-identifying biological males to live in overcrowded cells, despite knowing that female inmates are at a high risk of sexual assault by living in close proximity with trans-identifying biological males, and that a large percentage of sexual assault occurs in a victim's cell.

44.    Because S.B. 132 allows trans-inmates to request certain cellmates, trans-identifying males can further victimize female inmates with greater success due to the lack of surveillance and lower risk of detection.

45.    The CDCR applies PREA reporting standards differently based on single-sex and mixed-sex facilities. CIW is labeled as a single-sex facility while CCWF is referred to as a mixed-sex facility, discrediting the claims that trans-identifying biological males are, for all intents and purposes, "female."

46.    Since the implementation of S.B. 132, California state data shows that CDCR has transferred nearly 50 biological men into CIW and CCWF. Many of these individuals have criminal histories of violence against women, posing a legitimate threat to female inmates' safety.

10



First Amended Complaint                    Case Number: 1:21-cv-01657-JLT-HBK

**ER-105**

**C. Research demonstrates that trans-identifying biological male inmates pose a significant risk to female inmates based on their past criminal history.**

47.    CDCR reports that 33.8% of potential trans identifying biological male inmates that are seeking to transfer under S.B. 132 are registered sex offenders.

48.    Bureau of Federal Prisons reports that as of December 2021, approximately 48% of trans identifying biological male inmates have committed sex offenses, compared to 11.6% of general male inmate population.

49.    Canada's 2022 Correctional Service Research Report, *Examination of Gender Diverse Offenders*, examined data from 2017 to 2020 and reported that 64% of trans identifying biological male inmates had a "current sexual offense" conviction. Nearly 88% had a past sexual offense conviction, and 41% were imprisoned for homicide-related crimes—compared to only 21% of non-trans-identifying biological male inmates. 85% of trans-identifying biological males were convicted of violent crimes that caused either "serious harm" or death, and 58% of the victims of these crimes were women or children.

50.    A 2019 study in the United Kingdom reported that 58.9% of trans-identifying biological male inmates committed sex offenses, with 28% having committed rape and 18% having committed attempted rape.

51.    Rule 11 of The United Nations Standard for Rules for the Treatment of Prisoners recommends that "[m]en and women shall so far as possible be detained in separate institutions; in an institution which receives both men and women, the whole of the premises allocated to women shall be entirely separate," because of the risk male inmates pose to female inmates.

**D.  S.B. 132 subjects' female inmates to increased risk of mental health issues by placing trans-identifying male inmates with women who are known to suffer disproportionately from post-traumatic stress disorder ("PTSD").**

52.    In 2020, The Urban Institute's report "Addressing Trauma and Victimization in Women's Prisons" found that 53% of incarcerated women demonstrated lifetime prevalence of PTSD.

53.    The 2013 Department of Justice Assistance report found that nearly 43% of

11



First Amended Complaint                    Case Number: 1:21-cv-01657-JLT-HBK

ER-106

female inmates who participated in the study demonstrated at least one serious mental illness, and 53% met the criteria for lifetime PTSD.

54.    Plaintiffs have a substantial fear of future physical or sexual assault and sexual harassment by trans-identifying biological male inmates who are transferred to CCWF. Plaintiffs have experienced and continue to experience fear, depression, anxiety, and distress from the presence of biological male inmates, worsening their post-traumatic stress disorders, because they are forced to share close-living quarters, shower, go to the bathroom, and sleep with biological males.

55.    International studies researching trans-identifying biological males in different regions demonstrate the robust scientific knowledge that trans-identifying biological males pose a significant security risk to female inmates.

56.    Plaintiffs have a history of sexual abuse or assault.

57.    Plaintiffs suffer from mental distress, fear, anxiety, PTSD, hyper vigilance, panic attacks, or autoimmune disease due to their exposure and conditions of living with biological male inmates.

### PLAINTIFF ALLEGATIONS

**a. Janine Chandler**

58.    Janine has observed the arrangements and behavior of trans-identifying biological male inmates housed in her prison, and this has caused her fear and an exacerbated experience of PTSD. Janine has observed that most of the trans-identifying biological male inmates transferred to CCWF do not make any effort to behave gently around female inmates or assimilate to CCWF culture.

59.    Janine is not alone in her awareness of the risk trans-identifying biological males pose. On information and belief, CCWF staff now carries stronger pepper spray and is trained on harsher riot control measures—two changes only occurring once the prison began taking in trans-identifying biological male inmates.

60.    Janine also is aware that CCWF is distributing condoms to field the pregnancy

12



First Amended Complaint                    Case Number: 1:21-cv-01657-JLT-HBK

**ER-107**

risks only present after trans-identifying biological males entered the prison.

61.    Being housed with trans-identifying biological male inmates profoundly affects Janine's mental health in two ways. First, the presence of criminal, intimidating males gives her flashbacks of her violent husband. Second, her inability to choose who she undresses around and helplessness to prevent trans-identifying biological male inmates from observing her while she undresses is extremely distressing to Janine. Janine is a Muslim whose faith instructs her to not be unclothed with unrelated males. CCWF is forcing Janine to live in conditions that violate her sincerely held religious beliefs.

### b. Krystal Gonzalez

62.    Krystal was sexually assaulted by a trans-identifying biological male inmate transferred to her housing unit. This male inmate thrusted his penis against Krystal's backside without her consent.

63.    Krystal promptly disclosed the incident to CCWF staff, and, after staff failed to pursue her report, she filed a grievance with the CDCR.

64.    In her CDCR grievance, Krystal requested single-sex housing to prevent further sexual victimization. CCWF ultimately ignored her grievance but did note that Krystal had been assaulted by a "transgender woman with a penis."  CCWF ignored Krystal's documented concern of being housed with males.

65.    Generally, Krystal is very intimidated by trans-identifying biological male inmates living in her prison due to their behavior. The inmates Krystal has interacted with never attempt to present as women, which creates a culture of intimidation for Krystal and other female inmates. Krystal has observed trans-identifying biological male inmates manipulating prison staff's perceptions of them by "posing" femininely when meeting with prison counselors but reverting to their masculine habits upon returning to their housing units. These inmates, Krystal observes, also rush to engage in sexual relationships with female inmates upon entering CCWF, creating a profound sense of unease and angst among many of the female inmates, including Krystal.

///

13

First Amended Complaint                              Case Number: 1:21-cv-01657-JLT-HBK

### c. Tomiekia Johnson

66.    Tomiekia Johnson was diagnosed with acute PTSD upon pre-trial evaluation for the murder of her husband. This condition is exacerbated by the presence of trans-identifying biological males housed at CCWF and her observations of their behavior.

67.    Tomiekia witnessed and reported incidents of sexual harassment (voyeurism) of co-Plaintiff Cathleen Quinn by a trans-identifying biological male inmate named Michael Contreras ("Contreras"). Contreras is a large man who dresses and grooms masculinely and is not interested in making any effort to present as a woman. Despite a multi-witness report of his violent behavior, CCWF issued no reprimand and continued to house Contreras close to Cathleen.

68.    Tomiekia is also aware of Contreras stalking and attempting to rape another female inmate, Jennifer Barbero. Here again, CCWF took no disciplinary measures, citing the fact that since Jennifer fortunately defended herself effectively, Contreras was not removable because his rape was only "attempted" and not completed.

69.    With this demonstrated impunity, Contreras continued harming female inmates at CCWF. After attempting to rape Jennifer, Contreras strangled an elderly female inmate.

70.    Tomiekia knows of yet another incident of a trans-identifying biological male inmate harming a female inmate. Three inmates reported that they witnessed a trans-identifying biological male inmate vaginally rape a female inmate while she was unconscious. According to witnesses, after raping the female inmate, the trans-identifying biological male inmate threatened to rape and murder other female inmates within earshot of staff. This inmate was temporarily removed from the housing unit in which he committed the rape, but subsequently returned.

### d. Nadia Romero

71.    On multiple occasions in 2021, Nadia was repeatedly subjected to unwanted physical touching by a trans-identifying biological male inmate while Nadia was trying to complete a work assignment. She attempted to get the male inmate to stop, but he refused.

72.    Feeling unsafe, Nadia filed a grievance and requested that CCWF adjust her

14



First Amended Complaint                    Case Number: 1:21-cv-01657-JLT-HBK

work schedule to not overlap with that of this trans-identifying biological male, expressing her legitimate fear for her safety and mental wellbeing. Her grievance was ignored. Instead, CCWF went out of its way to lecture Nadia that her own experience of being harmed was not by a biological male but a "transgender woman." This invalidated the basis of Nadia's reported concern, leaving her without an option to avoid the male inmate.

73. As Nadia is a devout Catholic, she believes that gender identity conflicts with God's design of biological sex and that using an individual's "preferred pronouns" is sinful as it is asserting a lie. Additionally, having unrelated males and females living together and undressing in front of one another outside of marriage conflicts with her sincerely held religious beliefs.

74. By experiencing bias as to whether CCWF accommodates her safety requests if she refers to biological male inmates as such, Nadia's deeply held faith and her physical survival have been pitted against each another. And by housing trans-identifying biological male inmates in her section of the prison, CCWF is forcing Nadia to live in conditions that violate her sincerely held religious beliefs.

75. Nadia's multiple harmful experiences with a trans-identifying biological male inmate has made her hyperventilate and suffer panic attacks when in proximity to *any* trans-identifying biological male inmate. Since CCWF has placed numerous trans-identifying biological male inmates in the prison, these symptoms erupt constantly. Nadia has also reported feelings of helplessness, despair, anxiety, and depression.

### e. Cathleen Quinn

76. On two separate occasions in February 2022, Contreras, "peep[ed]" at Cathleen while she was using the bathroom and naked from the waist down. Contreras's behavior was caught on video.

77. Contreras suffered no punishment, being allowed to remain in the same housing unit where he invaded Cathleen's privacy in the bathroom.

### f. Channel Johnson

78. Channel Johnson was assigned to a cell with a trans-identifying biological male

15



First Amended Complaint                    Case Number: 1:21-cv-01657-JLT-HBK
                                                          ER-110

inmate, Jonathan Robertson.

79.     At first, Channel and Robertson engaged in consensual sex. Then, however, Robertson began stealing from Channel and reports of their relationship circulated to prison staff.

80.     After Robertson was placed in administrative segregation as discipline for his relationship with Channel, he began demanding Channel deny they ever had a relationship. When Channel refused to lie, Robertson threatened to rape and murder her. He also stole Channel's mail, read her family's home address, and began mailing threats of rape and murder to her family—including her minor younger brother and nephew.

81.     Despite both Channel and her family reporting the threatening letters to CCWF, it was Channel who was transferred to another prison, CIW. No action was taken by CCWF to punish Robertson.

82.     Channel was moved back to CCWF in 2023 while Robertson was still housed there. He threatened her upon arrival, saying, "I'm staying; you better watch out."

## RETALIATORY RESPONSES BY CALIFORNIA CORRECTIONAL WOMEN'S FACILITY AND CALIFORNIA INSTITUTE FOR WOMEN

### a. Nadia Romero

83.     CCWF retaliated against Nadia for using correct biological terms to refer to her attacker by completely ignoring her desperate pleas to be separated from him. CCWF's ignoring Nadia's request has proactively kept her in harm's way, which CCWF knows but chooses to not act upon.

### b. Krystal Gonzalez

84.     Beyond disregarding Krystal's grievances, CCWF has retaliated against her by lodging accusations at her for speaking out. She is accused of willful misgendering—even in the context of reporting her own sexual assault by a trans-identifying biological male inmate. This intimidates her into silence.

16



First Amended Complaint                    Case Number: 1:21-cv-01657-JLT-HBK

### c. Tomiekia Johnson

85. Consistent with CCWF's refusal to discipline trans-identifying males who brutalize female inmates, Tomiekia's reports to the prison have been consistently ignored, disregarded, and suppressed. Further, CCWF has retaliated against Tomeikia for her reporting. For example, after Tomiekia, Cathleen, and another inmate reported Contreras for sexually harassing Cathleen, CCWF put all three women into solitary confinement, citing "safety" concerns. CCWF did not, however, punish Contreras for his behavior and allowed him to continue living in proximity with his victims and other female inmates.

86. To further solidify the lesson it wanted to teach these women (for reporting the violent and threatening behavior of a trans-identifying biological male inmate), CCWF issued the women violation reports, declaring that they "falsely reported" Contreras. Though the reports were ultimately dropped (because the CCWF could not disprove the veracity of the reports), the violation report experience nonetheless shook the women.

87. To this day, Tomiekia continues to be subject to ongoing retaliation from CCWF. CCWF continues to discriminate against Tomiekia for filing grievances and reporting the assault. CCWF has even cited her constitutionally protected right to participate in this lawsuit as proof that she holds bias against trans-identifying biological male inmates. Most disturbingly, despite having consistently met or even exceeded the criteria for re-sentencing or commutation, Tomiekia has been told she is being denied parole for "political reasons."

