Case No. 26-3283

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

JANINE CHANDLER, et al.

Plaintiffs-Appellants,

v.

JEFFREY MACOMBER, et al.,

Defendants-Appellees,

On Appeal from the United States District Court for the
Eastern District of California

Case No. 1:21-cv-01657 JLT HBK

## OUR DUTY-USA AND AMIE ICHIKAWA'S AMICI CURIAE BRIEF SUPPORTING
## PLAINTIFFS-APPELLANTS AND REVERSAL

C. Erin Friday
P.O. Box 442
San Carlos, CA 94070
(415) 577-9271
erinfriday@yahoo.com
Erin@ourduty.group
*Counsel for* Amici Curiae

August 4, 2026

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, amicus curiae Our Duty – USA ("Our Duty") is a nonprofit and amicus curiae Amie Ichikawa is an individual and one of the founders of Woman II Woman. Neither Amie Ichikawa nor Our Duty has any parent companies, subsidiaries or affiliates and neither issue shares to the public.

**TABLE OF CONTENTS**

I. IDENTITY AND INTEREST OF AMICI CURIAE ...........................................1

    A. Our Duty-USA……………………………………………………..…1

    B. Amie Ichikaw**…………….……………………………..………….**.1

II. INTRODUCTION AND SUMMARY OF ARGUMENT.................................3

III. ARGUMENT ..............................................................................................4

    A. THE DISTRICT COURT ERRED IN FINDING THAT THE PLAINTIFFS DID NOT MEET THE REQUIREMENTS OF ARTICLE III OF THE CONSTITUTION………………………………………………………….5

        1. Plaintiffs' Requested Relief Is Redressable Because the Statute they Challenge is the Operative Legal Basis for the Conduct they Seek to Enjoin…………….....................................................................................5

        2. Redressability Does Not Require That the Requested Relief Eliminate Every Source of the Alleged Harm...............................................................6

        3. CDCR's Own Regulatory Text Confirms That Housing Determinations for Trans-identified Inmates Are Undertaken Pursuant to Penal Code Section 2606, Not Independently of It.......................................................7

        4. The District Court's Causation Analysis Misapplied Article III's Traceability Requirement...........................................................................10

i

B. S.B. 132 INFLICTS A SYSTEMIC EIGHTH AMENDMENT INJURY THAT DOES NOT DEPEND ON PROOF OF ANY SINGLE OFFICIAL'S INDIVIDUALIZED DELIBERATE INDIFFERENCE……………………15

C. INSIDE CALIFORNIA WOMEN'S PRISONS AND THE RISKS AND ACTUAL INCIDENTS OF SEXUAL ASSAULTS IN WOMEN'S PRISONS………………………………………………………....19

D. VULNERABLE MALE PRISONERS CAN BE HOUSED IN MALE PRISONS……………………………………………………….26

E. SNAPSHOTS OF MALES BEING HOUSED IN WOMEN'S PRISONS. …………………………………………………………….27

    1. Tremaine "Tremayne" Carroll ...............................................................28

    2. Kao Saetern .........................................................................................30

    3. John Jacobsen.......................................................................................31

    4. Richard Masbruch................................................................................32

    5. David Warfield .....................................................................................33

    6. Shawn Merle Gustafson.......................................................................34

    7. Jason Hann ...........................................................................................35

IV. CONCLUSION....................................................................................37

**TABLE OF AUTHORITIES**

**Cases**

*Bennett v. Spear*, 520 U.S. 154 (1997) ....................................................................11

*Brown v. Plata*, 563 U.S. 493 (2011)..................................................................3, 15

*California Assn. of Psychology Providers v. Rank*, 51 Cal.3d 1 (1990) ...................9

*Chandler v. Macomber*, No. 1:21-cv-01657-JLT-HBK, 2024 WL 3618381(E.D. Cal. July 31, 2024)……………………………………………………….2

*Chandler v. Macomber*, No. 1:21-CV-01657 JLT HBK, 2026 WL 799916, (E.D. Cal. Mar. 23, 2026) ...............................................................6, 7, 11, 15

*Communities for a Better Env't v. California Res. Agency*, 103 Cal.App.4th 98, (2002)......................................................................................................... 9-10

*Department of Commerce v. New York*, 588 U.S. 752 (2019).................. 3, 10,12-14

*Farmer v. Brennan*, 511 U.S. 825, 837 (1994)................................................. 15-17

*Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367 (2024)……………………………………………………………….3, 10, 11

*Hutto v. Finney*, 437 U.S. 678 (1978).......................................................................17

*LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993) ..............................................17

*Larson v. Valente*, 456 U.S. 228 (1982) ...................................................................6

*Littoral Dev. Co. v. San Francisco Bay Conservation & Dev. Comm'n,* 24
   Cal.App.4th 1050 (1994) ...........................................................................11

*Madrid v. Gomez*, 889 F. Supp. 1146, (N.D. Cal. 1995) .........................................17

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ..........................................................6

*Rhodes v. Chapman*, 452 U.S. 337 (1981)..............................................................16

*Taylor v. Michigan Dep't of Corr.*, 69 F.3d 76, (6th Cir. 1995) .......................17, 26

*West Virginia v. B.P.J.*, 605 U.S. ___, 146 S. Ct. 2356 (2026)................................5

*Wilson v. Seiter*, 501 U.S. 294, 304 (1991) ............................................................16

**Statutes**

Cal. Code Regs. tit. 15, § 3269 ......................................................... 3, 6-8

Cal. Gov. Code § 11349(d) ....................................................................10

Penal Code § 2606 ......................................................................... 3,7-9, 11

Section 3085.2....................................................................................7

Senate Bill 132 ...........................................................................passim

Senate Bill (S.B. 337) ...........................................................................21

**Other Authorities**

A. Hughes, et al., *Consensus Statement on Management of Intersex Disorders, 91
   Archives of Disease in Childhood* 554 (2006).......................................4

ACLU of Southern California, *LGBTQ Legal Rights Organizations Move to Protect California's Trans-Inclusive Incarceration Policy* (May 9, 2022) .........29

ACLU, *Facts About the Over-Incarceration of Women in the United States* (2004) ....................................................................................................................20

Amie Ichikawa & Erin Friday, *CA Bill Highlights Flood of Male Rapists Moving to Female Prisons*, The Federalist (Apr. 29, 2025)...............................................2

Barbara Bloom et al., *Gender-Responsive Strategies: Research, Practice, and Guiding Principles for Women Offenders* (Nat'l Inst. of Corr., U.S. Dep't of Justice, June 2023)........................................................................................20

