**No. 26-3283**

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

JANINE CHANDLER; KRYSTAL GONZALEZ; TOMIEKIA JOHNSON; NADIA ROMERO; CATHLEEN QUINN; AND CHANNELL JOHNSON,

*Plaintiffs-Appellants,*

v.

JEFF MACOMBER, Secretary of the California Department of Corrections and Rehabilitation, in his official capacity; ANISSA DE LA CRUZ, Warden, in her official capacity; LAVELLE PARKER, Warden, in his official capacity,

*Defendants-Appellees,*

and

TRANSGENDER, GENDER-VARIANT & INTERSEX JUSTICE PROJECT, et al.,

*Intervenors-Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of California
No. 1:21-cv-01657-JLT-HBK
Hon. Jennifer L. Thurston

---

# INTERVENORS' ANSWERING BRIEF

---

DIMITRI D. PORTNOI
dportnoi@omm.com
KYLE M. GROSSMAN
kgrossman@omm.com
ELIZABETH A. ARIAS
earias@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, Suite 1900
Los Angeles, California 90071
Telephone: (213) 430-6000

SHAWN THOMAS MEERKAMPER
shawn@transgenderlawcenter.org
TRANSGENDER LAW CENTER
P.O. Box 70976
Oakland, California 94612
Telephone: (510) 587-9696

AMANDA C. GOAD
agoad@aclusocal.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
P.O. Box 811370
Los Angeles, California 90081
Telephone: (213) 977-9500

NORA HUPPERT
nhuppert@lambdalegal.org
LAMBDA LEGAL
3656 N. Halsted St.
Chicago, Illinois 60613
Telephone: (312) 663-4413

RICHARD SAENZ
rsaenz@lambdalegal.org
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, New York 10005
Telephone: (212) 809-8585

PELECANOS
pelecanos@lambdalegal.org
LAMBDA LEGAL
800 South Figueroa Street, Suite 1260
Los Angeles, California 90017
Telephone: (213) 382-7600

*Attorneys for Intervenors-Defendants-Appellees Jennifer Rose, Katie Brown, Kelli Blackwell, Tremayne Carroll, and Transgender, Gender-Variant & Intersex Justice Project*

# TABLE OF CONTENTS


Page

I. INTRODUCTION ..... 1

II. ISSUES PRESENTED ..... 4

III. STATEMENT OF JURISDICTION ..... 4

IV. STATEMENT OF THE CASE ..... 4

A. California Women's Prisons Housed Transgender Women for Years Prior to S.B. 132. ..... 4

B. S.B. 132 Outlines the CDCR Procedure for Assigning Housing for Transgender People and CDCR's Authority to Deny Transfers for Individualized Management and Safety Reasons. ..... 7

C. CDCR Implements S.B. 132 Through a Rigorous, Individualized Review in Which Denials Far Outnumber Approvals ..... 9

D. The First Amended Complaint Failed to Establish Standing and Failed to State a Claim. ..... 11

V. STANDARD OF REVIEW ..... 14

VI. SUMMARY OF THE ARGUMENT ..... 14

VII. ARGUMENT ..... 17

A. The District Court Correctly Concluded that Appellants Lack Article III Standing Because Their Alleged Harms Are Not Redressable. ..... 17

1. The requested relief cannot redress the alleged injury because transgender women's placement in women's facilities does not depend solely on S.B. 132. ..... 19

2. Appellants' retooled remedy—"restoration of individualized safety screening"—does not cure their pleading defect. ..... 24

# TABLE OF CONTENTS
# (continued)

**Page**


3. Federal constitutional and statutory law independently require CDCR to house some transgender women in women's facilities. .................. 31

B. The First Amended Complaint Fails to State a Claim for Relief. .................. 35

1. S.B. 132 imposes no speech obligations on incarcerated people, and the alleged retaliatory conduct cannot be attributed to the statute. .................. 35

2. Appellants did not plead that S.B. 132 burdens their free exercise of religion, and nothing in the statute prevents them from seeking accommodations. .................. 38

3. Appellants failed to allege an Eighth Amendment claim based on the categorical and unsupported dangerousness of transgender women .................. 40

4. Appellants failed to allege an equal protection claim because S.B. 132 has no effect on how CDCR considers cisgender women's housing requests. .................. 43

VIII. CONCLUSION .................. 46

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Al Saud v. Days*,
50 F.4th 705 (9th Cir. 2022) .......... 38

*ASARCO Inc. v. Kadish*,
490 U.S. 605 (1989) .......... 30, 31

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 14

*Brown v. Budz*,
398 F.3d 904 (7th Cir. 2005) .......... 42

*California v. Texas*,
593 U.S. 659 (2021) .......... 18, 19

*Dep't of Educ. v. Brown*,
600 U.S. 551 (2023) .......... 17, 30

*Edmo v. Corizon, Inc.*,
935 F.3d 757 (9th Cir. 2019) .......... 32

*Farmer v. Brennan*,
511 U.S. 825 (1994) .......... 32, 41, 42

*Frisby v. Schultz*,
487 U.S. 474 (1988) .......... 35

*Fuqua v. Raak*,
120 F.4th 1346 (9th Cir. 2024) .......... 39

*Guy v. Espinoza*,
2020 WL 309525 (E.D. Cal. Jan. 21, 2020) .......... 6

*Haaland v. Brackeen*,
599 U.S. 255 (2023) .......... 18

*Harrison v. Kernan*,
971 F.3d 1069 (9th Cir. 2020) .......... 33

# TABLE OF AUTHORITIES
# (continued)

**Page**

*Helling v. McKinney*,
509 U.S. 25 (1993) .................... 21

*In re Eventbrite, Inc. Sec. Litig.*,
2020 WL 2042078 (N.D. Cal. Apr. 28, 2020) .................... 28

*Johnson v. Fed. Home Loan Mortg. Corp.*,
793 F.3d 1005 (9th Cir. 2015) .................... 28

*Juliana v. United States*,
947 F.3d 1159 (9th Cir. 2020) .................... 18, 31

*Kentucky v. Graham*,
473 U.S. 159 (1985) .................... 37

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) .................... 28

*Knievel v. ESPN*,
393 F.3d 1068 (9th Cir. 2005) .................... 28

*Larson v. Valente*,
456 U.S. 228 (1982) .................... 22

*Lemire v. Cal. Dep't of Corr. & Rehab.*,
726 F.3d 1062 (9th Cir. 2013) .................... 28, 29

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .................... 17

*Morrill v. Scott Fin. Corp.*,
873 F.3d 1136 (9th Cir. 2017) .................... 14

*Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville*,
508 U.S. 656 (1993) .................... 23

*Norsworthy v. Diaz*,
2020 WL 10965424 (N.D. Cal. June 10, 2020) .................... 7

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Perttu v. Richards*,
605 U.S. 460 (2025) ... 28

*Quine v. Kernan*,
741 F. App'x 358 (9th Cir. 2018) ... 6

*Reeves v. King*,
774 F.3d 430 (8th Cir. 2014) ... 41

*Richey v. Dahne*,
733 F. App'x 881 (9th Cir. 2018) ... 36

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC*,
532 F.3d 963 (9th Cir. 2008) ... 25

*Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*,
605 F.3d 703 (9th Cir. 2010) ... 35

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*,
547 U.S. 47 (2006) ... 37