### d. Cathleen Quinn

88. CCWF retaliated against Cathleen in both the short and long term. First, in the immediate aftermath of her reporting Contreras, she was put in solitary confinement.

89. Second, and most disturbingly, CCWF literally stripped her of her long-awaited freedom. The month after she reported Contreras for looking at her while she was half-naked, Cathleen was found suitable for parole. This began a 150-day waiting period by which her suitability would be confirmed, and she would be released.

90. But shortly after she was found suitable for parole, CCWF issued a retaliatory Rules Violation Report ("RVR") against Cathleen, leading to her parole grant being vacated. At

17



First Amended Complaint                    Case Number: 1:21-cv-01657-JLT-HBK

the time of the revocation, she was roughly four months away from freedom.

91. The next year, Cathleen appealed the RVR and, after 11 months, was found not guilty. Stripped of its reason to keep Cathleen in prison, CCWF's parole board created new pretextual reasons to continue to block her parole eligibility for an additional five years, this time by arbitrarily finding her guilty of an ambiguous violation of "institutional misconduct." The sole "misconduct" citied happened prior to (and did not prevent) her initial suitability grant, so it is implausible to claim it as the basis for her subsequent denial.

92. Shockingly, CCWF did not hide its bias against Cathleen. The Commissioner overseeing Cathleen's parole hearing told her she "should have been quiet" about her "victimization" so she could have "gone home."

### e. Channel Johnson

93. CCWF's retaliatory response to Channel's report of Robertson's violent, threatening letters to her family is demonstrated by the disparate treatment between the two inmates. Channel was put in solitary confinement and banished from the prison with which she had become familiar. Robertson, whose background includes having raped a woman in another female prison, stayed put.

**CLAIMS**

**FIRST CLAIM FOR RELIEF**

**42 U.S.C. § 1983 – Violation of the Cruel and Unusual Punishment Clause of the Eighth Amendment**

**(By All Plaintiffs Against All Defendants)**

94. Plaintiffs hereby incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

95. At the time of the relevant events, all Plaintiffs had a clearly established right under the Eighth Amendment to the United States Constitution to protection from cruel and unusual punishments, which is made applicable to the states through the Fourteenth Amendment. *Estelle v. Gamble,* 429 U.S. 97 (1976).

18



First Amended Complaint                     Case Number: 1:21-cv-01657-JLT-HBK

96.     Prison officials violate the Eighth Amendment when they act with deliberate indifference to an inmate's health or safety. Deliberate indifference occurs when an "official knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825 (1994).

97.     Further, where a prison authority ignores a condition of confinement that is "sure or very likely to cause serious illness and needless suffering," a court can find an Eighth Amendment violation. *Helling v. McKinney*, 509 U.S. 25 (1993).

98.     Eighth Amendment violations also exist where prisons consistently fail to account for prisoners' medical needs, including treatment accommodating environments in the interest of treating Post Traumatic Stress Disorder (PTSD). A prison's failure to guard against and provide for an inmate's medical conditions amounts to unnecessary and wanton infliction of harm, rising to the level of Eighth Amendment violations for cruel and unusual punishment. *California Coal. for Women Prisoners v. United States*, No. 4:23-CV-4155-YGR, 2024 WL 1290766 (N.D. Cal. Mar. 15, 2024) (citing *Jordan v. Gardner*, 986 F.2d 1521, 1525, 1528 (9th Cir. 1993)).

99.     S.B. 132 violates the Eighth Amendment both facially and as applied to Plaintiffs. S.B. 132 requires the CDCR to place trans-identifying biological male inmates in female housing facilities based on their preference and regardless of their sexual orientation, anatomy, and gender identity. This subjects female inmates to cruel and unusual punishment because the presence of trans-identifying biological male inmates—which statistics have shown are disproportionately violent relative to both the natal male and female prison population—in close quarters with female inmates, equates to a failure on CDCR's part to provide an accommodating environment for the population of female inmates suffering from PTSD. Knowing the medical needs of many female inmates, including Plaintiffs, and knowing the propensity of trans-identifying biological males to physically victimize women, CDCR is deliberately disregarding "an excessive risk to inmate health or safety."

100.     In adhering to S.B. 132, CDCR violated the Eighth Amendment protection against cruel and unusual punishment as to Plaintiffs by requiring trans-identifying biological male

19

First Amended Complaint                              Case Number: 1:21-cv-01657-JLT-HBK

inmates to be placed in female housing units. S.B. 132 allows for these placements on account of these male inmates' personal preferences, even when many of these male inmates have a known history of sexual violence against women.

101.    CDCR's implementation of S.B. 132 violates the Eighth Amendment, as the law's housing requirements represent a deliberate indifference to the Plaintiffs' safety. Many female inmates housed in CDCR's prisons carry *known* histories of PTSD caused by long histories of sexual, physical, and emotional abuse by males. Forcing these all-too-often sexually-traumatized and physically weaker female inmates to live with sexually violent male inmates amounts to a clear lack of appreciation of the risk these males pose. Allowing trans-identifying biological male inmates to live in close quarters, shower, sleep, and share intimate spaces with women deliberately disregards the historically known reality that "sex offenders who have criminally assaulted women in the past [can] be moved to do so again if access to women were established within the prison." *Dothard v. Rawlinson*, 433 U.S. 321, 335–36 (1977); *see also Torres v. Wisconsin Dep't. Of Health and Soc. Servs.*, 859 F.2d 1523, 1531 (7th Cir. 1988).

102.    Adhering to the requirements of S.B. 132, CDCR knowingly and deliberately subjected Plaintiffs to physical and sexual assault by trans-identifying biological male inmates The presence of biological male inmates in their prison continues to present a substantial and now clearly foreseeable risk to Plaintiffs of future physical and sexual assault by trans-identifying biological male inmates. The CDCR also failed to provide for the medical needs of female inmates plagued with PTSD by allowing trans-identifying biological males to live among them and harm them. It continues to fail in this area by rarely, if ever, disciplining trans-identifying male inmates who assault female inmates and instead retaliating against female inmates for advocating for their safety, dignity, and mental wellbeing.

103.    And even in the unlikely event that CDCR did not possess actual knowledge that complying with S.B. 132 would violate the Plaintiffs' Eighth Amendment rights, this lack of knowledge still amounts to deliberate indifference of a substantial risk of serious harm to Plaintiffs given the inevitable result of placing males adjudicated as violent, or demonstrably

First Amended Complaint                    Case Number: 1:21-cv-01657-JLT-HBK

violent, in close quarters with traumatized females.

104.    Plaintiffs have no adequate remedy at law and do and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from enforcing S.B. 132.

105.    Pursuant to 42 U.S.C. § 1983 and 1988, Plaintiffs are entitled to declaratory relief, and temporary, preliminary, and permanent injunctive relief, invalidating and restraining enforcement of S.B. 132.

106.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

### SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983 - Violation of the Free Speech Clause of the
### First Amendment of the United States Constitution
### (By All Plaintiffs Against All Defendants)

107.    Plaintiffs hereby incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

108.    S.B. 132 violates the First Amendment both facially and as applied to Plaintiffs. The First Amendment of the U.S. Constitution prohibits Congress from passing any law that abridges the freedom of speech. This is a fundamental right that applies to the state through the Fourteenth Amendment's due process clause. The First Amendment prohibits the government from forcing citizens to adopt the messages of the government and protects a citizen's right to think and speak as they wish. *Taking Offense v. State*, 66 Cal. App. 5th 696 (2021).

109.    The Free Speech Clause of the First Amendment protects against laws that prohibit speech based on the content of the message, including regulations of speech that "restrict expression because of its message, its ideas, its subject matter or its content." *Taking Offense*, 66 Cal. App. at 310.

110.    S.B. 132 requires Plaintiffs to refer to all inmates with their preferred pronouns,

21



First Amended Complaint                    Case Number: 1:21-cv-01657-JLT-HBK

regardless of their biological sex. Defendants actively change Plaintiffs' speech in their grievances to state that assault is not being perpetrated by trans-identifying males, but by transgender women, referring to these offending inmates with "she/her" pronouns.

111. Defendants retaliated against Plaintiffs by (i) issuing Rule Violation Reports (RVR) against Plaintiffs when they referred to trans-identifying male inmates with pronouns that align with their biological sex, and (ii) claiming that Plaintiffs' reporting is "harassment".

112. S.B. 132's unconstitutional burden on Plaintiffs' free speech rights in the form of prohibiting speech that some inmates or prison officials may find offensive or even "harassing" cannot stand. *See Taking Offense*, 66 Cal. App. at 310.

113. S.B. 132 violates the Freedom of Speech Clause of the First Amendment for two reasons: (1) S.B. 132 restricts and changes the speech and message that Plaintiffs convey in their grievances, and (2) retaliatory reactions Defendants have in response to Plaintiffs' speech as included in their grievances and biologically-correct pronoun usage, chills Plaintiffs speech by intimidating them out of filing additional grievances if necessary. It also effectively compels the speech of female inmates by forcing them to choose between speaking in line with S.B. 132's mandated pronoun language against their own conscience, or remaining in prison longer.

114. Defendants, in cooperating with S.B. 132, restricts and changes the speech Plaintiffs convey in their grievances about trans-identifying male inmates. "[T]he government may not compel a person to speak its own preferred messages[.]" *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505-506 (1969)). It also may not "force an individual to *include other ideas with h[er] own speech* that [s]he would not prefer to include." *Id.* (emphasis added).

115. S.B. 132 violates these First Amendment protection of free speech by compelling female inmates to use terms that submit to the government's own conception of gender identity. Indeed, Defendants used retaliatory methods to compel speech, claiming that "misgendering" inmates equates to "harassment" and may result in sentence extensions, and the Defendants changed Plaintiffs speech to reference trans-identifying male inmates with feminine pronouns and labels. Defendant's impermissible compel Plaintiffs that adopt their

22



First Amended Complaint                    Case Number: 1:21-cv-01657-JLT-HBK

preferred message by inserting their own belief about gender identity, thus burdening Plaintiff free speech rights. *303 Creative LLC*, 600 U.S. at 586, 143 S. Ct. at 2312.

116.    The Defendants also use S.B. 132 to compel Plaintiffs to speak a message which is factually untrue, violating the basic principles of the First Amendment. Given the First Amendment is disturbed even when the government forces an individual to speak *truthfully*, S.B. 132's consequences are especially egregious. *See Nat. Inst.* o*f Fam. and Life Advoc. v. Becerra*, 585 U.S. 755, 779, 138 S. Ct. 2361, 2378 (2018).

117.    Plaintiffs' right to speak a message, regardless of how offensive or unpopular that message is, includes Plaintiffs' right to refer to trans-identifying male inmates on the terms of their biological sex. *See Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 584 U.S. 617, 638, 138 S. Ct. 1719, 1731 (2018).

118.    Plaintiffs have no adequate remedy at law and do and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from enforcing S.B. 132.

119.    Pursuant to 42 U.S.C. § 1983 and 1988, Plaintiffs are entitled to declaratory relief, and temporary, preliminary, and permanent injunctive relief, invalidating and restraining enforcement of S.B. 132.

120.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

**THIRD CLAIM FOR RELIEF**

**42 U.S.C. § 1983 - Violation of the Free Exercise Clause of the**

**First Amendment of the United States Constitution**

**(By Plaintiffs Janine Chandler and Nadia Romero Against All Defendants)**

121.    Plaintiffs hereby incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

122.    The Free Exercise clause of the First Amendment of the United States

23

First Amended Complaint                    Case Number: 1:21-cv-01657-JLT-HBK



Constitution protects an individual's rights to practice her religion without undue governmental interference. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523 (2022).

123. S.B. 132 is incompatible with the Free Exercise clause of the First Amendment as applied to Plaintiffs Nadia Romero and Janine Chandler. Plaintiffs Romero and Chandler are respectively Catholic and Muslim. Chandler sincerely believes that it is wrong to be unclothed in the presence of unrelated members of the opposite sex, in line with her faith.[1] Fortunately, this sincerely-held religious belief is in harmony with CDCR's penological interest to maintain prison security. Plaintiffs have witnessed violence committed by trans-identifying male inmates against other female inmates not parties to this case.

124. Courts examine the sincerity of an individual's religious beliefs by looking at the individual's accounts and actions relevant to their religious identity. *See e.g. Pasaye v. Dzurenda*, 375 F.Supp.3d 1159, 1168-69 (D. Nev. 2019).

125. Nadia Romero and Janine Chandler have sincerely held religious beliefs against nakedness in the presence of males. At all times, Janine Chandler wears a hijab—a traditional religious head covering worn by Muslim women—as a practice of her Islamic faith to abide by modesty. Nadia Romero, a Catholic, believes that women should adorn themselves modestly as a practice of their faith, and should not "do anything that causes your brother to stumble,", and "whatever does not proceed from [this] faith is [a] sin." *Romans* 14:21, 23 (English Standard Version). Both Chandler and Romero have strong held, legitimate, and daily practiced religious beliefs, to the extent possible allowed by Defendants.