California Department of Corrections and Rehabilitation, Division of Correctional Policy Research and Internal Oversight, Office of Research, Monthly Report of Population by Gender Identity..................................................................14, 22

California Department of Corrections and Rehabilitation, Division of Correctional Policy Research and Internal Oversight, Office of Research, Senate Bill 132, Transgender Respect, Agency and Dignity Act (July 6, 2026)...........................22

CDCR, TRADA Adopted Regulations (Register 2026, No. 15)..............................8

Chris Pandolfo & Michael Ruiz, *3rd-Strike "Trans" Rape Suspect Prompts Rebellion Against CA Law After Attack in Women's Prison*, Fox News (June 3, 2024)......................................................................................................28

Christina Coulter, *Blue State Violent Crime Victims Ordered to Address 'Trans' Career Criminal by Preferred Pronouns*, Fox News (Dec. 26, 2024).................28

Dana Kennedy, F*ury as Trans Woman Who Murdered Three Is Sent to Female Prison After "Hate Crime,"* N.Y. Post (June 26, 2023) ....................................33

Independent Women's Forum's documentary series *Cruel & Unusual Punishment: The Male Takeover of Female Prisons*; https://www.iwfeatures.com/watch/cruel-unusual-punishment/ ...............................................................................35

Joseph Simonson and Susannah Luthi, *Transgender "Yacht Killer" Serving Life Sentence Gets Taxpayer-Funded Sex-Change Surgery Thanks to Kamala Harris: "He Killed My Daughter and Son-in-Law, Now He Gets What He Wants,"* Washington Free Beacon (Oct. 15, 2024)...............................................31

Keep Prisons Single Sex USA, CDCR Response on Data of Offenders Seeking Transfer to Female Facilities (Feb. 2022) ...........................................................23

Lorelei Hatpin, Prison Stories: "Sherri" Masbruch, Lorelei's Newsletter (Aug. 25, 2023)..................................................................................................................2

Mary Margaret Olohan, *Two-Time Baby Killer Among Trans Prison Inmates Housed at CA Women's Facility*, Daily Caller (Apr. 8, 2021)..............................35

Michael B. Field, et al., *Sexual Victimization in Prisons Reported by Inmates, 2023–24,* (U.S. Dep't of Justice, Bureau of Justice Statistics, Dec. 2025)..........20

Michael Balsamo & Michael R. Sisak, A*P Investigation: Women's Prisons Fostered a Culture of Abuse*, Associated Press (Feb. 6, 2022).............................21

Police Blotter: March 7, 2019, Corning Observer (Mar. 7, 2019) ..........................30

Ray Blanchard, *The Concept of Autogynephilia and the Typology of Male Gender Dysphoria*, 177 J. Nervous & Mental Disease 616, 616 (1989) ..........................32

Senate Comm. on Public Safety, Analysis of S.B. 337, at 7 (Apr. 29, 2025) .........21

Sharon Dolovich, *Two Models of the Prison: Accidental Humanity and Hypermasculinity in the L.A. County Jail*, 102 J. Crim. L. & Criminology 965, 968-969 (2012) ...............................................................................26

Special Review: The California Department of Corrections and Rehabilitation's Implementation of the Transgender Respect, Agency, and Dignity Act, Rep. No. 22-01 SR (Aug. 2023) ...........................................14, 16, 18, 19

Trying to Navigate This Ridiculous Pressure": Tremayne Carroll, MindSite News (Mar. 27, 2025)........................................................................29

Todd Bricker, *Protective Custody*, in The Encyclopedia of Corrections (Kent R. Kerley ed., 2017) ......................................................................31

U.S. Department of Justice, Report and Recommendations Concerning the Use of Restrictive Housing, at 23-24, 102 (Jan. 2016)...................................26

Women in California's Prisons (Cal. Policy Lab, July 2025) ...............................20

Yacht Murderer Wanted Sexual Reassignment Surgery, ABC News (Feb. 9, 2009) ...........................................................................................31

## Constitutional Provisions

Article III of the Constitution ............................................3, 5, 10, 13, 15

Eighth Amendment of the U.S. Constitution..................................................passim

First Amendment of the U.S. Constitution ..............................................5

Fourteenth Amendment of the U.S. Constitution ....................................5

## I.  IDENTITY AND INTEREST OF AMICI CURIAE[1]

### A.    Our Duty-USA

Our Duty-USA is a secular nonprofit whose members from all fifty states have varied political backgrounds, ethnicities, and sexual orientations but share the experience of raising former and current trans-identified children and the knowledge that sex matters and sex-separated spaces are needed to safeguard females.  A substantial number of members reside in California. Our Duty members have testified before the California Legislature on behalf of incarcerated females housed with males who identify as women. Our Duty members advocate to protect all individuals from the harms of the transgender agenda, which seeks to remove biological reality and replace it with a system of laws and policies based on feelings rather than facts.

### B.    Amie Ichikawa

Amicus Amie Ichikawa served nearly five years at Central California Women's Facility (CCWF) in Chowchilla, with her release occurring in August 2013. While she was incarcerated, a trans-identified male prisoner was transferred into her facility. This male, Richard Masbruch (a.k.a. Sherri Lashure), was doing

---

[1] No counsel for a party authored this brief in whole or in part; no one, other than amicus Our Duty and its counsel, made a monetary contribution for its preparation or submission.

1

time for convictions of rape and attempted murder of a mother and daughter (whom he had also sodomized).[2] Ichikawa knows firsthand the terror and anxiety female prisoners feel when housed with males, especially the males convicted of crimes of violence and rape against females.

Ichikawa co-founded Woman II Woman in March 2021 with two other formerly incarcerated women. Woman II Woman is a nonprofit that provides re-entry services, aids with parole hearing preparation, and advocates for incarcerated women's safety and dignity. Through this work, Ichikawa has daily contact with currently incarcerated women.[3] Woman II Woman has received hundreds of communications from female prisoners harmed by male prisoners claiming to be women. Many of these females already have histories of being sexually assaulted by men before incarceration and self-censor their objections for fear of retribution from

---

[2] Amie Ichikawa & Erin Friday, *CA Bill Highlights Flood of Male Rapists Moving to Female Prisons*, The Federalist (Apr. 29, 2025) (co-authored by undersigned counsel and amicus Ichikawa), https://thefederalist.com/2025/04/29/california-bill-highlights-epidemic-of-male-rapists-transferring-to-womens-prisons/; Lorelei Hatpin, *Prison Stories: "Sherri" Masbruch*, Lorelei's Newsletter (Aug. 25, 2023), https://loreleihatpin.substack.com/p/prison-stories-sherri-masbruch.