*Salisbury v. Hickman*,
974 F. Supp. 2d 1282 (E.D. Cal. 2013) ... 35

*Schillinger v. Kiley*,
954 F.3d 990 (7th Cir. 2020) ... 41

*Schneider v. Cal. Dep't of Corr.*,
151 F.3d 1194 (9th Cir. 1998) ... 25

*Sprewell v. Golden State Warriors*,
266 F.3d 979 (9th Cir. 2001) ... 28

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ... 29

*United States v. Skrmetti*,
605 U.S. 495 (2025) ... 33

## TABLE OF AUTHORITIES
## (continued)


**Page**

*West Virginia v. B.P.J. by Jackson*,
146 S. Ct. 2356 (2026) .......... 33

*Wright v. Riveland*,
219 F.3d 905 (9th Cir. 2000) .......... 27

**STATUTES**

28 U.S.C. § 1291 .......... 4

28 U.S.C. § 1331 .......... 4

28 U.S.C. § 1343(a) .......... 4

Cal. Penal Code § 2605 .......... 39

Cal. Penal Code § 2605(a)(1)–(3) .......... 8

Cal. Penal Code § 2606 .......... 39

Cal. Penal Code § 2606(a)(3)–(4) .......... 8

Cal. Penal Code § 2606(a)(3), (b) .......... 44

Cal. Penal Code § 2606(a)(4) .......... 23

Cal. Penal Code § 2606(b) .......... 8

**REGULATIONS**

28 C.F.R. § 115.41(d)(7) .......... 24, 44

28 C.F.R. § 115.42(a), (e) .......... 24, 44

28 C.F.R. § 115.42(c) .......... 5, 34

28 C.F.R. § 115.42(c)–(e), (g) .......... 16

28 C.F.R. § 115.42(d) .......... 6, 34

28 C.F.R. § 115.42(e) .......... 6, 34

# TABLE OF AUTHORITIES
# (continued)

**Page**

28 C.F.R. § 115.42(g) ........ 6, 34

Cal. Code Regs. tit. 15, § 3085.2(e)(3)(B) ........ 26

Cal. Code Regs. tit. 15, §§ 3085–3085.3 (2026) ........ 10

# I. INTRODUCTION

Appellants seek a remedy they cannot lawfully obtain: the categorical exclusion of transgender women from women's prison facilities in California.

It is undisputed that the California Department of Corrections and Rehabilitation ("CDCR") has housed transgender women in women's facilities for nearly a decade. CDCR has done so under regulations and practices, unchallenged here, that require it to take an individualized, case-by-case approach to the housing preferences of transgender women. The California Legislature's enactment of S.B. 132 in 2020 further directed CDCR to give "serious consideration" to transgender women's perception of their health and safety while authorizing CDCR to deny a housing request based on management or security concerns. S.B. 132 did not cause transgender women to become present in women's facilities, and enjoining it now, as Appellants seek, would not remove transgender women. Indeed, as the district court recognized, "regardless of the outcome of this suit, transgender women will continue to be housed in women's facilities."

That fact alone forecloses Appellants' challenge. It is the fundamental reason the district court twice rejected Appellants' request to declare S.B. 132 unconstitutional and grant an injunction prohibiting CDCR from enforcing it: Appellants' alleged injury—exposure to the presence of transgender women—could not plausibly be redressed. On appeal, Appellants refashion their request, insisting that what they seek now is not the categorical exclusion of transgender women from women's facilities but the "restoration of individualized safety screening." But S.B. 132 did nothing to displace or prohibit individualized safety screening, nor would the proposed screening remedy do anything to address Appellants' ultimate grievance—sharing spaces with transgender women. In any event, Appellants did not request this relief in their operative complaint, and their attempt to amend through briefing is improper.

This Court should reject Appellants' claims for the same reasons the district court did. ***First***, Appellants have again failed to establish that the requested relief is capable of redressing their alleged injury. An order requiring the removal of all transgender women from CDCR women's facilities is unavailable as a matter of law. It would exceed the

remedial power of an Article III court and violate the Eighth Amendment, the Equal Protection Clause, the Prison Rape Elimination Act, and other laws. Even if the Court were to accept Appellants' revised request for individualized safety screening, S.B. 132 already allows for individualized consideration of transfer requests and allows for denials due to management or security concerns. An injunction, as the district court correctly recognized, "will not redress a future harm."

***Second***, independent of their lack of standing, Appellants fail to state a claim for relief. Each of their four theories—free speech and retaliation, free exercise, Eighth Amendment, and equal protection—depends on a mischaracterization of S.B. 132. The statute (i) does not impose any penalties on inmates for misgendering fellow incarcerated people; (ii) does not impinge on Appellants' sincerely held religious beliefs by mandating they share a room or bed assignment with transgender women; (iii) does not allow Appellants to invent a theory that the mere presence of transgender women in a women's facility poses a categorical risk of harm; and (iv) does not impact the housing requests of cisgender women.

Intervenors—four transgender women in CDCR custody and the Transgender, Gender-Variant & Intersex Justice Project—respectfully request that this Court affirm the judgment of the district court dismissing this action.

## II. ISSUES PRESENTED

1. Whether the district court properly concluded that Appellants lack Article III standing because Appellants' alleged injuries were not the result of S.B. 132 and the relief they seek would not redress those injuries.

2. Whether the district court was correct to dismiss all of Appellants' claims—including Appellants' free speech, retaliation, free exercise, Eighth Amendment, and equal protection claims—for failure to state a claim.

## III. STATEMENT OF JURISDICTION

Intervenors concur in Appellants' statement of jurisdiction. AOB 10; *see* 28 U.S.C. §§ 1291, 1331, 1343(a); ER-3; ER-126.

## IV. STATEMENT OF THE CASE

### A. California Women's Prisons Housed Transgender Women for Years Prior to S.B. 132.

Since at least 2017, Title 15 of the California Code of Regulations has governed placement of transgender people in CDCR custody. ER-32. The 2017 rule directed that transgender people and people with gender dysphoria symptoms in CDCR custody "shall be referred to a

classification committee for a determination of appropriate housing at a designated institution," with consideration given to each person's "needs, interests and desires," behavior, and placement score, alongside institutional security and public safety concerns. ER-32 (quoting Cal. Code Regs. tit. 15, §§ 3269(g), 3375(b) (2017)). Likewise, CDCR's Department Operations Manual required transgender and intersex people to be referred for review of "case factors" in determining institutional placement and housing. ER-33 (citing DOM § 62080.14). That referral requirement remains in force, now codified at Title 15 section 3269(h). ER-32 n.2.

Federal standards independently require the same individualized approach to determining housing placements. The Prison Rape Elimination Act ("PREA") regulations state that, "[i]n deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates," an agency "shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems." 28 C.F.R. § 115.42(c). The incarcerated person's "own views with respect to his or her own safety shall be given serious

consideration." *Id.* § 115.42(e). Placements must be "reassessed at least twice each year to review any threats to safety." *Id.* § 115.42(d). Agencies may not place lesbian, gay, bisexual, transgender, or intersex people in dedicated facilities solely on the basis of their transgender status. *Id.* § 115.42(g). It is undisputed that CDCR must comply with PREA's screening requirements. ER-101.

It is also undisputed that transgender women were housed in CDCR women's facilities well before S.B. 132's enactment.[1] The district court correctly found that a CDCR regulation allowing transgender women to be housed with other women "existed at least three years prior to the enactment of S.B. 132." ER-54; *see also Quine v. Kernan*, 741 F. App'x 358, 361 (9th Cir. 2018) (transgender woman plaintiff Quine "is housed in a female institution" in CDCR); *Guy v. Espinoza*, 2020 WL 309525, at *1 (E.D. Cal. Jan. 21, 2020) (recommending dismissal of complaint filed in 2019 alleging that "CDCR has implemented policies" that resulted in transgender women being

---

[1] Appellants' amicus WDI concedes that "California housed male inmates [sic] in women's prisons before the passage of S.B. 132" and claims that S.B. 132 "simply codified existing practices." WDI Amicus Br. 14 (Dkt. 19.1).

housed in close proximity to cisgender women); *Norsworthy v. Diaz*, 2020 WL 10965424, at *1 (N.D. Cal. June 10, 2020) (addressing health care claims brought by a transgender woman housed at Central California Women's Facility).