126. The Constitution protects one's religious beliefs and practices even where they may not be widely accepted or traditionally practiced. *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 714 101 S. Ct. 1425, 1430 (1981).

127. The sexually perverse and sexually violent behavior by trans-identifying male

___

[1] *See* Ustadha Zaynab Ansari, *Guidelines for Interacting with the Opposite Sex*, IslamQA, ("Another requirement of interaction between the sexes is that everyone should observe Islamic modesty or covering the awrah. . . . For women, this means covering the whole body except the face and hands."). https://islamqa.org/hanafi/seekersguidance-hanafi/32089/guidelines-for-interacting-with-the-opposite-sex/, last viewed on July 19, 2024.

___

24



First Amended Complaint                    Case Number: 1:21-cv-01657-JLT-HBK

**ER-119**

inmates is, in and of itself, a breach in prison security. Not only is the interest Plaintiffs and other female inmates in CDCR's prisons have in living separately from trans-identifying male inmates not in conflict with the penological interest of security, but the failure also to promote this interest clashes with the interest of prison security.

128.    A constitutional violation exists where an institution puts substantial pressure on an individual to substantially modify her behavior or to violate her religious beliefs. *See Washington v. Klem*, 497 F.3d 272, 277-78 (3d Cir. 2007); *See also Vazquez v. Ragonese*, 393 F. Appx. 925, 928-29 (3d Cir. 2010).

129.    S.B. 132 unconstitutionally burdens Plaintiffs' religious practices by forcing female inmates to live, undress, and uncover their bodies to members of the opposite sex, due to the proximity of living in overcrowded housing units with other inmates.

130.    Plaintiffs each hold strong religious beliefs prohibiting them from living with and uncovering their naked bodies to anyone of the opposite biological sex that is not their lawfully wedded husband, and to abide by tenants of bodily modesty.

131.    Defendants violate Plaintiffs free exercise of their religious beliefs by requiring them to live with biological males and unconstitutionally burdening their religious beliefs.

132.    S.B. 132 requires CDCR to impermissibly prevent Plaintiffs from adhering to tenants of modesty as required by their religious practices.

133.    Plaintiffs have no adequate remedy at law and do and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from enforcing S.B. 132.

134.    Pursuant to 42 U.S.C. § 1983 and 1988, Plaintiffs are entitled to declaratory relief, and temporary, preliminary, and permanent injunctive relief, invalidating and restraining enforcement of S.B. 132.

135.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.



First Amended Complaint                                      Case Number: 1:21-cv-01657-JLT-HBK

**ER-120**

**FOURTH CLAIM FOR RELIEF**

**42 U.S.C. § 1983 - Violation of the Equal Protection Clause of the**

**Fourteenth Amendment of the United States Constitution**

**(By All Plaintiffs Against All Defendants)**

136.    Plaintiffs hereby incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

137.    CCWF's adherence to S.B. 132 violates Plaintiffs' equal protection secured by the Fourteenth Amendment to the U.S. Constitution. The Equal Protections clause requires that no state shall deny a person equal protection of the law and protects against discrimination against individuals based on arbitrary classification. *Engquist v. Oregon Dep't. of Agr.* 553 U.S. 591, 598 (2008). The Constitution's equal protection extends to prisoners, and prison officials cannot discriminate against prisoners based upon membership in a protected class. *Davis v. Powell*, 901 F. Supp. 2d 1196 (S.D. Cal. 2012).

138.    Discriminating against individuals on the bases of sex is only justified where there are "exceedingly persuasive" governmental objectives, and that the discriminatory means are substantially related to achieve the government's interest. *United States v. Virginia*, 518 U.S. 515, 116 S. Ct. 2264 (1996).

139.    Inherent differences between men and women exist, and "the two sexes are not fungible; a community made up exclusively of one sex is different from a community composed of both." *Id.* at 533 (citations omitted), S.B. 132 overlooks legitimate safety and security interest of female inmates by failing to house men and women inmates separate and apart from one another.

140.    S.B. 132 policy on transferring trans-identified males to women's prisons is not exceedingly persuasive to show that housing biological men in women's prisons meets a compelling governmental interest.

141.    In fact, the very reason for providing separate correctional facilities for men and women based on biological sex—not gender identity--serves a legitimate penological purpose of protecting inmate from violence and further abuse by other inmates.

26

First Amended Complaint                                    Case Number: 1:21-cv-01657-JLT-HBK

142.    Lawful incarceration limits and revokes many privileges and rights of inmates, including the rights of prisoners to decide who to live and associate with, and inmates do not have the unbridled privilege to choose where to live as they would outside of penal institutions. *Jones*, 433 U.S. at 125.

143.    S.B. 132 facially, and as applied, violates the Equal Protection clause because it requires the CDCR and CCWF to place trans-identifying male inmates in single sex female prisons at their request, thereby discriminating against female inmates. S.B. 132 requires the CDCR to value the preference of trans-identifying inmates' housing preferences over the safety and security of female inmates, unconstitutionally impinging on the Plaintiffs' right to equal protection under the law.

144.    Plaintiffs have no adequate remedy at law and do and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from enforcing S.B. 132.

145.    Pursuant to 42 U.S.C. § 1983 and 1988, Plaintiffs are entitled to declaratory relief, and temporary, preliminary, and permanent injunctive relief, invalidating and restraining enforcement of S.B. 132.

146.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this court enter judgment against Defendants as follows:

1.    An order and judgement declaring S.B. 132, facially and as applied to Plaintiffs, violates the Cruel and Unusual Punishment clause of the Eighth Amendment to the U.S. Constitution; the Free Exercise clause of the First Amendment to the U.S. Constitution; the Freedom of Speech Clause of the First Amendment to the U.S. Constitution; and the Equal Protections Clause of the Fourteenth Amendment of the

27

U.S. Constitution;

2. An order permanently enjoining and prohibiting Defendants from enforcing S.B. 132 or otherwise interfering with Plaintiff's constitutional rights and federal guarantees;

3. For attorneys' fees and costs;

4. Such other and further relief as the Court deems appropriate and just.


Dated: July 19, 2024,                    DHILLON LAW GROUP INC.


                                         _/s/ Mark P. Meuser_____
                                         Harmeet K. Dhillon, Esq.
                                         Mark P. Meuser, Esq.
                                         Matthew M. Hoesly, Esq.


                                         WOMEN'S LIBERATION FRONT
                                         Lauren A. Bone, Esp. (*Pro Hac Vice*)


                                         CAMPBELL MILLER PAYNE PLLC
                                         JORDAN C. CAMPBELL (*Pro Hac Vice Pending*)

                                         Attorneys for Plaintiffs

28



KARIN SWEIGART (SBN: 247462)
Karin.sweigart@sm-llp.com
SWEIGART MURDOCK, LLP
1160 Battery St., Suite 100
San Francisco, CA 94111
Telephone: (415) 873-0123

LAUREN ADAMS (Admitted PHV)
legal@womensliberationfront.org
WOMEN'S LIBERATION FRONT
1802 Vernon St. #2036
Washington D.C. 2009

*Attorneys for Plaintiffs*

### UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA (FRESNO DIVISION)

| | |
|---|---|
| JANINE CHANDLER; et al.<br><br>Plaintiffs,<br>v.<br><br>JEFFREY MACOMBER, et al.<br><br>Defendants. | **Case No.:** 1:21-cv-01657-JLT-HBK<br><br>**PLAINTIFFS' NOTICE OF ELECTION TO STAND ON THE SUFFICIENCY OF THE FIRST AMENDED COMPLAINT** |

Plaintiffs' Notice of Election to Stand on the Complaint            Case Number: 1:21-cv-01657-JLT-HBK

**ER-124**

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that Plaintiffs does not intend to file a Second Amended Complaint in this action and will stand upon the sufficiency of the First Amended Complaint (Dkt. 84) and appeal the Court's March 23, 2026, Order Granting Defendant's Motion to Dismiss (Dkt. 132) to the Court of Appeals for the Ninth Circuit. *See Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1064 (9th Cir. 2004) ("a plaintiff may obtain an appealable final judgment by 'fil[ing] in writing a notice of intent not to file an amended complaint.") (quoting *WMX Technologies, Inc. v. Miller*, 104 F.3d 113, 1135 (9th Cir. 1997); *Lopez v. City of Needles*, 95 F.3d 20, 22 (9th Cir. 1996)).

Dated: April 10, 2026

**SWEIGART MURDOCK, LLP**

 /s/ *Karin M. Sweigart*
KARIN M. SWEIGART (SBN: 247462)
Karin.sweigart@sm-llp.com
1160 Battery St., Suite 100
San Francisco, CA 94111

Attorneys for Plaintiffs

1

Plaintiffs' Notice of Election to Stand on the Complaint          Case Number: 1:21-cv-01657-JLT-HBK

**ER-125**

KARIN M. SWEIGART (SBN: 247462)
Karin.Sweigart@sm-llp.com
JESSE FRANKLIN-MURDOCK (SBN: 339034)
Jesse@sm-llp.com
**Sweigart Murdock, LLP**
1160 Battery St., Ste. 100
San Francisco, CA 94111
Tel.: (415) 873-0123
Direct: (415) 873-2345

*Attorneys for Plaintiffs*

### UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANINE CHANDLER, et al., | **Case No.:** 1:21-cv-01657-JLT-HBK |
| Plaintiffs, | |
| v. | **PLAINTIFFS' NOTICE OF APPEAL** |
| JEFFREY MACOMBER, et al., | |
| Defendants. | |

0

**ER-126**

### NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

**TO THE CLERK OF THE COURT AND ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that Plaintiffs Janine Chandler, Krystal Gonzalez, Tomiekia Johnson, Nadia Romero, Channel Johnson, and Catherine Quinn (collectively, "Plaintiffs") hereby appeal to the United States Court of Appeals for the Ninth Circuit from:

(1) the Order Dismissing Action With Prejudice on Plaintiffs' Election, entered on April 30, 2026 (ECF No. 135); and

(2) the Judgment in a Civil Case, entered on April 30, 2026 (ECF No. 136),

together with all interlocutory orders, opinions, rulings, findings, and conclusions that merge into, or have been incorporated by reference in, the foregoing Judgment and Order, including, without limitation, the Order Granting Motion to Dismiss With Leave to Amend in Part, entered March 23, 2026 (ECF No. 132).

This appeal is taken pursuant to 28 U.S.C. § 1291 and Federal Rules of Appellate Procedure 3 and 4. The filing fee required by 28 U.S.C. § 1913 will be tendered to the Clerk concurrently with this Notice. Pursuant to Ninth Circuit Rule 3-2(b), the Representation Statement (Form 6) is filed herewith.