[3] Woman II Woman was also a former plaintiff in this matter and was voluntarily dismissed from the suit. *Chandler v. Macomber*, No. 1:21-cv-01657-JLT-HBK, 2024 WL 3618381, at *4 n.7 (E.D. Cal. July 31, 2024).

both the male prisoners and the guards. Nonetheless, they experience abject terror and suffer ongoing harm to their mental health.

## II. INTRODUCTION AND SUMMARY OF ARGUMENT

The district court dismissed Plaintiffs' claims at the threshold, holding that, inter alia, it lacked jurisdiction. This dismissal rested on an error of law, and this Court should reverse.

First, the court's redressability analysis rested on the assumption that Cal. Code Regs. tit. 15, § 3269 authorizes cross-sex housing independently of S.B. 132, but it does not. The current regulations require housing determinations be made pursuant to Penal Code § 2606, the challenged statute. Invalidating that statute eliminates the foundation the regulation invokes as the source of its authority.

Second, the court's causation analysis misapplied Article III's traceability requirement, completely ignored *Department of Commerce v. New York*, 588 U.S. 752, 766 (2019) and misinterpreted *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 383 (2024).

Third, the district court evaluated Plaintiffs' Eighth Amendment claim under an unduly narrow, individualized framework, neglecting to apply cases that analyze deliberate indifference through the lens of systematic risks under *Brown v. Plata*, 563 U.S. 493 (2011), and its progeny.

3

Finally, the district court's errors must be judged against the backdrop of the actual conditions of the women's prisons presented in Section III below. For these reasons, this Court should reverse.

## III. ARGUMENT

The law and legal decisions should be based upon truths. The truth is that male and female are the only two categories of humans and those categories are based upon differing reproductive systems that result, generally, in markedly different strengths and physiques.[4]

According to Justice Thomas's concurrence in the Supreme Court's most recent ruling that males who identify as females can be banned from playing in girls' sports:

> [t]he class of people who claim transgender status could more accurately be described as people who are experiencing 'gender dysphoria,' which is not a 'discrete group.' . . . Men and boys with gender dysphoria are not women or girls, even if they believe that they are. Sex is an immutable 'biological' characteristic; it is binary; . . .

---

[4] "Intersex" conditions are disorders of sexual differences. They do not denote a third category of human, but represent a male or female whose reproductive system developed improperly. A. Hughes, et al., *Consensus Statement on Management of Intersex Disorders*, 91 Archives of Disease in Childhood, 554 (2006).

*West Virginia v. B.P.J.*, , at \*17 (June 30, 2026) (cleaned up) (Thomas, J., concurring). This is true even for those males who go to great lengths to appear as female through hormones and surgery.

### A. THE DISTRICT COURT ERRED IN FINDING THAT THE PLAINTIFFS DID NOT MEET THE REQUIREMENTS OF ARTICLE III OF THE CONSTITUTION.

For a plaintiff to meet the requisite "case and controversy" under Article III of the Constitution, he must "'present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling.'" *Department of Commerce*, 588 U.S. at 766 (2019) (citations omitted). In this case, Plaintiffs clearly meet these Article III requisites. Amici address redressability and traceability in turn below.

#### 1. Plaintiffs' Requested Relief Is Redressable Because the Statute They Challenge is the Operative Legal Basis for the Conduct they Seek to Enjoin.

Plaintiffs seek an order and judgment declaring that S.B. 132, facially and as applied to Plaintiffs, violates the Cruel and Unusual Punishment clause of the Eighth Amendment; the Free Exercise clause and the Freedom of Speech Clause of the First Amendment; and the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution.

The district court concluded that even a complete victory on every one of these theories would not redress Plaintiffs' injury because CDCR's authority to house inmates according to gender identity "predates" S.B. 132 and rests on independent regulatory authority under Cal. Code Regs. tit. 15, § 3269(g) and (h). *Chandler v. Macomber*, No. 1:21-CV-01657 JLT HBK, 2026 WL 799916, at *11 (E.D. Cal. Mar. 23, 2026). The court quotes Doc. 67 at 24: "regardless of the outcome of this suit, transgender women will continue to be housed in women's facilities." *Id.* That premise does not survive scrutiny of the regulation the court cited, and that is not how the law of redressability works in any event.

### 2. Redressability Does Not Require That the Requested Relief Eliminate Every Source of the Alleged Harm.

The district court's redressability analysis implicitly demanded that Plaintiffs show that a favorable judgment would end cross-sex housing *in its entirety*. That, however, is not the standard. "[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his every injury." *Larson v. Valente*, 456 U.S. 228, 244 n.15 (1982). Partial relief is sufficient. In *Massachusetts v. EPA*, 549 U.S. 497, 525-26 (2007), the Court held that relief which would only "slow or reduce" an ongoing injury but not eliminate it entirely satisfies

6

redressability. Even a "small incremental step" toward reducing harm is enough. The certainty demanded is likewise modest.

Under this standard, a judgment invalidating S.B. 132 does not need to be shown to completely end cross-sex housing under every conceivable future legal authority CDCR might invoke. It need only be shown to redress the injury caused by the authority CDCR is presently exercising which, as demonstrated below, is not independent of the statute Plaintiffs challenge.

> **3. CDCR's Own Regulatory Text Confirms That Housing Determinations for Trans-identified Inmates Are Undertaken Pursuant to Penal Code Section 2606, Not Independently of It.**

The district court's redressability holding rests on the single factual premise that Cal. Code Regs. tit. 15, § 3269 authorized cross-sex housing decisions before S.B. 132 was enacted and continues to do so independently of it. (citing the 2017 and 2022-23 versions of § 3269(g)-(h)).)[5] *Chandler* at 11. That premise ignores the current text of the regulation. The current substance,[6] through a rulemaking package

---

[5] Subsection (g) addresses single-cell status.

[6] The prior Cal. Code Regs. tit. 15, § 3269(h) did not include the last sentence of the operable Regulation that referenced section 3085.2. Section 3085.2 was amended to reference Penal Code §2606.

it officially titled the "Transgender Respect, Agency, and Dignity Act" regulations

— Notice of Change to Regulations 25-04 ("TRADA"), states as follows:

> Transgender, non-binary, and intersex incarcerated persons and incarcerated persons having symptoms of gender dysphoria . . . shall be referred to an Institution Classification Committee (ICC) for determination of appropriate housing at a designated institution, or when the incarcerated person initiates a request to be housed at a facility consistent with their gender identity, pursuant to Article 10 of Subchapter 4. For housing based on gender identity (transgender, non-binary, and intersex incarcerated persons), refer to section 3085.2.