### B. S.B. 132 Outlines the CDCR Procedure for Assigning Housing for Transgender People and CDCR's Authority to Deny Transfers for Individualized Management and Safety Reasons.

The Legislature enacted S.B. 132 to recognize, clarify, and streamline transgender, nonbinary, and intersex people's rights while incarcerated. The bill's author acknowledged that the California Code of Regulations established a process for assigning an incarcerated transgender person to a designated institution, but nonetheless concluded that the process failed to adequately account for gender identity and perceived safety, leaving transgender people more vulnerable to violence and more likely to be placed in solitary confinement. ER-33; ER-34. In analyzing the bill, the Senate Public Safety Committee cited research finding that transgender people in CDCR's custody were "13 times more likely to be sexually assaulted in prison than non-transgender inmates." *Id.*

Governor Newsom signed S.B. 132, the Transgender Respect, Agency, and Dignity Act, on September 26, 2020; it took effect January 1, 2021. ER-34; ER-100. The law added two Penal Code sections. ER-7. Section 2605 requires CDCR to ask people entering custody about gender identity, whether they identify as transgender, nonbinary, or intersex, and their pronouns and honorifics. Cal. Penal Code § 2605(a)(1)–(3).

Section 2606 requires that a transgender, nonbinary, or intersex person be "housed at a correctional facility designated for men or women based on the individual's preference," with "their perception of health and safety given serious consideration in any bed assignment, placement, or programming decision." Cal. Penal Code § 2606(a)(3)–(4). At the same time, CDCR may deny a preference based on "management or security concerns" if the Secretary or designee certifies "in writing a specific and articulable basis why the department is unable to accommodate that . . . housing preference." *Id.* § 2606(b).

### C. CDCR Implements S.B. 132 Through a Rigorous, Individualized Review in Which Denials Far Outnumber Approvals.

California's Office of the Inspector General conducted a review of CDCR's implementation of S.B. 132 ("OIG Report"). ER-8–9; ER-103–04.[2] The OIG Report described a multi-step, individualized transfer process: an applicant completes a questionnaire, moves to one of thirteen "hub" prisons, and takes a mandatory eight-session course addressing cultural and rule differences between men's and women's prisons. ER-9; ER-9–10. A counselor then conducts a "thorough" review of the applicant's mental health, prison record, and criminal history, and interviews them directly. ER-10. A transfer committee holds a hearing, and the chairperson—at the time, a warden of one of the two women's prisons, California Institution for Women ("CIW") and Central California Women's Facility ("CCWF")—decides whether management or safety concerns require denial. *Id.* CDCR's practice is that a transferee may be returned if problems arise. ER-11. CDCR initiated in 2023, and published as final in April 2026, regulations

---

[2] Because the complaint "quotes the OIG Report extensively" and relies on it to connect Appellants' claims to S.B. 132, the district court considered the report in full. ER-9.

describing the same multi-step process explained in the OIG Report. *See* Cal. Code Regs. tit. 15, §§ 3085–3085.3 (2026).

The OIG called the process "appropriately thorough" and "significantly longer and more detailed" than other transfer procedures. ER-11. At the time of its review, nearly 400 people had requested transfers, but only 55 requests had been processed. *Id.* A CDCR report showed that, as of March 4, 2026, about 1,110 of roughly 2,400 transgender, nonbinary, and intersex people in custody had requested transfers; 54 requests were approved, 144 denied, and 148 withdrawn during review. *Id.*

The OIG claimed that assessing an applicant's "sincerity" and "true intentions" could be difficult and that purposeful misidentification was possible, but did not report any transfer obtained in bad faith or on false pretenses. ER-12. It found that women's prison residents can report safety or security concerns to staff, request a bed change or temporary restrictive housing, and file a grievance; CDCR "properly investigated or responded to all allegations of consensual sexual misconduct and sexual assaults" OIG reviewed. ER-12–13.

### D. The First Amended Complaint Failed to Establish Standing and Failed to State a Claim.

Appellants filed this action on November 17, 2021. AOB 10; ER-59. The original complaint sought a declaration that S.B. 132 is unconstitutional and a permanent injunction "enjoining Defendants from enforcing or implementing S.B. 132." ER-53. Intervenors—four transgender women in CDCR custody and the Transgender, Gender-Variant & Intersex Justice Project, an organization that advocates for incarcerated transgender, nonbinary, and intersex people—intervened in the litigation. ER-95; ER-145. The district court permitted Intervenors to participate "to advocate for their interests." ER-15.

On May 14, 2024, the district court granted Defendants' first motion to dismiss. ER-32–57. The court held that the Eleventh Amendment barred claims against CDCR and that most claims were not redressable. ER-56–57. The court denied leave to amend against CDCR and for claims it could not redress. ER-57.

Appellants filed the First Amended Complaint ("FAC") on July 19, 2024. ER-94–123; AOB 10. The FAC asserts the same federal claims that had previously been dismissed. Although the district court denied leave to include a facial challenge to S.B. 132 in the FAC, ER-17,

Appellants again sought a declaration that S.B. 132 is unconstitutional and an injunction prohibiting CDCR from enforcing S.B. 132. ER-15. Appellants described the requested relief as "simply seek[ing] an injunction against the enforcement of S.B. 132 . . . and a return to the regime before its enactment," which, by Appellants' characterization, "provided for inclusion of" transgender women in women's facilities under the terms of PREA. *Id.*; ER-23–24. On March 23, 2026, the district court granted Defendants' and Intervenors' second motion to dismiss. The court granted limited leave to amend if different or additional allegations could provide the court with jurisdiction. ER-5–31. However, the court stated that claims based on the "mere presence of transgender inmates within California women's prisons" could not be cured by amendment and dismissed them without leave to amend. ER-24–25; ER-28–29.

In this second dismissal, the court held that Appellants had not alleged facts establishing with any plausibility that their claims were redressable. ER-23. Specifically, Appellants had not explained how restoring the pre-S.B. 132 "regime" would prevent their sharing intimate spaces with transgender women given that California had

been housing transgender women in women's prisons before and independent of S.B. 132. ER-23; ER-28; ER-30. The court reiterated that "regardless of the outcome of this suit, transgender women will continue to be housed in women's facilities." *Id.* When Appellants described the remedy as individualized vetting, the court reached the same conclusion: CDCR already considers the ramifications of individual transfers in a thorough, case-by-case process that accounts for the safety and well-being of others, so the requested injunction would "essentially instruct [CDCR] to do what they are already doing. It will not redress a future harm." ER-23–24. The court correctly concluded that Appellants lacked standing for their free speech, free exercise, and equal protection claims as well. ER-28; ER-30.

The district court permitted Appellants to file a second amended or supplemental complaint asserting narrower claims tied to specific officials, housing or cell assignments, or adverse actions. ER-25–31; ER-124. Rather than accept the district court's invitation, Appellants immediately filed this appeal. In doing so, they refashioned their proposed remedy as the "restoration of individualized safety screening"—a request absent from their prior pleadings.