Dated: May 18, 2026

**SWEIGART MURDOCK, LLP**

/s/ *Karin M. Swiegart*
Karin M. Swiegart
Jesse Franklin-Murdock
Attorneys for Plaintiffs

---

Plaintiffs' Notice of Appeal                    Case Number: 1:21-cv-01657-JLT-HBK

**ER-127**

CIVIL,APPEAL,CLOSED,YNP2,YNP3

# U.S. District Court
## Eastern District of California - Live System (Fresno)
### CIVIL DOCKET FOR CASE #: 1:21-cv-01657-JLT-HBK

Chandler et al v. California Department of Corrections and Rehabilitation et al
Assigned to: District Judge Jennifer L. Thurston
Referred to: Magistrate Judge Helena M. Barch-Kuchta
Case in other court: U.S.C.A. Ninth Circuit, 26-03283
Cause: 28:2201 Constitutionality of State Statute(s)

Date Filed: 11/17/2021
Date Terminated: 04/30/2026
Jury Demand: None
Nature of Suit: 950 Constitutional - State Statute
Jurisdiction: Federal Question

**Plaintiff**

**Janine Chandler**
*an individual*

represented by **Candice Erin Jackson**
Candice E. Jackson Attorney At Law
15640 NE Fourth Plain Blvd.
Suite 106 #433
Vancouver, WA 98682
818-481-4565
Email: candice@cejacksonlaw.com
*TERMINATED: 07/18/2024*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Harmeet Kaur Dhillon**
Dhillon Law Group, Inc.
177 Post Street
Suite 700
San Francisco, CA 94108
415-433-1700
Fax: 415-520-6593
Email: harmeet@dhillonlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Karin Sweigart**
Sweigart Murdock, LLP
1160 Battery Street
Suite 100
San Francisco, CA 94111
415-873-0123
Email: karin.sweigart@sm-llp.com
*ATTORNEY TO BE NOTICED*

**Lauren Adams , PHV**
Women's Liberation Front
1802 Vernon St. #2036
Washington, DC 20009
202-964-1127
Email: legal@womensliberationfront.org
*PRO HAC VICE*

**ER-128**

*ATTORNEY TO BE NOTICED*

**Matthew Michael Hoesly**
Dhillon Law Group Inc.
4675 MacArthur Ct.
Suite 1410
Newport Beach, CA 92660
949-396-0608
Email: mhoesly@dhillonlaw.com
*ATTORNEY TO BE NOTICED*

**Mark Philip Meuser**
Dhillon Law Group
290 N. Hudson Avenue 411E
Pasadena, CA 91101
415-577-2850
Email: mmeuser@chalmersadams.com
*TERMINATED: 02/13/2026*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Krystal Gonzalez**                    represented by    **Candice Erin Jackson**
*an individual*                                            (See above for address)
                                                           *TERMINATED: 07/18/2024*
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Harmeet Kaur Dhillon**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Karin Sweigart**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Matthew Michael Hoesly**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Mark Philip Meuser**
                                                           (See above for address)
                                                           *TERMINATED: 02/13/2026*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tomiekia Johnson**                    represented by    **Candice Erin Jackson**
*an individual*                                            (See above for address)
                                                           *TERMINATED: 07/18/2024*
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Harmeet Kaur Dhillon**
                                                           (See above for address)

**ER-129**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Karin Sweigart**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Michael Hoesly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Philip Meuser**
(See above for address)
*TERMINATED: 02/13/2026*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Nadia Romero**                    represented by **Candice Erin Jackson**
*an individual*                                      (See above for address)
                                                     *TERMINATED: 07/18/2024*
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Harmeet Kaur Dhillon**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Karin Sweigart**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Matthew Michael Hoesly**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Mark Philip Meuser**
                                                     (See above for address)
                                                     *TERMINATED: 02/13/2026*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Woman II Woman**                   represented by **Candice Erin Jackson**
*a California non-profit corporation*                (See above for address)
*TERMINATED: 05/17/2022*                             *TERMINATED: 07/18/2024*
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Karin Sweigart**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Cathleen Quinn**                    represented by **Karin Sweigart**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Michael Hoesly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Philip Meuser**
(See above for address)
*TERMINATED: 02/13/2026*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Channel Johnson**                    represented by **Karin Sweigart**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Michael Hoesly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Philip Meuser**
(See above for address)
*TERMINATED: 02/13/2026*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**California Department of Corrections**          represented by **Anthony Corso**
**and Rehabilitation**                                         Santa Cruz County Counsel's Office
701 Ocean Street
Ste 505
Santa Cruz, CA 95060
831-454-2040
Email: anthony.corso@santacruzcounty.us
*TERMINATED: 03/02/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Colin Andris Shaff**
Office of the Attorney General
300 S Spring Street, Suite 1702
Los Angeles, CA 90013
213-269-6039
Fax: 213-897-7604
Email: colin.shaff@doj.ca.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Preeti Kaur Bajwa**
California Attorney General's Office

**ER-131**

6/11/26, 9:54 AM

Case: 26-3283, 07/30/2026, DktEntry: 13.1, (132 of 151)
LIVE 1.8.5 NEXT GEN CM/ECF - U.S. District Court for Eastern California

Civil - Correctional Law
455 Golden Gate Ave.
Ste. 11000
San Francisco, CA 94102
415-510-3747
Fax: 415-703-5480
Email: preeti.bajwa@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kathleen Allison**                        represented by    **Anthony Corso**
*Secretary of the California Department of*                   (See above for address)
*Corrections and Rehabilitation, in her*                      *TERMINATED: 03/02/2023*
*official capacity*                                           *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Colin Andris Shaff**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Preeti Kaur Bajwa**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

**Defendant**

**Michael Pallares**                        represented by    **Anthony Corso**
*Warden, in his official capacity*                           (See above for address)
                                                             *TERMINATED: 03/02/2023*
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Colin Andris Shaff**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Preeti Kaur Bajwa**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

**Defendant**

**Mona D. Houston**                         represented by    **Anthony Corso**
*Warden, in her official capacity*                           (See above for address)
                                                             *TERMINATED: 03/02/2023*
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Colin Andris Shaff**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Preeti Kaur Bajwa**

**ER-132**

6/11/26, 9:54 AM

Case: 26-3283, 07/30/2026, DktEntry: 13.1 (133 of 151)
LIVE 1.8.5 NEXTGEN CM/ECF - U.S. District Court for Eastern California

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jeffrey Macomber**                                represented by  **Colin Andris Shaff**
*Secretary of the California Department of*                          (See above for address)
*Corrections and Rehabilitation, in his*                            *LEAD ATTORNEY*
*official capacity*                                                  *ATTORNEY TO BE NOTICED*

**Defendant**

**Anissa De La Cruz**                               represented by  **Colin Andris Shaff**
*Warden, in her official capacity*                                  (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Defendant**

**Lavelle Parker**                                  represented by  **Colin Andris Shaff**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Intervenor**

**Kelli Blackwell**                                 represented by  **Dimitri D Portnoi**
                                                                    O'Melveny and Myers LLP
                                                                    400 S. Hope Street, 18th Floor
                                                                    Los Angeles, CA 90071
                                                                    213-430-7699
                                                                    Fax: 213-430-6407
                                                                    Email: dportnoi@omm.com
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Richard Saenz , PHV**
                                                                    Email: rsaenz@lambdalegal.org
                                                                    *LEAD ATTORNEY*
                                                                    *PRO HAC VICE*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Amanda Goad**
                                                                    ACLU Foundation of SoCal
                                                                    PO Box 811370
                                                                    Los Angeles, CA 90081
                                                                    213-977-9500
                                                                    Email: agoad@aclusocal.org
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Christina S Paek**
                                                                    Lambda Legal
                                                                    800 South Figueroa Street
                                                                    Suite 1260
                                                                    Los Angeles, CA 90017
                                                                    213-382-7600
                                                                    Email: cpaek@lambdalegal.org

**ER-133**

*TERMINATED: 09/15/2023*
*ATTORNEY TO BE NOTICED*

**Elizabeth Arias**
O'Melveny & Myers LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071-2899
213-430-7423
Email: earias@omm.com
*ATTORNEY TO BE NOTICED*

**Kyle Grossman**
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071
213-430-7615
Email: kgrossman@omm.com
*ATTORNEY TO BE NOTICED*

**Michael Simeone**
US Securities and Exchange Commission
444 South Flower Street
Suite 900
Los Angeles, CA 90071
323-965-4579
Email: msimeone@omm.com
*TERMINATED: 09/29/2022*
*ATTORNEY TO BE NOTICED*

**Nora Huppert**
Lambda Legal Defense and Education Fund, Inc.
3656 N Halsted St
Chicago, IL 60613-5974
847-345-2094
Email: nhuppert@lambdalegal.org
*ATTORNEY TO BE NOTICED*

**Shawn Thomas Meerkamper**
Transgender Law Center
P.O. Box 70976
Oakland, CA 94612
510-587-9696
Email: shawn@transgenderlawcenter.org
*ATTORNEY TO BE NOTICED*

**Shilpi Agarwal**
ACLU of Northern California
39 Drumm Street
San Francisco, CA 94111
415-621-2493
Fax: 415-255-1478
Email: sagarwal@aclunc.org
*ATTORNEY TO BE NOTICED*

**ER-134**

**Shivani Isabel Morrison**
5358 Loma Linda Ave
Apt 14
Los Angeles, CA 90027
512-796-6743
Email: smorrison@omm.com
*TERMINATED: 03/16/2023*
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Katie Brown**                                      represented by  **Dimitri D Portnoi**
                                                                     (See above for address)
                                                                     *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Richard Saenz , PHV**
                                                                     (See above for address)
                                                                     *LEAD ATTORNEY*
                                                                     *PRO HAC VICE*
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Amanda Goad**
                                                                     (See above for address)
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Christina S Paek**
                                                                     (See above for address)
                                                                     *TERMINATED: 09/15/2023*
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Elizabeth Arias**
                                                                     (See above for address)
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Kyle Grossman**
                                                                     (See above for address)
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Michael Simeone**
                                                                     (See above for address)
                                                                     *TERMINATED: 09/29/2022*
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Nora Huppert**
                                                                     (See above for address)
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Shawn Thomas Meerkamper**
                                                                     (See above for address)
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Shilpi Agarwal**
                                                                     (See above for address)

**ER-135**

*ATTORNEY TO BE NOTICED*

**Shivani Isabel Morrison**
(See above for address)
*TERMINATED: 03/16/2023*
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Tremayne Carroll**                  represented by   **Dimitri D Portnoi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard Saenz , PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amanda Goad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christina S Paek**
(See above for address)
*TERMINATED: 09/15/2023*
*ATTORNEY TO BE NOTICED*

**Elizabeth Arias**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kyle Grossman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Simeone**
(See above for address)
*TERMINATED: 09/29/2022*
*ATTORNEY TO BE NOTICED*

**Nora Huppert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shawn Thomas Meerkamper**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shilpi Agarwal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shivani Isabel Morrison**

**ER-136**

(See above for address)
*TERMINATED: 03/16/2023*
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Jennifer Rose**                                    represented by   **Dimitri D Portnoi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard Saenz , PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amanda Goad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christina S Paek**
(See above for address)
*TERMINATED: 09/15/2023*
*ATTORNEY TO BE NOTICED*

**Elizabeth Arias**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kyle Grossman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Simeone**
(See above for address)
*TERMINATED: 09/29/2022*
*ATTORNEY TO BE NOTICED*

**Nora Huppert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shawn Thomas Meerkamper**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shilpi Agarwal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shivani Isabel Morrison**
(See above for address)
*TERMINATED: 03/16/2023*
*ATTORNEY TO BE NOTICED*

**ER-137**

**Intervenor**

**Transgender, Gender-Variant & Intersex**                represented by    **Dimitri D Portnoi**
**Justice Project ("TGIJP")**                                               (See above for address)
                                                                           *LEAD ATTORNEY*
                                                                           *ATTORNEY TO BE NOTICED*

                                                                           **Richard Saenz , PHV**
                                                                           (See above for address)
                                                                           *LEAD ATTORNEY*
                                                                           *PRO HAC VICE*
                                                                           *ATTORNEY TO BE NOTICED*

                                                                           **Amanda Goad**
                                                                           (See above for address)
                                                                           *ATTORNEY TO BE NOTICED*

                                                                           **Christina S Paek**
                                                                           (See above for address)
                                                                           *TERMINATED: 09/15/2023*
                                                                           *ATTORNEY TO BE NOTICED*

                                                                           **Elizabeth Arias**
                                                                           (See above for address)
                                                                           *ATTORNEY TO BE NOTICED*

                                                                           **Kyle Grossman**
                                                                           (See above for address)
                                                                           *ATTORNEY TO BE NOTICED*

                                                                           **Michael Simeone**
                                                                           (See above for address)
                                                                           *TERMINATED: 09/29/2022*
                                                                           *ATTORNEY TO BE NOTICED*

                                                                           **Nora Huppert**
                                                                           (See above for address)
                                                                           *ATTORNEY TO BE NOTICED*

                                                                           **Shawn Thomas Meerkamper**
                                                                           (See above for address)
                                                                           *ATTORNEY TO BE NOTICED*

                                                                           **Shilpi Agarwal**
                                                                           (See above for address)
                                                                           *ATTORNEY TO BE NOTICED*

                                                                           **Shivani Isabel Morrison**
                                                                           (See above for address)
                                                                           *TERMINATED: 03/16/2023*
                                                                           *ATTORNEY TO BE NOTICED*

**Intervenor**

**ER-138**

**Kennard Lee Davis**
*TERMINATED: 08/21/2024*

represented by **Kennard Lee Davis**
T-78448
SALINAS VALLEY STATE PRISON
(1050)
P.O. Box 1050
Soledad, CA 93960-1050
PRO SE