Cal. Code Regs. tit. 15, § 3269(h) (as amended by NCR 25-04, TRADA).[7]

Notably, the accompanying authority note for this subsection states: "Authority cited: Section 5058, Penal Code. Reference: Section 2606, 5054, Penal Code; and *Quine v. Beard*, No. C 14-02726 JST." *Id.*

The same rulemaking package adopted a new Article 9, "Transgender, Non-Binary, and Intersex Incarcerated Persons," including the new § 3085.2, titled "Housing Based on Gender Identity," filed and made operative April 9, 2026 (Register 2026, No. 15). Its first sentence reads:

---

[7] CDCR, TRADA Adopted Regulations (Register 2026, No. 15), https://www.cdcr.ca.gov/regulations/wp-content/uploads/sites/171/2026/04/TRADA_Adopted-Regulations.pdf.

8

> An incarcerated person who is transgender, non-binary, or intersex, regardless of anatomy, shall be housed at a correctional facility designated for men or women based on the individual's preference pursuant to Penal Code Section 2606 [S.B. 132], including, if eligible, at a residential program for incarcerated persons under the jurisdiction of the department unless the department has management or security concerns with an individual's preferred placement.

Pursuant to California administrative law "no regulation adopted is valid or effective unless consistent and not in conflict with the statute and reasonably necessary to effectuate the purpose of the statute." Cal. Gov. Code § 11342.2. California courts treat that requirement as more than an interpretive canon. "Administrative regulations that alter or amend the statute or enlarge or impair its scope are void," and a reviewing court "not only may, but it is their obligation to strike down such regulations." *California Assn. of Psychology Providers v. Rank*, 51 Cal.3d 1, 11 (1990); *accord Littoral Dev. Co. v. San Francisco Bay Conservation & Dev. Comm'n*, 24 Cal.App.4th 1050, 1058 (1994) ("Where regulations are void because of inconsistency or conflict with the governing statute, a court has a duty to strike them down.").

That duty is not discharged by deferring to the agency's own view of its authority. "The court, not the agency, has final responsibility for the interpretation of the law under which the regulation was issued." *Communities for a Better Env't*

9

*v. California Res. Agency*, 103 Cal.App.4th 98, 110 (2002). Consistency for these purposes means "being in harmony with, and not in conflict with or contradictory to, existing statutes, court decisions, or other provisions of law." Cal. Gov. Code § 11349(d).

If S.B. 132 is struck down, CDCR cannot return to the pre-S.B. 132 practices under existing regulations because the regulations invoke the challenged statute as their source of authority. They therefore have no independent legal life once the underlying statute is declared unconstitutional. Accordingly, Plaintiffs meet the redressability prong of Art. III. Simply put, if the statute permitting males to be imprisoned with female is cruel and unusual punishment, a regulation that permits the same action is likewise unconstitutional.

### 4. The District Court's Causation Analysis Misapplied Article III's Traceability Requirement

For its causality analysis, the district court relied on *Food & Drug Admin. v. Alliance For Hippocratic Med.*, for the proposition that it will be substantially more difficult to satisfy Article III's causation requirement when a plaintiff is not regulated by the challenged government action. 602 U.S. 367, 383 (2024). However, the district court makes two errors in its analysis. It incorrectly applies *Food & Drug* and it ignores *Department of Commerce*, which results in it erroneously analyzing causation under the "regulation of absent third parties" doctrine.

10

The court erred in its application of *Food & Drug* in that it treats Defendants' own legally compelled conduct as if it were the independent choice of an absent third party. *Chandler*, at 10. But S.B. 132's operative provisions do not merely create an opportunity which a third party may or may not exploit, they impose a direct, mandatory constraint on *Defendants' own conduct*. Penal Code § 2606(a)(4) requires CDCR to give the inmate's self-reported perception of safety "serious consideration," and section 2606(c) forecloses denial on specified grounds. Rather than merely regulating the conduct of absent third parties, these statutes compel the conduct of the Defendants. Second, even if the male prisoners seeking transfer are considered the "absent third parties," the court erred. In *Food & Drug*, the absent parties were doctors who choose to prescribe mifepristone and patients who take it. The plaintiff doctors do not prescribe mifepristone, and therefore are unaffected by the FDA's changed regulations as well as the actions of the doctors prescribing the drug. *Food & Drug*, at 386. In contrast, here, the third parties, including males convicted of rape and violent crimes who are transferred are attenuated to the Plaintiffs, as they and the other incarcerated prisoners are affected by their mere presence, as they are locked up with them.

The district court's second fundamental error in its causation analysis is to ignore important precedent regarding traceability. The Supreme Court has already rejected the district court's framing in an analogous context. In *Bennett v. Spear*, the

11

Court held that traceability is not defeated merely because an intervening administrative act separates the challenged government conduct from the ultimate injury; the third-party-independent-action bar applies only where the injury is "'the result of the *independent* action of some third party not before the court,'" and "'does not exclude injury produced by [the] determinative or coercive effect upon the action of someone else." 520 U.S. 154, 169 (1997) (citations omitted) (emphasis in original). Here, the "someone else" whose conduct S.B. 132 coerces is not an absent third party; it is CDCR itself. The statute directs the conduct of CDCR and thus is not exclusively dependent upon the actions of the transferred male prisoners.

The district court also ignores that under *Department of Commerce*, the Plaintiffs have satisfied traceability even if some part of the causal chain runs through a trans-identified male inmate's decision to request a transfer because the inmate's behavior is *predictable* due to S.B. 132. In *Department of Commerce*, the government argued that any harm from adding a citizenship question to the census was not fairly traceable to the Secretary's decision because it depended on the "independent action of third parties." That is, noncitizen households might unlawfully decline to respond, perhaps out of unfounded fear that their answers might be used against them. 588 U.S. 752 at 767. The government in *Commerce* invoked the same line of reasoning the *Chandler* district court relied on, including the refusal to "'endorse standing theories that rest on speculation about the decisions

12

of independent actors,'" *Department of Commerce*, 588 U.S. at 767 (citations omitted).