## V. STANDARD OF REVIEW

This Court reviews de novo a dismissal for lack of Article III standing and a dismissal for failure to state a claim under Rule 12(b)(6). *Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1141 (9th Cir. 2017). Well-pleaded factual allegations are accepted as true, but a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## VI. SUMMARY OF THE ARGUMENT

This appeal can be resolved on the threshold ground the district court twice identified: Appellants have not alleged an injury that any judgment in their favor could redress. Appellants allege that the enforcement of S.B. 132 has caused injury to them that rises to the level of a constitutional harm because of the mere presence of transgender women in the women's facilities where they are housed. ER-106; ER-114. Appellants disregard CDCR's years-long practice, prior to S.B. 132, of housing some transgender women in CDCR women's facilities, under separate laws and policies that Appellants do not challenge. ER-23; ER-32; ER-54–55. An injunction against S.B. 132 would not accomplish the relief that Appellants seek: exclusion of

transgender women from women's prisons and the removal of every transgender woman from CIW or CCWF.

After twice having their complaint dismissed, Appellants now attempt to refashion their requested relief as the "restoration of individualized safety screening"—a request absent from the FAC. AOB 8. In doing so, they fundamentally mischaracterize S.B. 132, which did nothing to displace or prohibit individualized safety screening. CDCR already performs extensive, case-by-case review, which has produced far more denials than approvals of housing transfers of transgender people in its custody. ER-9–11. Appellants' proposed relief would "essentially instruct the defendants to do what they are already doing," and so "will not redress a future harm." ER-24. Nor would the additional screening Appellants purport to seek address their actual alleged harm: the presence and housing of transgender women in women's facilities.

To remedy that alleged injury, a court would have to direct CDCR to identify, locate, and remove transgender women from women's facilities and deny all future transfers—thereby requiring CDCR to violate the Constitution and other protections, while placing

transgender people in CDCR custody at serious risk of harm. Such an order would exceed the remedial power of an Article III court, and it would independently violate: (1) the Eighth Amendment by compelling CDCR to house transgender women where they face a known and substantial risk of serious harm; (2) the Equal Protection Clause by classifying on the basis of transgender status and sex without sufficient justification to survive heightened scrutiny; (3) PREA's requirement of individualized, twice-yearly placement assessments, 28 C.F.R. § 115.42(c)–(e), (g); and (4) other laws. An order requiring the removal of all transgender women from CDCR women's facilities is unavailable as a matter of law.

The district court correctly dismissed the FAC for the additional reason that Appellants failed to state a claim. Each claim rests on an imagined version of S.B. 132 that the statute's text does not support. The district court correctly dismissed the free speech and retaliation claims because S.B. 132 imposes obligations only on CDCR employees, not on incarcerated people, and because Appellants failed to plausibly connect the conduct of individual correctional officers to a CDCR policy, the Secretary, or the two wardens they sued. ER-27. The free exercise

theory fails because Appellants do not allege that S.B. 132—rather than the mere presence of transgender women within the prison system—burdens their religious practice, and nothing in the statute bars them from seeking accommodations. ER-27. The Eighth Amendment theory fails because a pleading premised on the categorical dangerousness of transgender women identifies no facts from which officials could infer a substantial risk of serious harm. And the equal protection theory fails because S.B. 132 confers none of the preferential treatment Appellants describe and is silent on how CDCR should consider cisgender women's requests. ER-29.

## VII. ARGUMENT

### A. The District Court Correctly Concluded that Appellants Lack Article III Standing Because Their Alleged Harms Are Not Redressable.

The "irreducible constitutional minimum of standing" requires a plaintiff to show an injury in fact, a causal connection between the injury and the challenged conduct, and a likelihood, as opposed to mere speculation, that the injury "will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023). "To establish Article III redressability, the plaintiffs must show that the relief they seek is both

(1) substantially likely to redress their injuries; and (2) within the district court's power to award." *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020). Redressability requires the court to "consider the relationship between the judicial relief requested and the injury suffered." *California v. Texas*, 593 U.S. 659, 671 (2021) (internal quotation marks omitted). And because "[i]t is a federal court's judgment, not its opinion, that remedies an injury," the question is whether the judgment itself would afford relief. *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023).

Appellants fail this test. Their alleged injury is the presence of transgender women in women's facilities, but neither the injunction they sought in the district court nor the screening remedy they now describe on appeal would remove transgender women from those units. The only remedy that would achieve that outcome—categorical exclusion—is one that Appellants cannot lawfully obtain. AOB 40–41. This defect applies to every one of Appellants' claims.

**1. The requested relief cannot redress the alleged injury because transgender women's placement in women's facilities does not depend solely on S.B. 132.**

Redressability begins with the injury actually alleged. *California*, 593 U.S. at 671. Here, that injury is the presence of transgender women in the women's facilities where Appellants are housed, and the access to intimate spaces that presence entails. The FAC alleges that Appellants "have experienced and continue to experience fear, depression, anxiety, and distress from the presence of" transgender women, "worsening their post-traumatic stress disorders, because they are forced to share close-living quarters, shower, go to the bathroom, and sleep with" transgender women. ER-106. They assert that Defendants have adopted policies "forcing biological women to live in close proximity with" transgender women, including "requiring female inmates to sleep, shower, and go to the bathroom with" transgender women, ER-95, and that S.B. 132 removes the "agency and dignity of biological female inmates" by "forcing them to live with" transgender women. ER-102.

The individual allegations follow that pattern. Janine Chandler alleges that "the presence of" transgender women causes flashbacks,

and she cannot control who observes her while she undresses. ER-107. Cathleen Quinn alleges that a transgender woman "peep[ed]" at her while she was using the bathroom. ER-110. Channell Johnson alleges that she was assigned to a cell with a transgender woman. *Id.* Appellants do not contest a specific aspect of S.B. 132's application. At bottom, their complaint is that transgender women are present and housed in CIW and CCWF at all. That is the injury against which any requested remedy must be measured.

An injunction against S.B. 132 would not cure this alleged harm. Transgender women were housed in CDCR women's facilities before S.B. 132 under different, unchallenged regulations and practices. ER-23; ER-32; ER-54–55. Amicus briefing in support of Appellants recognizes as much, stating that S.B. 132 "simply codified existing practices." WDI Amicus Br. 14 (Dkt. 19.1). Because an injunction against S.B. 132 would leave these other regulations undisturbed, and would do nothing to remove the transgender women currently housed in women's facilities, transgender women would continue to live in women's facilities even if S.B. 132 were enjoined.

The only order that could eliminate the complained-of presence of transgender women in women's facilities would be one that directed CDCR to "identify, locate, and remove" transgender women from CIW and CCWF. ER-22; ER-54. The district court determined that such an order would exceed its Article III power. ER-54. And regardless, Appellants no longer claim to be seeking categorical exclusion or any order removing a particular person. AOB 35, 40–41. They therefore disclaim the only remedy that could address their alleged injury. Because their injury is not redressable by the remedy they seek, the court correctly concluded that they had failed to establish standing. Appellants advance three responses to avoid that conclusion. None succeeds.

***First***, Appellants recharacterize their injury on appeal as "exposure" to a population with an elevated rate of violent and sexual offenses, invoking *Helling v. McKinney*, 509 U.S. 25, 33 (1993), for the proposition that exposure to an unsafe condition is itself the cognizable harm. AOB 17–18, 20, 22. *Helling* is beside the point. It makes no difference whether the injury is an "exposure" to transgender women or

the presence of transgender women—whatever the injury, the remedy must redress it.