**Amanda Goad**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/17/2021 | 1 | COMPLAINT *FOR DECLARATORY AND INJUNCTIVE RELIEF* against Kathleen Allison, California Department of Corrections and Rehabilitiation, Mona D. Houston, Michael Pallares by Krystal Gonzalez, Tomiekia Johnson, Woman II Woman, Nadia Romero, Janine Chandler. Attorney Jackson, Candice Erin added. (Filing fee $ 402, receipt number ACAEDC-9931428) (Attachments: # 1 Civil Cover Sheet Civil Case Cover Sheet)(Jackson, Candice) (Entered: 11/17/2021) |
| 11/17/2021 | 2 | SUMMONS ISSUED as to *Kathleen Allison, California Department of Corrections and Rehabilitiation, Mona D. Houston, Michael Pallares* with answer to complaint due within *21* days. Attorney *Candice Erin Jackson* *Freeman, Mathis & Gary LLP* *1010 B Street, Suite 300* *San Rafael, CA 94901*. (Jessen, A) (Entered: 11/17/2021) |
| 11/17/2021 | 3 | CIVIL NEW CASE DOCUMENTS ISSUED: Initial Scheduling Conference set for 8/18/2022 at 10:30 AM in Yosemite (HBK) before Magistrate Judge Helena M. Barch-Kuchta. (Attachments: # 1 Standing Order, # 2 Standing Order re Judicial Emergency, # 3 Clarification Order, # 4 Consent Form, # 5 VDRP) (Jessen, A) (Entered: 11/17/2021) |
| 12/20/2021 | 4 | STIPULATION and PROPOSED ORDER for Extension of Time to File a Responsive Pleading by Kathleen Allison, California Department of Corrections and Rehabilitiation, Mona D. Houston, Michael Pallares. Attorney Corso, Anthony added. (Attachments: # 1 Proposed Order)(Corso, Anthony) (Entered: 12/20/2021) |
| 12/20/2021 | 5 | AFFIDAVIT *of Summons and Complaint* by Janine Chandler. (Attachments: # 1 Proof of Service to Summons and Complaint, # 2 Proof of Service to Summons and Complaint, # 3 Proof of Service to Summons and Complaint, # 4 Proof of Service to Summons and Complaint)(Jackson, Candice) (Entered: 12/20/2021) |
| 12/21/2021 | 6 | TEXT ONLY ORDER GRANTING 4 the parties' stipulated MOTION for EXTENSION of TIME to FILE RESPONSIVE PLEADING. Defendants' responsive pleading to Plaintiff's complaint is due no later than 2/9/2022. signed by Magistrate Judge Helena M. Barch-Kuchta on 12/21/2021. (Barch-Kuchta, Helena) (Entered: 12/21/2021) |
| 01/07/2022 | 7 | PRO HAC VICE APPLICATION and PROPOSED ORDER submitted by Janine Chandler for attorney Lauren Adams to appear Pro Hac Vice. (Filing fee $ 225, receipt number ACAEDC-10010842) (DUPLICATE RECEIPT ACAEDC-10010696 FOR $225.00 REFUNDED) (Jackson, Candice) Modified on 1/13/2022 (Washington, S). (Entered: 01/07/2022) |
| 01/10/2022 | 8 | TEXT ONLY ORDER GRANTING 7 Application for Pro Hac Vice. Having satisfied the requirements of Local Rule 180(b)(2), Attorney Lauren Adams' application is GRANTED and she may appear on behalf of Plaintiff Janine Taylor. The Pro Hac Vice attorney is |

**ER-139**

| | | directed to request electronic filing access through PACER. signed by Magistrate Judge Helena M. Barch-Kuchta on 1/10/2022. (alr) (Entered: 01/10/2022) |
|---|---|---|
| 01/10/2022 | 9 | ORDER by Chief Judge Kimberly J. Mueller: Due to the appointment of Judge Jennifer L. Thurston to the position of U.S. District Judge, this action is reassigned from *Unassigned DJ* to District Judge Jennifer L. Thurston for all further proceedings. (Martin-Gill, S) (Entered: 01/10/2022) |
| 01/12/2022 | 10 | STIPULATION and PROPOSED ORDER for Second Extension of Time to File a Responsive Pleading by Kathleen Allison, California Department of Corrections and Rehabilitiation, Mona D. Houston, Michael Pallares. (Attachments: # 1 Proposed Order) (Corso, Anthony) (Entered: 01/12/2022) |
| 01/13/2022 | 11 | ORDER GRANTING 10 Second Joint Request for Extension of Time for Defendant to File a Responsive Pleading, signed by Magistrate Judge Helena M. Barch-Kuchta on 1/13/2022. *Defendants' responsive pleading to the complaint shall be filed no later than 3/11/2022*. (Rivera, O) (Entered: 01/13/2022) |
| 01/26/2022 | 12 | STANDING ORDER signed by District Judge Jennifer L. Thurston on 1/26/2022. (Gonzalez, R) (Entered: 01/26/2022) |
| 02/17/2022 | 13 | STIPULATION and PROPOSED ORDER for Third Extension of Time to File a Responsive Pleading by Kathleen Allison, California Department of Corrections and Rehabilitiation, Mona D. Houston, Michael Pallares. (Attachments: # 1 Proposed Order) (Corso, Anthony) Modified on 2/22/2022 (Davis, D). (Entered: 02/17/2022) |
| 02/22/2022 | 14 | TEXT ONLY ORDER GRANTING (Doc. 13 ) Defendants' Third Request for Extension of Time to file a Responsive Pleading. Defendants' responsive pleading shall be filed no later than Monday, April 11, 2022. signed by Magistrate Judge Helena M. Barch-Kuchta on 2/22/2022. (Glinzak, Louis) (Entered: 02/22/2022) |
| 04/11/2022 | 15 | MOTION to DISMISS by Kathleen Allison, Mona D. Houston, Michael Pallares. Motion Hearing set for 5/19/2022 at 09:00 AM before District Judge Jennifer L. Thurston. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Request for Judicial Notice, # 3 Exhibit A-S to Request for Judicial Notice, # 4 Declaration of J. Thissen, # 5 Exhibit A-K to Declaration of J. Thissen, # 6 Motion to File Redacted Exhibits to Thissen Declaration and in Support of Defendants' Motion to Dismiss)(Corso, Anthony) (Entered: 04/11/2022) |
| 04/12/2022 | 16 | MINUTE ORDER (Text Only Entry) The parties are advised that pursuant to the undersigned's standing order and Local Rule 230(g), the recently filed motion to dismiss 15 will be decided on the papers. No hearing will be calendared. The hearing date selected by the movant will nonetheless serve to govern the deadlines for opposition and reply briefs pursuant to Local Rule 230(c). The parties are further informed that as a result of the judicial resource emergency described in this Court's standing order re judicial emergency, more than 80 motions remain under submission in the caseload recently re-assigned to the undersigned. Although the Court has begun the process of working through this significant backlog, it may still be many months until the motion in this matter is resolved. The Court reiterates that magistrate judge consent may alleviate some of the delays caused by the resource emergency signed by District Judge Jennifer L. Thurston on April 12, 2022. (Munoz, I) (Entered: 04/12/2022) |
| 04/20/2022 | 17 | STIPULATION and PROPOSED ORDER for to Extend Briefing Schedule by Kathleen Allison, California Department of Corrections and Rehabilitiation, Mona D. Houston, Michael Pallares. Attorney Bajwa, Preeti Kaur added. (Bajwa, Preeti) (Entered: 04/20/2022) |

**ER-140**

| 04/22/2022 | 18 | ORDER GRANTING 17 Joint Stipulation to Extend Briefing Schedule signed by District Judge Jennifer L. Thurston on 4/21/2022. *Meet and Confer Deadline: 5/2/2022. Motion to Intervene due by 5/9/2022. Brief in Support of Motion to Dismiss due by 5/16/2022. Opposition to Motion to Dismiss due by 5/31/2022. Replied due by 6/10/2022.* (Jessen, A) (Entered: 04/22/2022) |
|---|---|---|
| 05/09/2022 | 19 | MOTION to INTERVENE by Kelli Blackwell, Katie Brown, Tremayne Carroll, Jennifer Rose, Transgender, Gender-Variant & Intersex Justice Project ("TGIJP"). Attorney Portnoi, Dimitri D added. Motion Hearing set for 6/13/2022 at 09:00 AM in Courtroom 4 (JLT) before District Judge Jennifer L. Thurston. (Attachments: # 1 Memorandum, # 2 Declaration of Alex Binsfeld, # 3 Declaration of Katie Brown, # 4 Declaration of Jennifer Rose, # 5 Declaration of Kelli Blackwell, # 6 Declaration of Tremayne Carroll, # 7 Declaration of Shawn Thomas Meerkamper, # 8 Proposed Answer, # 9 Proposed Order) (Portnoi, Dimitri) (Entered: 05/09/2022) |
| 05/09/2022 | 20 | CORPORATE DISCLOSURE STATEMENT by Intervenor Transgender, Gender-Variant & Intersex Justice Project ("TGIJP"). (Portnoi, Dimitri) (Entered: 05/09/2022) |
| 05/09/2022 | 21 | PRO HAC VICE APPLICATION and PROPOSED ORDER submitted by Kelli Blackwell, Katie Brown, Tremayne Carroll, Jennifer Rose, Transgender, Gender-Variant & Intersex Justice Project ("TGIJP") for attorney Richard Saenz to appear Pro Hac Vice. (Filing fee $ 225, receipt number ACAEDC-10219985) (Portnoi, Dimitri) (Entered: 05/09/2022) |
| 05/09/2022 | 22 | NOTICE of APPEARANCE by Shawn Thomas Meerkamper on behalf of Kelli Blackwell, Katie Brown, Tremayne Carroll, Jennifer Rose, Transgender, Gender-Variant & Intersex Justice Project ("TGIJP"). Attorney Meerkamper, Shawn Thomas added. (Meerkamper, Shawn) (Entered: 05/09/2022) |
| 05/09/2022 | 23 | NOTICE of APPEARANCE by Dimitri D Portnoi on behalf of Kelli Blackwell, Katie Brown, Tremayne Carroll, Jennifer Rose, Transgender, Gender-Variant & Intersex Justice Project ("TGIJP"). (Portnoi, Dimitri) (Entered: 05/09/2022) |
| 05/09/2022 | 24 | NOTICE of APPEARANCE by Nora Huppert on behalf of Kelli Blackwell, Katie Brown, Tremayne Carroll, Jennifer Rose, Transgender, Gender-Variant & Intersex Justice Project ("TGIJP"). Attorney Huppert, Nora added. (Huppert, Nora) (Entered: 05/09/2022) |
| 05/09/2022 | 25 | NOTICE of APPEARANCE by Michael Simeone on behalf of Kelli Blackwell, Katie Brown, Tremayne Carroll, Jennifer Rose, Transgender, Gender-Variant & Intersex Justice Project ("TGIJP"). Attorney Simeone, Michael added. (Simeone, Michael) (Entered: 05/09/2022) |
| 05/09/2022 | 26 | NOTICE of APPEARANCE by Elizabeth Arias on behalf of Kelli Blackwell, Katie Brown, Tremayne Carroll, Jennifer Rose, Transgender, Gender-Variant & Intersex Justice Project ("TGIJP"). Attorney Arias, Elizabeth added. (Arias, Elizabeth) (Entered: 05/09/2022) |
| 05/09/2022 | 27 | NOTICE of APPEARANCE by Shivani Isabel Morrison on behalf of Kelli Blackwell, Katie Brown, Tremayne Carroll, Jennifer Rose, Transgender, Gender-Variant & Intersex Justice Project ("TGIJP"). Attorney Morrison, Shivani Isabel added. (Morrison, Shivani) (Entered: 05/09/2022) |
| 05/09/2022 | 28 | NOTICE of APPEARANCE by Christina S Paek on behalf of Kelli Blackwell, Katie Brown, Tremayne Carroll, Jennifer Rose, Transgender, Gender-Variant & Intersex Justice Project ("TGIJP"). Attorney Paek, Christina S added. (Paek, Christina) (Entered: 05/09/2022) |