The Supreme Court rejected that argument, holding that a plaintiff satisfies traceability when the plaintiff shows "the predictable effect of Government action on the decisions of third parties." *Id.* at 768. The evidence supporting that predictability did not need to be certain or even quantitatively precise. The Supreme Court accepted that historical response-rate data made the pattern of third-party reaction "likely," which was enough, because "Article III requires no more than de facto causality.'" *Id.* at 768 (citations omitted). Critically, the third-party conduct at issue in *Department of Commerce* was itself *unlawful* (a refusal to comply with census-taking) and premised on a fear the Court described as "unfounded," namely the noncitizen's apprehension that the government would violate confidentiality protections and misuse the household's answers. *Id.* at 767. The fact that the predicted third-party reaction rested on an assumption of future governmental or private wrongdoing did not matter once the pattern of harm was empirically predictable. *Id.* at 768.

To the extent the district court treated any part of Plaintiffs' theory as resting on the unpredictable, individualized choices of inmates who might request a transfer, including inmates who claim a trans-identity insincerely, *Department of Commerce*

13

supplies the standard for evaluating that concern. Plaintiffs need not show that any particular male inmate will falsely or opportunistically invoke S.B. 132 as the district court indicated; they need only show, as the OIG Report[8] and CDCR's own data already demonstrate, that the statute produces a predictable, quantifiable pattern of more than one thousand transfer requests, documented staff and inmate accounts of suspected insincere applications (even though any male transfer is unacceptable), and actual transfer of dangerous male inmates who have harmed Plaintiffs and other female prisoners. These extant facts are sufficient to establish "de facto causality" between the statute and the housing outcomes Plaintiffs challenge. Just as the Census Bureau's own data on historical response-rate disparities was sufficient in *Department of Commerce* without proof that any specific noncitizen household would decline to respond, CDCR's own OIG reports, along with Plaintiffs' averments are sufficient. Proof that any specific inmate transfer request now pending will be granted or denied in a particular way is unnecessary to meet the Art. III traceability prong.

---

[8] California Office of the Inspector General, *Special Review: The California Department of Corrections and Rehabilitation's Implementation of the Transgender Respect, Agency, and Dignity Act*, Rep. No. 22-01 SR (Aug. 2023) ("OIG Report").

**B.    S.B. 132 INFLICTS A SYSTEMIC EIGHTH AMENDMENT INJURY THAT DOES NOT DEPEND ON PROOF OF ANY SINGLE OFFICIAL'S INDIVIDUALIZED DELIBERATE INDIFFERENCE.**

In addition to misapplying Article III's traceability requirement, the district court erroneously evaluated  Plaintiffs' Eighth Amendment claim under an unnecessarily narrow individualized deliberate indifference standard. The district court dismissed Plaintiffs' Eighth Amendment claim because the complaint did not allege that the CDCR Secretary or either named warden personally knew of and disregarded a substantial risk of harm to a specific plaintiff, as *Farmer v. Brennan*, 511 U.S. 825, 837 (1994), allegedly requires. *Chandler* at 13. The court limited any further amendment to the complaint to a claim against "another official or staff member... with more direct responsibility for and knowledge about their housing, cell assignments, supervision, security, and safety." *Id*. While that is one pathway, it is not the only doctrinal path to Eighth Amendment liability for conditions of confinement, and it is not consistent with what Plaintiffs actually alleged. Plaintiffs' complaints address a statutorily mandated, system-wide housing practice whose foreseeable risks were documented by the state's own oversight body before this suit was filed, rather than the specific actions of identifiable officers.

In *Brown v. Plata*, 563 U.S. 493 (2011), the Supreme Court affirmed a systemic Eighth Amendment judgment against this  same  state  prison  system,

15

because of an overall failure with its mental health and medical care system. No plaintiff was required to show that a named official knew of and disregarded a risk to that specific plaintiff. The deliberate-indifference showing was made at the institutional level through data on staffing ratios, wait times, and documented deaths attributable to systemic delay. *Id.* at 505-11. Likewise, in this case, there is a similar type of aggregate, documentary proof of systemic failure, as contained in the OIG Report.

*Farmer*'s subjective standard applied at the level of the institution rather than the individual. Where a risk is sufficiently obvious and well-documented, a factfinder may infer that the responsible officials knew of it without requiring proof of any one official's personal, subjective awareness of a threat to any one prisoner. *Farmer*, 511 U.S. at 842 ("a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious").

The Supreme Court has long evaluated conditions-of-confinement claims under a totality standard directed at whether inmates are deprived of "the minimal civilized measure of life's necessities," not solely at whether a particular officer's mens rea can be pinned to a particular victim. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). In *Wilson v. Seiter*, the Court confirmed that several conditions, none independently sufficient, may combine to produce a single, identifiable Eighth

16

Amendment deprivation of a basic human need. 501 U.S. 294, 304 (1991); see also *Farmer*, 511 U.S. at 833 ("prison officials have a duty to protect prisoners from violence at the hands of other prisoners") (citation omitted). In *Hutto v. Finney*, the Court upheld a systemic injunction against Arkansas's punitive isolation practices based on the conditions as a whole, not on any single guard's intent toward any single inmate. 437 U.S. 678, 685-87 (1978). While *Wilson* forecloses a pure strict-liability theory, it does not require Plaintiffs to abandon institutional proof in favor of individualized proof. It requires only that deliberate indifference toward prisoners be shown.

Two circuit decisions apply this institutional framework to facts closely analogous to those here, as does one California district court. In *LaMarca v. Turner*, 995 F.2d 1526, 1535-38 (11th Cir. 1993), prison officials were held liable for a known, systemic risk of inmate rape created by housing policy and understaffing in a dormitory-style facility, without any showing that an official knew a specific plaintiff was individually targeted. Awareness of a general, well-documented risk to the class of inmates housed there was sufficient to find an Eighth Amendment violation. In *Taylor v. Michigan Dep't of Corr.*, 69 F.3d 76, 81-82 (6th Cir. 1995), a housing policy that produced a documented pattern of sexual misconduct was itself held sufficient to ground Eighth Amendment liability, again analyzed at the level of the policy rather than one officer's behavior toward one inmate. In *Madrid v. Gomez*,

17

889 F. Supp. 1146, (N.D. Cal. 1995), the court found deliberate indifference established institutionally through CDCR's own documented awareness that specific housing and classification practices posed a foreseeable risk of serious harm without requiring proof that any specific guard knew a specific inmate was in danger. *Id*. at 1260-67 (N.D. Cal. 1995). The relevant question decided by the court was whether Defendants knew of and consciously disregarded a documented risk to an identifiable class of inmates under their control. *Id.* at 1256.