***Second***, Appellants invoke the principle that a plaintiff need not show that a favorable decision will relieve every injury. AOB 21, 28 (citing *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982)). That principle does not help where the requested relief would redress *no* identified injury. Under *Larson,* a favorable decision still must relieve "a discrete injury." 456 U.S. at 243 n.15. But Appellants identify none: those already housed at CIW and CCWF would remain, future placements would continue under preexisting regulations, and any alternative procedure would be speculative and discretionary. ER-54; ER-23; ER-55; ER-21. Their assertion that relief "would plausibly reduce the frequency and intensity" of the challenged conditions, AOB 28, is conjecture. And regardless, the harm they allege is tied directly to the very presence of transgender women in women's facilities.

***Third***, Appellants contend that their equal protection injury is the denial of equal treatment itself, and that an injunction would therefore redress that injury without removing anyone from a women's facility. AOB 34–35 (citing *Ne. Fla. Chapter of Associated Gen.*

*Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993)). But *Northeastern Florida* addresses injury in fact, not redressability, and it does not relieve a plaintiff of the obligation to identify relief that a court may award and that would remedy the harm actually pleaded. 508 U.S. at 666. Under *Northeastern Florida*, a plaintiff must "demonstrate that it is able and ready" to seek the benefit from which the challenged barrier excludes it. *Id.* Appellants have not done so. They "do not allege that they intend or wish to apply for a different cell assignment or housing arrangements," ER-30, and the relief they seek confirms that they have no desire to be housed in a facility that does not correspond to their sex assigned at birth. Further, the municipal contract at issue in *Northeastern Florida* is a finite benefit that can be awarded to one bidder only. Housing consideration is not. A transgender woman having "her perception of health and safety given serious consideration" in a placement decision takes nothing away from Appellants and does not preclude CDCR from giving their safety concerns the same consideration. Cal. Penal Code § 2606(a)(4). A judgment withdrawing a statutory consideration from transgender, nonbinary, and intersex people would leave Appellants in the same facilities, the same housing

units, and the same cells. That is not redress of Appellants' alleged injury; it is the removal of someone else's protection.

And even if the housing consideration required by S.B. 132 were somehow unequal, an injunction would still not redress any injury, given that the PREA standards discussed in Section VII.A.3, *infra*, separately require that individuals' transgender or intersex status inform housing and bed assignments and that such a person's own views of her safety receive serious consideration. 28 C.F.R. §§ 115.41(d)(7), 115.42(a), (e). That is the same individualized consideration Appellants now characterize as a statutory entitlement withheld from them, and enjoining S.B. 132 would leave it fully in force.

**2. Appellants' retooled remedy—"restoration of individualized safety screening"—does not cure their pleading defect.**

In a belated attempt to overcome the barrier of redressability, Appellants propose changing the remedy itself. Unable to defend the injunction they actually requested, they now claim to seek "restoration of individualized safety screening without the challenged statutory preference." AOB 8; *see* AOB 21, 40–41. That reframing fails for four distinct reasons.

***First***, Appellants did not request this specific relief in the FAC, so it fails from the outset. The FAC requests a declaration that S.B. 132 is unconstitutional and an injunction against its enforcement, not a particular screening protocol, and Appellants may not amend through briefing. *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) ("In determining the propriety of a Rule 12(b)(6) dismissal, a court *may not* look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss.") (emphasis in original); ER-20. This Court should therefore analyze whether Appellants' alleged injury is redressable by the remedy they sought—not the one they refashioned on appeal. In deliberately choosing to forgo amendment in order to immediately seek appeal, Appellants are bound by the FAC's allegations. *See Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 976–77 (9th Cir. 2008).

***Second***, CDCR already screens transfer requests individually, contrary to Appellants' repeated attempts to portray the statute as somehow foreclosing individual screening. S.B. 132 permits CDCR to deny a housing preference for "management or security concerns," ER-35–36 (quoting Cal. Penal Code § 2606(b)); ER-8, and officials

consider bad faith and a history of violence or sexual assault.[3] ER-25. As the district court found, CDCR subjects transfer requests to a comprehensive, months-long process involving a mandatory course, mental health evaluation, prison and criminal history review, interview, and hearing before a committee chaired by a women's prison warden, ER-9–11—a level of scrutiny that had produced 144 denials and 54 approvals as of March 2026. ER-11. Appellants therefore seek an order requiring the individualized safety review CDCR already performs. Such an order would "essentially instruct the defendants to do what they are already doing" and would not redress future harm. ER-24.

In response, Appellants contend that the district court improperly relied on the OIG Report to resolve factual disputes about screening.

---

[3] *See also* Cal. Code Regs. tit. 15, § 3085.2(e)(3)(B) (in evaluating a transfer request, CDCR "may consider any individualized underlying facts and information that relate to the transgender, non-binary, or intersex incarcerated person in assessing a housing placement request, including, but not limited to, criminal history, including commitment offenses; documented history of violence, including sexual violence; documented history of sexual harassment; risks posed to the incarcerated person by other incarcerated persons at the current and preferred facility; and risks posed by the incarcerated person to other incarcerated persons at the current and preferred facility").

AOB 14, 21, 35–36. The objection is a distraction. The court's conclusions were fully supported by the statute's text, Appellants' concession that CDCR retains authority to consider "management and safety concerns," and a judicially noticed CDCR report they do not challenge. AOB 11–12; ER-8; ER-11 & n.2. The court's references to the Report were narrow and unnecessary to its disposition. In analyzing the Eighth Amendment claim, for example, the court cited the Report only for the limited point that officials had not identified any instance in which an incarcerated person had "managed to dishonestly or insincerely insinuate their way into a women's prison and thus have become the likely source of a future harm." ER-21. That observation displaced no allegation and negated no inference in Appellants' favor. And "[i]f support exists in the record, the dismissal may be affirmed on any proper ground, even if the district court did not reach the issue or relied on alternative grounds." *Wright v. Riveland*, 219 F.3d 905, 912 (9th Cir. 2000).

In any event, the court was entitled to consider the Report. Appellants quoted it "extensively" in the FAC and used it to supply "some of [the] few factual allegations connecting the plaintiffs' legal

claims to S.B. 132 in particular," ER-9, and they rely on it again on appeal, AOB 12, 35–36. A court "need not accept as true allegations contradicting documents that are referenced in the complaint." *Johnson v. Fed. Home Loan Mortg. Corp.*, 793 F.3d 1005, 1008 (9th Cir. 2015); *see Sprewell v. Golden State Warriors*, 266 F.3d 979, 990 (9th Cir. 2001); *Knievel v. ESPN*, 393 F.3d 1068, 1076–77 (9th Cir. 2005). Nor does *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1014 (9th Cir. 2018), permit a plaintiff to "select[] . . . portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *In re Eventbrite, Inc. Sec. Litig.*, 2020 WL 2042078, at *7 (N.D. Cal. Apr. 28, 2020).

Appellants also invoke *Perttu v. Richards*, 605 U.S. 460 (2025), and *Lemire v. California Department of Corrections & Rehabilitation*, 726 F.3d 1062 (9th Cir. 2013), to argue that the district court could not resolve questions about the screening process at the pleading stage. AOB 18. Neither decision applies. *Perttu* addresses whether a judge may resolve disputed facts bearing on a statutory exhaustion defense that overlaps the merits, 605 U.S. at 472, and *Lemire* concerns the sufficiency of the evidence at summary judgment on an Eighth

Amendment claim, 726 F.3d at 1075–76. The district court here neither weighed evidence nor granted summary judgment. It accepted the FAC's allegations as true and held that the relief Appellants requested would not redress the injury they described.