**ER-141**

| | | |
|---|---|---|
| 05/09/2022 | 29 | NOTICE of APPEARANCE by Amanda Goad on behalf of Kelli Blackwell, Katie Brown, Tremayne Carroll, Jennifer Rose, Transgender, Gender-Variant & Intersex Justice Project ("TGIJP"). Attorney Goad, Amanda added. (Goad, Amanda) (Entered: 05/09/2022) |
| 05/09/2022 | 30 | NOTICE of APPEARANCE by Shilpi Agarwal on behalf of Kelli Blackwell, Katie Brown, Tremayne Carroll, Jennifer Rose, Transgender, Gender-Variant & Intersex Justice Project ("TGIJP"). Attorney Agarwal, Shilpi added. (Agarwal, Shilpi) (Entered: 05/09/2022) |
| 05/10/2022 | 31 | STIPULATION *TO DISMISS ALL CLAIMS OF PLAINTIFF AND PROPOSED ORDER* by Woman II Woman. (Jackson, Candice) (Entered: 05/10/2022) |
| 05/16/2022 | 32 | MEMORANDUM by Kelli Blackwell, Katie Brown, Tremayne Carroll, Jennifer Rose, Transgender, Gender-Variant & Intersex Justice Project ("TGIJP") in SUPPORT of 15 Motion to Dismiss,,. (Huppert, Nora) (Entered: 05/16/2022) |
| 05/17/2022 | 33 | Stipulation of Dismissal With Prejudice of All Claims of Plaintiff Women II Women, signed by Magistrate Judge Helena M. Barch-Kuchta on 5/16/2022. (Marrujo, C) (Entered: 05/17/2022) |
| 05/18/2022 | 34 | MINUTE ORDER(Text Only Entry) The parties are advised that pursuant to the undersigned's standing order and Local Rule 230(g), the filed motion to intervene 19 will be decided on the papers. No hearing will be calendared. Local Rule 230, as revised March 1, 2022, will govern the filing of oppositions and replies. The parties are further informed that as a result of the judicial resource emergency described in this Court's standing order re judicial emergency, more than 80 motions remain under submission in the caseload recently re-assigned to the undersigned. Although the Court has begun the process of working through this significant backlog, it may still be many months until the motion in this matter is resolved. The Court reiterates that magistrate judge consent may alleviate some of the delays caused by the resource emergency signed by District Judge Jennifer L. Thurston on May 18, 2022. (Munoz, I) (Entered: 05/18/2022) |
| 05/23/2022 | 35 | OPPOSITION by Kathleen Allison, California Department of Corrections and Rehabilitiation, Mona D. Houston, Michael Pallares to 19 Motion to Intervene,,. (Corso, Anthony) (Entered: 05/23/2022) |
| 05/31/2022 | 36 | OPPOSITION by Janine Chandler, Krystal Gonzalez, Tomiekia Johnson, Nadia Romero to 15 Motion to Dismiss,,. (Attachments: # 1 Declaration Dec of Janine Chandler, # 2 Declaration Dec of Nadia Romero, # 3 Declaration Dec of Tomiekia Johnson, # 4 Declaration Dec of Colin Wright, # 5 Declaration Dec of Callie Burt, # 6 Declaration Dec of Sagal Sadiq, # 7 Declaration Dec of Mimi Le, # 8 Declaration Dec of Ayanna Green, # 9 Declaration Dec of Amie Ichikawa, # 10 Declaration Dec of Lauren Adams, # 11 Declaration Dec of Michelle Norsworthy, # 12 Declaration Dec of Krystal Gonzalez) (Jackson, Candice) (Entered: 05/31/2022) |
| 06/02/2022 | 37 | REPLY by Kelli Blackwell, Katie Brown, Tremayne Carroll, Jennifer Rose, Transgender, Gender-Variant & Intersex Justice Project ("TGIJP") re 19 Motion to Intervene,,. (Portnoi, Dimitri) (Entered: 06/02/2022) |
| 06/10/2022 | 38 | MOTION to STRIKE *Declarations Attached to Plaintiffs' Opposition to Defendants' Motion to Dismiss; Memorandum of Points and Authorities* re 36 Opposition to Motion,,. by Kathleen Allison, California Department of Corrections and Rehabilitiation, Mona D. Houston, Michael Pallares. (Corso, Anthony) (Entered: 06/10/2022) |

**ER-142**

| | | |
|---|---|---|
| 06/10/2022 | 39 | REPLY by Kathleen Allison, California Department of Corrections and Rehabilitiation, Mona D. Houston, Michael Pallares re 36 Opposition to Motion,,. (Corso, Anthony) (Entered: 06/10/2022) |
| 06/10/2022 | 40 | REPLY by Kelli Blackwell, Katie Brown, Tremayne Carroll, Jennifer Rose, Transgender, Gender-Variant & Intersex Justice Project ("TGIJP") re 36 Opposition to Motion,,. (Huppert, Nora) (Entered: 06/10/2022) |
| 06/16/2022 | 41 | OPPOSITION by Janine Chandler, Krystal Gonzalez, Tomiekia Johnson, Nadia Romero to 38 Motion to Strike,. (Jackson, Candice) (Entered: 06/16/2022) |
| 06/27/2022 | 42 | REPLY by Kathleen Allison, California Department of Corrections and Rehabilitiation, Mona D. Houston, Michael Pallares re 38 Motion to Strike,. Attorney Shaff, Colin Andris added. (Shaff, Colin) (Entered: 06/27/2022) |
| 07/05/2022 | 43 | MOTION for Leave to File Supplemental Reply re 38 Motion to Strike, by Kelli Blackwell, Katie Brown, Tremayne Carroll, Jennifer Rose, Transgender, Gender-Variant & Intersex Justice Project ("TGIJP"). (Attachments: # 1 Declaration of Nora Huppert, # 2 Exhibit A, Proposed Reply, # 3 Exhibit B, Davis Declaration, # 4 Proposed Order) (Huppert, Nora) (Entered: 07/05/2022) |
| 07/06/2022 | 44 | MOTION Leave to file [proposed] opposition to intervention by Janine Chandler, Krystal Gonzalez, Tomiekia Johnson, Nadia Romero. (Attachments: # 1 Declaration Declaration of Candice Jackson, # 2 [Proposed} Opposition to Intervention)(Jackson, Candice) (Entered: 07/06/2022) |
| 07/06/2022 | 45 | TEXT ORDER ONLY. Having satisfied the requirements of Local Rule 180(b)(2), Attorney Richard Saenz's Petition for Pro Hac Vice 21 is GRANTED and he may appear on behalf of intervenors Transgender, Gender-Variant & Intersex Justice Project; Kelli Blackwell; Katie Brown; Tremayne Carroll; and Jennifer Rose. Signed by Magistrate Judge Helena M. Barch-Kuchta on 7/6/2022. (Glinzak, Louis) (Entered: 07/06/2022) |
| 07/07/2022 | 46 | MINUTE ORDER (Text Only Entry) The Court has reviewed preliminarily the request to late-file an opposition 44 to the pending motion to intervene 19 . Any party wishing to file a response to the request to late-file shall do so within seven days of the date of this minute order. Any such responses shall be no longer than seven pages in length. Alternatively, the parties may submit a stipulation that sets forth a reasonable schedule for completing briefing on the motion to intervene signed by District Judge Jennifer L. Thurston on July 7, 2022. (Munoz, I) (Entered: 07/07/2022) |
| 07/14/2022 | 47 | OPPOSITION by Kelli Blackwell, Katie Brown, Tremayne Carroll, Jennifer Rose, Transgender, Gender-Variant & Intersex Justice Project ("TGIJP") to 44 Motion for Miscellaneous Relief,. (Attachments: # 1 Declaration OF ELIZABETH A. ARIAS) (Portnoi, Dimitri) (Entered: 07/14/2022) |
| 07/14/2022 | 48 | OPPOSITION by Janine Chandler, Krystal Gonzalez, Tomiekia Johnson, Nadia Romero to 43 Motion for Miscellaneous Relief,. (Attachments: # 1 Declaration Jackson Dec iso Plaintiff's Opp)(Jackson, Candice) (Entered: 07/14/2022) |
| 07/15/2022 | 49 | REPLY by Janine Chandler, Krystal Gonzalez, Tomiekia Johnson, Nadia Romero re 44 Motion for Miscellaneous Relief,. (Jackson, Candice) (Entered: 07/15/2022) |
| 07/19/2022 | 50 | ORDER DENYING 43 Proposed Intervenors' Motion for Leave to File a Sur-Reply re Pending Motion to Strike; ORDER DENYING 44 Motion for Leave to Late-File an Opposition to the Motion to Intervene, signed by District Judge Jennifer L. Thurston on 7/19/2022. (Marrujo, C) (Entered: 07/19/2022) |

**ER-143**

| 07/21/2022 | 51 | MOTION to VACATE *Notice of Administrative Motion and Administrative Motion to Vacate Initial Scheduling Conference* by Kathleen Allison, California Department of Corrections and Rehabilitiation, Mona D. Houston, Michael Pallares. (Attachments: # 1 Declaration of A. Corso, # 2 Exhibit A to Declaration of A. Corso, # 3 Proposed Order) (Corso, Anthony) (Entered: 07/21/2022) |
| --- | --- | --- |
| 07/27/2022 | 52 | ORDER GRANTING 51 Administrative Motion to Vacate Initial Scheduling Conference, signed by Magistrate Judge Helena M. Barch-Kuchta on 7/27/2022.<br>*August 18, 2022 at 10:30 AM Initial Scheduling Conference is VACATED.*<br>*Within ten (10) days after the issuance of the ruling on the Motion to Dismiss, should the matter go forward, the parties are directed to contact Courtroom Deputy Patricia Apodaca (PApodaca@caed.uscourts.gov) to secure a new scheduling conference date.* (Rivera, O) (Entered: 07/27/2022) |
| 07/27/2022 | 53 | LETTER Re 19 Motion to Intervene from Michelle-Lael Norsworthy. (Flores, E) (Entered: 08/09/2022) |
| 09/08/2022 | 54 | NOTICE of CHANGE of ADDRESS by Candice Erin Jackson. (Jackson, Candice) (Entered: 09/08/2022) |
| 09/09/2022 | 55 | CLERK'S NOTICE to *Attorney Lauren Adams* re 54 Notice of Change of Address: Due to the recent upgrade in the Eastern District of California to NextGen, all changes to address will need to be made through Pacer. Until you update your address through Pacer, the docket will reflect your previous address. (Lawrence, A) (Entered: 09/09/2022) |
| 09/28/2022 | 56 | NOTICE *OF WITHDRAWAL OF COUNSEL* by Kelli Blackwell, Katie Brown, Tremayne Carroll, Jennifer Rose, Transgender, Gender-Variant & Intersex Justice Project ("TGIJP"). (Simeone, Michael) (Entered: 09/28/2022) |
| 10/12/2022 | 57 | MINUTE ORDER (Text Only Entry) The Court is aware that at least one motion remains under submission before the undersigned in this matter. As a result of the judicial resource emergency described in this Court's standing order re judicial emergency, more than 100 motions remain under submission in the caseload recently re-assigned to the undersigned. Although the Court has begun the process of working through this significant backlog, it may be six or more months until the motion(s) in this matter is resolved. The Court reiterates that the magistrate judge consent can alleviate the delay caused by the resource emergency. **The parties SHALL reconsider magistrate judge consent for all purposes or only for this pending motion.** In addition, the parties are reminded of their ongoing obligation to inform the Court of any changed circumstances that have rendered all or part of any pending motion moot. Finally, the parties are informed that the undersigned generally requires a formal settlement conference take place before any civil case proceeds to trial. Should any party wish to schedule a settlement conference, they are directed to contact Courtroom Deputy Irma Munoz at imunoz@caed.uscourts.gov signed by District Judge Jennifer L. Thurston on October 12, 2022. (Munoz, I) (Entered: 10/12/2022) |
| 11/02/2022 | 58 | REQUEST for Consideration of New Legal Authority by Janine Chandler, Krystal Gonzalez, Tomiekia Johnson, Nadia Romero. (Jackson, Candice) (Entered: 11/02/2022) |
| 11/03/2022 | 59 | MINUTE ORDER (TEXT ENTRY ONLY) Plaintiff has filed a request for the Court to consider new authority 58 . In addition to attaching a recent case, the request contains legal argument. Local Rule 230(m)(2) provides the procedure for submitting notices of supplemental authority and indicates that such submissions do not need leave of court so long as they do not contain additional argument. Plaintiff has not explained why argument is needed under the circumstances, as supplemental authorities normally speak for themselves. Accordingly, the Clerk of Court is directed to administratively terminate the request 58 . To the extent the filings contain argument, the argument will be disregarded. |