In the case at bar, Plaintiffs have clearly demonstrated that CDCR's policy systematically harms the female prison population. The OIG Report documented that prison officials knew that S.B. 132 would increase the population of transferred inmates in women's facilities, that assessing an applicant's sincerity would be "difficult," and that inmates and staff themselves reported suspected bad-faith applications and "inequity and tension" arising from the policy. Doc. 84 ¶¶ 33-57; OIG Rep. at 2-3, 25-26, 30. The OIG Report combined with Plaintiffs' assertions (which, at this stage, must be taken as true) is exactly the aggregate, institution-level evidence of deliberate indifference that the cases discussed above envisioned. The fact that convicted male rapists, murderers, and pedophiles have been deliberately placed in housing with females where they sleep, eat, work, toilet and shower, constitutes the type of blatant deliberate indifference that the jurisprudence recognizes as ample grounds for an Eighth Amendment claim.

18

**C. INSIDE CALIFORNIA WOMEN'S PRISONS AND THE RISKS AND ACTUAL INCIDENTS OF SEXUAL ASSAULTS IN WOMEN'S PRISONS.**

There are two women's prisons in California: the Central California Women's Facility (CCWF) and California Institution for Women (CIW). The housing in CIW consists of two-person bunks with toilets in the cell and communal showers, and at CCWF, the sleeping quarters house up to eight inmates, with single stalled toilets and showers in the rooms. "Privacy is compromised at both." OIG Report at 26-27.[9]

The OIG Report describes in detail the lack of privacy while dressing, toileting or showering:

> At both CCWF and CIW, transferees [male trans-identified inmates] and nontransferees dress in a communal space, and in the case of CIW, may use the toilet in front of a cellmate. In addition, nontransferees at both prisons specifically expressed concern over showering around transferees, particularly those who have not had gender-affirming surgery. Although each prison had adequate shower curtains, privacy was still potentially compromised when entering and exiting the shower stalls.

*Id.* at 29. These areas cannot be modified. *Id.*

---

[9]https://www.oig.ca.gov/wp-content/uploads/2023/08/Special-Review-No.-22-01.pdf.

19

In 2024, 4% of California's prison population were women, of which approximately 66% were non-white.[10] Nonwhite women admitted to California prisons receive longer average sentences than white women for assault and robbery, the two most prevalent offenses among the female prison population.[11] Research on California's incarcerated women demonstrates that nearly 80% report histories of physical or sexual abuse.[12]

Nationally, female prison inmates report substantially higher rates of sexual victimization in prison than male inmates — 5.7% versus 4.0%.[13] California's own women's prisons report shows an even higher rate of sexual victimization in California prison as compared to the national average. CIW recorded a rate of 14.7% and CCWF recorded 14.1%, placing California facilities among eight state prison

[10] Mia Bird, et al., *Women in California's Prisons* (Cal. Policy Lab, July 2025), at p. 3, 7, https://capolicylab.org/wp-content/uploads/2025/07/Women-in-Prison-Fact-Sheet.pdf.

[11] *Id.* at 9.

[12] Barbara Bloom et al., *Gender-Responsive Strategies: Research, Practice, and Guiding Principles for Women Offenders* at 5 (Nat'l Inst. of Corr., U.S. Dep't of Justice, June 2023), https://s3.amazonaws.com/static.nicic.gov/Library/018017.pdf; cf. ACLU, *Facts About the Over-Incarceration of Women in the United States* (2004), https://www.aclu.org/documents/facts-about-over-incarceration-women-united-states (asserting a still-higher 92% figure).

[13] Michael B. Field, et al., *Sexual Victimization in Prisons Reported by Inmates, 2023–24*, at 6, tbl.3 (U.S. Dep't of Justice, Bureau of Justice Statistics, Dec. 2025), NCJ 310544, https://bjs.ojp.gov/document/svpri2324.pdf.

systems flagged as high-rate.[14] In fact, one California federal prison was nicknamed the "rape club," as prison employees allegedly sexually assaulted female prisoners with abandon, punishing those who reported their rapes.[15]

The California Legislature has recognized that sexual abuse in the state's prisons is a severe and ongoing problem, especially at the women's prisons. In 2025, Senator Menjivar introduced Senate Bill (S.B. 337), which would have required CDCR to have a zero tolerance policy for sexual violence against all offenders under its jurisdiction by protecting the inmates from prison employees with histories of sexual abuse. S.B. 337, § 5, 2025-2026 Reg. Sess. (Cal., as amended May 23, 2025). The bill's author was explicit that its purpose is preventative, stating that "[t]he spirit behind S.B. 337 is to focus on the preventative side and ensure that abuse does not happen in the first place," because "[t]he punishment is the imprisonment, not constant sexual assault, harassment, and fear of abuse." Senate Comm. on Public Safety, Analysis of S.B. 337, at 7 (Apr. 29, 2025). The Committee's own analysis catalogs the scale of the problem, referencing a lawsuit brought by 130 women

---

[14] *Id.* This survey period (March 2023 through March 2024), falls entirely after the effective date of S.B. 132, which means that assaults by male inmates housed with female inmates would be included in the figures.

[15] Michael Balsamo & Michael R. Sisak, *AP Investigation: Women's Prisons Fostered a Culture of Abuse*, Associated Press (Feb. 6, 2022), https://apnews.com/article/prisons-california-united-states-sexual-abuse-only-on-ap-d321ae51fe93dfd9d6e5754383a95801.

formerly incarcerated at CIW and CCWF alleging pervasive staff sexual abuse; the conviction of a CCWF correctional officer on 59 counts of rape, sodomy, and sexual battery against 13 incarcerated women over nine years; and a 2025 lawsuit alleging years of abusive examinations by the sole gynecologist at CIW. *Id.* at 7-8. However, the bill was silent about the new "rape club" created by S.B. 132, this time at the hands of male prisoners against female prisoners.

As of June 2026, the number of incarcerated individuals housed in the CIW was 1,129 and in CCWF 2,170.[16] Currently, 49 male prisoners are housed in female prisons, with a total of 1,076 males having requested transfer since January 1, 2021, the effective date of S.B. 132. Of that number, 216 have pending reviews, and 3 have been involuntarily transferred back.[17]  If all 1,076 males were transferred, the women's prison population would be *one-quarter male.*

---

[16] California Department of Corrections and Rehabilitation, Division of Correctional Policy Research and Internal Oversight, Office of Research, *Monthly Report of Population by Gender Identity* (as of midnight June 30, 2026) (July 1, 2026), https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2026/07/Tpop4_d2606.pdf.