***Third***, this revised relief would not remove transgender women from women's prisons and therefore suffers the same flaws as the relief sought at the district court. If the injury is caused by transgender women's presence, a screening process that allows some transgender women to be housed in women's facilities by definition does not address the injury alleged. To the extent that the alleged injury is the failure to use a preferred screening process, that injury is not concrete—Appellants have not connected it to any specific harms. Despite multiple opportunities, Appellants have identified no transferee who would have been screened out under their preferred procedure, no pending transfer that restoration would prevent, and no concrete reduction in the alleged harm. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right in vacuo—is insufficient to create Article III standing.").

***Fourth***, even if it were theoretically possible that an individualized screening requirement could differ from what the statute already allows and result in the exclusion of transgender women from women's facilities, such an outcome is necessarily dependent on the acts of individual government employees. An alleged injury is not redressable when an outcome that solves the alleged injury "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989); *Brown*, 600 U.S. at 563–64 ("Nor have we ever accepted that an injury is redressable when the prospect of redress turns on the Government's wholly discretionary decision[.]"). A discretionary screening requirement thus does not redress Appellants' alleged injuries.

Appellants resist that conclusion by arguing that their theory does not depend on third-party conduct, insisting it rests on Defendants' "own affirmative housing regime." AOB 19–20. The argument proves too much. In the regime Appellants describe, CDCR officials evaluate each request and may deny any for management or security concerns.

ER-8. Whether a particular transgender woman is housed at CIW or CCWF following a court-ordered screening process would therefore turn on the judgment of the counselors, committee members, and wardens who administer that process—precisely the "independent actors not before the courts" whose discretion a federal court cannot presume to control or predict. *ASARCO*, 490 U.S. at 615.

### 3. Federal constitutional and statutory law independently require CDCR to house some transgender women in women's facilities.

No remedy the district court could possibly fashion would address the harms Appellants allege. To cure their alleged injury, a remedy would need both to prevent transgender women from ever being housed in women's facilities and to remove those currently housed there. Such a remedy would violate Intervenors' protectable interests under the Eighth Amendment, the Equal Protection Clause, PREA, and other laws, and would therefore exceed the district court's power. *Juliana*, 947 F.3d at 1170.

**The Eighth Amendment.** Prison officials violate the Eighth Amendment when they (i) are "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," (ii) draw

that inference, and (iii) then disregard the risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); ER-25. That duty applies to the risks faced by incarcerated transgender people: *Farmer* itself involved a transgender woman who was placed in a men's prison and raped, *id.* at 829–31, and this Court has since confirmed that officials may not disregard the serious medical and safety needs of incarcerated transgender people. *Edmo v. Corizon, Inc.*, 935 F.3d 757, 785–86 (9th Cir. 2019). The California Legislature agrees that housing people without recognition of their gender identity makes them "more vulnerable to violence from other incarcerated people and solitary confinement," and reports that transgender women in men's prisons are "13 times more likely to be sexually assaulted in prison than non-transgender inmates." ER-34. An order categorically barring transgender women from women's facilities would require CDCR to house even the most vulnerable transgender women in the very places where they face a substantial risk of serious harm, and to do so knowing of that risk.

**The Equal Protection Clause.** Excluding transgender women from women's facilities on the basis of sex assigned at birth is a sex-based classification subject to heightened scrutiny. *Harrison v. Kernan*,

971 F.3d 1069, 1076–78 (9th Cir. 2020) (holding prison regulations that facially discriminate on the basis of gender must receive intermediate scrutiny).

Appellants argue that recent Supreme Court authority changes this analysis. AOB 16–17, 37. It does not. *West Virginia v. B.P.J. by Jackson*, 146 S. Ct. 2356 (2026), addressed eligibility for girls' athletic teams and repeatedly confined itself to that context; it did not purport to set the level of scrutiny applicable to every classification touching transgender status. *Id.* at 2374. Nor does *B.P.J.* disturb this Court's holding in *Harrison* applying intermediate scrutiny to gender-based prison regulations. *United States v. Skrmetti*, 605 U.S. 495 (2025), is likewise inapplicable. There, the Court found that the law in question turned on excluded medical diagnoses, and thus did not classify on the basis of sex. *Id.* at 513, 519. An order removing transgender women from women's facilities would necessarily sort by sex assigned at birth. Intermediate scrutiny would therefore apply, and because a policy excluding transgender women from CDCR's women's facilities could not meet that heightened showing, Defendants could not enforce it, even if S.B. 132 did not exist.

**PREA.** PREA's implementing regulations require case-by-case consideration of whether placement of a transgender or intersex person in a men's or women's facility ensures their health and safety. 28 C.F.R. § 115.42(c). The institution is to give serious consideration to the impacted person's safety views. *Id.* § 115.42(e). Placements must be reassessed at least twice yearly. *Id.* § 115.42(d). Transgender people may not be placed in dedicated facilities solely because of their transgender status. *Id.* § 115.42(g).[4] These requirements compel CDCR and Defendants to take many of the same actions that are prescribed by S.B. 132. A categorical bar that prohibits assigning a transgender woman to a CDCR women's facility would violate them.

Because Appellants have not alleged an injury that any judgment available to a federal court could redress, this Court need go no further to affirm.

[4] Amici speculate that federal executive action may amend the PREA regulations. WDI Amicus Br. 16–17 (Dkt. 19.1) (citing Exec. Order No. 14168, § 4(a)). Such conjecture, with no actual change in law, cannot affect the Court's analysis and cannot rescue a flawed FAC filed years prior to whenever that hypothetical change in law might occur.

### B. The First Amended Complaint Fails to State a Claim for Relief.

The district court was correct to dismiss the FAC for an independent reason: Appellants failed to state a claim for relief. Each of Appellants' theories depends on a characterization of S.B. 132 that its text does not support, and none satisfies the substantive pleading standards that govern it.

#### 1. S.B. 132 imposes no speech obligations on incarcerated people, and the alleged retaliatory conduct cannot be attributed to the statute.

The district court correctly held that Appellants failed to state a cognizable First Amendment free speech[5] or retaliation claim. As Appellants now acknowledge, AOB 19, S.B. 132 does not address which

---

[5] Appellants' attempt to construe misgendering of fellow incarcerated people in contexts like written grievances as First Amendment-protected speech could not withstand judicial scrutiny, given the extensive caselaw distinguishing constitutionally protected communication from insulting and harassing speech that seeks to cause harm and offense to a targeted individual, especially in contexts where the speaker is not conveying a message to the general public. *See, e.g.*, *Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 710 (9th Cir. 2010) ("racial insults or sexual advances directed at particular individuals in the workplace may be prohibited on the basis of their non-expressive qualities"); *Frisby v. Schultz*, 487 U.S. 474, 486 (1988); *see also Salisbury v. Hickman*, 974 F. Supp. 2d 1282, 1292 (E.D. Cal. 2013) (noting the heightened seriousness and legal significance of verbal harassment that occurs in the targeted person's home).

names, pronouns, or honorifics *incarcerated people* may or must use to refer to one another. The S.B. 132 provision involving pronouns applies only to those used by CDCR staff, contractors, and volunteers, not to the individuals in CDCR's custody. Appellants' free speech claim therefore fails on its own terms.