6/11/26, 9:54 AM

Case: 26-3283, 07/30/2026, DktEntry: 13.1, (145 of 151)
LIVE 1.8.5 NEXTGEN CM/ECF - U.S. District Court for Eastern California

| | | The Court is aware that motions have been pending in this case for some time. As the Court has indicated previously, it may still be many months until the motions in this matter are resolved signed by District Judge Jennifer L. Thurston on November 3, 2022. (Munoz, I) (Entered: 11/03/2022) |
|---|---|---|
| 03/02/2023 | 60 | DESIGNATION of COUNSEL FOR SERVICE. Added attorney Colin Andris Shaff for Kathleen Allison,Colin Andris Shaff for California Department of Corrections and Rehabilitiation,Colin Andris Shaff for Mona D. Houston,Colin Andris Shaff for Michael Pallares, attorney Anthony Corso terminated (Shaff, Colin) (Entered: 03/02/2023) |
| 03/16/2023 | 61 | DESIGNATION of COUNSEL FOR SERVICE., attorney Shivani Isabel Morrison terminated (Morrison, Shivani) (Entered: 03/16/2023) |
| 08/21/2023 | 62 | ORDER GRANTING WITH CONDITIONS 19 Motion to Intervene as of Right, signed by District Judge Jennifer L. Thurston on 08/20/2023. (Maldonado, C) (Entered: 08/21/2023) |
| 09/15/2023 | 63 | DESIGNATION of COUNSEL FOR SERVICE., attorney Christina S Paek terminated (Paek, Christina) (Entered: 09/15/2023) |
| 03/18/2024 | 64 | MOTION of Joinder of Claim by Kennard Lee Davis. (Lawrence, A) (Entered: 03/25/2024) |
| 04/08/2024 | 65 | OPPOSITION by Kathleen Allison, California Department of Corrections and Rehabilitiation, Mona D. Houston, Michael Pallares to 64 Motion for Miscellaneous Relief. (Shaff, Colin) (Entered: 04/08/2024) |
| 04/22/2024 | 66 | REPLY by Kennard Lee Davis to OPPOSITION to 64 Motion for Miscellaneous Relief. (Xiong, J.) (Entered: 04/22/2024) |
| 05/14/2024 | 67 | ORDER GRANTING 15 Defendants' Motion to Dismiss, DENYING Defendant's Motion to File Redacted Exhibits and Defendants' 38 Motion to Strike, and DENYING as Moot Defendants' Request for Judicial Notice, signed by District Judge Jennifer L. Thurston on 05/14/2024. *Amended Complaint or Notice of Dismissal due within Twenty-One Days.* (Maldonado, C) (Entered: 05/14/2024) |
| 05/14/2024 | | SERVICE BY MAIL: 67 Order served on Kennard Lee Davis. (Maldonado, C) (Entered: 05/14/2024) |
| 05/26/2024 | 68 | MOTION for 45-DAY EXTENSION OF TIME to File First Amended Complaint by Janine Chandler, Krystal Gonzalez, Tomiekia Johnson, Nadia Romero. (Attachments: # 1 Proposed Order Proposed Order re Extension of Time)(Jackson, Candice) (Entered: 05/26/2024) |
| 05/30/2024 | 69 | MINUTE ORDER (TEXT ENTRY ONLY) Good cause appearing, Plaintiffs' request (Doc. 68) for an extension of time to file an amended complaint is GRANTED. Any amended complaint or notice of dismissal shall be filed on or before July 19, 2024 signed by District Judge Jennifer L. Thurston on May 30, 2024. (Munoz, I) (Entered: 05/30/2024) |
| 05/30/2024 | 70 | MOTION to Modify or Alter Judgment by Kennard Lee Davis. (Maldonado, C) (Entered: 05/30/2024) |
| 06/28/2024 | 72 | NOTICE of INTERLOCUTORY APPEAL by Kennard Lee Davis as to 67 Order. (Lawrence, A) (Entered: 07/01/2024) |
| 07/01/2024 | 71 | NOTICE of INTERLOCUTORY APPEAL by Kennard Lee Davis as to 67 Order. (Xiong, J.) (Entered: 07/01/2024) |

**ER-145**

| 07/01/2024 | 73 | NOTICE of INTERLOCUTORY APPEAL by Kennard Lee Davis as to 67 Order. (Xiong, J.) (Entered: 07/01/2024) |
| 07/17/2024 | 74 | SUBSTITUTION of ATTORNEY - PROPOSED, submitted by Janine Chandler. (Dhillon, Harmeet) (Entered: 07/17/2024) |
| 07/17/2024 | 75 | SUBSTITUTION of ATTORNEY - PROPOSED, submitted by Krystal Gonzalez. (Dhillon, Harmeet) (Entered: 07/17/2024) |
| 07/17/2024 | 76 | SUBSTITUTION of ATTORNEY - PROPOSED, submitted by Nadia Romero. (Dhillon, Harmeet) (Entered: 07/17/2024) |
| 07/17/2024 | 77 | SUBSTITUTION of ATTORNEY - PROPOSED, submitted by Tomiekia Johnson. (Dhillon, Harmeet) (Entered: 07/17/2024) |
| 07/18/2024 | 78 | SUBSTITUTION of ATTORNEY - PROPOSED, submitted by Janine Chandler. (Meuser, Mark) (Entered: 07/18/2024) |
| 07/18/2024 | 79 | SUBSTITUTION of ATTORNEY - PROPOSED, submitted by Krystal Gonzalez. (Meuser, Mark) (Entered: 07/18/2024) |
| 07/18/2024 | 80 | SUBSTITUTION of ATTORNEY - PROPOSED, submitted by Nadia Romero. (Meuser, Mark) (Entered: 07/18/2024) |
| 07/18/2024 | 81 | SUBSTITUTION of ATTORNEY - PROPOSED, submitted by Tomiekia Johnson. (Meuser, Mark) (Entered: 07/18/2024) |
| 07/18/2024 | 82 | TEXT ORDER ONLY APPROVING 74 , 75 , 76 , 77 Notice of Substitution. Having satisfied the requirements of Local Rule 182(g), Attorney Harmeet Dhillon is substituted as counsel of record for Defendants Janine Chandler, Krystal Gonzalez, Tomiekia Johnson, and Nadia Romero in place of Candice Jackson. The Clerk of Court shall correct the docket to reflect the substitution. Signed by Magistrate Judge Helena M. Barch-Kuchta on 7/18/2024. (Apodaca, P) (Entered: 07/18/2024) |
| 07/18/2024 | 83 | MINUTE ORDER (Text Only): On July 18, 2024, Attorney Meuser submitted notices of substitution of counsel signed by the Plaintiffs 78 , 79 , 80 , 81 . Contrary to Local Rule 182(g), the notices of substitution did not include the signatures of these withdrawing attorney. Within seven days of this Text Only Order, counsel for Plaintiffs shall comply with Local Rule 182(g). Signed by Magistrate Judge Helena M. Barch-Kuchta on 7/18/2024. (Apodaca, P) (Entered: 07/18/2024) |
| 07/19/2024 | 84 | FIRST AMENDED COMPLAINT against Jeffrey Macomber, Anissa De La Cruz, Lavelle Parker by Tomiekia Johnson, Krystal Gonzalez, Nadia Romero, Janine Chandler, Cathleen Quinn, Channel Johnson. Attorney Meuser, Mark Philip added. (Meuser, Mark) (Entered: 07/19/2024) |
| 07/22/2024 | 85 | SUMMONS ISSUED as to *Anissa De La Cruz, Jeffrey Macomber, Lavelle Parker* with answer to complaint due within *21* days. Attorney *Mark Philip Meuser* *Dhillon Law Group* *290 N. Hudson Avenue 411E* *Pasadena, CA 91101*. (Flores, E) (Entered: 07/22/2024) |
| 07/23/2024 | 86 | SUBSTITUTION of ATTORNEY - PROPOSED, submitted by Janine Chandler. (Meuser, Mark) (Entered: 07/23/2024) |
| 07/23/2024 | 87 | SUBSTITUTION of ATTORNEY - PROPOSED, submitted by Krystal Gonzalez. (Meuser, Mark) (Entered: 07/23/2024) |
| 07/23/2024 | 88 | SUBSTITUTION of ATTORNEY - PROPOSED, submitted by Nadia Romero. (Meuser, Mark) (Entered: 07/23/2024) |

**ER-146**

| | | |
|---|---|---|
| 07/23/2024 | 89 | SUBSTITUTION of ATTORNEY - PROPOSED, submitted by Tomiekia Johnson. (Meuser, Mark) (Entered: 07/23/2024) |
| 07/24/2024 | 90 | NOTICE of APPEARANCE by Matthew Michael Hoesly on behalf of Janine Chandler, Krystal Gonzalez, Channel Johnson, Tomiekia Johnson, Cathleen Quinn, Nadia Romero. Attorney Hoesly, Matthew Michael added. (Hoesly, Matthew) (Entered: 07/24/2024) |
| 07/24/2024 | 91 | PRO HAC VICE APPLICATION and PROPOSED ORDER submitted by Kelli Blackwell, Katie Brown, Tremayne Carroll, Jennifer Rose, Transgender, Gender-Variant & Intersex Justice Project ("TGIJP") for attorney Pelecanos to appear Pro Hac Vice. (Filing fee $ 300, receipt number ACAEDC-11650654) (Huppert, Nora). Modified to add receipt on 8/9/2024 (Marrujo, C). (Entered: 07/24/2024) |
| 07/25/2024 | 92 | MOTION to PROCEED IN FORMA PAUPERIS by Kennard Lee Davis. (Flores, E) (Entered: 07/25/2024) |
| 07/25/2024 | 93 | AMENDED NOTICE of APPEAL by Kennard Lee Davis as to 67 Order on Motion to Dismiss. (Flores, E) (Entered: 07/26/2024) |
| 07/29/2024 | 94 | PRO HAC VICE APPLICATION and PROPOSED ORDER submitted by Janine Chandler, Krystal Gonzalez, Channel Johnson, Tomiekia Johnson, Cathleen Quinn, Nadia Romero for attorney Jordan Campbell to appear Pro Hac Vice. (Filing fee $ 300, receipt number ACAEDC-11657980) (Attachments: # 1 Certificate of Good Standing) (Meuser, Mark) (Entered: 07/29/2024) |
| 07/30/2024 | 95 | SUMMONS RETURNED EXECUTED: Anissa De La Cruz served on 7/24/2024, answer due 8/14/2024; Jeffrey Macomber served on 7/24/2024, answer due 8/14/2024; Lavelle Parker served on 7/24/2024, answer due 8/14/2024. (Hoesly, Matthew) (Entered: 07/30/2024) |
| 08/01/2024 | 96 | ORDER DENYING 64 Kennard Lee Davis's Motion to Intervene, and Denying as Moot 70 Davis's Motion to Modify or, Alter Judgment and 92 Motion for Leave to Proceed In Forma Pauperis signed by District Judge Jennifer L. Thurston on 7/31/2024. (Lawrence, A) (Entered: 08/01/2024) |
| 08/01/2024 | | SERVICE BY MAIL: 96 Order on Motion served on Kennard Lee Davis. (Lawrence, A) (Entered: 08/01/2024) |
| 08/01/2024 | 97 | TEXT ORDER ONLY APPROVING 86 , 87 , 88 , 89 Notice of Substitution. Having satisfied the requirements of Local Rule 182(g), Attorney Mark P. Meuser is substituted as counsel of record for Plaintiffs Janine Chandler, Krystal Gonzalez, Tomiekia Johnson, and Nadia Romero in place of Candice Jackson. The Clerk of Court shall correct the docket to reflect the substitution. Signed by Magistrate Judge Helena M. Barch-Kuchta on 8/1/2024. (Carlin, Daniel) Modified on 8/1/2024 (Carlin, Daniel). (Entered: 08/01/2024) |
| 08/01/2024 | 98 | TEXT ONLY ORDER GRANTING (Doc. No. 91 ) Application for Pro Hac Vice. Having satisfied the requirements of Local Rule 180(b)(2), Attorney Sophia Pelecanos may appear on behalf of Intervenors Kelli Blackwell, Katie Brown, Tremayne Carroll, Jennifer Rose, and Transgender, Gender-Variant & Intersex Justice Project. The Pro Hac Vice attorney is directed to request electronic filing access through PACER. Signed by Magistrate Judge Helena M. Barch-Kuchta on 08/01/2024. (Carlin, Daniel) (Entered: 08/01/2024) |
| 08/01/2024 | 99 | TEXT ONLY ORDER GRANTING 94 Application for Pro Hac Vice. Having satisfied the requirements of Local Rule 180(b)(2), Attorney Jordan Campbell may appear on behalf of Plaintiffs Janine Chandler, Krystal Gonzalez, Channel Johnson, Tomiekia Johnson, Cathleen Quinn, and Nadia Romero. The Pro Hac Vice attorney is directed to |