[17] California Department of Corrections and Rehabilitation, Division of Correctional Policy Research and Internal Oversight, Office of Research, *Senate Bill 132, Transgender Respect, Agency and Dignity Act as of July 1, 2026* (July 6, 2026), https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2026/07/STA472-072026.pdf.

The overwhelming majority of men in CDCR's trans-identified population retain fully intact genitalia. As of 2023, well over 98 percent of the population S.B. 132 authorizes to be housed according to gender identity has not undergone any surgical alteration, let alone removal of male anatomy.[18] Nor does CDCR require it. The practical consequence that follows is that the male inmates housed with females retain their ability to rape and impregnate their cell and block mates.

In 2022, of the then-287 incarcerated males who claimed a trans-identity nearly one-third were on California's sex-registry and 1 in 4 had been convicted of sex crimes.[19] The more than four-fold ballooning of the number of males claiming to be women should not surprise anyone. Why wouldn't a male convicted of sex crimes or sentenced to life try to spend it in the company of easy victims?

Since S.B. 132 became effective, Amicus Ichikawa has received communications like these from desperate female inmates:

---

[18] Nigel Duara, *More California Prisoners Are Requesting Gender-Affirming Health Care, Including Surgeries*, CalMatters (June 26, 2023), https://calmatters.org/justice/2023/06/gender-affirming-care-california-prisons/.

[19] Keep Prisons Single Sex USA, *CDCR Response on Data of Offenders Seeking Transfer to Female Facilities* (Feb. 2022), https://usa.kpssinfo.org/wp-content/uploads/2022/02/CDCR-Response-on-Data-of-Offenders-Seeking-Transfer-to-Female-Facilities.pdf.

Not sure if u got the latest on sb132 so here it is again
 SOS
I just received a new roommate yesterday while I was doing Comfort Care. Long story short after we made her she feel safe, she confined in what happened to her a week ago on byard by a ▮▮▮▮▮▮ #.
She was RAPED in the shower of her being housed seventy2 hrs with him. ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮. He's here for rape and spent twenty5 yrs. Then thrown in adseg for 12hrs after the prick called PREA on her. This chick is maybe 5' 140max think

24



> More like a grown ass man from a men's joint named ▮▮▮▮▮
> I'm wide awake,nightmare from my childhood 1:am.
> Okay so in my unit ▮▮▮▮ just keeps getting accommodation after accommodation. After 3 incidents with three different white women.
> The first one he choked,second he repeatedly punched her in the face,then the nerve to pull his penis out and demand she put it in her mouth to suck! Only the last victim was moved to C-yard pending prea investigation. This woman has been having the roughed time since,she has been put out from different rooms because she wakes up screaming from her nightmares triggered by ▮▮▮▮
> This last victim is here for murder / domestic violence partner. she has been raped ,beat,etc....

Torture of female prisoners at the hands of males is still torture, irrespective of how those males claim to perceive themselves.

25

### D. VULNERABLE MALE PRISONERS CAN BE HOUSED IN MALE PRISONS.

Correctional systems have long recognized that specific, well-defined categories of male inmates face a heightened risk of victimization from other male inmates. These include juveniles convicted as adults, mentally ill, intellectually or developmentally disabled, gay, bisexual, trans-identified, former law enforcement officers, pedophiles and celebrities.[20] The institutional response to these recognized risks has never been to transfer these vulnerable inmates to a women's facility. Instead, it has been protective custody or specialized housing within the male system. For example, in Los Angeles, for decades, gay and trans-identified males were housed in the K6G jail, a specialized, segregated housing ward in the Los

---

[20] See U.S. Department of Justice, *Report and Recommendations Concerning the Use of Restrictive Housing*, at 23-24, 102 (Jan. 2016), https://www.justice.gov/dag/file/815551/dl; 28 C.F.R. § 115.41(d); Todd Bricker, *Protective Custody*, in The Encyclopedia of Corrections (Kent R. Kerley ed., 2017), https://doi.org/10.1002/9781118845387.wbeoc195; *see also Taylor v. Michigan Department of Corrections*, 69 F.3d 76 (6th Cir. 1995).

26

Angeles Men's Central Jail designed to protect gay and trans-identified males.[21] K6G was relatively free of sexual assault.[22]

Using female prisons to compensate for the state's failure to control risk within its male prisons represents an extraordinary cruelty and indifference to the basic well-being of female prisoners. Rather than addressing the risk, it merely relocates it onto women who bear no responsibility for it, and can only do so on the premise that their safety matters less than men's.

### E.    SNAPSHOTS OF MALES BEING HOUSED IN WOMEN'S PRISONS.

Below are relevant histories of some of the males who have been locked up, are locked up or are requesting to be locked in inescapable cells where they have access to incarcerated California women. These are the men that cause women to sleep in shifts or spend their days in fear of being sexually preyed upon.

---

[21] Sharon Dolovich, *Two Models of the Prison: Accidental Humanity and Hypermasculinity in the L.A. County Jail*, 102 J. Crim. L. & Criminology 965, 968-969 (2012), https://scholarlycommons.law.northwestern.edu/jclc/vol102/iss4/1.
[22] *Id.*

Imagine getting undressed, showering and sleeping in a locked cage with one of these males.

### 1. Tremaine "Tremayne" Carroll



Carroll is a three-strikes criminal who is serving 25 years to life, having begun his criminal career with burglary, kidnapping and sexual assault charges at age 17.[23] Within three months of the passage of S.B. 132, Carroll took advantage of the law, and was transferred to CCWF claiming to be a transgender woman. He retains his penis.[24] He was housed at the women's prison for close to three years when, despite

---

[23] Chris Pandolfo & Michael Ruiz, *3rd-Strike "Trans" Rape Suspect Prompts Rebellion Against CA Law After Attack in Women's Prison*, Fox News (June 3, 2024), https://www.foxnews.com/us/third-strike-trans-rape-suspect-prompts-rebellion-against-ca-law-after-attack-womens-prison.

[24] Christina Coulter, *Blue State Violent Crime Victims Ordered to Address 'Trans' Career Criminal by Preferred Pronouns*, Fox News (Dec. 26,

the fact that his cell was separated from the females (obviously an insufficient safety measure),[25] he was charged with two counts of rape against two separate female prisoners, after getting a third prisoner pregnant. Carroll has been returned to the male prison as he awaits trial.[26] The ACLU intervened in the case at bar using Carroll as an intervening party. Carroll's statement that "[i]f these plaintiffs [in *Chandler*] get what they want, I'll be sent back to a men's prison, where I would face relentless sexual harassment and the constant threat of rape. That was my reality for years, and I am terrified to go back. I am a woman, and I don't belong in a men's prison,") did not age well since he is on trial for rape.[27]

---

2024), https://www.foxnews.com/us/blue-state-violent-crime-victims-ordered-address-trans-career-criminal-preferred-pronouns.print.