On appeal, Appellants now attempt to resuscitate their First Amendment claim by construing CDCR's alleged paraphrasing of their written grievances as a free speech violation stemming from S.B. 132—to no avail. Appellants argue that CDCR staff engaged in unconstitutional compulsion of speech by adjusting the pronouns in their past written grievances to reflect terminology like "transgender woman" and the pronouns transgender incarcerated people have requested for themselves. AOB 29. To be clear, Appellants are referring to language CDCR staff used in *responding* to their complaints.[6] Paraphrasing of grievances in responding to them is a

[6] Appellants have not alleged that CDCR declined to process any grievances *because* they contained deliberately incorrect pronouns. *Cf. Richey v. Dahne*, 733 F. App'x 881, 883–84 (9th Cir. 2018) (prison official violated First Amendment when he refused to process a grievance unless and until the submitter edited offensive language about another staff member).

standard practice not only within CDCR, but across a wide range of government agencies fielding administrative complaints, and cannot credibly give rise to a speech infringement claim. No reasonable reader would mistake CDCR's paraphrasing of an incarcerated person's complaint in the course of responding to it as a message stemming *from* the complainant themself. *See, e.g., Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 64–65 (2006) (no compelled speech violation when context made clear that the challenged communications originated from government sources, not the plaintiffs, and plaintiffs remained free to voice both displeasure with those communications and separate messages of their own).

Appellants' additional claim to have suffered unconstitutional retaliation for their speech and expression also fails, given the lack of connection between alleged misdeeds by an individual CDCR correctional officer (such as individual disciplinary write-ups) and the managerial responsibilities of the named Defendants, especially in the absence of any CDCR policy directing staff to do so. *See, e.g.*, *Kentucky v. Graham,* 473 U.S. 159, 166 (1985) ("a governmental entity is liable under § 1983 only when the entity itself is a 'moving force' behind the

deprivation . . . ; thus, in an official-capacity suit the entity's 'policy or custom' must have played a part in the violation of federal law"). Although Appellants claim that CDCR staff have "accuse[d]" them of harassment, "threaten[ed]" them with adverse consequences in the parole process, and "issue[d] disciplinary reports" against them, AOB 29, they do not contend that any Defendant here engaged in such behavior or directed such behavior. They argue in effect that suing CDCR's Secretary and two wardens in their official capacities sweeps every action by a CDCR staff member into the FAC's reach, but the various actions they complain of do not add up to a policy or coordinated CDCR practice.

**2. Appellants did not plead that S.B. 132 burdens their free exercise of religion, and nothing in the statute prevents them from seeking accommodations.**

Appellants likewise failed to allege sufficient facts to state a free exercise claim. This Court has held that the rights of incarcerated people under the Free Exercise Clause are necessarily limited by institutional objectives and by the loss of freedom concomitant with incarceration. *Al Saud v. Days*, 50 F.4th 705, 714 (9th Cir. 2022). To maintain a free exercise claim, plaintiffs must first show they have a

sincerely held religious belief that has been impinged by a government action. *Fuqua v. Raak*, 120 F.4th 1346, 1352 (9th Cir. 2024). Only if that showing is made does the burden shift to the government to demonstrate that the regulation is reasonably related to legitimate penological interests. *Id.*

Appellants Chandler and Romero pleaded two free exercise concerns. First, Chandler and Romero share a religious practice of living with and undressing in the presence of only their relatives or other women, not unrelated men. ER-107; ER-109; ER-118. This practice is based on a belief that males and females should not see each other naked outside of marriage. *Id.* Appellants' unspoken assumption is that transgender women are men. Second, Romero claims she has a religious practice of referring to someone only in accordance with her perception of that person's biological sex. ER-109.

Appellants failed to plead that S.B. 132 actually impinged their sincerely held religious beliefs. Nothing in S.B. 132 mandates that CDCR house Chandler or Romero in the same room or bed assignment with transgender women. Cal. Penal Code §§ 2605, 2606; ER-21. Likewise, S.B. 132 does not mandate that CDCR place Chandler or

Romero in a state of undress in the presence of transgender women. ER-21. And absent S.B. 132, Chandler and Romero would still be housed in the same facility as at least some transgender women. If Chandler and Romero wish to seek accommodations from CDCR to ensure they can practice their faith as they see fit, nothing in S.B. 132 is stopping them.[7]

#### 3. Appellants failed to allege an Eighth Amendment claim based on the categorical and unsupported dangerousness of transgender women.

The FAC failed to state an Eighth Amendment claim because it rests on a conjectural theory of deliberate indifference to an imagined risk of future harm. Appellants' theory is composed of two parts: first, that S.B. 132 "increase[s] Appellants' proximity to a population" they allege to be inherently dangerous; and second, that CDCR officials, having perceived a heightened risk of physical or emotional harm to incarcerated cisgender women, and having received complaints and grievances about incidents involving individual transgender women,

[7] Appellants have not pleaded any facts that suggest they requested religious accommodations to live separately from transgender women or to remain fully clothed in the presence of transgender women.

failed to mitigate the risk of harm by taking certain steps, up to and including discontinuing implementation of S.B. 132.

Appellants' theory of harm is legally insufficient and speculative, falling far short of what the pleading standard requires. While there are cases that suggest an incarcerated person's risk of assault can constitute a substantial risk of serious harm, they all involve specific factual showings of concrete risks based on expressed threats or clear vulnerabilities, not speculative theories rooted in stereotype and based on membership in a group alleged to be categorically unsafe. *See, e.g., Reeves v. King*, 774 F.3d 430, 432 (8th Cir. 2014) (collecting cases where a prisoner being labeled a "snitch" gave rise to significant risk of serious harm); *Schillinger v. Kiley*, 954 F.3d 990, 994 (7th Cir. 2020) ("threatening incident" gave rise to substantial risk of serious harm).

Appellants' theory also requires prison officials to make an inherently unreasonable inference—that transgender women pose a *per se* categorical risk—which finds no support in the caselaw and, indeed, departs from precedent establishing that transgender status can be a basis to infer a likelihood of *being subjected to* harm. *Farmer*, 511 U.S. at 848. And although Appellants allege a handful of supposed incidents

of threatening or harmful conduct, their theory is not that prison officials failed to respond to these discrete alleged incidents by ameliorating a risk from specific individuals; it is that these alleged incidents *should* have given rise to an inference among prison officials about *other, unrelated* incarcerated people based on their shared attribute—their transgender status. Appellants offer no support in caselaw or logic for this gender identity theory of inferential thinking. While the Eighth Amendment does not necessarily require that a threat originate from a specific prisoner, *id.* at 849 n.10, relevant cases hold only that the prison official does not need to know the specific *identity* of the victim or assailant in advance—they do not sweep away the requirement that the official be aware of some actual basis for an inference of substantial risk of serious harm, such as a "victim's particular vulnerability" or an "assailant's predatory nature." *Brown v. Budz*, 398 F.3d 904, 915 (7th Cir. 2005). These cases do not allow Appellants to invent a gender identity theory of risk out of whole cloth.

### 4. Appellants failed to allege an equal protection claim because S.B. 132 has no effect on how CDCR considers cisgender women's housing requests.

The district court correctly rejected Appellants' equal protection claim, explaining that they offered no "factual allegations showing the plaintiffs have personally suffered any harms as a result of any unequal preferences that S.B. 132 might grant to transgender inmates." ER-30. On appeal, Appellants claim that S.B. 132 fails intermediate scrutiny because it "gives statutorily preferred consideration to gender-identity-based housing requests while denying equivalent consideration to" cisgender women. AOB 38. As for *Turner* deference, they claim that "[b]ecause [S.B. 132] retains residual safety discretion, the argument is not whether officials may ever deny a request, but whether the differential preference itself rationally advances safe housing when a neutral, individualized screening system already served that interest and the new rules predictably increased safety problems for the receiving population." AOB 40.