**ER-147**

| | | request electronic filing access through PACER. Signed by Magistrate Judge Helena M. Barch-Kuchta on 08/01/2024. (Carlin, Daniel) (Entered: 08/01/2024) |
|---|---|---|
| 08/01/2024 | 100 | ORDER FINDING AS MOOT 78 Substitution of Attorney, in light of the Court granting 86 Substitution of Attorney. Signed by Magistrate Judge Helena M. Barch-Kuchta on 08/01/2024. (Carlin, Daniel) (Entered: 08/01/2024) |
| 08/01/2024 | 101 | ORDER FINDING AS MOOT 79 Substitution of Attorney, in light of the Court granting 87 Substitution of Attorney. Signed by Magistrate Judge Helena M. Barch-Kuchta on 08/01/2024. (Carlin, Daniel) (Entered: 08/01/2024) |
| 08/01/2024 | 102 | ORDER FINDING AS MOOT 80 Substitution of Attorney, in light of the Court granting 88 Substitution of Attorney. Signed by Magistrate Judge Helena M. Barch-Kuchta on 08/01/2024. (Carlin, Daniel) (Entered: 08/01/2024) |
| 08/01/2024 | 103 | ORDER FINDING AS MOOT 81 Substitution of Attorney, in light of the Court granting 89 Substitution of Attorney. Signed by Magistrate Judge Helena M. Barch-Kuchta on 08/01/2024. (Carlin, Daniel) (Entered: 08/01/2024) |
| 08/05/2024 | 104 | STIPULATION and PROPOSED ORDER for RE. BRIEFING SCHEDULE ON FIRST AMENDED COMPLAINT (ECF NO. 84) re 84 Amended Complaint by Anissa De La Cruz, Jeffrey Macomber, Lavelle Parker. Attorney Shaff, Colin Andris added. (Attachments: # 1 Proposed Order [PROPOSED] ORDER) (Shaff, Colin) M (Entered: 08/05/2024) |
| 08/08/2024 | 105 | ORDER approving Stipulated Briefing Schedule 104 signed by Magistrate Judge Helena M. Barch-Kuchta on 8/7/2024. (Lundstrom, T) (Entered: 08/08/2024) |
| 08/12/2024 | 108 | MOTION to PROCEED IN FORMA PAUPERIS (RE: Appeal) by Kennard Lee Davis. (Xiong, J.) (Entered: 08/14/2024) |
| 08/13/2024 | 106 | REQUEST for JUDICIAL NOTICE by Kennard Lee Davis. (Attachments: # 1 Part 2) (Lundstrom, T) Modified on 8/14/2024 (Gonzalez, R). (Entered: 08/13/2024) |
| 08/13/2024 | 107 | NOTICE of INTERLOCUTORY APPEAL by Kennard Lee Davis as to 67 Order, 96 Order. (Xiong, J.) (Entered: 08/14/2024) |
| 08/14/2024 | 109 | APPEAL PROCESSED to Ninth Circuit re 107 Notice of Interlocutory Appeal filed by Kennard Lee Davis. Notice of Appeal filed *8/13/2024*, Complaint filed *11/17/2021* and Appealed Order / Judgment filed *8/1/2024*. ** *Fee Status: IFP Pending* (Attachments: # 1 Appeal Information) (Xiong, J.) (Entered: 08/14/2024) |
| 08/14/2024 | | SERVICE BY MAIL: 109 Appeal Processed to USCA, served on Kennard Lee Davis. (Xiong, J.) (Entered: 08/14/2024) |
| 08/21/2024 | 110 | NOTICE of APPEAL by Kennard Lee Davis as to 67 Order & 96 Order on Motion. (Marrujo, C) Modified on 8/21/2024 (Marrujo, C). (Entered: 08/21/2024) |
| 08/26/2024 | 111 | RESPONSE by Janine Chandler, Krystal Gonzalez, Channel Johnson, Tomiekia Johnson, Cathleen Quinn, Nadia Romero to 106 Request for Judicial Notice. (Meuser, Mark) (Entered: 08/26/2024) |
| 08/27/2024 | 112 | ORDER to Plaintiffs to File Supplemental Briefing and Allowing Kennard Lee David to File Supplemental Briefing re: the Court's Jurisdiction, signed by District Judge Jennifer L. Thurston on 8/27/2024. Fourteen Days Deadline. (Marrujo, C) (Entered: 08/27/2024) |
| 09/10/2024 | 113 | BRIEF *on Jurisdiction* filed by Janine Chandler, Krystal Gonzalez, Channel Johnson, Tomiekia Johnson, Cathleen Quinn, Nadia Romero. (Meuser, Mark) (Entered: 09/10/2024) |

**ER-148**

| 09/11/2024 | 114 | ORDER DENYING 106 Kennard Lee Davis's Motion for Reconsideration and Request for Judicial Notice, signed by District Judge Jennifer L. Thurston on 09/11/2024. (Maldonado, C) (Entered: 09/11/2024) |
|---|---|---|
| 09/13/2024 | 115 | NOTICE of CHANGE of ADDRESS by Matthew Michael Hoesly. (Hoesly, Matthew) (Entered: 09/13/2024) |
| 09/20/2024 | 116 | MOTION for an Extension of Time and for Other Relief by Kennard Lee Davis. (Lawrence, A) (Entered: 09/24/2024) |
| 09/26/2024 | 117 | MINUTE ORDER (TEXT ENTRY ONLY) Kennard Lee Davis has filed a document that, among other things, requests an extension of time to file "objections" (Doc. 116 .) That request is DENIED because there is no pending motion before this Court for which an extension can be granted. To the extent applicant is requesting other forms of relief, such as transfer to a mental health crisis bed, this Court lacks jurisdiction to address those requests in the context of this lawsuit, as the request is not related to the subject of this suit. Applicant has now filed several meritless motions in this case, which have delayed and multiplied the proceedings. Applicant's remedy for being denied intervenor status is an appeal, which has already been noticed. No further filings from this applicant will be entertained unless and until any such appeal is decided in applicant's favor signed by District Judge Jennifer L. Thurston on September 26, 2024. (Munoz, I) (Entered: 09/26/2024) |
| 09/26/2024 | | SERVICE BY MAIL: 117 Order on Motion for Extension of Time served on Kennard Lee Davis. (Robles, S) (Entered: 09/26/2024) |
| 10/03/2024 | 118 | NOTICE *of Motion to Dismiss First Amended Complaint* by Anissa De La Cruz, Jeffrey Macomber, Lavelle Parker. (Attachments: # 1 Defendants' Notice of Motion and Motion to Dismiss First Amended Complaint; Memorandum of Points and Authorities) (Shaff, Colin) (Entered: 10/03/2024) |
| 10/10/2024 | 119 | NOTICE of APPEARANCE by Kyle Grossman on behalf of Kelli Blackwell, Katie Brown, Tremayne Carroll, Jennifer Rose, Transgender, Gender-Variant & Intersex Justice Project ("TGIJP"). Attorney Grossman, Kyle added. (Grossman, Kyle) (Entered: 10/10/2024) |
| 10/10/2024 | 120 | MOTION to DISMISS by Kelli Blackwell, Katie Brown, Tremayne Carroll, Jennifer Rose, Transgender, Gender-Variant & Intersex Justice Project ("TGIJP"). (Attachments: # 1 Memorandum of Points and Authority in Support of Motion to Dismiss) (Portnoi, Dimitri) (Entered: 10/10/2024) |
| 10/23/2024 | 121 | MINUTE ORDER (Text Only Entry) The parties are informed that pursuant to Local Rule 302 and the Standing Order 12 , the filed Motions to Dismiss 118 120 will be heard and decided by the undersigned. No hearing will be calendared, and the matter will be decided on the papers. A written decision will issue as soon as is practicable in light of the Court's extraordinarily heavy caseload signed by District Judge Jennifer L. Thurston on October 23, 2024. (Munoz, I) (Entered: 10/23/2024) |
| 10/24/2024 | 122 | OPPOSITION by Janine Chandler, Krystal Gonzalez, Channel Johnson, Tomiekia Johnson, Cathleen Quinn, Nadia Romero to 118 Motion for Miscellaneous Relief, 120 Motion to Dismiss,. (Meuser, Mark) (Entered: 10/24/2024) |
| 11/01/2024 | 123 | REPLY by Anissa De La Cruz, Jeffrey Macomber, Lavelle Parker re 120 Motion to Dismiss,. (Shaff, Colin) (Entered: 11/01/2024) |
| 11/12/2024 | 124 | REPLY by Kelli Blackwell, Katie Brown, Tremayne Carroll, Jennifer Rose, Transgender, Gender-Variant & Intersex Justice Project ("TGIJP") re 120 Motion to Dismiss,. (Portnoi, Dimitri) (Entered: 11/12/2024) |

**ER-149**

| 04/04/2025 | 125 | NOTICE OF WITHDRAWAL OF COUNSEL by Janine Chandler, Krystal Gonzalez, Tomiekia Johnson, Nadia Romero. (Dhillon, Harmeet) (Entered: 04/04/2025) |
|---|---|---|
| 04/04/2025 | 126 | NOTICE of APPEARANCE by Karin Sweigart on behalf of Janine Chandler, Krystal Gonzalez, Channel Johnson, Tomiekia Johnson, Cathleen Quinn, Nadia Romero. Attorney Sweigart, Karin added. (Sweigart, Karin) (Entered: 04/04/2025) |
| 08/29/2025 | 127 | NOTICE to AMEND by Kennard Lee Davis. (Deputy Clerk EF) (Entered: 09/05/2025) |
| 09/08/2025 | 128 | MINUTE ORDER (Text Only Entry) Kennard Lee Davis previously filed a motion to intervene (Doc. 64 ). That motion was denied (Doc. 96 ), and Davis' appeal of that ruling (Doc. 110) remains pending. Davis has now filed a document that appears to request permission to amend the notice of appeal, but therein cites authorities, including *Slack v. McDaniel, 529 U.S. 473 (2000)*, and Fed. R. App. P. 22, that pertain to the issuance of a certificate of appealability in the habeas context. This is not a habeas proceeding, and the Court cannot otherwise identify any reason or authority that would justify amendment of the notice of appeal. Thus, the request is DENIED signed by District Judge Jennifer L. Thurston on September 8, 2025. (Deputy Clerk IM) (Entered: 09/08/2025) |
| 09/09/2025 | | SERVICE BY MAIL: 128 Minute Order, served on Kennard Lee Davis. (Deputy Clerk RMG) (Entered: 09/09/2025) |
| 02/12/2026 | 129 | SUBSTITUTION of ATTORNEY - PROPOSED, submitted by Janine Chandler, Krystal Gonzalez, Channel Johnson, Tomiekia Johnson, Cathleen Quinn, Nadia Romero. (Meuser, Mark) (Entered: 02/12/2026) |
| 02/13/2026 | 130 | ORDER Noting Withdrawal of Counsel signed by Magistrate Judge Helena M. Barch-Kuchta on 02/12/2026. Attorney Mark Philip Meuser terminated. (Deputy Clerk EF) (Entered: 02/13/2026) |
| 02/19/2026 | 131 | NOTICE of CHANGE of ADDRESS by Amanda Goad. Attorney Goad, Amanda added. (Goad, Amanda) (Entered: 02/19/2026) |
| 03/23/2026 | 132 | ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND IN PART signed by District Judge Jennifer L. Thurston on March 23, 2026. (Docs. 118, 120) (Deputy Clerk IM) (Entered: 03/23/2026) |
| 04/01/2026 | 133 | NOTICE of CHANGE of ADDRESS by Karin Sweigart. (Sweigart, Karin) (Entered: 04/01/2026) |
| 04/10/2026 | 134 | NOTICE OF ELECTION by All Plaintiffs. (Sweigart, Karin) (Entered: 04/10/2026) |
| 04/30/2026 | 135 | ORDER DISMISSING ACTION With Prejudice on Plaintiff's Election signed by District Judge Jennifer L. Thurston on 4/30/2026. CASE CLOSED. (Deputy Clerk JPX) (Entered: 04/30/2026) |
| 04/30/2026 | 136 | JUDGMENT dated *4/30/2026* pursuant to order 135 . (Deputy Clerk JPX) (Entered: 04/30/2026) |
| 05/18/2026 | 137 | NOTICE *of Appeal* by All Plaintiffs. (Attachments: # 1 Notice of Appeal)(Sweigart, Karin) (Entered: 05/18/2026) |
| 05/19/2026 | 138 | CLERK'S NOTICE to Attorney Karin Sweigart re 137 Notice - Other: When submitting a Notice of Appeal, please use the specific event **Notice of Appeal** which may be found in the *Other Filings, Appeal Documents* Category. Do NOT use the generic Notice (Other) event when a more specific event is available. Please **RE-FILE** your document using the correct event. (Deputy Clerk SSA) (Entered: 05/19/2026) |
| 05/19/2026 | 139 | NOTICE of APPEAL by Janine Chandler, Krystal Gonzalez, Channel Johnson, Tomiekia Johnson, Cathleen Quinn, Nadia Romero, Woman II Woman. (Filing fee $ 605, receipt |

| | | |
|---|---|---|
| | | number ACAEDC-13343611) (Attachments: # 1 Appeal Information)(Sweigart, Karin) (Entered: 05/19/2026) |
| 05/19/2026 | 140 | APPEAL PROCESSED to Ninth Circuit re 139 Notice of Appeal, filed by Tomiekia Johnson, Channel Johnson, Cathleen Quinn, Krystal Gonzalez, Nadia Romero, Janine Chandler, Woman II Woman. Notice of Appeal filed *5/19/2026*, Complaint filed *11/17/2021* and Appealed Order / Judgment filed *4/30/2026*. ** *Fee Status: Paid on 5/19/2026 in the amount of $605.00* (Attachments: # 1 Appeal Information) (Deputy Clerk SSA) (Entered: 05/19/2026) |
| 05/21/2026 | 141 | USCA CASE NUMBER 26-3283 for 139 Notice of Appeal, filed by Tomiekia Johnson, Channel Johnson, Cathleen Quinn, Krystal Gonzalez, Nadia Romero, Janine Chandler, Woman II Woman. (Deputy Clerk CM) (Entered: 05/21/2026) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 06/11/2026 09:47:51 | | | |
| **PACER Login:** | Lawshark74 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cv-01657-JLT-HBK |
| **Billable Pages:** | 23 | **Cost:** | 2.30 |

**ER-151**