[25] *"Trying to Navigate This Ridiculous Pressure": Tremayne Carroll*, MindSite News (Mar. 27, 2025), https://mindsitenews.org/my-sexuality-is-mine-and-mine-alone-tremayne-carroll/.

[26] See supra, n. 20.

[27] Press Release, ACLU of Southern California, *LGBTQ Legal Rights Organizations Move to Protect California's Trans-Inclusive Incarceration Policy* (May 9, 2022), https://www.aclusocal.org/press-releases/lgbtq-legal-rights-organizations-move-protect-californias-trans-inclusive/.

## 2. Kao Saetern



Kao Saetern is a male currently housed in CIW[28] because he claims to be a woman. He was arrested in 2019, and booked into Tehama County Jail on suspicion of lewd or lascivious acts with a child under 14 years of age and sexual penetration with a foreign object.[29]

---

[28] CDCR, California Incarcerated Records and Information Search (CIRIS), "Kao Siew Saetern," CDCR No. WH2533, https://ciris.mt.cdcr.ca.gov/.

[29] *Police Blotter: March 7, 2019*, Corning Observer (Mar. 7, 2019), https://www.appeal-democrat.com/corning_observer/police-blotter-march-7-2019/article_0e805a92-407c-11e9-87bd-e7fa4f698e75.html.

### 3. John Jacobsen



Double murderer and death row inmate, the "Yacht-killer" John Jacobsen aka Skylar DeLeon, who murdered a couple and dumped their bodies into the sea, is currently housed in prison system medical unit for his own safety (in his words) while he awaits transfer to the women's prison.[30] Despite undergoing sex-rejecting surgeries, Jacobsen admits that he is only sexually attracted to women.[31]

---

[30] Joseph Simonson and Susannah Luthi, *Transgender "Yacht Killer" Serving Life Sentence Gets Taxpayer-Funded Sex-Change Surgery Thanks to Kamala Harris: "He Killed My Daughter and Son-in-Law, Now He Gets What He Wants,"* Washington Free Beacon (Oct. 15, 2024), https://freebeacon.com/elections/transgender-yacht-killer-serving-life-sentence-is-now-eligible-for-taxpayer-funded-sex-change-surgery-thanks-to-kamala-harris-he-killed-my-daughter-and-son-in-law-and-now-he-gets-what-he-wants/.

[31] *Yacht Murderer Wanted Sexual Reassignment Surgery*, ABC News (Feb. 9,2009), https://abcnews.com/TheLaw/story?id=6813191&page=1; Ray Blanchard used the term "autogynephilia" to describe males, like Jacobsen, who are typically sexually interested in women and also experience erotic arousal at the thought or image of themselves as female.

### 4. Richard Masbruch



**RICHARD MASBRUCH**

Richa...
sodo...
cons...
even...
The v...
wom...
was e...
right...
Masb...

Masbruch aka Sherri Lashure is being housed at CIW.[32] See Brief at p. 1 for information about his crime and his behavior in prison.

---

Ray Blanchard, *The Concept of Autogynephilia and the Typology of Male Gender Dysphoria*, 177 J. Nervous & Mental Disease 616, 616 (1989).

[32] CIRIS, "Sherri Lashure," CDCR No. X29503, https://ciris.mt.cdcr.ca.gov/.

### 5. David Warfield



David Warfield, aka Dana Rivers, a staunch trans-rights activist, was convicted in November 2022 of the November 2016 murders of a lesbian married couple and their 19-year-old son, at their Oakland home.[33] Warfield was sentenced to life without parole and is currently serving his time at CCWF.[34]

---

[33] Dana Kennedy, *Fury as Trans Woman Who Murdered Three Is Sent to Female Prison After "Hate Crime,"* N.Y. Post (June 26, 2023), https://nypost.com/2023/06/26/fury-as-trans-woman-who-murdered-three-is-sent-to-female-prison-after-hate-crime/.

[34] CIRIS, "Dana Rivers," CDCR No. WH1178, https://ciris.mt.cdcr.ca.gov/.

### 6. Shawn Merle Gustafson



Shawn Merle Gustafson, at age 29, entered no contest pleas to two counts of oral copulation with a child under 10, specifically involving an 8-year-old and a 6-year-old boy. He is currently being housed with females at CIW.[35]

---

[35] CIRIS, "Shawn Gustafson," CDCR No. WH2534, https://ciris.mt.cdcr.ca.gov/.

### 7. Jason Hann



Jason (aka Jessica) Hann was originally sentenced to death in 2014 for the first degree murder of two of his infant children.[36] He is serving his now-life sentence among the female inmates in CCWF. [37]

These are just some of the men who will continue to terrorize vulnerable women pursuant to the district court's reasoning in this case.[38]

---

[36] Mary Margaret Olohan, *Two-Time Baby Killer Among Trans Prison Inmates Housed at CA Women's Facility*, Daily Caller (Apr. 8, 2021), https://dailycaller.com/2021/04/08/california-transgender-prison-inmate-jessica-hann/.

[37] CIRIS, "Jessica Hann," CDCR No. WB1140, https://ciris.mt.cdcr.ca.gov/.

[38] Additional stories can be found in Independent Women's Forum's documentary series *Cruel & Unusual Punishment: The Male Takeover of Female Prisons*; https://www.iwfeatures.com/watch/cruel-unusual-punishment/ (last visited July 24, 2026)

## IV. CONCLUSION

Based upon the foregoing, this Court should reverse the district court.

Dated: August 4, 2026

Respectfully submitted,

/s C. Erin Friday
C. Erin Friday
Counsel for Our Duty-USA and
Amie Ichikawa
P.O. Box 442
San Carlos, CA 94070
(415) 577-9271
Erin.friday@yahoo.com

37

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** Appeal No. 26-3283.

I am the attorney or self-represented party.

**This brief contains 6396 words,** including **217 words** manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ X ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[    ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** s/Erin Friday, Esq. **Date  August 4, 2026**
*(use "*s/[typed name]*" to sign electronically-filed documents)*

39

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2026, I electronically filed the foregoing brief with the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that counsel for all parties in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Erin Friday*
ERIN FRIDAY

40