But the statute does not do what Appellants describe. Section 2606 refers to an individual's own "housing preference"—that is, the facility the person prefers—not to preferential treatment of one group

over another. Cal. Penal Code § 2606(a)(3), (b). What the statute does do is require CDCR to take certain steps with incarcerated transgender, nonbinary, and intersex people; it is silent on whether CDCR may or should take those same steps for anyone else, and nothing in it forbids CDCR from extending the same protections to cisgender women. S.B. 132 therefore does nothing in the way of "denying equivalent consideration to" cisgender women. And if CDCR staff were in practice to treat transgender and cisgender people differently, that practice would not be caused by the statute Appellants have chosen to challenge.

Appellants' theory would apply with equal force to the federal standards they say should govern in S.B. 132's place. As noted above, the PREA regulations likewise direct that transgender or intersex status inform housing and bed assignments and that transgender and intersex individuals' own safety views receive serious consideration. *See supra* Section VII.A.1; 28 C.F.R. §§ 115.41(d)(7), 115.42(a), (e). Appellants do not challenge these regulations and in fact ask that the pre-S.B. 132 regime apply. The Equal Protection Clause does not require a state to legislate in all directions at once before it may address a documented risk to a particular population.

Appellants mischaracterize S.B. 132 as "requir[ing] the CDCR and CCWF to place" transgender women "in single sex female prisons at their request[.]" ER-122. Appellants' insistence on that false assertion was so egregious below that the district court observed, "The obvious contradictions between the plaintiffs' allegations about S.B. 132's effects and its own plain language could suggest that something less than good faith underlies their counsel's drafting decisions, but any second amended complaint they file on their clients' behalf would be subject to Federal Rule of Civil Procedure 11(b)(3)." ER-24.

And still, Appellants continue to distort S.B. 132's clear text. *See, e.g.*, AOB 11 ("[S.B. 132] requires CDCR to house inmates according to their self-declared gender identity[.]"); 17 (referring to "Defendants' mandatory housing regime under S.B. 132"); 19–20 (claiming "any biological male may self-identify as female without outward signs of transition, medical diagnosis, or safety screening, and must then be transferred into a women's facility regardless of a documented history of sexual violence against women"); 20 (referring to "the current mandatory-transfer protocol"); 21 (suggesting that under S.B. 132 there is no "individualized assessment" of transferees). Without even a

plausible reading of the statute they seek to challenge, Appellants fail to plead an equal protection violation.

## VIII. CONCLUSION

For the foregoing reasons, Intervenors respectfully request that this Court affirm the judgment of the district court dismissing this action.

Date: October 30, 2026

Respectfully submitted,

*/s/ Dimitri D. Portnoi*
DIMITRI D. PORTNOI
dportnoi@omm.com
KYLE M. GROSSMAN
kgrossman@omm.com
ELIZABETH A. ARIAS
earias@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, Suite 1900
Los Angeles, California 90071
Telephone: (213) 430-6000

SHAWN THOMAS MEERKAMPER
shawn@transgenderlawcenter.org
TRANSGENDER LAW CENTER
P.O. Box 70976
Oakland, California 94612
Telephone: (510) 587-9696

AMANDA C. GOAD
agoad@aclusocal.org
ACLU FOUNDATION OF

SOUTHERN
CALIFORNIA
P.O. Box 811370
Los Angeles, California 90081
Telephone: (213) 977-9500

NORA HUPPERT
nhuppert@lambdalegal.org
LAMBDA LEGAL
3656 N. Halsted St.
Chicago, Illinois 60613
Telephone: (312) 663-4413

RICHARD SAENZ
rsaenz@lambdalegal.org
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, New York 10005
Telephone: (212) 809-8585

PELECANOS
pelecanos@lambdalegal.org
LAMBDA LEGAL
800 South Figueroa Street, Suite
1260
Los Angeles, California 90017
Telephone: (213) 382-7600

*Attorneys for Intervenors-Defendants-Appellees Jennifer Rose, Katie Brown, Kelli Blackwell, Tremayne Carroll, and Transgender, Gender-Variant & Intersex Justice Project*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Intervenors are not aware of any related case pending in this Court.

Date: October 30, 2026

Respectfully submitted,

*/s/ Dimitri D. Portnoi*
DIMITRI D. PORTNOI
dportnoi@omm.com
KYLE M. GROSSMAN
kgrossman@omm.com
ELIZABETH A. ARIAS
earias@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, Suite 1900
Los Angeles, California 90071
Telephone: (213) 430-6000

SHAWN THOMAS MEERKAMPER
shawn@transgenderlawcenter.org
TRANSGENDER LAW CENTER
P.O. Box 70976
Oakland, California 94612
Telephone: (510) 587-9696

AMANDA C. GOAD
agoad@aclusocal.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
P.O. Box 811370
Los Angeles, California 90081
Telephone: (213) 977-9500

NORA HUPPERT
nhuppert@lambdalegal.org

LAMBDA LEGAL
3656 N. Halsted St.
Chicago, Illinois 60613
Telephone: (312) 663-4413

RICHARD SAENZ
rsaenz@lambdalegal.org
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, New York 10005
Telephone: (212) 809-8585

PELECANOS
pelecanos@lambdalegal.org
LAMBDA LEGAL
800 South Figueroa Street, Suite 1260
Los Angeles, California 90017
Telephone: (213) 382-7600

*Attorneys for Intervenors-Defendants-Appellees Jennifer Rose, Katie Brown, Kelli Blackwell, Tremayne Carroll, and Transgender, Gender-Variant & Intersex Justice Project*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-3283

I am the attorney or self-represented party.

**This brief contains** 8,598 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- [x] complies with the word limit of Cir. R. 32-1.
- [ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- [ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- [ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- [ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- [ ] complies with the length limit designated by court order dated ______.
- [ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** Dimitri D. Portnoi **Date** 10/30/2026
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I certify that on October 30, 2026, I caused a copy of the foregoing to be served on the Court and all parties by filing it with the Clerk of the Court through the ACMS system, which will provide an electronic notice and link to this document to all counsel of record.

Date: October 30, 2026

Respectfully submitted,

*/s/ Dimitri D. Portnoi*

DIMITRI D. PORTNOI
dportnoi@omm.com
KYLE M. GROSSMAN
kgrossman@omm.com
ELIZABETH A. ARIAS
earias@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, Suite 1900
Los Angeles, California 90071
Telephone: (213) 430-6000

SHAWN THOMAS MEERKAMPER
shawn@transgenderlawcenter.org
TRANSGENDER LAW CENTER
P.O. Box 70976
Oakland, California 94612
Telephone: (510) 587-9696

AMANDA C. GOAD
agoad@aclusocal.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
P.O. Box 811370

Los Angeles, California 90081
Telephone: (213) 977-9500

NORA HUPPERT
nhuppert@lambdalegal.org
LAMBDA LEGAL
3656 N. Halsted St.
Chicago, Illinois 60613
Telephone: (312) 663-4413

RICHARD SAENZ
rsaenz@lambdalegal.org
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, New York 10005
Telephone: (212) 809-8585

PELECANOS
pelecanos@lambdalegal.org
LAMBDA LEGAL
800 South Figueroa Street, Suite 1260
Los Angeles, California 90017
Telephone: (213) 382-7600

*Attorneys for Intervenors-Defendants-Appellees Jennifer Rose, Katie Brown, Kelli Blackwell, Tremayne Carroll, and Transgender, Gender-Variant & Intersex Justice Project*